**PAUL HASTINGS LLP**
Pedro A. Jimenez
Andres C. Mena
Douglass Barron
200 Park Avenue
New York, NY 10166
(212) 318-6000 (Tel)
(212) 319-4090 (Fax)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| ENJOY S.A.[1] | Case No. 20-11411 (MG) |
| Debtor in a Foreign Proceeding. | |

**FOREIGN REPRESENTATIVE'S MOTION FOR ORDER GRANTING RELIEF PURSUANT TO 11 U.S.C. §§ 105(a), 1145, 1507(a), 1521(a), AND 1525(a) (I) RECOGNIZING AND ENFORCING THE REORGANIZATION AGREEMENT AND CONFIRMATION ORDER AND (II) GRANTING RELATED RELIEF**

Patricio Jamarne Banduc (the "Foreign Representative"),[2] the duly authorized and appointed foreign representative of Enjoy S.A., (the "Foreign Debtor"), the above-captioned Foreign Debtor that is subject to an insolvency proceeding (the "Foreign Proceeding") pending in the 8th Civil Court of Santiago in Santiago, Chile (the "Chilean Court"), by and through his undersigned counsel, respectfully submits this motion (the "Motion") seeking entry by the Court of an order substantially in the form annexed hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105(a), 1145, 1507(a), 1521(a), and 1525(a) of title 11 of the United States Code (the "Bankruptcy Code"), (i) recognizing and enforcing the Reorganization Agreement and

---

1 The Foreign Debtor's Chilean tax identification number is 96.970.380-7. The location of the Foreign Debtor's executive office is Av. Presidente Riesco 5711, 15th Floor, Borough of Las Condes, Santiago, Chile, Postal Code 7561114.

2 Unless otherwise indicated herein, capitalized terms shall have the meaning ascribed to them in the *Declaration of the Foreign Representative Patricio Jamarne Banduc in Support of Verified Chapter 15 Petition* (the "Jamarne Declaration") [Docket No. 19], and unless otherwise specified, all citations to docket numbers herein are in reference to case number 20-11411 (MG).

Confirmation Order (each, as defined below) (ii) declaring that the offer and sale (or deemed

offer and sale) of the Foreign Debtor's new Senior Secured Notes due 2027 (the "New

International Bonds") in exchange for the Foreign Debtor's old Senior Secured Notes due 2022

(the "Old International Bonds") pursuant to the Reorganization Agreement is exempt from

registration requirements under the securities laws of the United States (the "Registration

Requirements") pursuant to section 1145 of the Bankruptcy Code, except to the extent that any

holder thereof is deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy

Code, and (iii) granting such other and further relief as consistent with extending comity and

giving full force and effect to the Reorganization Agreement and the transactions contemplated

thereunder.  In support of entry of the Motion, the Foreign Representative respectfully states, as

follows:

## PRELIMINARY STATEMENT

1.       The Motion comes on the heels of the successful approval by the Chilean Court of

the Foreign Debtor's reorganization plan during the hearing on August 14, 2020 held before the

Chilean Court (the "Reorganization Agreement Approval Hearing"), at which the overwhelming

majority of creditors and/or their representatives present and entitled to vote on the

Reorganization Agreement (100% in number and amount of the class of secured creditors, and

93.04% in number and 92.74% in amount of the class of unsecured creditors) voted in favor of

approval of the Foreign Debtor's Reorganization Agreement.[3]  To complete its successful

restructuring process, and at the request and with the support of the Indenture Trustee (as defined

---

[3]      A copy of the Reorganization Agreement as filed with the Chilean Court on August 8, 2020, along with a
certified translation thereof, is attached hereto as **Exhibit B**.  A copy of the final Reorganization Agreement, as
filed with the Chilean Court and approved on August 14, 2020 (which includes some minor changes to the
August 8 version), along with a certified translation thereof, will be filed with this Court once the translation
becomes available, which is expected to be no later than tomorrow, August 18, 2020.

below) and holders of the majority of the Old International Bonds, the only debt governed by

United States law and held in part by creditors in the United States, the Foreign Debtor now

seeks recognition by this Court of the Reorganization Agreement and the order issued by the

Chilean Court (in the form of the minutes issued in connection with the Reorganization

Agreement Approval Hearing) approving same (the "Confirmation Order"),[4] and, further, the

exemption of the New International Bonds from the Registration Requirements pursuant to

section 1145(a) of the Bankruptcy Code.

## JURISDICTION, VENUE, AND STATUTORY BASES

2.        This Court has jurisdiction to consider this Motion pursuant to sections 157 and

1334 of title 28 of the United States Code.  This is a core proceeding pursuant to 28 U.S.C. §

157(2)(P).

3.        Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. §

1410.

4.        Sections 105(a), 1145, 1507(a), 1521, and 1525(a) of the Bankruptcy Code form

the statutory bases for the relief requested herein.

## RELIEF REQUESTED

5.        The Foreign Representative requests that this Court enter an order, substantially in

the form of the Proposed Order attached hereto, and pursuant to Sections 105(a), 1145, 1507(a),

1521(a), and 1525(a) of the Bankruptcy Code, (i) enforcing the Reorganization Agreement (the

"Requested Enforcement Relief"), (ii) declaring the offer and sale of the New International

Bonds exempt from the Registration Requirements (the "Requested Exemption Relief," together

with the Requested Enforcement Relief, the "Relief Requested"), and (iii) granting such other

---

[4]    A copy of the Confirmation Order and certified translation thereof is attached hereto as **Exhibit C**.

and further relief as the Court deems just and proper consistent with extending comity and giving full force and effect to the Reorganization Agreement.

<div align="center">**BACKGROUND**</div>

6.      For additional background concerning the Foreign Debtor and the broader economic circumstances precipitating the commencement of the Foreign Proceeding and the above captioned case under chapter 15 of the Bankruptcy Code (the "Chapter 15 Case"), the Foreign Representative respectfully refers the Court to the *Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding* (the "Verified Petition") [Docket No. 2] and the *Declaration of Rodrigo C. Larrain in Support of Verified Chapter 15 Petition* [Docket No. 3] (the "Larrain Declaration").  For additional information regarding Chilean bankruptcy law, the Foreign Representative respectfully refers the Court to the *Declaration of Nelson Contador Rosales in Support of Verified Chapter 15 Petition* (the "Contador Declaration") [Docket No. 4], the Jamarne Declaration, and the *Supplemental Declaration of the Foreign Representative Patricio Jamarne Banduc Regarding Restructuring Agreement and Confirmation Process* (the "Supplemental Jamarne Declaration"), attached hereto as **Exhibit D**.  The Supplemental Jamarne Declaration also contains the relevant factual background with respect to the negotiation, solicitation, voting on, and approval of the judicial reorganization agreement (the "Reorganization Agreement").

**I.      General Background**

7.      For a description of the Foreign Debtor's business, the circumstances leading to the commencement of the Foreign Proceeding and Chapter 15 Case, as well as the Foreign Debtor's equity ownership, assets, and capital structure, the Foreign Representative refers the Court to the Verified Petition and Larrain Declaration, which is incorporated by reference herein with respect to such matters.

## II.    __Foreign Proceeding__

8.      On April 24, 2020, the Foreign Debtor filed an application with the Chilean Court to commence the Foreign Proceeding.  Suppl. Jamarne Decl. ¶ 5.  The *Superintendencia de Insolvencia y Reemprendimiento* (the "Superintendence") published a Certificate of Nomination stating that Patricio Ricardo Jamarne Banduc had been selected as the overseer (*veedor*) of the Foreign Proceeding (in such capacity, the "Overseer") for the Foreign Proceeding and Enrique Marco Antonio Ortiz D'amico had been selected as the alternate Overseer.  *Id.*  The Overseer, under Chilean law, was tasked with, among other responsibilities, promoting agreements between debtors and creditors, facilitating the filing of restructuring agreements, and protecting the interests of creditors while acting under the supervision of the Superintendence.  *Id.*

9.      The Chilean Court commenced the Foreign Proceeding by entering a stay order dated May 5, 2020, which provided the Foreign Debtor protection for a period of 30 business days.  *Id.* ¶ 6.  On May 27, 2020, the stay was extended by creditor vote, including the vote of the indenture trustee under the Old International Bonds (the "Indenture Trustee"), until July 20, 2020.  *Id.*  The stay was subsequently extended to August 14, 2020.  *Id.*

10.     Over the course of the Foreign Proceeding and in the ordinary course of the Foreign Debtor's business, the Foreign Debtor paid all outstanding claims of employees, taxing authorities, and other creditors required to be paid in full on a priority basis pursuant to Chilean law (collectively, the "Priority Claims").  *Id.* ¶ 7.  In addition, a deadline of June 25, 2020 was established for creditors to submit proofs of claim, creditors were provided notice of such deadline, and proofs of claim were reviewed and verified by the Overseer and those reporting to the Overseer based on the Overseer's responsibilities under Chilean law.  *Id.*

11.     Following extensive negotiation with creditors, the Foreign Debtor filed an initial version of the Reorganization Agreement with the Chilean Court on July 4, 2020.  *Id.* ¶ 8.

Following further negotiations, amended versions of the Reorganization Agreement were filed

with the Chilean Court on July 31, August 8, and August 14, 2020.  *Id.*  The process for

solicitation of votes from holders of Old International Bonds (the "International Bondholders")

in connection with the Reorganization Agreement commenced on July 16, 2020.  To facilitate

this process and ensure sufficient notice to the International Bondholders, the Foreign Debtor

established a website (https://dm.epiq11.com/case/enjoy/info) with key documents, including a

detailed summary of the Reorganization Agreement, filed SEC disclosures with respect to the

planned issuance of the New International Bonds under the Reorganization Agreement, and

otherwise ensured that creditors had access to all relevant documents.  *Id.*  The Foreign Debtor

also solicited votes from and provided information and relevant documents regarding the

Reorganization Agreement to the holders of unsecured claims.  *Id.*  Thus, the notice provided

comports with Chilean law and, as a matter of Chilean law, the International Bondholders

received sufficient information and opportunity to provide their vote with respect to the

Reorganization Agreement.  *Id.*  The International Bondholders are the only group of creditors of

the Foreign Debtor that include entities based in the United States.  *Id.*

        12.      At the Reorganization Agreement Approval Hearing held on August 14, 2020, the

Reorganization Agreement was approved by the overwhelming majority of creditors and/or their

representatives present and entitled to vote on the Reorganization Agreement (including the

Indenture Trustee).  *Id.* ¶ 9.  The creditors and/or their representatives voted in classes

established under Chilean law, with (i) 100% in number and amount of the class of secured

creditors (consisting exclusively of the Indenture Trustee, as the sole representative of the

International Bondholders entitled to vote, who submitted its vote in favor of the Reorganization

Agreement on their behalf),[5] and (ii) 93.04% in number and 92.74% in amount of the class of

unsecured creditors, voting in favor of the Reorganization Agreement. *Id.* These votes satisfied

the requirements for the approval of the Reorganization Agreement under Chilean law. *Id.*

Pursuant to the Overseer's responsibilities under Chilean law, the Overseer received and

reviewed the votes of the creditors and/or their representatives and verified to the Chilean Court

that the requirements for approval of the Reorganization Agreement had been satisfied. *Id.*

Upon the completion of the Reorganization Agreement Approval Hearing, the Chilean Court

issued the Confirmation Order. *Id.*

13.    The Confirmation Order is the functional equivalent of an order confirming a

chapter 11 plan in the United States and as a matter of Chilean law is binding on the International

Bondholders, whose legal representative voted in favor of the Reorganization Agreement. *Id.* ¶

10.

14.    In addition, while under Chilean law dissenting creditors have a period of five (5)

business days subsequent to the Reorganization Agreement Approval Hearing to file challenges

to the Reorganization Agreement on certain limited grounds, such challenges can only affect the

enforceability of the Reorganization Agreement if they are filed by creditors entitled to vote and

holding at least 30% in amount of the claims in their class. *Id.* ¶ 11.  Such challenges are an

impossibility where, as here, over 90% in amount of the unsecured class (the only class

registering votes in opposition to the Reorganization Agreement) supported the Reorganization

Agreement. *Id.*  Under the circumstances of the Chilean Proceeding, the Foreign Representative

---

[5]    The Foreign Representative understands that the Foreign Debtor and Indenture Trustee collaborated closely to
execute a solicitation process to allow the International Bondholders to determine whether the Indenture Trustee
would vote to support the Reorganization Agreement and, further, that this solicitation process closely
resembled a traditional solicitation of bondholders under an out-of-court exchange offer.

fully expects that the Chilean Court will issue an order on August 24, 2020, confirming that no challenges to the Reorganization Agreement have been filed.[6]  *Id.*

### III.   Terms of the Restructuring Agreement

15.   The Reorganization Agreement contains a restructuring and repayment proposal for the Foreign Debtor's secured creditors (*i.e.*, the International Bondholders) and a restructuring and payment proposal for unsecured creditors (the "Local Unsecured Creditors"), along with special repayment proposals for certain Local Unsecured Creditors who are bank lenders (the "Bank Lenders") and suppliers (the "Suppliers").  *Id.* ¶ 12.  The purpose of the proposals, and the Reorganization Agreement generally, was to promote the effective continuation of the ongoing commercial activities of the Foreign Debtor, establish new conditions for the payment of all applicable loans, reduce the Foreign Debtor's debt level, and obtain fresh funding.  *Id.*

16.   Under the Reorganization Agreement, International Bondholders are to be paid in full through the issuance of new instruments, the New International Bonds, which replace the Old International Bonds issued under the indenture dated May 16, 2017 (the "Old International Bond Indenture").  *Id.* ¶ 13.  The New International Bonds will be secured by first priority liens pursuant to amended security documents to the same extent and in the same manner as the Old International Bonds, and the guarantees provided under the Old International Bond Indenture by the Foreign Debtor's subsidiaries are maintained under the New International Bonds.  *Id.* Repayment of the New International Bonds' entire principal balance will occur on August 14, 2027.  *Id.*  International Bondholders also may be eligible to participate in new financing of the Foreign Debtor.  *Id.*

---

[6]   The Foreign Representative will file a copy of this order, along with a translation thereof, as soon as it is available.

17.    Further, under the Reorganization Agreement, Local Unsecured Creditors shall be entitled to the payment of 80% of their claims through either (i) delivery of bonds convertible to shares in the Foreign Debtor, or, in the alternative, (ii) money received in connection with the subscription of such convertible bonds, with the remaining 20% payable through the issuance of a fixed income bond.  *Id.* ¶ 14.

18.    Finally, under the Reorganization Agreement, Bank Lenders who elect to enter into certain lending arrangements with the Foreign Debtor immediately after the Reorganization Agreement Approval Hearing are to be provided with a preferential repayment of 100% of their claims through fixed income bonds, and the Suppliers are to be paid within a period of twelve (12) months from the approval of the Reorganization Agreement, consistent with Chilean law, the full principal of the loans deriving from invoices or vouchers issued by them.  *Id.* ¶ 15.

## IV.    The Chapter 15 Case

19.    The Chapter 15 Case commenced on June 12, 2020 with the filing of the *Chapter 15 Petition for Recognition of Foreign Proceeding* [Docket No. 1], and on July 8, 2020, the Court entered the *Stipulation and Agreed Order Substituting Foreign Representatives and Related Counsel* [Docket No. 17] substituting the Overseer as Foreign Representative in the Chapter 15 Case in replacement of Rodrigo C. Larrain and Esteban Rigo-Righi.  *Id.* ¶ 16.

20.    On July 27, 2020, the Court held a hearing in connection with the Verified Petition and entered the *Order Recognizing Foreign Proceeding* [Docket No. 24] granting the Verified Petition and recognizing the Foreign Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code, during which hearing counsel to both the Indenture Trustee and International Bondholders appeared and expressed support for the recognition of the Chilean Proceeding.  *Id.* ¶ 17.  During the July 27, 2020 hearing, the Court also agreed to schedule a hearing for August 25, 2020, to consider approval of this Motion.  *Id.*

On August 14, 2020, consistent with the colloquy at the July 27, 2020 hearing, the Foreign

Debtor filed a status letter reporting the approval of the Reorganization Agreement [Docket No.

26]. *Id.*

## BASIS FOR RELIEF

21.    The Foreign Representative respectfully submits that the Relief Requested is

appropriate to complete the successful restructuring of the Foreign Debtor and is supported by

the provisions and purposes of the Bankruptcy Code.  The Relief Requested is founded on the

congressional mandate that U.S. courts should cooperate with foreign proceedings and foreign

representatives to promote the goals of chapter 15.  *See* 11 U.S.C. § 1525(a) ("Consistent with

section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a

foreign representative, either directly or through the trustee.").  Enforcing the Reorganization

Agreement will support the principles of coordination and cooperation mandated by section

1525(a) and will promote the fair and efficient administration of the Foreign Debtor's

restructuring.  Exempting the New International Bonds from the Registration Requirements will

benefit the Foreign Debtor and International Bondholders alike by eliminating the additional cost

and effort that further disclosure would necessitate.

**I.**    **The Court Should Grant Full Force and Effect to the Reorganization Agreement
and Confirmation Order in the United States**

22.    "Chapter 15 . . . provides courts with broad, flexible rules to fashion relief that is

appropriate to effectuate the objectives of the chapter in accordance with comity."  *In re Rede*

*Energia S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014).  Indeed, the Court has ample statutory

authority to order the recognition of and extension of comity to the Restructuring Agreement and

Confirmation Order.

**A.    Requested Enforcement Relief is Warranted under Section 1521 of the Bankruptcy Code**

23.    The Court may grant the Requested Enforcement Relief under section 1521(a) of the Bankruptcy Code, which provides that, after recognition of a foreign proceeding and at the request of a foreign representative, the Court may grant (with exceptions not here relevant) "any appropriate relief" necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors, including any injunctive relief and "any additional relief that may be available to a trustee." 11 U.S.C. § 1521(a). Such relief may "include granting any additional relief that may be available to a trustee except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) . . . ." 11 U.S.C. § 1521(a)(7). The Court may grant relief under section 1521(a) of the Bankruptcy Code only if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

24.    The Court should grant the Requested Enforcement Relief under section 1521. Chapter 15 case law demonstrates that the Requested Enforcement Relief here—recognition of the Reorganization Agreement and Confirmation Order in the United States—is "appropriate relief" under section 1521(a)(7) of the Bankruptcy Code because it is the type of relief available under former section 304 and routinely granted under the law of the United States. *In re Oi S.A.* 587 B.R. 253, 266 (Bankr. S.D.N.Y. 2018) (granting recognition to Brazilian plan pursuant to sections 1521 and 1507); *In re Rede*, 515 B.R. at 92–93 (same). *See also In re Lupatech S.A.,* 611 B.R. 496, 502 (Bankr. S.D.N.Y. 2020) ("'Appropriate relief' under section 1521 includes enforcing a foreign order confirming a debtor's plan.").

25.    In addition, the Requested Enforcement Relief easily passes the "sufficiently protected" test under section 1522(a). This test involves "a balance between relief that may be

granted to the foreign representative and the interests of the person that may be affected by such relief." *In re Rede*, 515 B.R. at 90 (quoting *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y.2010)). *See also Jaffé v. Samsung Elecs. Co.*, 737 F.3d 14, 27–28 (4th Cir. 2013) ("The analysis required by § 1522(a) is . . . logically best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test . . . "); *In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. 899, 909 (Bankr. S.D. Fla. 2015) (Section 1522 "requires a balancing of the interests of Debtors, creditors, and other interested parties.").  Further, and as is logical given the nature of a chapter 15 case as an ancillary case in which the Court's orders effectuate relief in the United States, the phrase "person that may be affected" in section 1522(a) ***refers specifically to a person in the United States***.  *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 82 (Bankr. S.D.N.Y. 2011), *aff'd,* 474 B.R. 88 (S.D.N.Y. 2012) ("Under chapter 15 the court is required to ascertain that the interests of *U.S. creditors* are 'sufficiently protected' before it grants any discretionary relief . . . .") (emphasis added).

26.     Here, analyzing the Requested Enforcement Relief under section 1522(a) weighs in favor of granting relief because the International Bondholders, the only interested parties that include creditors in the United States and holding debt governed by United States law who would be affected by the Requested Enforcement Relief, supported the Reorganization Agreement through the vote of the Indenture Trustee at the Reorganization Agreement Approval Hearing, and a majority in amount of the International Bondholders have encouraged the Foreign Representative to seek recognition of same.  Further, the interests of the Foreign Debtor, creditors, and other interested parties have been protected in this process, as required by section 1522(a), given that the Reorganization Agreement provides a distribution to each class of

creditors to which each class of creditors voted its approval.  Moreover, both the Indenture

Trustee and counsel to a majority in amount of the International Bondholders support approval of

this Motion.

>    **B.    Requested Enforcement Relief is Warranted under Section 1507 of the
>           Bankruptcy Code**

27.    The Court may also exercise its discretion to grant the Requested Enforcement

Relief pursuant to section 1507 of the Bankruptcy Code, which authorizes the Court to provide

"additional assistance" to a foreign representative under the Bankruptcy Code or other applicable

U.S. law. 11 U.S.C. § 1507(a).  *See also* H.R. Rep. No. 109-31, pt. 1, at 109 (2005) (stating that

section 1507 provides authority for "additional relief" beyond that permitted under section 1521

of the Bankruptcy Code).  The case law on section 1507 is also clear that recognizing and

granting comity with respect to the Restructuring Agreement and Confirmation Order is an

appropriate form of "additional relief" under section 1507.  *See In re Oi S.A.* 587 B.R. at 266

(granting recognition to Brazilian plan pursuant to section 1507); *In re Rede*, 515 B.R. at 92–93

(same).  *See also In re Cell C Proprietary Ltd.,* 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017) ("As

with section 1521, relief under section 1507 may include recognition and enforcement of a plan

approved by a foreign court.").

28.    In exercising discretion to grant relief under section 1507(a) of the Bankruptcy

Code, the principle of comity is the governing standard in a court's consideration of whether to

grant additional assistance.  *See* 11 U.S.C. § 1507(b).  Section 1507(b) further provides that in

determining whether to grant additional assistance, the court shall consider whether such

additional assistance, consistent with the principles of comity, will reasonably assure, in relevant

part, (1) just treatment of all holders of claims against or interests in the debtor's property; (2)

protection of claim holders in the United States against prejudice and inconvenience in the

processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; and (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by the Bankruptcy Code.  11 U.S.C. § 1507(b).

29.     The relevant section 1507 factors are clearly satisfied here.  The first factor—"just treatment of all holders of claims," 11 U.S.C. § 1507(b)(1)—is satisfied where "foreign insolvency law provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all of the estate's creditors in one proceeding."  *In re Oi S.A.,* 587 B.R. at 267.  Chilean bankruptcy law provides such a comprehensive procedure, in which all creditors participate in a collective decision-making process, the debtor operates under the supervision of the Overseer and Superintendence, and a Reorganization Proceeding Stay is imposed.  Contador Declaration, ¶¶ 9-11.  Moreover, for a Chilean reorganization agreement to be approved, creditors with verified claims that are present at the reorganization agreement approval hearing representing both two-thirds of the total number of creditors in each class of creditors and creditors holding two-thirds of the total debt in each class of creditors (in each case of those that are present at the hearing) must vote in favor of the plan.  Supp. Jamarne Decl. ¶ 17.

30.     The second factor, that additional assistance should reasonably assure "protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding," 11 U.S.C. § 1507(b)(2), is "satisfied where . . . creditors are given adequate notice of the timing and procedures for filing claims, and such procedures do not create additional burdens for a foreign creditor seeking to file a claim.  *In re Oi S.A.,* 587 B.R. 253, 268 (Bankr. S.D.N.Y. 2018).  This factor is easily satisfied here where the International Bondholders, who include the only creditors in the United States, supported the Reorganization

Agreement.  Moreover, a deadline of June 25, 2020 was established for creditors to submit

proofs of claim, creditors including the International Bondholders were provided notice of such

deadline and submitted proofs of claim, and proofs of claim were reviewed and verified by the

Overseer pursuant to his responsibilities under Chilean law.

   31. The third factor in Section 1507(b) requires that the additional assistance

requested reasonably assures "prevention of preferential or fraudulent dispositions of property of

the debtor." 11 U.S.C. § 1507(b)(3).  This factor is satisfied where foreign insolvency law

provides for the avoidance of "transfers that were made to third parties with the intention to harm

creditors or damage the debtor's estate." *In re Oi S.A.*, 587 B.R. 253, 268 (Bankr. S.D.N.Y.

2018).  Chilean law provides mechanisms for the avoidance of transfers.  Therefore, the

Requested Enforcement Relief satisfies this factor as well.

   32. Finally, the fourth relevant factor of Section 1507(b) requires that the additional

assistance reasonably assures "distribution of proceeds of the debtor's property substantially in

accordance with the order prescribed by" the Bankruptcy Code.  11 U.S.C. § 1507(b)(3).  "This

factor requires simply that the 'foreign distribution scheme be "substantially in accordance" with

United States bankruptcy law; it does not have to mirror the United States distribution rules.'" *In*

*re Oi S.A.,* 587 B.R. 253, 268–69 (Bankr. S.D.N.Y. 2018) (quoting *In re Ionica*, 241 B.R. 829,

836 (Bankr. S.D.N.Y. 1999)).  Here, Chile's bankruptcy distribution scheme, as set forth in the

Reorganization Agreement, is substantially in accordance with United States bankruptcy law

because the Reorganization Agreement provides a distribution to creditors consistent with an

agreement supported by each class of creditors, a result which would also be allowed in

connection with a plan of reorganization in a chapter 11 case in the United States supported by

all classes of creditors.

**C.**      **Requested Enforcement Relief is Warranted under Section 105 of the Bankruptcy Code**

33.      In addition, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Thus, the Court may also grant the Requested Enforcement Relief under section 105 of the Bankruptcy Code given that granting the Requested Enforcement Relief is necessary and appropriate to carry out the provisions of chapter 15.

**II.      The Court Should Exercise its Discretion under Section 1145 of the Bankruptcy Code to Grant the Requested Exemption Relief**

34.      The Foreign Representative requests exemption from U.S. Registration Requirements for the offer and sale under the Reorganization Agreement of the New International Bonds, except to the extent that any holder is deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.  In addition to promoting the purposes and objectives of chapter 15 set forth in section 1501, and the directives from Congress set forth in section 1525, sections 1507(a) and 1521(a) of the Bankruptcy Code provide the statutory basis for providing the relief available under section 1145 to transactions involving securities issued in a foreign proceeding by the debtor.  Absent the Requested Exemption Relief, the Foreign Debtor may be required to comply with registration procedures that are unduly burdensome and unnecessary in light of the extensive disclosure and careful procedures already executed in connection with the solicitation and approval of the Reorganization Agreement, and such registration requirements would surely present additional costs and time requirements for the Foreign Debtor.

**A.      Sections 1507 and 1521 Provide the Court may Apply Section 1145 in this Case**

35.      As stated above, section 1521(a)(7) allows additional relief that may be available to a trustee in chapter 15 cases.  Section 1145, which exempts transactions involving securities from the Registration Requirements, states the debtor in possession, as trustee, may issue and distribute securities under a chapter 11 plan without implicating Registration Requirements. Because section 1145 is applicable to chapter 11 debtors in possession and is not excluded by section 1521(a)(7), its relief is available to a foreign representative in a chapter 15 case.

36.      This Court has held that sections 1507(a) and 1521(a) allow for granting relief under section 1145 to transactions involving securities offered in a foreign proceeding.  *See In re CGG S.A.*, 579 B.R. 716, 720-21 (Bankr. S.D.N.Y. 2017); *see also In re Oi S.A.,* 587 B.R. at 269 n.3 (enforcing the Brazilian RJ Plan, the Brazilian Confirmation Order and granting exemption relief under section 1145); *In re PT Bumi Resources TBK*, Case No. 17-10115 (MKV) (Bankr. S.D.N.Y. Mar. 17, 2017) [Docket No. 17] (granting recognition of an Indonesian insolvency proceeding and declaring that securities to be issued under the Indonesian plan of reorganization were exempt from the registration requirements of section 5 of the Securities Act on papers invoking section 1145).

**B.      The Foreign Debtor has Satisfied the Requirements of Section 1145**

37.      Section 1145(a)(1) of the Bankruptcy Code provides an exemption from the Registration Requirements for transactions involving securities that are:

(1) offered or sold "under a plan";

(2) "of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan"; and

(3) "in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate."

11 U.S.C. § 1145(a)(1).

38.     Section 1145(a)(2) additionally exempts the offer of "a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in [section 1145(a)(1)], or the sale of a security upon the exercise of such a warrant, option, right, or privilege" under a chapter 11 plan.  11 U.S.C. § 1145(a)(2).

39.     The first requirement—that the New International Bonds be offered or sold "under a plan"—is satisfied if the plan is the "functional equivalent" of a chapter 11 plan.  *See In re CGG*, 579 B.R. at 721.  The New International Bonds are offered and will be sold pursuant to the confirmed Reorganization Agreement, which is the functional equivalent of a chapter 11 plan.

40.     The second requirement that the securities must be of a debtor or an "affiliate participating in a joint plan" is also satisfied.  The New International Bonds are securities issued or to be issued by the Foreign Debtor.

41.     The third requirement that the securities be offered "in exchange for a claim against . . . [a] debtor or such affiliate" is also satisfied because the New International Bonds are being offered and sold under the Reorganization Agreement in exchange for claims held by the International Bondholders.

### C.     Extensive Disclosure Issued by the Foreign Debtor Supports the Requested Exemption Relief

42.     Comity in chapter 15 cases provides that application of section 1145 to such cases does not require foreign proceeding disclosure processes to match those of chapter 11 cases.  *See Rede*, 515 B.R. at 104-05 (citations omitted) ("This Court will not decline to extend comity and

grant additional relief simply because Brazilian bankruptcy law is not identical to U.S. bankruptcy law."); *In re PT Bakrie Telecom Tbk*, 601 B.R. 707, 724 (Bankr. S.D.N.Y. 2019) ("The key determination required by this Court is whether the procedures used in [the foreign proceeding] meet [U.S.] fundamental standards of fairness.").  In light of the relevant standard, there is significant evidence of disclosure supporting the Requested Exemption Relief.

43.     The Reorganization Agreement included detailed descriptions of the claims against and interests in the Foreign Debtor, as well as the proposed treatment of those claims.  In addition to the extensive information contained in the Reorganization Agreement, creditors were also provided disclosure through the Website, Reorganization Agreement Summary, and SEC filings.  Essentially, the approval of the Reorganization Agreement resembles the confirmation process under chapter 11, and, as a result, the Foreign Debtor provided appropriate disclosure to justify the Requested Exemption Relief.  Given the significant disclosures already made, imposing further disclosure requirements would unduly burden the Foreign Debtor and its estate.  Accordingly, the Foreign Representative submits that the Requested Exemption Relief should be granted pursuant to section 1145.

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests that the Court: (a) enter the Proposed Order, upon notice and a hearing, substantially in the form attached hereto as **Exhibit A**, and (b) grant such other and further relief as may be just and proper.

Dated: August 17, 2020
        New York, New York

                        PAUL HASTINGS LLP

                        */s/ Pedro A. Jimenez*
                        Pedro A. Jimenez
                        Andres C. Mena
                        Douglass Barron
                        200 Park Avenue
                        New York, NY 10166
                        Telephone: (212) 318-6000
                        Facsimile: (212) 319-4090
                        pedrojimenez@paulhastings.com

                        *Counsel to the Foreign Representative*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| ENJOY S.A.[1] | Case No. 20-11411 (MG) |
| Debtor in a Foreign Proceeding. | |

**ORDER (I) GRANTING FULL FORCE AND EFFECT IN THE UNITED
STATES TO THE CHILEAN REORGANIZATION AGREEMENT AND
CONFIRMATION ORDER AND (II) GRANTING RELATED RELIEF**

Upon consideration of the Motion[2] of the Foreign Representative, Patricio Jamarne

Banduc, in his capacity as the duly-authorized foreign representative of the Foreign Proceeding

pending before the Chilean Court, in respect of the Foreign Debtor, for entry of an Order (this

"Order") after notice and a hearing, for the permanent injunctive and related relief described

below, (i) enforcing the Foreign Debtor's judicial reorganization agreement (together with all its

exhibits, annexes and schedules and in the form that, pursuant to any modifications and

clarifications effective under Chilean law, is valid and enforceable as a matter of Chilean Law,

the "Reorganization Agreement") and the August 14,2020 Confirmation Order in respect of the

Foreign Debtor in the United States, and (ii) declaring the offer and sale (or deemed offer and

sale) of the New International Bonds exempt from the Registration Requirements pursuant to

section 1145 of the Bankruptcy Code, except to the extent that any holder thereof is deemed to

be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code in respect of the New

International Bonds; and this Court having reviewed the Motion and the statements of counsel

with respect to the Motion at a hearing before this Court (the "Hearing"); and the Indenture

---

[1]    The Foreign Debtor's Chilean tax identification number is 96.970.380-7.  The location of the Foreign Debtor's
       executive office is Av. Presidente Riesco 5711, 15th Floor, Borough of Las Condes, Santiago, Chile, Postal
       Code 7561114.
[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

Trustee and International Bondholders supporting entry of this Order; and appropriate and timely notice of the filing of the Motion and the Hearing having been given; and no other or further notice being necessary or required; and this Court having determined *for the reasons set forth in the Court's bench decision on August 25, 2020* that the legal and factual bases set forth in the Motion and all other pleadings and papers in this case establish just cause to grant the relief ordered herein, and after due deliberation therefor;

## THIS COURT HEREBY FINDS AND DETERMINES THAT:

A.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    This Court has jurisdiction to consider this matter and enter this Order pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, <u>In re Standing Order of Reference Re: Title 11</u>, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2)(P).  Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

C.    The Foreign Representative has standing to make the Motion pursuant to sections 105, 1145, 1507, 1521, and 1525 of 11 U.S.C. §§ 101 et seq. (as amended, the "<u>Bankruptcy Code</u>").

D.    The Foreign Representative and the Foreign Debtor, as applicable, are entitled to the relief granted hereby.

E.    The Foreign Representative and the Foreign Debtor, as applicable, are entitled to the Court's cooperation under section 1525(a) of the Bankruptcy Code in implementing the Reorganization Agreement in the form of relief granted by this Order on the terms provided herein.  The terms of the Reorganization Agreement, and the process for solicitation of votes on and confirmation of the Reorganization Agreement, in each case before the Chilean Court, provided creditors and parties in interest with appropriate due process and were not manifestly contrary to U.S. public policy.

F.    Absent the relief granted hereby, the Foreign Proceeding and the Foreign Debtor's efforts to consummate the Reorganization Agreement could be impeded by the actions of certain creditors and/or equity holders, a result that would be contrary to the purposes of Chapter 15 of the Bankruptcy Court as set forth, inter alia, in section 1501(a) of the Bankruptcy Code.  If taken, such actions could threaten frustrate delay, and ultimately jeopardize the Foreign Proceeding and implementation of the Reorganization Agreement, and, as a result, the Foreign Debtor, its creditors and such other parties in interest would suffer irreparable harm for which there is no adequate remedy at law.

G.    In the Foreign Proceeding, the Foreign Debtor sought and obtained approval of the Reorganization Agreement from the requisite percentage of its creditors participating pursuant to Chilean bankruptcy law.

H.    The relief granted hereby (i) is essential to the success of the Foreign Proceeding and the Reorganization Agreement, (ii) is an integral element of the Foreign Proceeding and the Reorganization Agreement and/or integral to their effectuation, and (iii)

3

confers material benefits on, and is in the best interests of the Foreign Debtor and its creditors, including without limitation the bondholders and other unsecured creditors.

I.      The offer and sale (or deemed offer and sale) by Enjoy S.A. of the New International Bonds will be "under a plan" (within the meaning of such phrase as it is used in section 1145 of the Bankruptcy Code).

J.      Each of the New International Bonds will be offered and sold (or deemed offered and sold) by the Foreign Debtor.

K.      The New International Bonds offered and sold (or deemed offered and sold) under the Reorganization Agreement will be offered and sold (or deemed offered and sold) in exchange for pre-petition claims against the Foreign Debtor.

L.      Enjoy S.A. disseminated or otherwise made available information to creditors of Enjoy S.A. prior to the approval of the Reorganization Agreement at the Reorganization Agreement Approval Hearing, which information in the aggregate, constituted "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code).

M.      Under the facts and circumstances of this Chapter 15 case and the Foreign Proceeding, it is appropriate to exempt the offer and sale (or deemed offer and sale) of the New International Bonds, and, as applicable, the offer and resale of the New International Bonds by the holders thereof, in each case, from the Registration Requirements pursuant to section 1145 of the Bankruptcy Code, except to the extent that any bondholder is deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code in respect of the New International Bonds.

N.      The relief sought by the Motion will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may

4

result to such parties, it is outweighed by the benefits of the requested relief to the Foreign

Debtor, its estate, and creditors.

O.    The relief granted hereby is necessary to effectuate the purposes and

objectives of Chapter 15 and to protect the Foreign Debtor and the interest of its creditors and

other parties in interest.

P.    Appropriate notice of the filing of, and the Hearing on, the Motion was

given, which notice is deemed adequate for all purposes, and no other or further notice need be

given.

Q.    The relief granted hereby: (i) is necessary and appropriate in the interests

of the public and international comity; (ii) is consistent with the public policy of the United

States; (iii) is available and warranted pursuant to sections 105(a), 1145, 1507(a), 1521(a), and

1525(a) of the Bankruptcy Code; and (iv) will not cause the Foreign Debtor's creditors or other

parties in interest any hardship that is not outweighed by benefits of granting the relief herein.

For all of the foregoing reasons, and for the reasons stated by the Court on the

record of the Hearing, and after due deliberation and sufficient cause appearing therefor, it is

hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted as provided herein.

2.    The Confirmation Order and the Reorganization Agreement, subject to all

terms, conditions and limitations set forth therein, are hereby recognized, granted comity, and

given full force and effect within the territorial jurisdiction of the United States and for purposes

of U.S. law with respect to the Foreign Debtor.

3.       Pursuant to sections 1521(a)(7) and 1145 of the Bankruptcy Code, the

offer and sale (or deemed offer and sale) of the New International Bonds and the Reorganization

Agreement and the resale of any New International Bonds by the holders thereof are exempt

from any applicable Registration Requirements pursuant to section 1145 of the Bankruptcy

Code, except to the extent that any such holder is deemed to be an "underwriter" as defined in

section 1145(b) of the Bankruptcy Code, in respect of the New International Bonds.

4.       No action taken by the Foreign Representative in preparing,

disseminating, applying for, implementing or otherwise acting in furtherance of the

Reorganization Agreement, any order entered in respect of this Motion, this Chapter 15 Case,

and further order for additional relief in this Chapter 15 Case, or any adversary proceedings or

contested matters in connection therewith, shall be deemed to constitute a waiver of the

immunity afforded the Foreign Representative pursuant to sections 306 and 1510 of the

Bankruptcy Code.

5.       Nothing herein shall restrict, limit, or enjoin (i) the commencement or

continuation of any action, appeal, suit or other proceeding (including arbitration, mediation or

any judicial, quasi-judicial, or administrative action, proceeding or process in any judicial,

arbitral, administrative or other forum) to enforce any party's rights or obligations under the

Reorganization Agreement or under any securities issued pursuant to the Reorganization

Agreement, (ii) the right to oppose in Chile any past or future modifications made to the version

of the Reorganization Agreement approved by creditors at the Reorganization Agreement

Approval Hearing, (iii) the performance of any act to collect, recover or offset any debt created

under the Reorganization Agreement, or under any securities issued pursuant to the

Reorganization Agreement; or (iv) the prosecution of any judgment enforcing any party's

obligations under the Reorganization Agreement, or under any securities issued pursuant to the

Reorganization Agreement.

6.      Nothing in this Order shall limit or impair the present or future rights of

holders (or their agents) of the New International Bonds.

7.      Notwithstanding any provision in the Bankruptcy Rules to the contrary:

(a) this Order shall be effective immediately and enforceable upon entry; (b) other than as

expressly provided in this Order, the Foreign Representative is not subject to any stay of the

implementation, enforcement, or realization of the relief granted in this Order; (c) the Foreign

Representative is authorized and empowered, and may, in his discretion and without further

delay, take any action and perform any act necessary to implement and effectuate the terms of

the Reorganization Agreement and this Order, including using or disposing of the Foreign

Debtor's assets located in the territorial jurisdiction of the United States.

8.      This Court shall retain jurisdiction with respect to the effect, enforcement,

amendment or modification of this order.

Dated:    August __, 2020
          New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Reorganization Agreement**



STATE OF NEW YORK

      )
      )
      )

COUNTY OF NEW YORK      )      ss

### **CERTIFICATION**

This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate

translation from Spanish into English of the attached document *Enjoy S.A. Judicial Reorganization Agreement*.

Edward J. Jacob
Divergent Language Solutions, LLC

State of New York

County of New York

Subscribed to and sworn before me this 11th day of August, 2020,

by Edward J. Jacob.

Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, State of New York
No. 01ZE6350239
Qualified in New York County
Commission Expires November 7, 2020

183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11th Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

Presentation version 8/8

## JUDICIAL REORGANIZATION AGREEMENT

**ENJOY S.A.**



Judicial Reorganization Bankruptcy Proceedings

8th Civil Court of Santiago, Case C-6,689-2020

Deliberative Creditors' Meeting

Santiago, August 14, 2020

Presentation version 8/8

# CONTENTS

I.      BACKGROUND INFORMATION ON THE PETITIONING DEBTOR COMPANY.Error!   Bookmark   not defined.

II.     CREDITORS ENROLLED IN THE REORGANIZATION AGREEMENT. Error! Bookmark not defined.

III.    DEVELOPMENT OF THE PURPOSE OF THE AGREEMENT.....................................................4

IV.     PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO SECURED CREDITORS.Error!   Bookmark not defined.

V.      PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO UNSECURED CREDITORS.Error!  Bookmark not defined.

VI.     PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO BANK CREDITORS.Error!   Bookmark   not defined.

VII.    PROPOSED PAYMENT OF PRINCIPAL TO SUPPLIER CREDITORS.....................................22

VIII.   NEW FINANCING. ...........................................................................................................22

IX.     OPTION FOR CONDITIONAL SUBSCRIPTION OF SHARES BY CURRENT SHAREHOLDERS.....30

X.      LEGAL STRUCTURE FOR THE FINANCING AND CONVERSION PROCESSES...............................30

XI.     ADMINISTRATION....................................................................................................34

XII.    RENEWAL OF GUARANTEE VOUCHERS. ......................................................................34

XIII.   OBLIGATIONS TO DO AND NOT DO..........................................................................37

XIV.    APPROVAL AND VALIDITY OF THE AGREEMENT.........................................................38

XV.     CREDITORS COMMISSION. .......................................................................................39

XVI.    BANKRUPTCY ADMNINISTRATOR. ...........................................................................41

XVII.   NON-COMPLIANCE.................................................................................................42

XVIII.  GUARANTEES. .......................................................................................................42

XIX.    FORMAL RECORDING REQUIREMENTS AND OTHER STIPULATIONS...........................44

XX.     REPRESENTATIONS   AND   ASSURANCES   ON   THE   DATE   OF   THIS   JUDICIAL REORGANIZATION AGREEMENT...................................................................................45

**XXI.    DOMICILE AND COMPETENT JURISDICTION.** ....................................................................................46

Presentation version 8/8

# JUDICIAL REORGANIZATION AGREEMENT
## ENJOY S.A.

### I.  BACKGROUND INFORMATION ON THE PETITIONING DEBTOR COMPANY

**1.- Corporate name:**            ENJOY S.A.

**2.- R.U.T.:**            96.970.380-7.

**3.- Domicile:**            Avenida Presidente Riesco N° 5.711, piso 15, comuna de Las Condes, Metropolitan Region.

**4.- Organization:**            Organized pursuant to a public instrument dated October 23, 2001. On June 9, 2009, the Company was registered with the Securities Registry of the Chilean Financial Market Commission (*Comisión para el Mercado Financiero*) (CMF) under No. 1033.

### II.  CREDITORS ENROLLED IN THE REORGANIZATION AGREEMENT.

For purposes of this Judicial Reorganization Agreement, creditors (hereinafter, indiscriminately, the "*Creditors*") shall be considered all holders of direct loans against **ENJOY S.A.** (hereinafter, indiscriminately, "*Enjoy*," the "*Debtor Company*" or the "*Company*"), which originated prior to the Reorganization Resolution, pursuant to Article 66 of Law 20,720. Loans originating after the Reorganization Resolution shall be repaid in accordance with the agreed-upon terms and tenors.

Pursuant to Article 61 of the aforementioned bankruptcy law, this Judicial Reorganization Agreement (hereinafter, indiscriminately, "*Reorganization Agreement*," "*Agreement*" or the "*Proposal*") contains a restructuring and repayment proposal for secured creditors, which corresponds to International Bondholders (as said term is defined further below), a restructuring and payment proposal for unsecured creditors, excluding creditors that are related companies belonging to the Enjoy S.A. group of companies (hereinafter the "*Unsecured Creditors*"), a special repayment proposal for bank creditors (hereinafter the "*Bank Creditors*") and a special repayment proposal for unsecured creditors participating as suppliers to Enjoy of goods and services (hereinafter the "*Suppliers*") as these terms are defined in the following chapters.

Pursuant to Article 63 of Law No. 20,720, loans held by related companies belonging to the group of Enjoy S.A. subsidiary companies will be subject to postponed repayment, until expiration of this Reorganization Agreement. Nevertheless, all payments may be made to related companies that correspond to Enjoy's normal operational activities with its subsidiaries.

Presentation version 8/8

## III. DEVELOPMENT OF THE PURPOSE OF THE AGREEMENT.

The Reorganization Agreement shall have the following purpose and content:

1.- The effective and total continuation of the ongoing commercial activities of **ENJOY S.A.,** as from the date of presentation of this Proposal, with a view to fulfilling payment conditions consistent with projected cash flows, recovering the Company's operating levels and providing for the payment of its obligations.

2.- The granting of new conditions for the repayment of all loans enrolled in the Reorganization Agreement under the conditions set forth in this instrument;

3.- A reduction in the Company's debt level, through conversion of at least 70% of the unsecured debt consisting of bonds convertible to Enjoy shares, with a strong incentive for conversion.

4.- Obtaining fresh funds for the Company totaling approximately $50,000,000,000 (fifty billion Chilean pesos),[1] through the granting of loans to be prepaid through the issuance of a bond convertible to shares of Enjoy, with a strong incentive for conversion.

## IV. PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO SECURED CREDITORS.

Guaranteed creditors are holders of debt issued under the instrument referred to as the "Indenture," dated May 16, 2017, supplemented by the instrument known as "Supplemental Indenture No. 1" dated May 30, 2017, entered into between the Company, as issuer, its guarantor subsidiaries ("***Guarantors***") and Citibank N.A. as International Bondholders Representative or Trustee[2] (hereinafter the "***Indenture***"), concerning the guaranteed bonds maturing in 2022 (10.50% Senior Secured Notes due to 2022) placed by the Company in the international markets under US Securities and Exchange Commission Rule 144A and Regulation S and the US Securities Act of 1933 (hereinafter the "***International Bonds***," with their holders or final beneficiaries being the "***International Bondholders***"[3])

As explained further below, under the Agreement the International Bonds will be extended and, subject to the Renegotiation Conditions (as this term is defined further below), renegotiated without intent to substitute, with said renegotiation reflected in a new Indenture, new bonds, and the guarantee documents needed in

---

[1] Hereinafter, all references to figures in pesos refer to Chilean pesos.

[2] Pursuant to the document titled "Agreement of Resignation, Appointment and Acceptance" dated July 9, 2020 entered into between the Company, UMB BANK, N.A. and CITIBANK, N.A., UMB BANK, N.A. was appointed as "Trustee" for purposes of the Indenture.

[3] After the exchange of the International Bonds for the New International Bonds, "International Bondholders" will mean the holders of the New International Bonds.

5

Presentation version 8/8

order to extend, ratify and reserve the International Bonds' current guarantees to the extended and restructured debt (hereinafter, the "**New Indenture**" and the "**New International Bonds**" and, together, the "**New Instruments**").

### 1.- Extension.

The due dates of the loans under this **Chapter IV** will be extended for a maximum of 90 days after the date of the Deliberative Meeting [*Junta Deliberativa*] of Creditors, convened to hear and decide on the Proposal (hereinafter the "***Deliberative Meeting***"), unless it becomes certain prior to said deadline that the Renegotiation Conditions (as this term is defined further below) will not be fulfilled, in which case the extension period will expire on the day that said conditions failed (the "***Extension of the International Bonds***"), unless the Creditors Commission resolves to maintain the Extension of the International Bonds as provided for in **Chapter XV** of this Agreement.

Until such time as the Renegotiation Conditions are met, the International Bonds shall remain current in accordance with their original terms (including interest accrued after the request for reorganization); non-compliance events and rights and actions existing under the Indenture due to existing non-compliance events shall not be waived; and current real and personal guarantees of the International Bonds (hereinafter the "***Guarantees***" shall remain in full force and effect. So long as the International Bonds Extension is current, the above is without prejudice to International Bondholders' committing not to individually or collectively file any enforcement proceeding whatsoever, as long as the Renegotiation Conditions are pending.

### 2.- Renegotiation Conditions.

The International Bonds shall be renegotiated by means of their exchange for the New International Bonds, in the event of fulfillment of the following contingent and supplementary conditions, as established to the benefit of the International Bondholders (the "***Renegotiation Conditions***"):

(i) That this Reorganization Agreement is understood as approved and begins to apply pursuant to Art. 89 of Law No. 20,720;

(ii) That the New York Southern District Bankruptcy Court (New York State, United States of America) recognizes the Agreement in the Chapter 15 proceeding the Company is filing with said court by reason of its Reorganization Proceeding, Case No. 20-11411 (MG);

(iii) That the promissory notes to which Section 7 below refers, and the documents for the reserve and ratification of guarantees to which **Chapter XVIII** below refers, are granted simultaneously, in both cases to the satisfaction of the International Bonds' Trustee;

(iv) That collection expenses, fees and reimbursements owed to the Trustee under the Indenture have been paid to its satisfaction, including the Trustee's advisors fees, applicable under the rules of the Indenture;

(v) That the other terms of the Financing Condition (as this term is defined further below in **Chapter VIII** of this Agreement) and the release of the funds from the Bridge Loan to the Company have been met.

Having certified the fulfillment of the Renegotiation Conditions by the Bankruptcy Administrator [*Interventor Concursal*] or, absent the latter, by the Creditors Commission with the favorable vote of four of its members, the loans shall be renegotiated in the form set forth in Number 3 below.

In the event that the Bankruptcy Administrator determines that the Renegotiation Conditions have failed due to expiration of the International Bonds Extension without the latter's having been verified, or because it has become certain before expiration of the term of the Extension that none of the events comprising them will occur:

(i) International Bondholders may exercise all their rights under the Indenture to obtain payment of their receivables, with no restrictions whatsoever and without being subject to this Agreement;

(ii) non-fulfillment of the Renegotiation Conditions or expiration of the term without their verification shall be a *Bankruptcy Law Event of Default* under the Indenture; and

(iii) International Bondholders may judicially enforce and collect their loans individually under the rules of the Indenture, with all their real or personal guarantees and in any jurisdiction, without need to obtain a declaration of breach of this Agreement and without its serving as defense for that enforcement.

To remove all doubt, in all aspects not modified by this Reorganization Agreement, the obligations contained in the Indenture and in the International Bonds are ratified, and therefore all International Bondholder rights under said agreement shall be maintained, as well as all real and personal guarantees established in the Indenture, the International Bonds and their related documents. Nothing in this Agreement may be interpreted as restricting or impeding the International Bondholders from exercising their rights and actions under the Indenture in the face of a breach of the Debtor Company's obligations under said agreement, as it is understood that all those rights and actions are expressly reserved.

All the above is without prejudice to the Creditors Commission's resolving to extend the Extension of the International Bonds in the event that the Renegotiation Conditions fail as set forth in **Chapter XV** below. As long as the International Bond Extension is current, International Bondholders undertake to not individually or jointly take any enforcement action whatsoever against Enjoy and its Guarantors (as this term is defined further below).

NELSON CONTADOR
A B O G A D O S   &   C O N S U L T O R E S

Presentation version 8/8

### 3.- Renegotiation of the International Bonds:

Having satisfied Renegotiation Conditions within the deadline for the International Bonds Extension, the International Bonds shall be renegotiated in the form indicated below, exchanging the current debt instruments for the New International Bonds, on the understanding that, for all legal purposes, the International Bonds' renegotiation date shall be the date of the Deliberative Meeting.

Having completed the exchange of the International Bonds for the New International Bonds, the Company will have to obtain CUSIP and ISIN numbers for the New international Bonds (separately for the Senior New International Bonds and the Junior New International Bond, as these terms are defined below).

The total principal value of the New International Bonds shall be equivalent to the sum of: (i) USD 195 million (equivalent to the total principal owed under the International Bonds); and (ii) total interest under the International Bonds (including Defaulted Interest and Post-Petition Interest, as these terms are defined in the Indenture), accrued and not paid as of the date of the Deliberative Meeting.

The New International Bonds shall be divided into two tranches, the "***Senior New International Bond***" and the "***Junior New International Bond***," which shall be identical in all aspects, except the following: (i) the Senior New International Bonds shall have priority to be redeemed early in the event of mandatory early redemption as a result of sale of the assets backing the New International Bonds, pursuant to **Appendix No. 1** of this Agreement, which is understood as forming part of the same for all legal purposes; and (ii) in the event the Company enters into liquidation, the Senior New International Bonds shall have the right to comprehensive payment (both outstanding principal and interest accrued and not paid) before any payment is made to the Junior New International Bonds, all as described in **Appendix No. 1** of this Agreement.

Senior New International Bonds shall be issued and delivered, in exchange for the International Bonds, to International Bondholders who issue Financing Commitments (as this term is defined further below) for an amount greater than or equal to the prorated New Financing corresponding to the respective International Bondholder in accordance with that bondholder's proportion of principal of the International Bonds (the "***International Bondholder Financing Minimum Amount***"), and undertake the respective disbursement (directly or through the option assignee) from the Bridge Loan (as this term is defined further below) in an amount effectively assigned thereto; all the above is in accordance with **Chapter VIII** of this Agreement.

For their part, Junior New International Bonds will be issued to International Bondholders that (i) do not participate in the New Financing up to at least the International Bondholder Financing Minimum Amount, or who (ii) do not undertake the respective disbursement of the Bridge Loan up to at least the amount assigned in the Bridge Loan under the terms described in **Chapter VIII**.

Presentation version 8/8

The International Bondholder Financing Minimum Amount shall be calculated in pesos in accordance with the following formula:

$$\text{International Bondholder j Financing Minimum Amount (pesos)} = \frac{\text{International Bondholder j Principal}}{\text{(Total International Bond Principal)}} \times (10{,}000{,}000{,}000)$$

To this end, "International Bondholder j Principal" shall mean the unpaid balance of principal of the International Bonds of the respective International Bondholder (face value). For its part, "Total International Bond Principal" shall mean the total balance of unpaid principal of the International Bonds (face value), i.e., USD 195 million (one hundred ninety-five million US dollars) as of the date of the Deliberative Meeting.

The equivalent in US dollars of the International Bondholder Financing Minimum Amount shall be calculated by using the Observed Dollar published in the *Diario Oficial* [Official Daily Gazette] on the date of the Deliberative Meeting. Attached as **Appendix No. 3** to this Proposal are examples of calculations of the International Bondholder Financing Minimum Amount, solely for purposes of facilitating its understanding and application.

The New International Bonds shall be issued by the Company and be governed by the New Indenture. The New International Bonds and New Indenture shall be identical in all aspects to the current International Bonds and Indenture (including the fact of being subject to the laws of the State of New York of the United States of America), with the sole exception of those changes that will be incorporated into the New Indenture and the New International Bonds as noted in **Appendix No. 1** of this Agreement. The initial Trustee, paying agent and Registrar and Transfer Agent for the New Indenture shall be UMB BANK, N.A. It is confirmed that the terms contained in the **Appendix No. 1** are those that must be reflected in the New Indenture.

The New International Bonds will be issued as one or more global amounts registered in the name of Cede & Co. as Holder of Record, and as nominee of The Depository Trust Company, in the same way as the International Bonds were issued.

Additionally, all Guarantees and Security Documents established in the Indenture and in the International Bonds will be maintained, to be reflected in the New Instruments, in accordance with the terms set forth in **Chapter XVIII** of this Agreement.

**4.- New term for repayment of the loans:**

The Debtor Company must pay the entire principal balance of the renegotiated loans in a single installment (bullet), on August 14, 2027**.** The above is without prejudice to any redemptions that may occur in accordance with the New Indenture.

9

**5.- Interest:**

**a.- Interest accrued up to the date of the Deliberative Meeting:**

All loans applied to this **Chapter IV** shall be set as of the date of the Deliberative Meeting, in accordance with the outstanding balance of principal and interest accrued and not paid to date. Contractual interest and any that might have accrued during the delinquency period, up to the date of holding of the Deliberative Meeting, shall be calculated in accordance with the rate originally agreed upon (including Defaulted Interest and Post-Petition Interest, as these terms are defined in the Indenture), excluding the payment of any penalty interest, fines and collection expenses, which shall be expressly forgiven, if they exist. Interest accrued up to the date of the Deliberative Meeting shall be capitalized on said date, as shown in the amortization table of Part d. below.

Any collection expenses, fees and reimbursements that may be owed under the Indenture to the Bondholders' Representative (Trustee), Paying Agent, Registrar and Transfer Agent or Guarantee Agent must be paid as set forth in the Indenture, including any advisory and attorney expenses applicable under the rules of the Indenture and those necessary for purposes of recording the guarantees in accordance with the new conditions set forth in the Agreement, which shall also be assumed by the Debtor Company.

In the event that stamp and recording taxes – if applicable – are to be owed for this reason, they shall be assumed solely by the Debtor Company, and must be paid in timely fashion at the request of any Creditor.

**b.- Calculation of the interest rate:**

Interest shall be calculated and paid on all loans described in this **Chapter IV**, applying an annual interest rate, subject to the increments detailed below:

i.    **6.0%** annual basis 30/360 days the **first year** of approval of this Reorganization Agreement.

ii.   **7.0%** annual basis 30/360 days the **second year** of approval of this Reorganization Agreement.

iii.  **7.5%** annual basis 30/360 days the **third year** of approval of this Reorganization Agreement.

iv.   **8.0%** annual basis 30/360 days the **fourth year** of approval of this Reorganization Agreement.

v.    **8.5%** annual basis 30/360 days the **fifth year** of approval of this Reorganization Agreement.

vi.   **9.0%** annual basis 30/360 days the **sixth year** of approval of this Reorganization Agreement.

vii.  **9.5%** annual basis 30/360 days the **seventh year** of approval of this Reorganization Agreement.

Presentation version 8/8

This interest shall accrue as from the date the Deliberative Meeting is held.

**c.- Interest payment schedule:**

Interest shall be paid in accordance with the following payment schedule:

**i.- First Period:** For the period running from the Deliberative Meeting to the fourth quarter after said date, i.e., between August 15, 2020 and August 14, 2021, interest shall accrue to be capitalized quarterly, i.e., on November 14, 2020, February 14, 2021, May 14, 2021 and August 14, 2021.

**ii.- Second Period:** For the period running between the fifth and sixth quarters after the Deliberative Meeting, i.e., between August 15, 2021 and February 14, 2022, interest shall accrue, 50% of which shall be paid and the remaining 50% capitalized quarterly, i.e., on November 14, 2021 and February 14, 2022.

**iii.- Third Period:** For the period running from the seventh quarter after the Deliberative Meeting and henceforth, i.e., from February 15, 2022, interest shall be paid quarterly, at the end of each three-month period.

Within five business days after each of the indicated interest payment dates, the Company shall provide to the Trustee and the New International Bondholders a report showing the amount of interest capitalized on said dates.

Interest not to be capitalized in accordance with Roman numerals ii or iii above shall be due and must be paid on the respective payment date, as indicated in the amortization schedule in Section d.- below.

**d.- Principal and interest amortization schedule:**

**Secured Loan (USD)**

| Installment | Maturity | Unpaid balance | Interest (100%) | Capitalized interest | Amortization of principal | Installment amount |
|---|---|---|---|---|---|---|
| | 8/14/2020 | 210,505,263 | 0 | 0 | 0 | 0 |
| 1 | 11/14/2020 | 213,662,841 | 3,157,579 | 3,157,579 | 0 | 0 |
| 2 | 2/14/2021 | 216,867,784 | 3,204,943 | 3,204,943 | 0 | 0 |
| 3 | 5/14/2021 | 220,120,801 | 3,253,017 | 3,253,017 | 0 | 0 |
| 4 | 8/14/2021 | 223,422,613 | 3,301,812 | 3,301,812 | 0 | 0 |
| 5 | 11/14/2021 | 225,377,561 | 3,909,896 | 1,954,948 | 0 | 1,954,948 |
| 6 | 2/14/2022 | 227,349,614 | 3,944,107 | 1,972,054 | 0 | 1,972,054 |
| 7 | 5/14/2022 | 227,349,614 | 3,978,618 | 0 | 0 | 3,978,618 |
| 8 | 8/14/2022 | 227,349,614 | 3,978,618 | 0 | 0 | 3,978,618 |
| 9 | 11/14/2022 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 10 | 2/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 11 | 5/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 12 | 8/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 13 | 11/14/2023 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 14 | 2/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 15 | 5/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 16 | 8/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 17 | 11/14/2024 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 18 | 2/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |

11

Presentation version 8/8

| 19 | 5/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
|----|-----------|-------------|-----------|---|---|-----------|
| 20 | 8/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 21 | 11/14/2025 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 22 | 2/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 23 | 5/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 24 | 8/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 25 | 11/14/2026 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 26 | 2/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 27 | 5/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 28 | 8/14/2027 | 0 | 5,399,553 | 0 | 227,349,614 | 232,749,168 |

**6.- Participation in the New Financing:**

International Bondholders, subject to any restrictions that might apply to each of them in any relevant jurisdiction, shall have the preferential option to grant new financing to Enjoy (hereinafter the "***New Financing***"), pursuant to the terms described in **Chapter VIII** below, for a minimum amount totaling $10,000,000,000.- (ten billion pesos), subject to an exchange rate adjustment indicated further below in this Agreement.

**7.- Promissory Notes.**

Having fulfilled the Renegotiation Conditions, on the same date and provided that the renegotiation of the International Bonds and their exchange for the New International Bonds is realized, the Debtor Company will deliver promissory notes signed by Enjoy with the same maturity as the New International Bonds and for the total amount owed under the New Indenture, to the satisfaction of the International Bondholders' Trustee.

## V.   PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO UNSECURED CREDITORS

**1.- Extension.**

The loans of Unsecured Creditors shall be restructured, subject to the Rescheduling Conditions (as this term is defined below), under the conditions set forth in this **Chapter V** (hereinafter the "***Unsecured Rescheduling***"), with the exception of those Unsecured Creditors who are Bank Creditors or Suppliers and who opt for the restructuring stipulated for them in **Chapter VI** and **Chapter VII** of this Agreement, respectively (hereinafter the "***Unsecured Loans***").

The maturity of Unsecured Loans under this **Chapter V** shall be extended for a maximum of 90 days as from the date the Deliberative Meeting is held (hereinafter, the "***Extension of the Unsecured Loans***"), unless it becomes certain before that date that the Rescheduling Conditions will not be verified, during the term of which the Extension of the Unsecured Loans will expire on the date that said conditions failed, unless the Creditors Commission resolves to maintain the Extension of the Unsecured Loans as provided for in **Chapter XV** of this Agreement. So long as the Extension of the Unsecured Loans remains current, the Unsecured Creditors subject to this **Chapter V** undertake to not individually or collectively file any enforcement proceeding whatsoever, to the

Presentation version 8/8

extent that the Renegotiation Conditions remain pending.

The Unsecured Rescheduling shall be subject to fulfillment of the following contingent conditions: (i) that this Reorganization Agreement is understood as approved and enters into force, in accordance with the provisions of Art. 89 of Law No. 20,720; (ii) that the other terms of the Financing Conditions are fulfilled; and (iii) that the Bridge Loan funds are released to the Company, hereinafter referred to together as the "***Rescheduling Conditions***," are fulfilled. Having satisfied the Rescheduling Conditions, it shall be assumed, for all due purposes, that the date of the Unsecured Rescheduling shall be the date of the Deliberative Meeting.

Until such time as the Rescheduling Conditions are fulfilled, the Unsecured Loans shall remain current in accordance with their original terms (including interest accrued after the reorganization request).

Once the Rescheduling Conditions have been met, their fulfillment shall be certified by the Bankruptcy Administrator or, in the latter's absence, by the Creditors Commission with the favorable vote of four of its members, and the Unsecured Loans shall be set as if they had been rescheduled on the date of the Deliberative Meeting, consistent with the outstanding balance of principal and interest accrued up to that date. Contractual interest and that which had accrued during the delinquency period – i.e., up to the date of holding of the Deliberative Meeting – will be calculated in accordance with the rate originally agreed to therein, excluding the payment of any penalty interest, fines and collection expenses, which shall be expressly forgiven. Interest accrued up to the date of the Deliberative Meeting shall be capitalized on said date.

In the event that stamp and recording taxes – if any – are to be paid for this item, they shall be assumed solely by the Debtor Company, and must be paid in a timely fashion at the petition of any Creditor.

As of the date the Deliberative Meeting is held, Unsecured Loans, including those to Bank Creditors and excluding Suppliers, represent a total of $189,909,378,544 (one hundred eighty-nine billion, nine hundred nine million, three hundred seventy-eight thousand, five hundred forty-four pesos) on the date of the aforementioned Meeting.

**2.- Rescheduling of Unsecured Loans and Mandatory Prepayment.**

Once the Rescheduling conditions are fulfilled, the provisions of this Section 2 and thereafter of this **Chapter V** shall apply.

The Debtor Company must pay the entire principal of the rescheduled Unsecured Loans, in a single installment (bullet) within 7 years and one month from the date of the Deliberative Meeting. The above is without prejudice to the mandatory prepayment of these loans as regulated in this **Chapter V**.

13

Presentation version 8/8

As from the day after the date of the Deliberative Meeting, the rescheduled Unsecured Loans shall accrue interest during the periods and in accordance with the rate originally agreed to for them, to be capitalized on the maturity date of the rescheduled Unsecured Loans or on the Prepayment Date (as this term is defined below), as the case may be.

All rescheduled Unsecured Loans shall be required to be prepared (for both the Debtor Company and the respective Unsecured Creditor) at no prepayment cost, and assuming their par value on the Prepayment Date, i.e., the unpaid balance of principal and interest accrued and not capitalized up to the Prepayment Date, which shall be capitalized on said date (hereinafter the "***Prepayment Amount***") as follows: (a) 80% of the Prepayment Amount (hereinafter the "***Convertible Prepayment Amount***") shall be prepaid through delivery of (i) the bonds convertible to shares of Enjoy to which numerals 3.a.- and 3.b.- below refer, and (ii) the money received for the subscription of the aforementioned convertible bonds during their Preferential Offer Period (as this term is defined below) by shareholders of the Debtor Company (hereinafter the "***Shareholders***"), as detailed in **Chapter X** below; and (b) the remaining 20% of the Prepayment Amount shall be prepaid through the delivery of Fixed Income Bond B to which numeral 3.c below refers. Section 4 below of this **Chapter V** details how this prepayment shall be made.

The rescheduled Unsecured Loans that, before rescheduling, were denominated in *Unidades de Fomento* [Chilean Incentive Units], will be updated according to the change in the Unidad de Fomento from the date of the Deliberative Meeting to their due dates or up to the Prepayment Date, as applicable.

As from the date of the Deliberative Meeting, the obligations to do and not do as contained in Chapter XIII of this Agreement shall apply solely and exclusively to the rescheduled Unsecured Loans, and the default events considered in the debt instruments containing the rescheduled Unsecured Loans, if applicable, shall not be valid.

To facilitate the recording in the Securities Registry of the changes in rescheduled Unsecured Loans that are publicly offered securities, which will be applicable thereto under this Agreement, the Debtor Company, together with the Administrator and the Bondholders Representative, if applicable, will be expressly entitled to sign all instruments, agreements and documents, whether public or private, that are necessary, appropriate or requested by a competent authority to afford confirmation of the terms of this Agreement in these instruments, including the execution of new issuances of securities that may be necessary in order to facilitate modification of the rescheduled Unsecured Loans, and the Extension of the Unsecured Loans, if applicable. The Debtor Company will also be expressly authorized to deliver instructions and information to Depósito Central de Valores S.A., Depósito de Valores (hereinafter "***DCV***"), that may be necessary for facilitating the rescheduled Unsecured Loans, their extension and execution of their prepayment, as described in Section 4 of this **Chapter V**.

**3.- New issuance of bonds for mandatory prepayment of the Rescheduled Unsecured Loans:**

To undertake the mandatory prepayment of the entire Prepayment Amount, the Debtor Company unconditionally and irrevocably assumes the obligation to issue bonds convertible to shares of Enjoy and fixed-

Presentation version 8/8

income bonds and to record them with the Securities Registry maintained by the Financial Market Commission ("hereinafter the "**CMF**"), with the following characteristics:

### a.- Convertible A-1 Bond:

As noted above, Unsecured Creditors are required to be prepaid the Convertible Prepayment Amount, through: (i) the delivery of bonds convertible to Enjoy A-1 shares ("*Convertible A-1 Bond*") not placed during the Preferential Offer Period, in an amount equivalent to that needed to prepay the Convertible Prepayment Amount, assuming for these purposes the par value of the Convertible A-1 Bond, which in no case may be for amounts less than or under conditions more advantageous than those offered to Shareholders during the Preferential Offer Period; and (ii) in the event of the existence of a balance in the Convertible Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible A-1 Bonds that would have been acquired during their Preferential Offer Period by the Shareholders (as described in **Chapter X** below), until the Convertible Prepayment Amount is realized.

The Convertible A-1 Bond will be payable in a single installment 99 years (bullet) after the date of the Deliberative Meeting, and will accrue interest at a nominal peso rate equal to zero. The other terms and conditions of the Convertible A-1 Bond will be attached as **Appendix No. 2** to this Proposal, on the understanding that said **Appendix No. 2** forms part of the Proposal for all legal purposes.

The exchange rate for converting the Convertible A-1 Bond shall be **66.67** (sixty-six point six seven) new common shares of Enjoy for every $1,000 (one thousand pesos) of principal owed on the Convertible Prepayment Amount. In the event that this calculation results in a fraction of a share, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next highest whole number, and should there be a difference, it shall be paid in cash by the Debtor Company, assuming the sum of $15 as the price per share. Should there exist fractions of Convertible A-1 Bonds as a result of the difference between the Convertible Prepayment Amount and the cutoff amount for the Convertible A-1 Bond, the difference shall be paid in cash by the Debtor Company. These payments shall be made by the Company on the Prepayment Date and the conversion date, respectively.

The option for conversion of the Convertible A-1 Bonds into Company shares must be exercised within 60 banking days from the Prepayment Date. Convertible A-1 Bondholders may exercise the option to convert the Convertible A-1 Bond to shares of Enjoy at any time during the validity of the aforementioned conversion period, by written communication sent to Enjoy expressing therein their intent to exercise the conversion option, under the terms and in accordance with the communication form to be described in the Convertible A-1 Bonds issuance agreement.

15

Presentation version 8/8

Since the Convertible A-1 Bonds must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanisms for doing so shall be regulated in **Chapter X**.

**b.- Convertible A-2 Bond:**

As an incentive for participating in the New Financing, once the Reorganization Agreement is approved, those Unsecured Creditors who participated in the New Financing and effected the disbursement of the respective Bridge Loan (directly or through their option assignee) shall be entitled to receive in payment of a "portion" of their Convertible Prepayment Amount, with said portion to be determined according to their Prorated Share (as this term is defined further below), through: (i) the delivery of bonds convertible to A-2 Enjoy shares ("**Convertible A-2 Bond**") not placed during the Preferential Option Period, in an amount equivalent to that which is necessary to prepay the aforementioned "portion" of their Convertible Prepayment Amount, assuming for these purposes the par value of the Convertible A-2 Bond, which under no circumstances may be less than or under conditions more advantageous than those offered [to?] Shareholders during the Preferential Offer Period; and (ii) should there exist a balance in the aforementioned "portion" of the Convertible Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible A-2 Bonds that had been acquired during the Preferential Offer Period by Shareholders (as described in **Chapter X** below), until completing the aforementioned "portion" of the Convertible Prepayment Amount.

The "portion" of the Convertible Prepayment Amount that each Unsecured Creditor shall be entitled to be paid with Convertible A-2 Bonds (or with the proceeds of their placement during their preferential offer) shall be equal to their prorated share in the Bridge Loan (hereinafter, the "**Prorated Share**"), multiplied by a factor equal to 0.80. Should there exist fractions of Convertible A-2 Bonds, the difference will be paid in cash by the Debtor Company.

The **Prorated Share** shall be calculated as the quotient between (i) the amount effectively disbursed by the respective Unsecured Creditor ("**unsecured creditor i**") in the Bridge Loan, over (ii) the proportion represented by its receivable among total Unsecured Loans, excluding Suppliers, on the date of the Deliberative Meeting, multiplied by $40,000,000,000, in accordance with the following formula:

$$\text{Prorated Share of unsecured creditor i} = \frac{\text{(Total effectively disbursed by unsecured creditor i in the Bridge Loan)}}{\frac{\text{(Receivable of unsecured creditor i)}}{\text{(Unsecured Loans excluding Suppliers)}}} * (40,000,000,000)$$

where Unsecured Loans (excluding Suppliers) as of the date of the Deliberative Meeting total approximately $189,909,378,544 (one hundred eighty-nine billion, nine hundred nine million, three hundred seventy-eight thousand, five hundred forty-four pesos). Attached as **Appendix No. 3** to this Proposal are examples of the calculation of the "portion" of the Convertible Prepayment Amount that could be paid in Convertible A-2 Bonds, for the sole purpose of facilitating understanding and implementation.

NELSON CONTADOR
ABOGADOS & CONSULTORES

Presentation version 8/8

The terms and conditions of the Convertible A-2 Bond shall be identical to the terms and conditions of the Convertible A-1 Bond, which are considered expressly reproduced herein, with the sole exception of the exchange rate for shares of Enjoy, which in the case of the Convertible A-2 Bond shall be **198.02** (one hundred ninety-eight point zero two) new common shares of Enjoy for each $1,000.- (one thousand pesos) of principal owed from Convertible Prepayment Amount. The other terms and conditions of the Convertible A-2 Bond are attached as **Appendix No. 2** to this Proposal, on the understanding that said **Appendix No. 2** forms part of the Proposal for all legal purposes.

In the event that the results of this calculation yield a fraction of shares, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next highest whole number, and should there be a difference, it will be paid in cash by the Debtor Company, considering the sum of $5.05 as the price per share. Should there be fractions of Convertible A-2 Bonds as a result of the difference between the Convertible Prepayment Amount to be prepaid with Convertible A-2 Bonds, and the cutoff amount of the Convertible A-2 Bond, the difference shall be paid in cash by the Debtor Company. These payments shall be made by the Debtor Company on the Prepayment Date and conversion date, respectively.

If, pursuant to the calculations noted above, the "portion" of an Unsecured Creditor's Convertible Prepayment Amount does not yield as a result the receipt of 100% of its Convertible Prepayment Amount in A-2 Convertible B, the difference shall be paid through the delivery of Convertible A-1 Bonds. Should fractions of Convertible A-1 Bonds exist, the difference shall be paid in cash by the Debtor Company.

Since Convertible A-2 Bonds must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanism for this is regulated in **Chapter X**.

**c.- Fixed Income Bond B (Tranche B):**

The amortization of 20.0% of the total Prepayment Amount (whether or not they had participated in the New Financing) (hereinafter the "*Fixed Income Prepayment Amount B*") shall be required to be prepaid through delivery of a fixed income bond to be issued for an amount equivalent to at least the Fixed Income Prepayment Amount B (hereinafter the "*Fixed Income B Bond*"), payable within 10 years as from the date of the Deliberative Meeting. If fractions of Fixed Income B Bonds exist as a result of the difference between the Fixed Income Prepayment Amount B and the cutoff amount of the Fixed Income B Bond , the difference shall be paid in cash by the Debtor Company to the respective Unsecured Creditor on the Prepayment Date.

Fixed Income B Bond shall have the following features.

i.- <u>Currency</u>:

17

Presentation version 8/8

Fixed Income B Bond shall be issued in Chilean pesos.

ii.- <u>Amortization of principal</u>:

The dates of payment of interest and amortizations of principal of the Fixed Income B Bond, as well as the amounts to be paid in each case, are as shown in the Amortization Table indicated in Part c.iv.- below.

iii.- <u>Interest</u>:

Interest shall be calculated and paid by applying an annual effective nominal interest rate, which will gradually increase as described below:

- **1.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, the **first two years and six months** after the date the Deliberative Meeting is held. This interest shall accrue and be capitalized semi-annually, all in accordance with the amortization table indicated in Part c.iv.- below.

- **6.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the end of the **sixth semi-annual period** after the date the Deliberative Meeting is held, and henceforth. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below in Part c.iv.-.

iv.- <u>Amortization table for Fixed Income Bond B</u>[4]:

**Fixed Income Bond B (CLP millions)**

| Installment | Maturity | Unpaid principal | Interest (100%) | Capitalized interest | Amortization of principal | Value of installment |
|---|---|---|---|---|---|---|
| | 8/14/2020 | 38,031 | 0 | 0 | 0 | 0 |
| 1 | 2/14/2021 | 38,315 | 284 | 284 | 0 | 0 |
| 2 | 8/14/2021 | 38,601 | 286 | 286 | 0 | 0 |
| 3 | 2/14/2022 | 38,890 | 288 | 288 | 0 | 0 |
| 4 | 8/14/2022 | 39,180 | 291 | 291 | 0 | 0 |
| 5 | 2/14/2023 | 39,473 | 293 | 293 | 0 | 0 |
| 6 | 8/14/2023 | 39,473 | 1,263 | 0 | 0 | 1,263 |
| 7 | 2/14/2024 | 39,473 | 1,263 | 0 | 0 | 1,263 |
| 8 | 8/14/2024 | 39,473 | 1,263 | 0 | 0 | 1,263 |
| 9 | 2/14/2025 | 39,473 | 1,263 | 0 | 0 | 1,263 |
| 10 | 8/14/2025 | 39,473 | 1,263 | 0 | 0 | 1,263 |
| 11 | 2/14/2026 | 38,486 | 1,263 | 0 | 987 | 2,250 |
| 12 | 8/14/2026 | 37,499 | 1,231 | 0 | 987 | 2,218 |
| 13 | 2/14/2027 | 35,526 | 1,200 | 0 | 1,974 | 3,173 |
| 14 | 8/14/2027 | 33,552 | 1,136 | 0 | 1,974 | 3,110 |
| 15 | 2/14/2028 | 30,592 | 1,073 | 0 | 2,960 | 4,034 |
| 16 | 8/14/2028 | 27,631 | 979 | 0 | 2,960 | 3,939 |
| 17 | 2/14/2029 | 22,697 | 884 | 0 | 4,934 | 5,818 |
| 18 | 8/14/2029 | 17,763 | 726 | 0 | 4,934 | 5,660 |
| 19 | 2/14/2030 | 8,881 | 568 | 0 | 8,881 | 9,450 |
| 20 | 8/14/2030 | 0 | 284 | 0 | 8,881 | 9,166 |

---

[4] This table is for reference purposes, with the UF value of July 2, 2020. Said amount must be updated in accordance with the value of the UF on the date of the Deliberative Meeting, i.e., August 14, 2020.

18

v.- <u>Early Redemption</u>:

As from the date the New International Bonds are repaid in their entirety, the Debtor Company may redeem the Fixed Income B Bonds in advance, in whole or in part, at the equivalent of the amount of outstanding principal to be prepaid on the date set for the redemption, plus interest accrued and not paid during the period between the day after the due date of the final installment of paid interest and the date set for the redemption (at par).

vi.- <u>Financial Covenant</u>:

In addition to the obligations to do and not do as indicated in Chapter XIII of this Judicial Reorganization Agreement, in the Fixed Income B Bond the Debtor Company shall undertake to maintain a Net Financial Debt / EBITDA ratio not to exceed: **(a)** 6.5x measured and calculated on the consolidated financial statements of Enjoy reported quarterly to the CMF (the "***Financial Statements***") as of March 31, 2024, and up to the Financial Statements of December 31, 2025; **(b) 6.0 times** measured and calculated on the Financial Statements as of March 31, 2026 and up to the Financial Statements of December 2026; **(c) 5.5x** measured and calculated on the Financial Statements as of March 31, 2027 and up to the Financial Statements of December 31, 2027; **(d) 5.0x** measured and calculated on the Financial Statements as of March 31, 2028 and up to the Financial Statements of December 31, 2028; and **(e) 4.5 times** measured and calculated on the Financial Statements as of March 31, 2029 and henceforth.

The Net Financial Debt / EBITDA ratio shall not be measured on the Financial Statements prior to March 31, 2024.

For these purposes:

a.   <u>Net Financial Debt</u>: shall correspond to: /i/ The sum of the items posted under "Other current financial liabilities," "Other non-current financial liabilities," "Current leasing liabilities" and "Non-current leasing liabilities," less /ii/ the item posted as "Cash and cash equivalents;" all the above are from the Enjoy Consolidated Statement of Financial Position, which forms an integral part of the Financial Statements.

b.   <u>EBITDA</u>: corresponds to the results of the following items from the Income Statement by Function of the Financial Statements: /i/ Revenue from ordinary activities; less /ii/ Cost of sales; less /iii/ Administrative expenses; plus /iv/ Annual depreciation; plus /v/ Annual amortization.

vii.- <u>Other terms and conditions</u>:

Other terms and conditions applicable to the Fixed Income B Bonds are added as **<u>Appendix No. 4</u>** to this Proposal, on the understanding that said Appendix shall form part of the Proposal for all legal purposes.

**4.- Mandatory Prepayment of the Rescheduled Unsecured Loans:**

Presentation version 8/8

The procedure that shall apply for purposes of undertaking mandatory prepayment of the Prepayment Amount of the rescheduled Unsecured Loans shall be the following:

**a.- Prepayment Date:**

Within 15 banking days after expiration of the Preferential Offer Period, the Debtor Company must undertake to make mandatory prepayment of the rescheduled Unsecured Loans (hereinafter the "***Prepayment Date***"). To this end, Enjoy must grant a prepayment notice to the Unsecured Creditors, by reporting an essential Event as least five Banking Days prior to the Prepayment Date.

**b.- Receivables that are unrealized public debt offering instruments:**

Rescheduled Unsecured Loans that correspond to public debt offering instruments shall be prepaid on the Prepayment Date by means of electronic funds transfers, in the case of cash payments, and through delivery of the respective Convertible A-1 and/or A-2 Bonds, as applicable, and the Fixed Income B Bond, through DCV by means of their transfer and/or deposit to the accounts that the respective Unsecured Creditors have registered with DCV, subject to instruction from the Debtor Company and information to the Administrator.

Further, on the Prepayment Date, the Debtor Company shall send an instruction to DCV in order for the latter to leave as invalid the positions corresponding to the unrealized debt instruments that had been the object of the prepayment.

**c.- Other Receivables:**

In the case of receivables other than those indicated in Part 5.b above and those public debt offering instruments that are released, Unsecured Creditors must direct themselves on the Prepayment Date to the offices of Enjoy, located at calle Rosario Norte No. 555, piso 10, commune of las Condes, Santiago, during business hours, to monitor the information and instruments that attest to their capacity as Unsecured Creditors. On that occasion, Enjoy shall prepay those corresponding cash amounts through immediately available funds, to the bank accounts reported by the respective Unsecured Creditors to Enjoy, at least two banking days before the Prepayment Date, while instructing the DCV to make the transfer and/or deposit of the Convertible A-1 and/or A-2 Bonds, as applicable, and the Fixed Income B Bond that also corresponds to said creditors, into the accounts that the respective Unsecured Creditors have registered with DCV and reported to Enjoy at least two banking days before the Prepayment Date, and the respective Unsecured Creditors must sign a document acknowledging complete prepayment of their rescheduled Unsecured Loan.

## VI. PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO BANK CREDITORS (TRANCHE C).

Pursuant to Article 64 of Law No. 20,720, more favorable conditions are proposed for Bank Creditors who commit to granting to the Debtor Company, or to one or more of its subsidiaries, to be agreed to with the Debtor Company, one or more revolving lines of credit within a maximum of 15 banking days after the date of entry into force of the Agreement, with the following features:

1.- Term: 3 years after the date of holding of the Deliberative Meeting.

2.- Interest rate: consistent with the market.

3.- Amount: the equivalent of at least 40% of its corresponding loan against the Debtor Company, allocated to this Reorganization Agreement.

4.- Other conditions: those typical in the market for these types of transactions.

Bank Creditors that opt for this Chapter VI of the Agreement must grant their binding commitment to open the aforementioned lines to the Administrator within five banking days after the date of the Deliberative Meeting.

The most favorable condition offered consists of the prepayment, at no prepayment costs, of 100% of outstanding principal and accrued interest from the respective Bank Creditor's loans through issuance of a fixed income bond totaling said amount, for the purposes of which the Debtor Company proposes assuming the obligation to issue a fixed income bond with the characteristics described in this **Chapter VI** and to record it with the Securities Registry maintained by the CMF (hereinafter "***Fixed Income Bond C***"), payable within 12 years after approval of this Reorganization Agreement. Should there exist fractions of Fixed Income C Bonds as a result of the difference between the amount of the loan of a Bank Creditor, and the cutoff amount of the Fixed Income C Bond, the difference shall be paid in cash by the Debtor Company. These loans, prior to delivery of the Fixed Income C Bonds, shall be extended and shall capitalize interest in the form stipulated in numerals 1.- and 2.- of **Chapter V**, where applicable.

The Bank Creditors' loans shall be prepaid within 15 banking days after the date of acquisition of registration of the Fixed Income C Bonds with the CMF's Securities Registry. To this end, Enjoy must issue a prepayment notice to the Bank Creditors, by declaring an Essential Event at least five banking days before its prepayment date. Prepayment shall be made through the DCV by means of transfer and/or deposit to the accounts the respective Bank Creditors have registered with the DCV, subject to instructions of the Debtor Company and information to the Administrator.

Bank Creditors who do not conform to the provisions of this **Chapter VI** shall be governed by the provisions of **Chapter V** above.

These Bank Creditors represent **five** creditors, totaling **$19,629,681,603.94 (**nineteen billion, six hundred twenty-nine million, six hundred eighty-one thousand, six hundred three pesos).

21

NELSON CONTADOR
A B O G A D O S  &  C O N S U L T O R E S

Presentation version 8/8

The Fixed Income C Bond shall have the following features.

i.- Currency:

The Fixed Income C Bond shall be issued in Chilean pesos.

ii.- Amortization of principal:

Payment of the Fixed Income C Bond shall be made in a single installment after 12 years after the date of the Deliberative Meeting, in accordance with the Amortization Table provided in Part iv.- below.

iii.- Interest:

Interest shall be calculated and paid by applying an annual effective nominal interest rate, which will gradually increase as described below:

- **1.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, the **first five semi-annual periods** after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **2.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **sixth semi-annual period** to the **twelfth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **3.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **thirteenth semi-annual period** to the **eighteenth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **4.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **nineteenth semi-annual period** to the **twenty-fourth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

iv.- Amortization table for Fixed Income Bond C:

| Installment | Maturity | Unpaid principal | Interest (100%) | Capitalized interest | Amortization of principal | Value of installment |
|---|---|---|---|---|---|---|
|  | 8/14/2020 | 100.0 |  |  |  |  |
| 1 | 2/14/2021 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 2 | 8/14/2021 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 3 | 2/14/2022 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 4 | 8/14/2022 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 5 | 2/14/2023 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 6 | 8/14/2023 | 101.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 7 | 2/14/2024 | 102.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 8 | 8/14/2024 | 103.0 | 1.0 | 1.0 | 0.0 | 0.0 |

22

Presentation version 8/8

| 9 | 2/14/2025 | 104.1 | 1.0 | 1.0 | 0.0 | 0.0 |
| 10 | 8/14/2025 | 105.1 | 1.0 | 1.0 | 0.0 | 0.0 |
| 11 | 2/14/2026 | 106.2 | 1.1 | 1.1 | 0.0 | 0.0 |
| 12 | 8/14/2026 | 107.2 | 1.1 | 1.1 | 0.0 | 0.0 |
| 13 | 2/14/2027 | 108.8 | 1.6 | 1.6 | 0.0 | 0.0 |
| 14 | 8/14/2027 | 110.5 | 1.6 | 1.6 | 0.0 | 0.0 |
| 15 | 2/14/2028 | 112.1 | 1.7 | 1.7 | 0.0 | 0.0 |
| 16 | 8/14/2028 | 113.8 | 1.7 | 1.7 | 0.0 | 0.0 |
| 17 | 2/14/2029 | 115.5 | 1.7 | 1.7 | 0.0 | 0.0 |
| 18 | 8/14/2029 | 117.2 | 1.7 | 1.7 | 0.0 | 0.0 |
| 19 | 2/14/2030 | 119.6 | 2.3 | 2.3 | 0.0 | 0.0 |
| 20 | 8/14/2030 | 122.0 | 2.4 | 2.4 | 0.0 | 0.0 |
| 21 | 2/14/2031 | 124.4 | 2.4 | 2.4 | 0.0 | 0.0 |
| 22 | 8/14/2031 | 126.9 | 2.5 | 2.5 | 0.0 | 0.0 |
| 23 | 2/14/2032 | 129.4 | 2.5 | 2.5 | 0.0 | 0.0 |
| 24 | 8/14/2032 | 0.0 | 2.6 | 0.0 | 129.4 | 132.0 |

v.- <u>Early Redemption</u>:

As from the date the New International Bonds are repaid in their entirety, the Debtor Company may redeem the Fixed Income C Bonds early, in whole or in part, at the equivalent of the total outstanding principal to be prepaid on the date set for the redemption, plus interest accrued and not paid during the period between the day after the due date of the final installment of paid interest and the date set for the redemption (at par).

v.- <u>Other terms and conditions</u>: Other terms and conditions applicable to the Fixed Income C Bonds shall be attached as **Appendix No. 4** to this Proposal before the date of the Deliberative Meeting, on the understanding that said Appendix shall form part of the Proposal for all due purposes.

## VII. PROPOSED PAYMENT OF PRINCIPAL TO SUPPLIER CREDITORS

Pursuant to Article 64 of Law 20,720, more favorable conditions are proposed for some of the unsecured creditors. The more favorable condition proposed consists in paying 100% of the principal of the loans originating from invoices or receipts issued by Suppliers under the same terms, which must be paid within 12 months as from approval of this Judicial Reorganization Agreement.

These Suppliers represent **18** creditors, totaling **$382,029,349.-** (three hundred eighty-two million, twenty-nine thousand, three hundred forty-nine pesos).

## VIII. NEW FINANCING (TRANCHE D).

The International Bondholders and Unsecured Creditors shall have the preferential option of granting New Financing to Enjoy totaling approximately $50,000,000,000 (fifty billion pesos) (hereinafter, the International Bondholders and Unsecured Creditors participating in the New Financing shall be referred to jointly as the "***New Financers***").

The New Financing shall be documented in a single, non-revolving loan opening agreement to be entered into between Enjoy and the New Financers under terms substantially similar to those attached as **Appendix No. 5** of this Agreement, which is understood as forming a part thereof for all legal purposes (the "***Bridge Loan***"), which

Presentation version 8/8

shall be required to be prepaid (for both the Debtor Company and the respective New Financer) at no prepayment cost, and assuming as the amount to be prepaid the outstanding balance of principal plus interest accrued and to be capitalized on the Prepayment Date (hereinafter the "***New Financing Prepayment Amount***"), through the delivery of (i) bonds convertible to Enjoy shares ("***Convertible D Bond***") not placed during the Preferential Offer Period, in an amount equivalent to that which is necessary to prepay the New Financing Prepayment Amount, assuming for these purposes the par value of the Convertible D Bond, which under no circumstances may be for amounts less than or under conditions more advantageous than those offered to Shareholders during the Preferential Offer Period; and (ii) in the event there exists a balance of the New Financing Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible D Bonds that had been acquired during their Preferential Offer Period by the Shareholders (as described in **Chapter X** below), until completing the New Financing Prepayment Amount; all the above shall be prorated for the New Financers' Share in the New Financing.

**1.- Bridge Loan**.

a.- With a view to participating in the New Financing, the New Financers will sign a non-revolving loan opening agreement, under identical terms and conditions maturing at 18 months, the disbursements of which shall be documented by signing promissory notes to the order of each respective New Financer. The disbursement shall take place on the third banking day after the signing date of the Bridge Loan, or on the banking day after which the Financing Condition (as this term is defined below) has been fulfilled, if fulfilled after entering into the Bridge Loan, at which time the respective promissory note authorized by a Notary shall be issued.

Loans granted under the Bridge Loan shall accrue annual interest of 5.7% (base 360 days and semi-annual periods equal to 180 days), unless said rate exceeds the current maximum contractual rate applicable to loans with these characteristics current on the signing date of the Bridge Loan, in which case said contractual maximum rate shall apply.

It shall be required for the Bridge Loan to be prepaid for the debtor and creditor on the Prepayment Date, with no prepayment costs, through the issuance of Convertible D Bonds not placed during the Preferential Option Period, the characteristics of which are noted in Numeral 3 of this **Chapter VIII**, and in the event of a difference, with the proceeds from the subscription and paying of the Convertible D Bonds that had been acquired during its Preferential Offer Period by the Shareholders, as indicated below.

b.- The opportunity to participate in the Bridge Loan shall be offered preferentially to the groups and in the proportions specified below (hereinafter the "***Groups***"):

i.- To International Bondholders: up to $10,000,000,000.- (ten billion pesos) (hereinafter, "***Group A***") or its equivalent in US dollars, according to the Observed Dollar Exchange rate published by the Central Bank of Chile on the date the Deliberative Meeting is held.

Presentation version 8/8

ii.- To Unsecured Creditors: up to $40,000,000,000.- (forty billion pesos) (hereinafter, "**Group B**").

c.- Those interested in participating in the New Financing must express this in writing to the Bankruptcy Administrator, through a financing commitment (hereinafter the "***Financing Commitment***"), the results and total amounts of which must be subsequently reported by the Bankruptcy Administrator. With regard to International Bondholders, they must express their interest by sending a written communication to the International Bondholders Representative. The International Bondholders Representative shall send to the Bankruptcy Administrator any Financing Commitment forms it might receive from International Bondholders.

i.- Financing Commitments received within a specified Group shall be allocated to the value of the share in the New Financing offered to the corresponding Group, prorated in accordance with the share in the liabilities of the respective Group held by all group creditors who have expressed interest, until the allocation to each participating creditor within the Group of 100% of what would correspond to each creditor in accordance with their prorating, or their commitment offer, whichever is less. If a share of the New Financing remains after the above allocation, it shall be distributed among the creditors of the respective Group that delivered Financing Commitments above their prorating for the respective Group's liabilities, prorated for these excess commitment offers. If the Financing Commitments received within a specific Group exceed the share in the New Financing offered to the Corresponding Group, said excess shall be allocated to cover shortfalls in the other Group, if any, prorated (among all those considering only the excess) until depletion of the total of $50,000,000,000 (fifty billion pesos).

ii.- In the event it is not possible to obtain Financing Commitments in an initial round for an amount equivalent to 100% of the New Financing, successive rounds may be held among interested parties who submitted Financing Commitments in previous rounds, which shall be allocated, prorated for the new request until the amount of the shortfall is depleted.

iii.- If, despite having been offered in the form indicated in Parts i.- and ii.- above, a portion of the New Financing remains without having received Financing Commitments, the Company may offer said remainder of the New Financing to third parties under terms no more favorable than those offered to these three Groups.

iv.- Rounds and offerings of New Financing that follow the first must be concluded within a maximum of 10 banking days.

d.- Notwithstanding the above, and prior to the Deliberative Meeting, those convened to participate in the New Financing may state in advance their intent to participate therein, through a binding note to be sent to the Bankruptcy Auditor (*Veedor Concursal*), in order for the latter to acknowledge this at the respective

25

Presentation version 8/8

meeting. At the respective Deliberative Meeting, a record may be left of the commitments received in advance, and the creditors may appear who expressed them, to repeat said commitment, which under no circumstances shall affect the validity or enforceability of the written commitment delivered to the Bankruptcy Auditor.

e.- **Minimum Amount of Financing Commitments:**

i.- In the event that, after completing the rounds and offerings of New Financing described in Part c. above, the Financing Commitments do not exceed $25,000,000,000 (twenty-five billion pesos) ("***Minimum Financing Amount***"), the Financing Condition (as this term is defined below) shall be understood as unfulfilled and, as a consequence, a cause for breach of the Reorganization Agreement shall occur and Enjoy must immediately request its own voluntary liquidation.

ii.- In the event that, after completing the New Financing rounds and offers as described in Part c. above, Financing Commitments are greater than or equal to $25,000,000,000 (twenty-five billion pesos) but less than $45,000,000,000 (forty-five billion pesos), the New Financers who delivered the Financing Commitments to the Company are not required to maintain said commitments, and may inform the Company and the Administrator of their withdrawal, maintenance or increase within two business days after the notice issued by the administrator to the New Financers with the final results of the New Financing rounds and offers. Those New Financers who indicate nothing within said period shall be understood as maintaining their respective Financing Commitment. After fulfilling the withdrawal period for the Financing Commitments, the Company and the Administrator shall calculate the total amount of Financing Commitments net of those withdrawn (the "***Net Financing Commitments***"). If Net Financing Commitments do not exceed the Minimum Financing Amount, the Financing Condition will be understood as unfulfilled and, consequently, a default event under the Reorganization Agreement shall occur and Enjoy must immediately request its own voluntary liquidation. If the Net Financing Commitments are greater than or equal to $25,000,000,000 (twenty-five billion pesos) but less than $45,000,000,000 (forty-five billion pesos), the Financing Condition shall be understood as fulfilled in this aspect, unless the Creditors Commission resolves otherwise by vote of four of its members, in which case the Reorganization Agreement shall be understood as not fulfilled and Enjoy must immediately request its own voluntary liquidation.

iii.- In the event that the Financing Commitments meet or exceed $45,000,000,000 (forty-five billion pesos), the Financing Condition shall be considered as fulfilled in that respect.

iv.- For purposes of calculating the amounts set forth in this letter **e.-**, the amounts committed by New Financers who are International Bondholders shall be assumed in their peso-equivalent, using the Observed Dollar exchange rate published by the Central Bank of Chile applicable on the day the

26

Deliberative Meeting is held, without prejudice to the amount at which the currencies received from them are effectively liquidated on the date of the respective disbursement.

f.- Once the periods for receiving the Financing Commitments have lapsed, as noted in letter **c.-** above, the New Financers must sign the non-revolving loan opening agreement and other New Financing documents by the second banking day after the date the Administrator reports each New Financer's share in the Bridge Loan. For purposes of entering into the non-revolving credit line agreement, the New Financers shall authorize the Administrator to sign the aforementioned agreement in their name and behalf, upon exercising their option to grant the New Financing. The terms defined in the process of allocating each New Financer's share in the Bridge Loan and entering and disbursing them shall be reported by the Auditor and/or Administrator, as applicable.

g.- Funds disbursed by each New Financer shall be kept on deposit with the withholding agents to be designated in the Bridge Loan (hereinafter the "*Withholding Agents*"), until their release and delivery to Enjoy in accordance with the Bridge Loan's provisions.

h.- If, by the second banking day after the Bridge Loan disbursement date, one or more New Financers fails to fulfill their Financing Commitment and consequently an amount has not been delivered to the Withholding Agents equivalent to those they permitted to give in fulfillment of the condition set forth in Letter h of the Financing Condition, the Debtor Company must so advise the Administrator and the Creditors Commission in order for the latter to determine whether the amount effectively disbursed is sufficient as to trigger the release of funds to the Company by the Withholding Agents. If the Creditors Commission, by vote of four of its members, fails to accept the amount effectively disbursed, the Company, within 10 banking days after the date of the Creditors Commission's resolution, must propose new alternative financing to supplement the missing amount, under the same terms as the Bridge Loan. If the Creditors Commission accepts the Company's proposal, it shall undertake release of the funds to the Company by the Withholding Agents. Otherwise, the disbursed amounts shall be considered sufficient, unless the Creditors Commission resolves otherwise by vote of four of its members, and the disbursed amounts shall be returned by the Withholding Agents to the respective New Financer.

i.- The Debtor Company shall pay each New Financer (to the extent the respective disbursement is actually made under the Bridge Loan) a commitment fee totaling 2% of the total amount actually disbursed by the respective New Financer under the Bridge Loan, to be deducted from their total disbursement when the latter becomes due.

j.- Funds disbursed under the Bridge Loan shall be allocated to repaying obligations incurred during the course of the regular business activities of the Debtor Company and its subsidiaries, in accordance with the conditions

Presentation version 8/8

and restrictions applying thereto under this Agreement. In this regard, the Debtor Company must submit to the Creditors Commission a Plan for the Use of Funds for general approval, with the Debtor Company retaining the allocation and specific responsibility for its implementation, the fulfillment of which shall be supervised by the Administrator.

k.- The Unsecured Creditors' receivables and the loans against Enjoy that arise after the date of the Deliberative Meeting (with the exception of the International Bonds and the New International Bonds, which are preferential, the "Lease Agreement with Purchase Option" entered into between Enjoy and Banco Security, pursuant to a public instrument dated October 5, 2016, Directory No. 21,180-2016 issued through the Santiago Notary office of Mr. Eduardo Diez Morello, and the guarantee vouchers referenced in **Chapter XII** below), shall be understood as subordinate to the Bridge Loan and the Convertible D Bonds. Loans against Enjoy that arise after the date of the Deliberative Meeting, excepting those already noted, as well as loans with respect to non-financial providers generated during the ordinary course of Enjoy's business  must expressly contain this subordination in its instruments. Without prejudice to the subordination specified above with respect to the Unsecured Creditors, Unsecured Creditors who participate in the Bridge Loan authorize the Administrator to confirm and ratify the aforementioned subordination agreements on their behalf, by public instrument.

l.- The option to grant the New Financing may be assigned by the respective creditor, to which end it shall so note in the communication expressing its Financing Commitment, which must also be signed by the respective assignee.

**2.- Financing Condition.**

The obligation to undertake disbursements under the Bridge Loan shall be subject to fulfillment, within a maximum of 90 calendar days from the date of the Deliberative Meeting, of the following contingent and supplementary conditions (the "***Financing Condition***"):

a.- That Enjoy have the relevant corporate authorizations to subscribe, disburse and fulfill the Bridge Loan;

b.- Approval by part of the Shareholders at an extraordinary shareholders meeting of Enjoy for a capital increase, through the issuance of shares and of bonds convertible to shares of Enjoy, in an amount sufficient as to back the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the shares to be allocated to the Option and the Support Shares (as these terms are defined in **Chapter X**), and amendments of the corporate bylaws that might be needed for these purposes;

c.- Acquisition of the commitment of at least 60% of current Shareholders, to waive their preferential option rights to subscribe the Convertible A-1 Bond and Convertible A-2 Bond, under the terms stipulated in the Support Agreement.

d.- Acquisition of the commitment of at least 60% of current Shareholders to waive 90.88% of their preferential option rights to subscribe the Convertible D Bond, under the terms stipulated in the Support Agreement;

e.- Acquisition of a commitment of at least 60% of current Shareholders to not sell their shares in the Company under the terms stipulated in the Support Agreement.

f.- That this Reorganization Agreement be understood as approved and begin to apply pursuant to Art. 89 of Law No. 20,720;

g.- That the Administrator certify that, except for the disbursement of the Bridge Loan, the conditions have been fulfilled for the release in favor of the Debtor Company of time deposits totaling $9,300,000,000 currently held in guarantee by the banks issuing the guarantee vouchers to which **Chapter XII** of this Agreement refers, as opposed to the condition for the effective disbursement of at least $25,000,000,000 of the New Financing; and

h.- (i) That the Debtor Company receive Financing Commitments totaling at least the Minimum Financing Amount and (ii) that the Creditors Commission not declare a violation of the Financing Condition in the event that Financing Commitments are less than $45,000,000,000 (forty-five billion pesos), as noted in Letter e, Part ii of Numeral 1 above.

i.- That the New York Southern District Bankruptcy Court (New York State, United States of America) recognizes the Agreement in the so-called Chapter 15 proceeding the Company is filing with said court by reason of its Reorganization Proceeding, Case No. 20-11411 (MG), as described in Appendix 1.

**3.- Convertible D Bond**.

a.- Enjoy unconditionally and irrevocably undertakes to issue the Convertible D Bond, which shall have an issuance amount equal to $65,000,000,000 (sixty-five billion pesos). Should fractions of Convertible D Bonds exist as a result of the difference between a New Financer's New Financing Prepayment Amount and the Convertible D Bonds cutoff amount, this difference shall be paid in cash by the Debtor Company to the respective New Financers, prorated for their share in the New Financing, on the Prepayment Date.

b.- Since Convertible D Bonds must preferentially be offered to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanism for doing so shall be regulated in Chapter X.

c.- The Convertible D Bond shall have the following features:

**i.- Currency**:

29

The Convertible D Bond shall be issued in Chilean pesos.

**ii.- Principal amortization**:

The Convertible D Bond shall be repaid through a single installment within 99 years of the date of the Deliberative Meeting approving the Proposal (bullet).

**iii.- Interest:**

Interest shall be calculated and capitalized by applying an annual effective nominal rate (base 360 days and semi-annual periods equal to 180 days) up to the date of conversion to shares, which shall be reduced gradually as described below:

- **5.7%** for the period starting on the Prepayment Date of the Bridge Loan and ending 540 days after the date of disbursement of the Bridge Loan.

- **0.0%** nominal annual effective rate from day 541 after the date of disbursement of the Bridge Loan.

**iv.- Conversion Period**:

The Convertible D Bond may only be converted to shares of Enjoy during a period starting on the Prepayment Date, and ending 540 days after the date of disbursement of the Bridge Loan. At any time during the lifetime of the aforementioned conversion period, Convertible D Bondholders may exercise the option to convert the Convertible D Bond to shares of Enjoy, subject to written communication sent to Enjoy expressing therein their intent to exercise the conversion option, under the terms and in accordance with the communication form to be described in the agreement for the issuance of the Convertible D Bonds.

**v.- Conversion Rate**:

The Convertible D Bond will have a conversion rate of 266.67 (two hundred sixty-six point six seven) new shares of Enjoy for each $1,000.- (one thousand pesos) of current principal and accrued interest up to the latest date of interest capitalization prior to the conversion date.

In the event that the results of this calculation yield a fraction of shares, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next whole number, and if there is a difference, this difference shall be paid in cash by the Debtor Company, assuming as share price the sum of $3.75, to be paid by the Debtor Company on the conversion date.

**vi.- Preference**:

The Convertible D Bond shall be considered preferential for the payment of principal and interest and in the event of bankruptcy settlement with respect to Unsecured Creditors (with the exception of the International Bonds and the New International Bonds, which are preferential, the "Lease Agreement with Purchase Option" entered into between Enjoy and Banco Security, pursuant to a public instrument dated October 5, 2016, Directory No. 21,180-2016, issued through the Notary Office of Mr. Eduardo Diez Morello, and the guarantee vouchers discussed in **Chapter XII** below) and loans against Enjoy that arise after the date of the Deliberative Meeting (with the exception of loans expressly agreed to by means of this Judicial Reorganization Agreement), which loans, therefore, shall be understood as being subordinate to the Convertible D Bond. Loans against Enjoy that arise after the date of the Deliberative Meeting, excepting those already noted, must expressly contain this subordination in their instruments. Without prejudice to the subordination set forth in this Agreement with respect to all Unsecured Creditors, those Unsecured Creditors that participate in the Bridge Loan authorize the Administrator to confirm and ratify the aforementioned subordination agreements on their behalf, by public instrument,.

**vii.- Use of funds**:

Funds from the Convertible D Bond shall be used exclusively for prepaying the Bridge Loan, and in the event of a remainder after paying the above, said funds shall be allocated to repaying the obligations corresponding to the normal operations of the Debtor Company and its subsidiaries.

**viii.- Other terms and conditions**
Other terms and conditions of the Convertible D Bond are attached as **<u>Appendix No. 2</u>** to this Proposal, on the understanding that said Appendix shall form part of the Proposal for all legal purposes.

**4.- Prepayment of the Bridge Loan**

Prepayment of the Bridge Loan to the New Financers shall be made on the Prepayment Date, to which end Enjoy must grant a prepayment notice to the New Financers, by declaring an Essential Event at least five banking days before the Prepayment Date, and on said date Enjoy shall prepay the corresponding amounts in cash through immediately available funds, to the bank accounts reported by the respective New Financers to Enjoy at least two banking days before the Prepayment Date, and for delivery of the Convertible D Bonds, by delivering the same through the DCV, by means of their transfer and/or deposit to the accounts that the respective New Financers have registered with the DCV and reported to Enjoy at least two banking days before the Prepayment Date. For these purposes, the New Financers must deliver to Enjoy on that same date the promissory notes delivered to them under the Bridge Loan, with confirmation of payment of the same.

31

NELSON CONTADOR
ABOGADOS & CONSULTORES

Presentation version 8/8

## IX. OPTION FOR CONDITIONAL SUBSCRIPTION OF SHARES BY CURRENT SHAREHOLDERS.

Pursuant to this Reorganization Agreement, and subject to the corresponding statutory approvals, Shareholders shall be granted an option (hereinafter the "***Option***"), simultaneously with the opening of the Preferential Offer Period, to subscribe 9,389,919,856 new Company payment shares for a term of 24 months after the date of the Deliberative Meeting approving the Proposal, at a subscription price of $5.75 per share (yielding a rate of 2.00 new shares for each current share).

To apply the Option, Enjoy shall grant, in the same capital increase as supports the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the issuance of shares for payment of the Option. The Option on these new payment shares shall be offered preferentially to Shareholders with right to subscribe them (those registered with the Enjoy Shareholders Registry as of midnight on the fifth business day prior to the start date of the Preferential Offer Period), at a subscription price of $5.75 (five point seven five pesos) per share, who may exercise the Option (and ultimately subscribe the shares at the aforementioned price of $5.75) within 24 months after the date of the Deliberative Meeting. The Option shall be implemented by entering into an option agreement for the subscription of Enjoy shares incorporating the above terms as to the option's subscription price and exercise period, expressly stating that the aforementioned option may be freely assigned by the respective shareholder.

The preferential subscription offering of the shares covered by the Option shall be undertaken in accordance with the terms set forth in **Chapter X** below.

## X.   LEGAL STRUCTURE FOR THE FINANCING AND CONVERSION PROCESSES.

1.- Prior to the Deliberative Meeting, the Debtor Company may supplement the legal structure for implementation of the loan renegotiation as agreed to in this Accord and, specifically, for implementation of the New Financing, mandatory prepayment of the unsecured loans with Convertible A-1 Bonds and Convertible A-2 Bonds and Fixed Income B Bond, repayment of the Bridge Loan with Convertible D Bonds, etc.

2.- Without prejudice to the entry into force of this Agreement, the Bankruptcy Administrator shall convene the Creditors Commission, together with the Debtor Company and the technical advisors assisting them, to adopt the necessary agreements for appropriate implementation of the various steps considered in the Reorganization Agreement if necessary, with full powers. Said meeting of the Creditors Committee must be held no later than the fifth business day after the date of holding of the Deliberative Meeting.

3.- Notwithstanding the above, following are the general guidelines proposed for some of the steps considered in this Proposal.

a.- All bonds convertible to shares issued by the Company must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations (hereinafter the "***Preferential Offer Period***"). If no Shareholder exercises their preferential option during the Preferential Offer Period, the Company shall allocate the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds that are necessary to be delivered in prepayment of the Convertible Prepayment Amount and the New Financing Prepayment Amount, as set forth in this Reorganization Agreement. If shareholders exercise their aforementioned preferential subscription option, the procedure shall be as follows:

i.- Convertible A-1 Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the Convertible Prepayment Amount of the rescheduled Unsecured Loans entitled to receive Convertible A-1 Bonds in payment, prorated.

ii.- Should there exist a balance in the Convertible Prepayment Amount after applying the amounts indicated in number i.- above, the net proceeds the Company obtains for the subscription and payment of the Convertible A-1 Bonds during the Preferential Offer Period shall be allocated for paying off the balance of the Convertible Prepayment Amount of the rescheduled Unsecured Loans with right to receive Convertible A-1 Bonds in payment, prorated.

iii.- Convertible A-2 Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the Convertible Prepayment Amount of the rescheduled Unsecured Loans entitled to receive Convertible A-2 Bonds in payment, prorated.

iv.- Should there exist a balance in the Convertible Prepayment Amount right to receive Convertible A-2 Bonds in payment after applying the amounts indicated in Number iii.- above, the net proceeds the Company obtains for the subscription and payment of the Convertible A-2 Bonds during the Preferential Offer Period shall be allocated for paying off the balance of the Convertible Prepayment Amount with right to receive Convertible A-2 Bonds in payment, prorated.

v.- Convertible D Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the New Financing Prepayment Amount, prorated.

vi.- Should there exist a balance in the New Financing Prepayment Amount right to receive Convertible D Bonds in payment after applying the amounts noted in Number v.- above, the net proceeds the Company obtains for subscription and payment of the Convertible D Bonds during the Preferential Offer Period shall be allocated to paying off the balance of the New Financing Prepayment Amount, prorated.

33

vii.- In the three cases set forth above, the Company may issue Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, as applicable, for an amount greater than requested to cover the payment set forth in this Reorganization Agreement.

b.- The Preferential Offer Period for the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds and for shares to exercise the Option shall be realized simultaneously (at the same time). The Preferential Offer Period for the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds and for shares to exercise the Option must be initiated within [15] business days after the deadline for recording these issuances in the CMF's Securities Registry.

c.- With a view to facilitating the feasibility of the agreements contained in this Reorganization Proposal:

i.- The companies Entretenciones Consolidadas SpA, Inversiones e Inmobiliaria Almonacid Limitada and Inversiones Cumbres Limitada, which represent 60.52% of the Enjoy shareholder capital, shall sign a support agreement with Enjoy (hereinafter the "***Support Agreement***") pursuant to which: (i) they undertake to assist and participate with all their shares in the extraordinary shareholders meeting addressing Part e below, approving thereat the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the capital increase noted in the aforementioned Letter e, the changes of bylaws necessary for these purposes, and other matters necessary for implementation of the Proposal in the context of the Enjoy Judicial Reorganization Agreement; (ii) they promise to waive their preferential subscription rights to subscribe the Convertible A-1 Bonds and Convertible A-2 Bonds and waive 90.88% of their rights to preferentially subscribe the Convertible D Bonds, when said rights arise, under the terms stipulated in the Support Agreement; and (iii) they undertake not to transfer their shares, in accordance with the terms set forth in the Support Agreement. The Support Agreement must be entered into and delivered to the Auditor in advance of the date of the Deliberative Meeting, in order for the Auditor to address the Support Agreement at the aforementioned Meeting; and

ii.- Company Creditors must express and send to the Auditor, before the date of the Deliberative Meeting, their commitment to participate in the New Financing subject to the terms and conditions of this Reorganization Agreement, in the amount of $25,000,000,000 (twenty-five billion pesos).

d.- The Financing Commitments must be formalized through a standardized binding document, the format of which shall be sent to each creditor by the Auditor, prior to the Deliberative Meeting, which must be delivered by the respective creditor to the Bankruptcy Administrator. The procedure for formalizing this commitment shall be reported by the Auditor prior to the Deliberative Meeting, which in any case must be consistent with the procedure described in Letter c), Number 1, **Chapter VIII** of this Agreement.

e.- Within 60 calendar days after the date of entry into force of the Reorganization Agreement, an Extraordinary Shareholders Meeting must be held, to which the following will be submitted for Shareholder consideration:

i.- A single capital increase, through the issuance of new shares, to allow fulfillment of the following:

- Issuance of the necessary shares to support the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds;

- Issuance of shares needed to be able to grant the Option to Shareholders; and

- Issuance of payment shares for up to an additional $10,000,000,000.- (ten billion pesos), as a mechanism to protect against cash flow needs, the conditions of which (including their placement price) may be set by the board within the legal deadlines (hereinafter the "***Reserve Shares***"), a part of which may be allocated to compensation plans for workers of the Company and its subsidiaries, in accordance with the terms set by the Board (hereinafter the "***Stock Option***").

ii.- Issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds identified previously in this Reorganization Agreement.

iii.- Any other matters that may be necessary to submit for consideration of the Shareholders at the aforementioned Meeting, for correct implementation of this Agreement.

4.- In all cases, the number of shares into which the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds may be converted pursuant to this Agreement were set in order to fulfill the condition that current Company shareholders not reduce their equity stake in Enjoy to a percentage less than 10% after converting all the aforementioned bonds. However, this minimum of 10% falls exclusively within the context of the Judicial Reorganization of Enjoy, and therefore is not applicable in the event that Enjoy, after completing the Reorganization, requires new capital, in which case the shareholders and their dilutions (if applicable) shall be subject to the specific conditions of said new capital increase or financing.

## XI.  ADMINISTRATION.

The administration of Enjoy shall be exercised by the current entities that have established its bylaws,

NELSON CONTADOR
ABOGADOS & CONSULTORES

Presentation version 8/8

during the term of this Agreement.

Without prejudice to the above, and as set forth in Article 69 of Law No. 20,720, it is proposed that the creditors at the Deliberative Meeting appoint a Bankruptcy Administrator with the authority indicated below and for the term set forth in the aforementioned provision. The latter's fees shall be set by the Creditors Commission, which shall be regulated below, together with the Debtor Company.

## XII. RENEWAL OF GUARANTEE VOUCHERS (*BOLETAS DE GARANTIAS*).

1.- With a view to guaranteeing to the Superintendency of Gambling Casinos fulfillment of the technical offer; construction and development [of] the plans in timely and appropriate fashion at the Coquimbo, Viña del Mar, Puerto Varas and Pucón casinos; and finally, complete fulfillment of the economic offer contained in the tender proceedings carried out by the regulatory authority, in 2018 the banks Banco BTG Pactual Chile, Banco Internacional and Banco Security issued Guarantee Vouchers for approximately UF 4,800,000.0 (four million, eight hundred thousand Unidades de Fomento) in favor of Casino de la Bahía S.A., Casino del Mar S.A., Casino de Lago S.A. and Casino de Puerto Varas S.A. Part of said Guarantee Vouchers are secured by insurance policies issued by CESCE Chile Aseguradora S.A.

2.- All guarantee vouchers – which are not secured by the security policies referenced above – and the obligations under said policies are, in turn, guaranteed (i) by the endorsement, joint and several surety and joint and several co-debt of Enjoy; (ii) by a mortgage on a property owned by an Enjoy S.A. subsidiary located in the city of Castro; (iii) by time deposits pledged in guarantee, totaling approximately $32,000,000,000 (thirty-two billion pesos), taken by Enjoy S.A. in favor of the Banks, which securities are in the possession of Banco BTG Pactual Chile, as the agent bank for the bank syndicate and as guarantee agent.

3.- On July 14, 2020, the Administration and issuers of the aforementioned guarantee vouchers entered into new agreements for renewal of the aforementioned vouchers and policies, and agreed to the conditions for the release of the aforementioned security deposits, subject to the meeting of certain milestones, including the granting and subsequent recording of a mortgage on certain properties owned by an Enjoy subsidiary located in the commune of Rinconada de Los Andes, corresponding to fourteen lots (together the "**Rinconada Property**").

4.- Release of the security deposits is subject to fulfillment of the following conditions:

**a.- For the release of $5,200,000,000 (five billion, two hundred million pesos):** When all the following conditions are found to be met: (i) Authorizations have been obtained from Enjoy creditors pursuant to Article 74, Section Two of Law No. 20,720, and with regard to local bondholders and, in addition, the latter have approved all the matters stipulated in Letters c) and d) of the convocation of the bondholders meeting, the first notice of which was published June 27, 2020, to be held July 13 at 12 noon; (ii) all parties have signed the mortgage agreement and restrictions on the Rinconada Property in favor of Banco BTG Pactual

36

Presentation version 8/8

Chile, as guarantee agent, together with all the Loan Documentation, as this term is defined below to the satisfaction of the financers; and (iii) complete payment of the premium or premiums corresponding to the guarantee insurance policy. These conditions have already been met, and therefore these deposits were released on July 14;

**b.- For the release of $18,600,000,000 (eighteen billion, six hundred million pesos)**

i.-     $9,300,000,000 (nine billion, three hundred million pesos) will be released when the following three conditions together are met:

- When the Court certifies that the Debtor Company's Judicial Reorganization Agreement is approved pursuant to Article 89 of Law No. 20,720 and that it may be fulfilled and begin to apply in accordance with Part Four of said article.

- That said Judicial Reorganization Agreement incorporates and agrees to the following matters: (a) Complete restructuring of the Enjoy international bond; and (b) Capitalization of at least 70% of the unsecured loans verified in the reorganization procedure, with a minimum of $115,000,000,000 (one hundred fifteen billion pesos); and c) That the text of the approved Reorganization Agreement includes statements aimed at confirming and expressly ratifying (c.i) all loans granted; (c.ii) the restructuring of liabilities; and (c.iii) transactions between the banks, Banco BTG Pactual Chile, Banco Internacional and Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos and their administered funds, including but not limited to BTG Pactual Deuda Privada Fondo de Inversión [Private Debt Investment Fund] and its respective subsidiaries and other related parties, with Enjoy and its subsidiary companies, in the two years prior to the start of the Judicial Reorganization Procedure, leaving confirmation in the text of the agreement of the withdrawal and final waiver by the creditors of all judicial or other types of actions seeking to dispute or question the efficacy and/or enforceability of the acts and agreements executed or entered into to which Points (c.1), (c.ii) and (c.iii) above refer, and the conditions noted in letter c) above, that have not been subject to dispute.

  In fulfillment of the above terms and conditions, by means of this Agreement, the matters to which Points (c.1), (c.ii) and (c.iii) above refer are expressly confirmed and ratified. Further, by means of this Agreement, the Creditors confirm the withdrawal and final abandonment of any judicial or other type of action that might seek to dispute or question the efficacy and/or enforceability of the instruments and agreements executed or entered into to which Points (c.1), (c.ii) and (c.iii) above refer.

NELSON CONTADOR
ABOGADOS & CONSULTORES

Presentation version 8/8

- For purposes of the above, and without prejudice to the fact that the Bondholders Meeting held July 13 of this year approved and ratified the validation of the aforementioned deals, among other matters, the creditors present at this Deliberative Meeting expressly confirm and ratify (i) all grants of loans; (ii) the restructuring of liabilities; and (iii) arrangements entered into or executed between the banks, Banco BTG Pactual Chile, Banco Internacional and Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos, and their administrated funds, including but not limited to BTG Pactual Deuda Privada Fondo de Inversión and their respective subsidiaries and other related parties, with Enjoy and its subsidiary companies, in the two years before the start of the Judicial Reorganization Procedure, and have stated that they expressly waive the exercise of any judicial or other type of action seeking to dispute or question the efficacy and/or enforceability of the acts and agreements executed or entered into to which Points (i), (ii) and (iii) above refer, or request their revocation.

- The effective disbursement of at least $25,000,000,000 (twenty-five billion pesos) under the New Financing granted to Enjoy, by one or more creditors, effectively incorporating said amount into the company's coffers.

ii.- $9,300,000,000 (nine billion, three hundred million pesos) will be released when the above conditions, together, have been met and the specific mortgage and restrictions set on the Rinconada Property have been legally recorded in favor of the Agent Bank, as creditor and guarantee agent, in the respective Real Estate Registry.

**c.- For the release of $8,300,000,000 (eight billion, three hundred million [pesos]):** Having fulfilled each and every one condition, together, mentioned previously in Parts a.- and b.- above, the procedure shall be: (a) The release of $4,150,000,000 (four billion, one hundred fifty million pesos), against the effective incorporation into Enjoy's coffers of at least another $10,000,000,000 (ten billion pesos) in addition to the $25,000,000,000 (twenty-five billion pesos) referenced previously; (b) The release of $4,150,000,000 (four billion, one hundred fifty million pesos) against the effective incorporation into Enjoy's coffers of at least another $5,000,000,000 (five billion pesos) in addition to the $25,000,000,000 (twenty-five billion pesos) and $10,000,000,000 (ten billion pesos) mentioned above.

**d.- For the release of the mortgage and restrictions on the Rinconada Property:** This may only be released as of month 18 after the date of issuance of the respective guarantee vouchers and/or policies, subject to certain conditions noted in the respective financing documents signed on the occasion of the issuance of the new guarantee vouchers, including that the decision approving the Judicial Reorganization Agreement be final and enforceable.

### XIII.    OBLIGATIONS TO DO AND NOT DO.

As set forth in **Chapter IV**, the obligations to do and to not do shall be maintained vis-à-vis the International Bondholders as contained in the **Indenture** – with the changes described in **Appendix No. 1** with respect to the New International Bonds. In turn, the following obligations to do and not do shall be established exclusively vis-à-vis the rest of the Creditors enrolled in this Agreement:

1**.- Obligations to Do**.

a.- To carry out or cause to carry out all necessary measures to preserve and maintain in full force and effect its corporate existence and validity, without altering its corporate form, including its status as publicly traded, limited-liability corporation, registered with the Securities Registry maintained for these purposes by the CMF and, in addition, including but not limited to, its dissolution or transformation, without incurring legal grounds for dissolution; as well as to preserve and maintain all rights, properties, licenses, trademarks, permits, exemptions, easements, concessions or patents that may be necessary for the normal functioning of the Debtor Company and the development of its business operations; and to maintain all its relevant assets in good state of repair consistent with their natural use and wear and tear.

b.- To pay all taxes and other applicable tax obligations as well as those of a labor-related origin or other preferential payments in accordance with current law, except those that may be disputed in good faith and in accordance with the appropriate legal procedures.

c.- To fulfill in all aspects the laws, regulations and provisions and applicable orders, specifically including, without restriction, the timely payment of all taxes, contributions, encumbrances and tax charges of any other kind affecting the Debtor Party or its assets, and to fulfill any tax, labor, social security and environmental obligations that may apply thereto in a timely fashion, as applicable, except those with respect to which the appropriate legal appeals have been filed in good faith.

d.- To provide the Bankruptcy Administrator with all additional financial and/or accounting information that might be requested thereby.

e.- To ensure that, at all times, its obligations under this Reorganization Agreement have at least the same prevalence and payment priority under the law as its remaining payment obligations, current or future, to other creditors of the same class, in accordance with the law. The above is without prejudice to the preferences set forth in this Reorganization Agreement.

f.- To complete, sign, execute and enter into any instruments and agreements to afford complete fulfillment of the Reorganization Agreement, as required of it by the Bankruptcy Administrator.

2.- **Obligations to Not Do**.

39

Presentation version 8/8

a.- Grant loans or credits or any type of financing to third parties, excluding subsidiaries, except in the case of financing within the Issuer's ordinary course of business, which must at all times and under all circumstances be carried out under market conditions.

b.- Enter into transactions with Related Parties, without fulfillment of the provisions of Title XVI of the Chilean Corporations Act [*Ley de Sociedades Anónimas*]. For all due purposes, "transactions with related parties" shall be understood as those defined as such in Article One Hundred Forty-Six of the Corporations Act, or that which may modify or replace it in the future.

c.- As of the date of the Deliberative Meeting approving the Proposal, to establish itself as endorser, guarantor, joint and several co-debtor or to commit its equity to fulfill third-party obligations, unless said third parties are subsidiaries of the Issuer.

## XIV. APPROVAL AND VALIDITY OF THE AGREEMENT.

1.- Pursuant to Art. 89 of Law 20,720, this Agreement shall be understood as approved and shall enter into force provided that:

a.- Upon expiration of the period for disputing it, without its having been disputed, the competent court so declares it at its own behest or at the petition of any interested party of the Auditor.

b.- If it has been disputed and the disputes are dismissed, provided that the resolution dismissing the dispute or disputes is enforceable and the Agreement is declared approved.

c.- If it had been disputed and the disputes were filed by creditors of a specified class or category, representing less than 30% of the liabilities with right to vote in their respective class or category and the court so states.

2.- The Reorganization Agreement shall be valid until the last of the following dates: (i) (a) the expiration date of the conversion period of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bond or (b) the date when all Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds have been converted, whichever occurs first, in the event that this latter event occurs before expiration of the aforementioned conversion period, and (ii) the date of occurrence of the exchange of the International Bonds for the New International Bonds.

## XV. CREDITORS COMMISSION.

1.- To oversee fulfillment of the stipulations of the Judicial Reorganization Agreement and the actions of the Company's Administrative Entities, a Creditors Commission is appointed (non-remunerated, except as noted further below), consisting of five acting members and their respective alternates (one for each acting member of the Creditors Commission), who shall exercise their duties so long as this Agreement remains in force. The Creditors

40

Commission shall consist of two representatives of the International Bondholders, two representatives of the domestic bondholders and a fifth member, not a creditor nor a creditor representative, and its respective alternate, who shall be elected by the remaining members of the Creditors Commission at its first session, at which remuneration may also be set. Each creditor mentioned above shall be entitled to remove their representative from the Creditors Commission and appoint a replacement. The four acting members and alternates of the Creditors Commission who shall be creditor representatives shall be elected at the Creditors Meeting, respectively, by the International Bondholders (two acting members and two alternates) and domestic bondholders (two acting members and two alternate members).

2.- Members of the Creditors Commission shall be required to maintain absolute secrecy over all information that is confidential by nature of its content and must refrain from disclosing it to any person or entity. To this end, they must sign a Confidentiality Agreement containing the obligation set forth above.

3.- The Commission shall set its form [of] functioning and determine the frequency of its meetings. There shall be acting and alternate members. Nevertheless, the management of the Debtor Company or the Bankruptcy Administrator, as the case may be, may request that the Creditors Commission meet to hear and decide upon specific matters. To this end, a certified letter shall be sent to the domicile of the legal representative of the respective members of the Creditors Commission or to their email addresses (registered at the first organizational session of this Commission), at least seven banking days in advance, requesting a meeting and noting the topics to be consulted or discussed. The resulting convocations must have at least two business day's difference between the first and second convocations. If, at the latter's request, the Creditor's Commission does not meet, having issued the two consecutive convocations, the corresponding authorizations shall be requested of the competent Court.

4.- As to quorums for sessions and majorities to approve resolutions, the Creditors Commission shall meet with the participation of a simple majority of its members (at least three) and resolutions shall be adopted by simple majority of its members attending the respective session (at least two), except with regard to the Renegotiation Conditions, Rescheduling Conditions and/or Financing Condition or the matters noted in Numbers 6.g and 6.j below, for which a quorum of attendance of at least 4 (four) of its members and a majority of at least four of those in attendance shall be required to approve resolutions.

5.- The Creditors Commission shall appoint a Chair thereof, which shall have the following powers:

a.- To convene the Commission members to meet, at the request of any Commission Member, the Bankruptcy Administrator or the Debtor Company.

b.- To convene the Creditors Meeting in all cases that the Commission deems necessary or appropriate.

c.- To communicate to the Debtor Company the decisions adopted by the Creditors Commission.

Presentation version 8/8

6.- The Creditors Commission shall have the following powers:

a.- To remove and replace the Administrator and request from it such information and actions as it deems relevant.

b.- To set the fees of the Administrator with regard to its administration activities as such. Said fees must be adapted to current market remuneration, in accordance with the complexity and responsibility of the position and the Company's payment capacity.

c.- To hear the background information provided by the Administrator, in particular the account of its management, the frequency of which shall be determined by the Commission.

d.- To provide the authorizations set forth in this Reorganization Agreement.

e.- To replace the Chair and/or Vice Chair of the Creditors Commission.

f.- To request the Debtor Company, through the Administrator's intermediation, for information on the regular course of business and its operations, plans and programs.

g.- Pursuant to Part Two, Art. 83 of Law 20,720, the Creditors Commission may amend all or part of the contents of the Reorganization Agreement, except with respect to the capacity of creditor, its class or category, differences between creditors of the same class or category, the amount of their loans and their preference. It is set forth that any modification to the rights of the International Bondholders under the Indenture or the New Indenture shall require the modification of said agreement, as applicable, with the prior consent of the Company and of the International Bondholders under the rules of the Indenture or the New Indenture.

h.- To authorize Enjoy, on an extraordinary basis, to not fulfill a specific obligation to do and/or to not do under this Reorganization Agreement.

i.- In representation of the creditors, to justifiably waive fulfillment of any of the conditions established to its benefit in the Agreement (subject to the respective quorum set in this Agreement), or to approve its fulfillment in a form other than that originally agreed to or to temporarily suspend its application.

j.- In the event that the Renegotiation Conditions stipulated in **Chapter IV**, or the Financing Conditions contained in **Chapter VIII** of this Reorganization Agreement are not fulfilled, the Creditors Commission shall analyze and identify a mechanism that permits implementing renegotiation of the International Bonds in accordance with the terms stipulated in the aforementioned **Chapter IV** or, as the case may be, shall approve the appropriate formula for obtaining temporary financing, with the ability to agree with the Debtor Company on the

42

terms and other conditions of this financing. These matters must be approved by at last four members of the Commission, who shall also set the terms for fulfilling execution of the instruments and agreements necessary for implementing and developing the aforementioned Creditor actions.

k.- To approve the Plan for the Use of Funds from the New Financing in general, with the Debtor Company to retain the allocation and specific responsibility for its implementation, the fulfillment of which will be supervised by the Administrator.

l.- Such other powers as this Agreement grants thereto.

## XVI. BANKRUPTCY ADMINISTRATOR.

1.- Without prejudice to the formation of a Creditors Commission, and as set forth in Article 69 of Law 20,720, it is proposed that the Deliberative Creditors Meeting appoint an Administrator (hereinafter the '***Bankruptcy Administrator***" or '***Administrator***"), who shall exercise their duties so long as this Agreement remains in force, and shall have the powers set forth in the aforementioned article and those stipulated below.

2.- This appointment must fall to a current auditor from the List of Auditors registered with the Chilean Insolvency and Recovery Superintendency (*Superintendencia de Insolvencia y Reemprendimiento)*.

3.- Without prejudice to the powers corresponding thereto under Article 294 of the Chilean Civil Procedures Code [*Código de Procedimiento Civil*], it is proposed that the appointed Bankruptcy Administrator have the following powers:

a.- Have access to the offices and facilities of the Debtor Company to request all the latter's accounting, financial and commercial information, in order to verify or monitor due fulfillment of the obligations assumed in this Reorganization Agreement.

b.- Inform the Creditors Commission of any background information or transaction executed by the Debtor Company that might affect normal servicing of the debt assigned to this Agreement.

c.- Regularly (at least monthly) inform the Creditors Commission of the revenue and expenses of the Debtor Company, and in particular its operational efficiency and expenses and its payment of suppliers.

d.- Draw up minutes of the Commission's meetings.

e.- Approve all payments made for debt service.

f.- Undertake confirmation as to the balance of the loans assigned to this Reorganization Agreement and determine the priority of the payments.

43

Presentation version 8/8

g.- Authorize the Debtor Company to grant personal or real guarantees to secure own and/or third-party obligations, in cases other than those already permitted under this Agreement, when linked to the Company's operations.

h.- Fulfill and execute all powers and obligations set forth in this Reorganization Agreement and those assigned thereto by the Creditors Commission.

i.- Regularly (at least monthly) inform the Creditors Commission as to the use of the funds originating from the Bridge Loan.

j.- Such other powers as are granted thereto in this Reorganization Agreement.

## XVII. NON-COMPLIANCE.

1.- Pursuant to Articles 98 and thereafter of Law 20,720, any creditor to which this Agreement is applied may request a declaration of non-compliance, in the event of failure to comply with the stipulations of this Agreement, and/or in the event that the poor condition of the Debtor Company's businesses has been aggravated in such a way as to cause said creditors fear of loss.

2.- It shall be an express cause for violation of the Reorganization Agreement, if the Financing Commitments do not exceed $25,000,000,000 (twenty-five billion pesos). Should said violation occur, Enjoy must immediately request its own voluntary liquidation.

3.- The following events shall be express causes for violation of the Reorganization Agreement (and a "Bankruptcy Law Event of Default" under the New Indenture): (i) that the extraordinary shareholders meeting for capital increase is not held [as] indicated in **Chapter X** above within 60 days after the date of the Deliberative Meeting; (ii) that at the aforementioned extraordinary shareholders meeting not all proposed matters are approved; (iii) that Enjoy does not sign each bond issuance agreement within 90 days after the date of the Deliberative Meeting; (iv) that Enjoy does not request that the CMF record the respective bonds on the Securities Registry within 120 days after the date of the Deliberative Meeting; (v) that Enjoy does not obtain from the CMF the recording of the respective bonds in the Securities Registry within one year after the date of the Deliberative Meeting; (vi) that Enjoy does not initiate the Preferential Offer Period within 30 business days after the deadline for effecting the recording in the CMF Securities Registry of the issuances of convertible bonds and shares; and (vii) that Enjoy does not undertake prepayments of the respective bonds on the dates set in this Agreement. Should any of the above events transpire, Enjoy must immediately request its own voluntary liquidation.

4.- Moreover, the Creditors may also individually exercise any actions conferred thereon by the law to obtain complete repayment of their loans, all within the framework of this Reorganization Agreement, except in the case of the shares of the International Bondholders under the Indenture, which shall be freely exercised without being subject to this Agreement as explained in Chapters IV and XVIII.

44

Presentation version 8/8

## XVIII. GUARANTEES.

Enjoy's obligations under the **Indenture** and the **International Bonds** are ratified, and therefore all real and personal guarantees established in these documents are maintained, ratified and reserved, in all their parts, to guarantee payment of the Indenture obligations, including but not limited to during the Extension of the International Bonds. Further, said real and personal Guarantees shall guarantee all Enjoy's obligations under the New Instruments, and the documents that may be required under Chilean and Uruguayan law for the due reserve, ratification and maintenance of the same must be granted, or for the creation of new guarantees in accordance with terms substantially identical to the current ones.

By means of this instrument, or rather, through a Public Instrument of Declaration (hereinafter the "*Declaration Instrument*"), forwarded to the 8th Civil Court of Santiago, in Case C-6,689-2020, before holding the Deliberative Meeting, Enjoy Gestión Limitada., Inversiones Enjoy SpA, Inversiones Inmobiliarias Enjoy SpA., Enjoy Consultora S.A., Inversiones Andes Entretención Limitada., Inmobiliaria Proyecto Integral Coquimbo SpA, Operaciones Integrales Coquimbo Limitada, Inmobiliaria Kuden SpA, Campos del Norte S.A., Enjoy Caribe SpA, Inmobiliaria Proyecto Integral Castro SpA, Slots S.A., Masterline S.A., Kuden S.A., Operaciones Turísticas S.A., Operaciones Integrales Isla Grande S.A., Rantrur S.A., Casino de Iquique S.A., Casino de la Bahía S.A., Casino del Mar S.A., Casino del Lago S.A., Casino de Puerto Varas S.A., Yojne S.A. and Baluma S.A. (hereinafter jointly the "*Guarantors*"), represented by the legal representatives Messrs. Esteban Rigo-Righi Baillie, RUT No. 13.454.480-5 and Rodrigo Larraín Kaplan, RUT No. 10.973.139-0, appear and expressly represent that they are acceding to Enjoy's obligations under the Indenture, this Agreement and the New Instruments, and expressly represent that the pledges, mortgages, trusts and joint and several co-debts established thereby as set forth in the terms noted in the Indenture, as applicable, shall also be extended to the obligations of the Debtor Company under the Indenture, this Agreement and the New Instruments, as set forth in this Agreement.

Additionally, by means of this instrument or through the Declaration Instrument, Inmobiliaria Proyecto Integral Coquimbo SpA and Inmobiliaria Kuden SpA, represented by their legal representatives Messrs. Esteban Rigo-Righi Baillie and Rodrigo Larraín, appear and represent that they will expressly accede to Enjoy's new obligations under the Indenture, this Agreement and the New Instruments herein agreed to. Further, pursuant to Article 1,642 of the Chilean Civil Code [*Código Civil*], Inmobiliaria Proyecto Integral Coquimbo SpA, Inmobiliaria Kuden SpA and the Debtor Company, all of them represented by the legal representatives Messrs. Esteban Rigo-Righi Baillie and Rodrigo Larraín Kaplan, and the International Bondholders expressly agree to the reserve of the mortgages established by Inmobiliaria Coquimbo SpA and Inmobiliaria Kuden SpA, to the benefit of the International Bondholders.

To remove all doubt, real and personal guarantees covering Enjoy's obligations under the Indenture and the International Bonds, reserved and ratified by means of this instrument or through the Declaration Instrument, are extended and accede to the total payment of Enjoy's debt to the International Bondholders, under either this

NELSON CONTADOR
ABOGADOS & CONSULTORES

Presentation version 8/8

Agreement, the current International Bonds, the Indenture and its Security Documents, or the New Indenture and New International Bonds in the event that the exchange provided for in **Chapter IV** is carried out, extending in all cases to the successive extensions, renegotiations or substitutions of said loans, as expressly accepted by the appearing guarantors.

The Guarantors, represented in the form set forth above, undertake to sign all instruments, agreements and documents that may be necessary or appropriate for the implementation of this Reorganization Agreement, including on or before the exchange of the International Bonds by the new Instruments and as a condition for said exchange, the granting of public instruments of reserve and ratification of the Guarantees, and the granting of the corresponding corporate authorizations, to the satisfaction of the International Bonds Trustee.

In the event that the International Bonds Trustee believes that, for any of the Guarantees, it is more beneficial for the International Bondholders to be granted new guarantee agreements applying to those same assets, moveable or real, in place of the ratification and reserve of existing ones, the Guarantors shall sign all instruments, agreements and documents that may be necessary or appropriate for the implementation of those new guarantees, under terms substantially identical to those of the current Guarantees, and the exchange condition shall be understood as fulfilled upon granting the new guarantees to the satisfaction of the International Bonds Trustee.

## XIX. FORMAL RECORDING REQUIREMENTS AND OTHER STIPULATIONS.

1. As set forth in Article 90 of Law 20,720, a copy of the minutes of the Creditors Meeting declaring a vote in favor of the Agreement and its complete text, and a copy of the court resolution approving it and its execution certificate, may be authorized by a certifying officer or be notarized by a notary public. Without prejudice to the above, the Debtor Company shall be required to sign the new instruments documenting the terms of this Agreement.

2.- This Reorganization Agreement, duly approved, shall have the effect of immediately terminating all pending judgments or of preventing the filing of legal actions of various kinds, whether civil, commercial or other, including but not limited to judgments of notification of collection of invoices, judgments of notification of protest of check, complaints for fraudulent passing of checks and/or enforcement judgments of any kind, which have been filed against the Debtor Company or its joint and several co-debtors, endorsers or guarantors, by the creditors to whom this Reorganization Agreement applies pursuant to Article 66 of Law 20,720.

3.- To this end, an authorized copy of the resolution approved by the Reorganization Agreement shall serve as timely and sufficient official notice to request the corresponding Court to call for termination of the judgment and the lifting of attachments, precautionary measures and any encumbrances of various kinds. All the above is without prejudice to the direct instruction sent electronically for this purpose by the Court convened to hear this Proposal, requesting termination of the procedures and the respective lifting.

46

The Agreement now starting to apply shall have the same effect as indicated in the preceding paragraphs notwithstanding any disputes by creditors representing fewer than 30% of the liabilities with right to vote in their respective class or category, as provided for in Part Four, Article 89 of Law 20,720. For purposes of determining the percentage stipulated above, a certification must be executed by the Secretary of this Court.

4.- The creditors of the Debtor Company that have published their delinquent receivables in the respective registries maintained by various institutions, whether public or private, such as DICOM EQUIFAX, the *Boletín Comercial* published by the Chile Chamber of Commerce, the delinquency registry of the Financial Market Commission, and in general any existing registry of delinquencies in our country, hereby authorize the Debtor Company to request the elimination of all records of delinquencies and in general any publication related to this purpose, with regard to receivables prior to the Reorganization Resolution and those subsequent thereto concerning previously assumed loans.

Further, the creditors hereby undertake to not request new publications with respect to the loans forming part of this Reorganization Agreement, so long as the Debtor Company is current with fulfillment of its obligations under this Agreement.

The background information specified in the first number of this Chapter shall serve as timely and sufficient official notice for purposes of requesting elimination of the publications referenced previously.

5. The creditors and the Debtor Company set forth that after fulfillment of the Financing Condition, the restriction set forth in Article 67 of Law No. 20,720 shall not apply, without prejudice to the contractual restriction on effecting capital reductions under the New Indenture.

## XX.  REPRESENTATIONS AND ASSURANCES ON THE DATE OF THIS JUDICIAL REORGANIZATION AGREEMENT.

The Debtor Company, duly represented in the form stipulated in the body of this instrument, on this date, represents and assures the following to each Creditor of this Judicial Reorganization Agreement:

1.- That it is a corporation duly organized and current under the laws of Chile and that both the entering into of this Judicial Reorganization Agreement, and the fulfillment and execution of all the obligations contained therein fall within the legal and corporate powers that have been approved by its competent administrative entities; and that the parties appearing in this Judicial Reorganization Agreement on its behalf have sufficient power and authority as to enter into this Reorganization Agreement and to fulfill the obligations assumed therein.

2.- That entering into this Judicial Reorganization Agreement does not require the approval or authorization of any additional government or judicial authority whatsoever, nor of third parties, except those already obtained

47

Presentation version 8/8

and that remain current, and that it has no information or knowledge that entering into and fulfilling this Judicial Reorganization Agreement violates or contravenes current laws, regulations or resolutions, nor its respective bylaws. The above is without prejudice to any approvals and/or authorizations and/or procedures that may be required by reason of implementation of this Agreement, pursuant to /**i**/ the bylaws of Enjoy; /**ii**/ Law 18,046 on Corporations and its Regulation; /**iii**/ Law 18,045 on the Securities Market and related regulations decreed by the Financial Market Commission; /**iv**/ DL [Decree-Law] 211 setting the regulations for the protection of Free Trade; /**v**/ Law No. 19,995 establishing the general bases for the authorization, functioning and monitoring of gambling casinos; /**vi**/ regulations issued by the Chilean Superintendency of Gambling Casinos; and /**vii**/ the applicable regulations and laws in Uruguay and Argentina.

3.- That this instrument constitutes legal, valid, necessary, enforceable, mandatory and sufficient documentation for its collection, and in any collection action involving the obligations under this Judicial Reorganization Agreement, it will recognize this instrument as sufficient for their collection.

4.- No waiver of any provision of this Judicial Reorganization Agreement, nor the consent for the Debtor Company to act differently therefrom, shall have any effect whatsoever unless granted in writing and signed by the Creditors Commission in this Judicial Reorganization Agreement, and in said case that waiver or consent shall have effect only in the specific case and for the specific purpose for which it has been granted. In all cases, any changes to this Judicial Reorganization Agreement must adhere to and comply, in all applicable aspects, with the stipulations contained in this instrument.

5.- The provisions of this Judicial Reorganization Agreement shall be mandatory for and extended to the benefit of the Parties and their respective legal successors and assigns.

6.- The names signed by the Parties for the various stipulations of this Reorganization Agreement have been established solely for reference and ease of reading, without affecting the meaning or scope of the entire clause which might differ from said name.

## XXI. DOMICILE AND COMPETENT JURISDICTION.

The special domicile of the Agreement shall be the city of Santiago, and therefore the decision as to any difficulty that might arise in any of the classes or categories of this Agreement shall be submitted to the competency of its ordinary courts, without excluding the possibility that the International Bondholders might resort for fulfillment of the Indenture to the corresponding jurisdictions under this agreement.

Versión Presentación 08-08



## ACUERDO DE REORGANIZACIÓN JUDICIAL

**ENJOY S.A.**



Procedimiento Concursal de Reorganización Judicial

8° Juzgado Civil de Santiago, causa Rol C-6.689-2020

Junta Deliberativa de Acreedores

Santiago, 14 de agosto de 2020.

1

Versión Presentación 08-08

**NELSON**CONTADOR
A B O G A D O S  &  C O N S U L T O R E S

# ÍNDICE

I.      ANTECEDENTES DE LA EMPRESA DEUDORAPROPONENTE. ................................................... 3

II.     ACREEDORES AFECTOS AL ACUERDO DE REORGANIZACIÓN. ........................................... 3

III.    DESARROLLO DEL OBJETO DEL ACUERDO. ............................................................................ 4

IV.     PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES GARANTIZADOS............. 4

V.      PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES VALISTAS. .................... 11

VI.     PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES BANCARIOS.................. 19

VII.    PROPUESTA DE PAGO DE CAPITAL A ACREEDORES PROVEEDORES. .................................. 22

VIII.   NUEVO FINANCIAMIENTO. .................................................................................................... 22

IX.     OPCIÓN DE SUSCRIPCIÓN CONDICIONAL DE ACCIONES A ACTUALES ACCIONISTAS. ....... 31

X.      MODALIDAD JURIDICA PARA LOS PROCESOS DE FINANCIAMIENTO Y CONVERSIÓN........ 31

XI.     ADMINISTRACIÓN. ................................................................................................................. 34

XII.    RENOVACIÓN DE BOLETAS DE GARANTIAS. ........................................................................ 35

XIII.   OBLIGACIONES DE HACER Y NO HACER. ............................................................................ 38

XIV.    APROBACIÓN Y VIGENCIA DEL ACUERDO. .......................................................................... 39

XV.     COMISIÓN DE ACREEDORES. ................................................................................................ 39

XVI.    INTERVENTOR CONCURSAL. ................................................................................................. 42

XVII.   INCUMPLIMIENTO. ................................................................................................................ 43

XVIII.  GARANTÍAS. ........................................................................................................................... 44

XIX.    FORMALIDAD Y OTRAS ESTIPULACIONES. .......................................................................... 45

XX.     DECLARACIONES Y SEGURIDADES A LA FECHA DE ESTE ACUERDO DE REORGANIZACIÓN

JUDICIAL. ........................................................................................................................................ 46

XXI.    DOMICILIO Y JURISDICCIÓN COMPETENTE. ....................................................................... 47



## ACUERDO DE REORGANIZACIÓN JUDICIAL
## ENJOY S.A.

### I.    ANTECEDENTES DE LA EMPRESA DEUDORA PROPONENTE.

| | |
|---|---|
| **1.- Razón social** | : ENJOY S.A. |
| **2.- R.U.T.** | : 96.970.380-7. |
| **3.- Domicilio** | : Avenida Presidente Riesco N° 5.711, piso 15, comuna de Las Condes, Región Metropolitana. |
| **4.- Constitución** | : Constituida mediante escritura pública de fecha 23 de octubre de 2001. Con fecha 9 de junio del año 2009 la Sociedad fue inscrita en el Registro de Valores, de la Comisión para el Mercado Financiero (CMF) bajo el N° 1033. |

### II.   ACREEDORES AFECTOS AL ACUERDO DE REORGANIZACIÓN.

Para los efectos del presente Acuerdo de Reorganización Judicial, se consideran acreedores (en adelante, indistintamente, los "*Acreedores*") todos los titulares de créditos directos en contra de **ENJOY S.A.** (en adelante, indistintamente, "*Enjoy*", la "*Empresa Deudora*" o la "*Compañía*"), cuyo origen sea anterior a la Resolución de Reorganización, conforme lo dispone el artículo 66 de la Ley Nº 20.720. Los créditos que se originen con posterioridad a la Resolución de Reorganización se pagarán en los términos y plazos convenidos.

De conformidad a lo dispuesto en el artículo 61 de la citada ley concursal, este Acuerdo de Reorganización Judicial (en adelante, indistintamente, "*Acuerdo de Reorganización*", "*Acuerdo*" o la "*Propuesta*"), contiene una propuesta de reestructuración y pago para los acreedores garantizados, que corresponden a los Tenedores de Bonos Internacionales (según dicho término se define más adelante), una propuesta de reestructuración y pago para los acreedores valistas, excluyendo a los acreedores que son sociedades relacionadas que pertenecen al grupo de empresas de Enjoy S.A. (en adelante, los "*Acreedores Valistas*"), una propuesta de pago especial para los acreedores valistas bancarios (en adelante los "*Acreedores Bancarios*") y una propuesta de pago especial para los acreedores valistas que forman parte de los proveedores de bienes y servicios de Enjoy (en adelante, los "*Proveedores*") en los términos que se indican en los capítulos siguientes.

De acuerdo a lo previsto en el artículo 63 de la Ley Nº 20.720, los créditos que posean las empresas relacionadas que pertenecen al grupo de empresas filiales de Enjoy S.A., quedarán pospuestos en su pago, hasta que termine la vigencia del presente Acuerdo de Reorganización. No obstante lo anterior, se podrán realizar todos los pagos a las empresas relacionadas que correspondan al normal desarrollo operacional que realiza Enjoy con sus filiales.

3

Versión Presentación 08-08

## III.  DESARROLLO DEL OBJETO DEL ACUERDO.

El Acuerdo de Reorganización tendrá el siguiente objeto y contenido:

1.- La continuación efectiva y total del giro de las actividades comerciales de **ENJOY S.A.,** a contar de la fecha de presentación de esta Propuesta, con el objeto de dar cumplimiento a una modalidad de pagos acorde a sus flujos proyectados, recuperando el nivel operacional de la Compañía y la disposición para el pago de sus obligaciones.

2.- El otorgamiento de nuevas condiciones para el pago de la totalidad de los créditos afectos al Acuerdo de Reorganización, bajo las modalidades que se indican en el presente instrumento;

3.- Una reducción del nivel de endeudamiento de la Compañía, mediante la conversión de, al menos, un 70% de la deuda valista en bonos convertibles en acciones de Enjoy, con un fuerte incentivo a la conversión.

4.- La obtención de recursos frescos para la Compañía por un monto de, aproximadamente, $50.000.000.000.- (cincuenta mil millones de pesos)[1], mediante el otorgamiento de créditos que serán prepagados con la emisión de un bono convertible en acciones de Enjoy, con un fuerte incentivo a la conversión.

## IV. PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES GARANTIZADOS.

Los acreedores garantizados son los tenedores de la deuda emitida bajo el instrumento denominado "*Indenture*", de fecha 16 de mayo de 2017, complementado por el instrumento denominado "*Supplemental Indenture No. 1*" de fecha 30 de mayo de 2017, celebrado entre la Compañía, como emisor, sus filiales garantes ("*Garantes*") y Citibank N.A. como Representante de los Tenedores de Bonos Internacionales o *Trustee*[2] (en adelante, el "*Indenture*"), relativo a los bonos garantizados con vencimiento al año 2022 (*10,50% Senior Secured Notes due to 2022*) que fueron colocados por la Compañía en los mercados internacionales al amparo de la Norma 144A y la Regulación S de la "*Securities and Exchange Commission*" (Comisión de Mercados y Valores) y de la "*Securities Act of 1933*" (Ley de Valores del año 1933) de los Estados Unidos de América (en adelante, los "***Bonos Internacionales***" y los tenedores de los mismos o sus beneficiarios finales los "***Tenedores de Bonos Internacionales***"[3]).

Según se explica más adelante, en virtud del Acuerdo los Bonos Internacionales serán prorrogados y, sujeto a las Condiciones de Repactación (según este término se define más adelante), repactados sin ánimo de novar, reflejándose dicha repactación en un nuevo Indenture, en nuevos bonos, y en los documentos de garantía necesarios para extender, ratificar y reservar las actuales

---

[1] En adelante, todas las referencias de cifras en pesos, se refieren a pesos chilenos.
[2] Conforme al documento denominado "Agreement of Resignation, Appointment and Acceptance" de fecha 9 de julio de 2020 celebrado entre la Compañía, UMB BANK, N.A. y CITIBANK, N.A., UMB BANK, N.A. fue designado como "Trustee" para efectos del Indenture.
[3] Después del intercambio de los Bonos Internacionales por los Nuevos Bonos Internacionales, los "Tenedores de Bonos Internacionales" significará los tenedores de los Nuevos Bonos Internacionales.

4



Versión Presentación 08-08

garantías de los Bonos Internacionales a la deuda prorrogada y restructurada (en adelante, el "**Nuevo Indenture**" y los "**Nuevos Bonos Internacionales**" y, en su conjunto los "**Nuevos Instrumentos**").

### 1.- Prórroga.

El vencimiento de los créditos afectos a este **Capítulo IV** se prorrogará por un plazo máximo de 90 días contado desde la fecha en que se celebre la Junta Deliberativa de Acreedores llamada a conocer y pronunciarse sobre la Propuesta (en adelante la "***Junta Deliberativa***"), salvo que con anterioridad a dicho plazo máximo llegue a ser cierto que las Condiciones de Repactación (según este término se define más adelante) no ser verificarán, en cuyo caso el plazo de la prórroga vencerá el día en que hayan fallado dichas condiciones (la "***Prórroga de los Bonos Internacionales***"), a menos que la Comisión de Acreedores resuelva mantener la Prórroga de los Bonos Internacionales según lo dispuesto en el **Capítulo XV** de este Acuerdo.

Mientras no se cumplan las Condiciones de Repactación, los Bonos Internacionales se mantendrán vigentes de acuerdo a sus términos originales (incluyendo los intereses devengados después de la solicitud de reorganización), los eventos de incumplimiento y los derechos y acciones existentes bajo el Indenture por eventos de incumplimiento existentes no serán renunciados; y las actuales garantías reales y personales de los Bonos Internacionales (en adelante las "***Garantías***") se mantendrán plenamente vigentes. Lo anterior es sin perjuicio que, mientras se encuentre vigente la Prórroga de los Bonos Internacionales, los Tenedores de Bonos Internacionales se comprometen a no ejecutar individual ni colectivamente procedimiento de ejecución alguno, en la medida que se encuentre pendiente la Condiciones de Repactación.

### 2.- Condiciones de Repactación.

Los Bonos Internacionales serán repactados mediante su intercambio por los Nuevos Bonos Internacionales, en el evento de cumplirse las siguientes condiciones suspensivas y copulativas, establecidas en beneficio de los Tenedores de Bonos Internacionales (las "***Condiciones de Repactación***"):

(i) Que el presente Acuerdo de Reorganización se entienda aprobado y entre a regir, de conformidad a lo previsto en el art. 89 de la Ley Nº 20.720;

(ii) Que el Tribunal de Quiebras del Distrito Sur de Nueva York (del estado Nueva York de los Estados Unidos de América) reconozca el Acuerdo en el procedimiento denominado *Chapter 15* que la Compañía está tramitando en dicho tribunal con motivo de su Procedimiento de Reorganización, Caso N° 20-11411 (MG);

(iii) Que se otorguen simultáneamente los pagarés a que se hace referencia en la sección 7 siguiente y los documentos de reserva y ratificación de garantías a que hace referencia el



**Capítulo XVIII** siguiente, en ambos casos a satisfacción del *Trustee* de los Bonos Internacionales;

(iv) Que se hayan pagado a satisfacción del Trustee los gastos de cobranza, comisiones y reembolsos que se le deban bajo el Indenture, incluyendo honorarios de asesores del Trustee que procedan bajo las reglas del Indenture;

(v) Que se cumplan los demás términos de la Condición de Financiamiento (según este término se define más adelante en el **Capítulo VIII** de este Acuerdo) y liberación de los fondos del Crédito Puente a la Compañía.

Certificado el cumplimiento de las Condiciones de Repactación por el Interventor Concursal o, en su defecto, por la Comisión de Acreedores con el voto favorable de cuatro de sus miembros, los créditos se repactarán en la forma dispuesta en el número 3 siguiente.

En el evento que el Interventor Concursal determine fallidas las Condiciones de Repactación por haber vencido la Prórroga de los Bonos Internacionales sin que éstas se verificaren, o bien, por haber llegado a ser cierto antes del vencimiento del plazo de la Prórroga que no ocurrirá alguno de los hechos que las constituyen:

(i) los Tenedores de Bonos Internacionales podrán ejercer todos sus derechos bajo el Indenture para obtener el pago de sus acreencias, sin limitación alguna y sin sujeción a este Acuerdo;

(ii) el incumplimiento de las Condiciones de Repactación o el vencimiento del plazo sin que éstas se verifiquen, será un *Bankruptcy Law Event of Default* bajo el Indenture; y

(iii) los Tenedores de Bonos Internacionales podrán ejecutar y cobrar judicialmente sus créditos en forma individual conforme a las reglas del Indenture, con todas sus garantías reales o personales y en cualquier jurisdicción, sin necesidad de obtener una declaración de incumplimiento de este Acuerdo y sin que el mismo sirva de defensa a esa ejecución.

Para ausencia de duda, en todo lo no modificado por el presente Acuerdo de Reorganización, se ratifican las obligaciones contenidas en el Indenture y en los Bonos Internacionales, y por lo tanto se mantendrán todos los derechos de los Tenedores de Bonos Internacionales bajo dicho contrato, y todas las garantías reales y personales establecidas en el Indenture, los Bonos Internacionales y sus documentos conexos. Nada en este Acuerdo podrá interpretarse en el sentido de impedir u obstaculizar que los Tenedores de Bonos Internacionales ejerzan sus derechos y acciones bajo el Indenture frente a un incumplimiento de las obligaciones de la Empresa Deudora bajo dicho contrato, entendiéndose todos esos derechos y acciones expresamente reservados.

Todo lo anterior, es sin perjuicio que la Comisión de Acreedores resuelva extender la Prórroga de los Bonos Internacionales en caso que fallen las Condiciones de Repactación según lo señalado en el **Capítulo XV** siguiente. Mientras se encuentre vigente la Prórroga de los Bonos Internacionales, los Tenedores de Bonos Internacionales se comprometen a no ejecutar individual ni



colectivamente procedimiento de ejecución alguno en contra de Enjoy y sus Garantes (según este término se define más adelante).

### 3.- Repactación de los Bonos Internacionales:

Cumplidas las Condiciones de Repactación dentro del plazo de la Prórroga de los Bonos Internacionales, los Bonos Internacionales se repactarán en la forma indicada a continuación, intercambiándose los actuales títulos de deuda por los Nuevos Bonos Internacionales, entendiéndose, para todos los efectos legales, que la fecha de la repactación de los Bonos Internacionales será la fecha de la Junta Deliberativa.

Efectuado el intercambio de los Bonos Internacionales por los Nuevos Bonos Internacionales, la Compañía deberá obtener números CUSIP y ISIN para los Nuevos Bonos Internacionales (separadamente para el Nuevo Bonos Internacional Senior y para el Nuevo Bono Internacional Junior, según estos términos se definen más adelante).

El monto total de capital de los Nuevos Bonos Internacionales será el equivalente a la suma de: (i) UDS$195 millones (equivalente al monto total del capital adeudado bajo los Bonos Internacionales); y (ii) el monto total de los intereses bajo los Bonos Internacionales (incluyendo los *Defaulted Interest* y los *Post-Petition Interest* según estos términos se definen en el Indenture) devengados y no pagados a la fecha de la Junta Deliberativa.

Los Nuevos Bonos Internacionales se dividirán en dos tramos, identificados como el "***Nuevo Bono Internacional Senior***" y el "***Nuevo Bono Internacional Junior***", los que serán idénticos en todos los aspectos, excepto por lo siguiente: (i) los Nuevos Bonos Internacionales Senior tendrán prioridad para ser rescatados anticipadamente en caso de rescate anticipado obligatorio producto de la venta de los activos que garantizan los Nuevo Bonos Internacionales en los términos que se indican en el **Anexo N°1** de este Acuerdo, el que se entiende formar parte del mismo para todos los efectos legales; y (ii) en caso que la Compañía entre en liquidación, los Nuevos Bonos Internacionales Senior tendrán derecho de optar por pagarse íntegramente (tanto su capital adeudado como los intereses devengados y no pagados) antes de que se efectúe cualquier pago a los Nuevos Bonos Internacionales Junior, todo lo anterior, en los términos que se describen en el **Anexo N°1** de este Acuerdo.

Los Nuevos Bonos Internacionales Senior serán emitidos y entregados, en intercambio por los Bonos Internacionales, a los Tenedores de Bonos Internacionales que entreguen Compromisos de Financiamiento (según este término se define más adelante) por un monto igual o mayor a la prorrata del Nuevo Financiamiento que corresponda al respectivo Tenedor de Bonos Internacionales según su participación en el capital de los Bonos Internacionales (el "***Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales***"), y efectúen el respectivo desembolso (directamente o a través de su cesionario de la opción) del Crédito Puente (según este término se define más adelante) por el monto que efectivamente se le asigne; todo lo anterior, conforme al **Capítulo VIII** de este Acuerdo.

Por su parte, los Nuevos Bonos Internacionales Junior serán entregados a los Tenedores de Bonos Internacionales que (i) no participen del Nuevo Financiamiento por, al menos, el Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales o (ii) no efectúen el respectivo



desembolso del Crédito Puente por, al menos, el monto asignado en el Crédito Puente en los términos descritos en al **Capítulo VIII**.

El Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales se calculará en Pesos de acuerdo a la siguiente fórmula:

$$\begin{array}{c}\text{Monto Mínimo Financiamiento}\\\text{Tenedor Bono Internacional j}\\\text{(pesos)}\end{array} = \frac{(\text{Capital Tenedor Bono Internacional j})}{(\text{Total capital Bonos Internacionales})} \quad x \quad (10.000.000.000)$$

Para estos efectos "Capital Tenedor Bono Internacional j" significará el saldo insoluto de capital de los Bonos Internacionales del respectivo Tenedor de Bonos Internacionales (*face value*). Por su parte, "Total capital Bonos Internacionales" significará el saldo total de capital insoluto de los Bonos Internacionales (*face value*), esto es, USD\$195 millones (ciento noventa y cinco millones de dólares de los Estados Unidos de América) a la fecha de la Junta Deliberativa.

El equivalente en dólares de los Estados Unidos de América del Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales se calculará utilizando el Dólar Observado publicado en el Diario Oficial en la fecha de la Junta Deliberativa. Se adjunta como **Anexo N°3** a esta Propuesta ejemplos del cálculo del Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales, con el único objeto de facilitar su compresión y operatoria.

Los Nuevos Bonos Internacionales serán emitidos por la Compañía y se regirán por el Nuevo Indenture. Los Nuevos Bonos Internacionales y el Nuevo Indenture serán idénticos en todos sus aspectos a los actuales Bonos Internacionales e Indenture (incluido el hecho de estar sujetos a las leyes del Estado de Nueva York de los Estados Unidos de América), con la única excepción de aquellos cambios que serán incorporados al Nuevo Indenture y a los Nuevos Bonos Internacionales en los términos que se indican en el **Anexo N°1** de este Acuerdo. El *Trustee* inicial, agente pagador (*Paying Agent*) y agente de registro y transferencia (Registrar and Transfer Agent) del Nuevo Indenture será UMB BANK, N.A. Se deja constancia que los términos contenidos en el **Anexo N°1** son los que deberán reflejarse en el Nuevo Indenture.

Los Nuevos Bonos Internacionales serán emitidos como uno o más valores globales registrados a nombre de Cede & Co. como Tenedor de Registro, y como *nominee* del *The Depository Trust Company*, de la misma forma que fueron emitidos los Bonos Internacionales.

Adicionalmente, se mantendrán todas las Garantías y *Security Documents* establecidas en el Indenture y en los Bonos Internacionales, las que serán reflejadas en los Nuevos Instrumentos, en los términos que se indican en el **Capítulo XVIII** de este Acuerdo.

**4.- Nuevo plazo para el pago de los créditos:**

La Empresa Deudora deberá pagar la totalidad del capital de los créditos repactados en una sola cuota (*bullet*), el día 14 de agosto de 2027. Lo anterior, es sin perjuicio de los rescates que puedan ocurrir de conformidad al Nuevo Indenture.



**5.- Intereses:**

**a.- Intereses devengados hasta la fecha de la Junta Deliberativa:**

Todos los créditos afectos a este **Capítulo IV** quedarán fijados al día de la Junta Deliberativa, según el saldo insoluto de capital e intereses devengados y no pagados hasta esa fecha. Los intereses convencionales y aquellos que se hubiesen devengado durante el período moratorio hasta la fecha en que se celebre la Junta Deliberativa -, se calcularán de conformidad a la tasa originalmente pactada (incluyendo *Defaulted Interest* y los *Post-Petition Interest* según estos términos se definen en el Indenture), excluyendo el pago de los intereses penales, multas y gastos de cobranza, los cuales de existir, serán expresamente condonados. Los intereses devengados hasta el día de la Junta Deliberativa se capitalizarán en dicha fecha, según se indica en la tabla de desarrollo del literal d. siguiente.

Todos los gastos de cobranza, comisiones y reembolsos que se deban bajo el Indenture al Representante de los Tenedores de Bonos (*Trustee*), el Agente Pagador, al Agente de Registros y Transferencias, o el Agente de Garantías deberán pagarse en la forma establecida en el Indenture, incluyendo los gastos de asesores y abogados que procedan bajo las reglas del Indenture y aquellos necesarios para efectos de regularizar las Garantías conforme las nuevas modalidades convenidas en el Acuerdo, que también serán de cargo de la Empresa Deudora.

En caso de que por este concepto se debieran pagar impuestos de timbres y estampillas -si procediere-, estos serán de cargo exclusivo de la Empresa Deudora, y deberán ser pagados oportunamente a petición de cualquier Acreedor.

**b.- Determinación de la tasa de interés:**

Los intereses serán determinados y pagados sobre el total de los créditos descritos en este **Capítulo IV**, aplicando una tasa de interés anual, con la progresión que se detalla a continuación:

    i.  **6,0%** anual base 30/360 días el **primer año** de aprobado el presente Acuerdo de Reorganización.

    ii.  **7,0%** anual base 30/360 días el **segundo año** de aprobado el presente Acuerdo de Reorganización.

    iii. **7,5%** anual base 30/360 días el **tercer año** de aprobado el presente Acuerdo de Reorganización.

    iv. **8,0%** anual base 30/360 días el **cuarto año** de aprobado el presente Acuerdo de Reorganización.

    v.  **8,5%** anual base 30/360 días el **quinto año** de aprobado el presente Acuerdo de Reorganización.

    vi. **9,0%** anual base 30/360 días el **sexto año** de aprobado el presente Acuerdo de Reorganización.

    vii. **9,5%** anual base 30/360 días el **séptimo año** de aprobado el presente Acuerdo de Reorganización.

NELSON CONTADOR
ABOGADOS & CONSULTORES

Versión Presentación 08-08

Estos intereses se devengarán a partir de la fecha en que se celebre la Junta Deliberativa.

**c.- Calendario de pago de intereses:**

Los intereses se pagarán mediante el siguiente calendario de pago:

**i.- Primer Período:** Aquel comprendido entre la Junta Deliberativa y el cuarto trimestre contado desde dicha fecha, es decir entre los días 15 de agosto de 2020 y 14 de agosto de 2021, se devengarán intereses que serán capitalizados trimestralmente, es decir, los días 14 de noviembre de 2020, 14 de febrero de 2021, 14 de mayo de 2021 y 14 de agosto de 2021.

**ii.- Segundo Período:** Aquel comprendido entre el quinto y sexto trimestre desde la Junta Deliberativa es decir entre los días 15 de agosto de 2021 y 14 de febrero de 2022, se devengarán intereses que serán pagados en un 50% y capitalizados en el 50% restante, trimestralmente, es decir, los días 14 de noviembre de 2021 y 14 de febrero de 2022.

**iii.- Tercer Período:** Aquel comprendido entre el séptimo trimestre desde la Junta Deliberativa en adelante, es decir desde el día 15 de febrero de 2022, se pagarán intereses trimestralmente, al final de cada periodo de tres meses.

Dentro de los cinco días hábiles siguientes a cada una de las fechas de pago de intereses señaladas, la Compañía proporcionará al *Trustee* y a los Tenedores de Nuevos Bonos Internacionales, un informe que muestre el monto de los intereses capitalizados en dichas fechas.

Los intereses que no se deban capitalizar de conformidad con los románicos ii o iii anteriores, se harán exigibles y deberán pagarse en la respectiva fecha de pago, según se indica en la tabla de desarrollo de la sección d.- siguiente.

**d.- Tabla de desarrollo de capital e intereses:**

**Crédito garantizado (USD)**

| Cuota | Vencimiento | Capital insoluto | Interés (100%) | Interés capitalizado | Amortización capital | Valor cuota |
|---|---|---|---|---|---|---|
| | 14-08-2020 | 210.505.263 | 0 | 0 | 0 | 0 |
| 1 | 14-11-2020 | 213.662.841 | 3.157.579 | 3.157.579 | 0 | 0 |
| 2 | 14-02-2021 | 216.867.784 | 3.204.943 | 3.204.943 | 0 | 0 |
| 3 | 14-05-2021 | 220.120.801 | 3.253.017 | 3.253.017 | 0 | 0 |
| 4 | 14-08-2021 | 223.422.613 | 3.301.812 | 3.301.812 | 0 | 0 |
| 5 | 14-11-2021 | 225.377.561 | 3.909.896 | 1.954.948 | 0 | 1.954.948 |
| 6 | 14-02-2022 | 227.349.614 | 3.944.107 | 1.972.054 | 0 | 1.972.054 |
| 7 | 14-05-2022 | 227.349.614 | 3.978.618 | 0 | 0 | 3.978.618 |
| 8 | 14-08-2022 | 227.349.614 | 3.978.618 | 0 | 0 | 3.978.618 |
| 9 | 14-11-2022 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 10 | 14-02-2023 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 11 | 14-05-2023 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 12 | 14-08-2023 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 13 | 14-11-2023 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 14 | 14-02-2024 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 15 | 14-05-2024 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 16 | 14-08-2024 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 17 | 14-11-2024 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |
| 18 | 14-02-2025 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |

10

NELSON CONTADOR
ABOGADOS & CONSULTORES

Versión Presentación 08-08

| 19 | 14-05-2025 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |
| 20 | 14-08-2025 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |
| 21 | 14-11-2025 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 22 | 14-02-2026 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 23 | 14-05-2026 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 24 | 14-08-2026 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 25 | 14-11-2026 | 227.349.614 | 5.399.553 | 0 | 0 | 5.399.553 |
| 26 | 14-02-2027 | 227.349.614 | 5.399.553 | 0 | 0 | 5.399.553 |
| 27 | 14-05-2027 | 227.349.614 | 5.399.553 | 0 | 0 | 5.399.553 |
| 28 | 14-08-2027 | 0 | 5.399.553 | 0 | 227.349.614 | 232.749.168 |

**6.- Participación en el Nuevo Financiamiento:**

Los Tenedores de Bonos Internacionales, sujeto a las restricciones que pudieran eventualmente ser aplicables a cada uno de ellos en cualquier jurisdicción relevante, tendrán la opción preferente de otorgar un nuevo financiamiento a Enjoy (en adelante, el "***Nuevo Financiamiento***"), en los términos que se describen en el **Capítulo VIII** siguiente, por un monto ascendente a $10.000.000.000.- (diez mil millones de pesos), sujeto a un ajuste por tipo de cambio que se indica más adelante en este Acuerdo.

**7.- Pagarés.**

Cumplidas las Condiciones de Repactación, en la misma fecha y a condición de que se efectúe la repactación de los Bonos Internacionales y su intercambio por los Nuevos Bonos Internacionales, la Empresa Deudora hará entrega de pagarés suscritos por Enjoy con el mismo vencimiento de los Nuevos Bonos Internacionales y por el monto total adeudado bajo el Nuevo Indenture a satisfacción del *Trustee* de los Tenedores de Bonos Internacionales.

**V.    PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES VALISTAS.**

**1.- Prórroga.**

Los créditos de los Acreedores Valistas serán reestructurados, sujetos a las Condiciones para la Reprogramación (según este término se define más adelante), en las condiciones que se establecen en este **Capítulo V** (en adelante la "***Reprogramación Valista***"), a excepción de aquellos Acreedores Valistas que sean Acreedores Bancarios o Proveedores y que opten por la reestructuración que se indica para ellos en el **Capítulo VI** y en el **Capítulo VII** del presente Acuerdo, respectivamente (en adelante los "***Créditos Valistas***").

El vencimiento de los Créditos Valistas afectos a este **Capítulo V** se prorrogará por un plazo máximo de 90 días contado desde la fecha en que se celebre la Junta Deliberativa (en adelante, la "***Prórroga de los Créditos Valistas***"), salvo que con anterioridad a esa fecha llegue a ser cierto que las Condiciones para la Reprogramación no se verificarán, en cuyo plazo la Prórroga de los Créditos Valistas vencerá el día en que hayan fallado dichas condiciones, a menos que la Comisión de Acreedores resuelva mantener la Prórroga de los Créditos Valistas según lo dispuesto en el **Capítulo XV** de este Acuerdo. Mientras se encuentre vigente la Prórroga de Créditos Valistas, los Acreedores Valistas sujetos a este **Capítulo V** se comprometen a no ejecutar individual ni colectivamente procedimiento de ejecución alguno, en la medida que se encuentren pendientes las Condiciones para la Reprogramación.



La Reprogramación Valista estará sujeta a que se cumplan las siguientes condiciones suspensivas: (i) que el presente Acuerdo de Reorganización se entienda aprobado y entre a regir, de conformidad a lo previsto en el art. 89 de la Ley N° 20.720; (ii) que se cumplan los demás términos de la Condición de Financiamiento; y (iii) la liberación de los fondos del Crédito Puente a la Compañía, en adelante conjuntamente denominadas como las "**Condiciones para la Reprogramación**". Cumplidas las Condiciones para la Reprogramación, se entenderá, para todos los efectos, que la fecha de la Reprogramación Valista será la fecha de la Junta Deliberativa.

Mientras no se cumplan las Condiciones para la Reprogramación, los Créditos Valistas se mantendrán vigentes de acuerdo a sus términos originales (incluyendo los intereses devengados después de la solicitud de reorganización).

Una vez cumplidas las Condiciones para la Reprogramación, se certificará su cumplimiento por el Interventor Concursal o, en su defecto, por la Comisión de Acreedores con el voto favorable de cuatro de sus miembros, y los Créditos Valistas quedarán fijados como si hubieran sido reprogramados al día de la Junta Deliberativa, según el saldo de capital insoluto e intereses devengados hasta esa fecha. Los intereses convencionales y aquellos que se hubiesen devengado durante el período moratorio -es decir hasta la fecha en que se celebre la Junta Deliberativa - se calcularán de conformidad a la tasa originalmente pactada en ellos, excluyendo el pago de los intereses penales, multas y gastos de cobranza los cuales, de existir, serán expresamente condonados. Los intereses devengados hasta el día de la Junta Deliberativa se capitalizarán en dicha fecha.

En caso de que por este concepto se debieran pagar impuestos de timbres y estampillas -si procediere-, estos serán de cargo exclusivo de la Empresa Deudora, y deberán ser pagados oportunamente a petición de cualquier Acreedor.

A la fecha de la Junta Deliberativa, los Créditos Valistas, incluyendo a los Acreedores Bancarios y excluyendo a Proveedores, representan un monto total de $189.909.378.544 (ciento ochenta y nueve mil novecientos nueve millones trescientos setenta y ocho mil quinientos cuarenta y cuatro pesos) a la fecha de la referida Junta.

**2.- Reprogramación de los Créditos Valistas y Prepago Obligatorio.**

Una vez cumplidas las Condiciones para la Reprogramación, regirá lo dispuesto en esta Sección 2 y siguientes de este **Capítulo V**.

La Empresa Deudora deberá pagar la totalidad del capital de los Créditos Valistas reprogramados, en una sola cuota (*bullet*), en un plazo de 7 años y un mes contado desde la fecha de la Junta Deliberativa. Lo anterior, es sin perjuicio del prepago obligatorio de estos créditos que se regula en este **Capítulo V**.

A partir del día siguiente a la fecha de la Junta Deliberativa, los Créditos Valistas reprogramados devengarán intereses en los plazos y de conformidad a la tasa originalmente pactada en ellos, los que serán capitalizados en la fecha de vencimiento de los Créditos Valistas



Versión Presentación 08-08

reprogramados o en la Fecha de Prepago (según este término se define más adelante) según corresponda.

Todos los Créditos Valistas reprogramados serán prepagados de forma obligatoria (tanto para la Empresa Deudora como para el respectivo Acreedor Valista), sin costo de prepago, y considerando su valor par a la Fecha de Prepago, esto es, el saldo insoluto de capital e intereses devengados y no capitalizados hasta la Fecha de Prepago los que se capitalizarán en dicha fecha (en adelante el "**Monto de Prepago**") de la siguiente forma: (a) un 80% del Monto de Prepago (en adelante el "**Monto de Prepago Convertible**") se prepagará mediante la entrega de (i) los bonos convertibles en acciones de Enjoy a que se refieren los numerales 3.a.- y 3.b.- siguientes y (ii) el dinero recibido por la suscripción de los referidos bonos convertibles durante su Período de Oferta Preferente (según este término se define más adelante) por los accionistas de la Empresa Deudora (en adelante los "**Accionistas**"), según se detalla en el **Capítulo X** siguiente; y (b) el 20% restante del Monto de Prepago se prepagará mediante la entrega del Bono Renta Fija B a que se refiere el numeral 3.c siguiente. En la sección 4 siguiente del presente **Capítulo V** se detalla la manera en que se efectuará este prepago.

Los Créditos Valistas reprogramados que previo a su reprogramación se encontraban denominados en Unidades de Fomento, se actualizarán según la variación que experimente la Unidad de Fomento, desde el día de la Junta Deliberativa hasta la fecha de su vencimiento o hasta la Fecha de Prepago, según corresponda.

A partir de la fecha de la Junta Deliberativa a los Créditos Valistas reprogramados les serán aplicables, única y exclusivamente, las obligaciones de hacer y de no hacer contenidas en el Capítulo XIII del presente Acuerdo y no tendrán vigencia las causales de incumplimiento que contemplen los títulos de deuda en que constan los Créditos Valistas reprogramados, de ser aplicable.

Para facilitar la inscripción en el Registro de Valores de las modificaciones de los Créditos Valistas reprogramados que sean valores de oferta pública que serán aplicables a los mismos en virtud del presente Acuerdo, la Empresa Deudora se encontrará expresamente facultada en conjunto con el Interventor y el Representante de los Tenedores de Bonos, de ser aplicable, para suscribir todos los actos, contratos y documentos, sean éstos instrumentos públicos o privados, que sean necesarios, convenientes o requeridos por una autoridad competente para dar constancia de los términos de este Acuerdo en estos instrumentos, incluyendo la realización de nuevas emisiones de valores que puedan ser necesarias para instrumentalizar las modificaciones de los Créditos Valistas reprogramados y la Prórroga de los Créditos Valistas, de ser aplicable. Asimismo, la Empresa Deudora estará expresamente facultada para entregar instrucciones e información al Depósito Central de Valores S.A., Depósito de Valores (en adelante el "**DCV**"), que sea necesaria para la instrumentalización de los Créditos Valistas reprogramados, su prórroga y la ejecución de su prepago, en los términos descritos en la Sección 4 de este **Capítulo V**.

**3.- Nuevas emisiones de bonos para el prepago obligatorio de los Créditos Valistas Reprogramados:**

Para efectuar el prepago obligatorio de la totalidad del Monto de Prepago, la Empresa Deudora asume de manera incondicional e irrevocable la obligación de emitir bonos convertibles en acciones de

13



Versión Presentación 08-08

Enjoy y bonos de renta fija e inscribirlos en el Registro de Valores que lleva la Comisión para el Mercado Financiero ("en adelante la "**CMF**"), con las siguientes características:

**a.- Bono Convertible A-1**:

Según lo indicado precedentemente, se prepagará obligatoriamente a los Acreedores Valistas el Monto de Prepago Convertible, a través de: (i) la entrega de bonos convertibles en acciones de Enjoy A-1 ("***Bono Convertible A-1***") no colocados durante el Periodo de Oferta Preferente, en una cantidad equivalente a la necesaria para prepagar el Monto de Prepago Convertible considerando para estos efectos el valor nominal del Bono Convertible A-1, el cual en ningún caso podrá ser a valores inferiores o a condiciones más ventajosas que las ofrecidas a los Accionistas durante el Período de Oferta Preferente; y (ii) en caso de existir un saldo de Monto de Prepago Convertible pendiente de prepago luego de aplicar lo señalado en el número (i) anterior, con el producto de la suscripción y pago de los Bonos Convertibles A-1 que hubieren sido adquiridos durante su Período de Oferta Preferente por los Accionistas (según se describe en el **Capítulo X** siguiente), hasta completar el Monto de Prepago Convertible.

El Bono Convertible A-1 será pagadero en una sola cuota a 99 años (*bullet*) contado desde la fecha de la Junta Deliberativa, y devengará interés a una tasa nominal en pesos igual a cero. Los demás términos y condiciones del Bono Convertible A-1 se adjuntarán como **Anexo N°2** a esta Propuesta, entendiéndose que dicho **Anexo N°2** forma parte de la Propuesta para todos los efectos legales.

La relación de canje para la conversión del Bono Convertible A-1 será de **66,67** (sesenta y seis coma sesenta y siete) nuevas acciones ordinarias de Enjoy por cada $1.000.- (mil pesos) de capital adeudado del Monto de Prepago Convertible. En caso que producto de este cálculo exista una fracción de acción, ésta se redondeará al entero más próximo y, si la fracción fuere 0,5, se redondeará al entero siguiente, y de haber una diferencia, ésta se pagará en dinero por la Empresa Deudora, considerando como precio de la acción la suma de $15. De existir fracciones de Bonos Convertibles A-1 como resultado de la diferencia entre el Monto de Prepago Convertible, y el monto de corte del Bono Convertible A-1, la diferencia se pagará en dinero por la Empresa Deudora. Estos pagos se efectuarán por la Empresa en la Fecha del Prepago y en la fecha de conversión, respectivamente.

La opción de conversión de los Bonos Convertibles A-1 en acciones de la Compañía, deberá ejercerse dentro de un plazo de 60 días hábiles bancarios, contado desde la Fecha de Prepago. En cualquier momento dentro de la vigencia del plazo de conversión antes señalado, los tenedores del Bono Convertible A-1 podrán ejercer la opción de conversión del Bono Convertible A-1 por acciones de Enjoy, mediante comunicación escrita dirigida a Enjoy manifestando en ella su intención de ejercer la opción de conversión, en los términos y conforme al formato de comunicación que se detallarán en el contrato de emisión de los Bonos Convertibles A-1.

Dado que los Bonos Convertibles A-1 deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley N°18.046 sobre Sociedades Anónimas, la mecánica para ello se regula

14



Versión Presentación 08-08

en el **Capítulo X**.

**b.- Bono Convertible A-2:**

Como incentivo a participar en el Nuevo Financiamiento, una vez aprobado el Acuerdo de Reorganización, aquellos Acreedores Valistas que hayan participado en el Nuevo Financiamiento y efectuado el desembolso del respectivo Crédito Puente (directamente o a través de su cesionario de la opción), tendrán derecho a recibir en pago de una "porción" de su Monto de Prepago Convertible, a ser determinada dicha porción según su Prorrata de Participación (según este término se define más adelante), a través de: (i) la entrega de bonos convertibles en acciones de Enjoy A-2 ("**Bono Convertible A-2**") no colocados durante el Periodo de Oferta Preferente, en una cantidad equivalente a la necesaria para prepagar la referida "porción" de su Monto de Prepago Convertible considerando para estos efectos el valor nominal del Bono Convertible A-2, el cual en ningún caso podrá ser a valores inferiores o en condiciones más ventajosas que las ofrecidas Accionistas durante el Período de Oferta Preferente; y (ii) en caso de existir un saldo de la referida "porción" del Monto de Prepago Convertible pendiente de prepago luego de aplicar lo señalado en el número (i) anterior, con el producto de la suscripción y pago de los Bonos Convertibles A-2 que hubieren sido adquiridos durante el Período de Oferta Preferente por los Accionistas (según se describe en el **Capítulo X** siguiente), hasta completar la referida "porción" del Monto de Prepago Convertible.

La "porción" del Monto de Prepago Convertible que cada Acreedor Valista tendrá derecho a que sea pagada con Bonos Convertibles A-2 (o con el producto de su colocación durante su oferta preferente), será igual a su prorrata de participación en el Crédito Puente (en adelante, la "**Prorrata de Participación**") multiplicada por un factor igual a 0,80. De existir fracciones de Bonos Convertibles A-2, la diferencia se pagará en dinero por la Empresa Deudora.

La **Prorrata de Participación** se calculará como la división entre (i) el total efectivamente desembolsado por el respectivo Acreedor Valista ("**acreedor valista i**") en el Crédito Puente, sobre (ii) la proporción que representa su acreencia en el total de los Créditos Valistas, excluidos Proveedores, a la fecha de la Junta Deliberativa, multiplicada por $40.000.000.000., según la siguiente fórmula:

$$\text{Prorrata de Participación de acreedor valista i} = \frac{(\text{Total efectivamente desembolsado por acreedor valista i en Crédito Puente})}{\frac{(\text{Acreencia acreedor valista i})}{(\text{Créditos Valistas ex. Proveedores})} * (40.000.000.000)}$$

donde los Créditos Valistas (excluidos Proveedores) a la fecha de la Junta Deliberativa asciende aproximadamente a $189.909.378.544 (ciento ochenta y nueve mil novecientos nueve millones trescientos setenta y ocho mil quinientos cuarenta y cuatro pesos). Se adjunta como **Anexo N°3** a esta Propuesta ejemplos del cálculo de la "porción" del Monto de Prepago Convertible que podría ser pagada en Bonos Convertibles A-2, con el único objeto de facilitar su comprensión y operatoria.

Los términos y condiciones del Bono Convertible A-2 serán idénticos a los términos y

15



condiciones del Bono Convertible A-1, los que se dan por expresamente reproducidos, con la sola excepción de la relación de canje por acciones de Enjoy , la que en el caso del Bono Convertible A-2 será de **198,02** (ciento noventa y ocho coma cero dos) nuevas acciones ordinarias de Enjoy por cada $1.000.- (mil pesos) de capital adeudado del Monto de Prepago Convertible. Los demás términos y condiciones del Bono Convertible A-2 se adjuntan como **Anexo Nº2** a esta Propuesta, entendiéndose que dicho **Anexo Nº2** forma parte de la Propuesta para todos los efectos legales.

En caso de que producto de este cálculo exista una fracción de acción, ésta se redondeará al entero más próximo y, si la fracción fuere 0,5, se redondeará al entero siguiente, y de haber una diferencia, ésta se pagará en dinero por la Empresa Deudora, considerando como precio de la acción la suma de $5,05. De existir fracciones de Bonos Convertibles A-2 como resultado de la diferencia entre el Monto de Prepago Convertible a ser prepagado con Bonos Convertibles A-2, y el monto de corte del Bono Convertible A-2, la diferencia se pagará en dinero por la Empresa Deudora. Estos pagos se efectuarán por la Empresa Deudora en la Fecha de Prepago y en la fecha de conversión, respectivamente.

Si en virtud de los cálculos señalados anteriormente, la "porción" del Monto de Prepago Convertible de un Acreedor Valista no arroja como resultado que reciba el 100% de su Monto de Prepago Convertible en Bonos Convertibles A-2, la diferencia será pagada mediante la entrega de Bonos Convertibles A-1. De existir fracciones de Bonos Convertibles A-1, la diferencia se pagará en dinero por la Empresa Deudora.

Dado que los Bonos Convertibles A-2 deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley Nº 18.046 sobre Sociedades Anónimas, la mecánica para ello se regula en el **Capítulo X**.

**c.-   Bono Renta Fija B (Tramo B)**:

La amortización del 20% del total de Monto de Prepago (sea que éstos hubieran o no participado en el Nuevo Financiamiento) (en adelante el "***Monto de Prepago Renta Fija B***"), se prepagarán obligatoriamente mediante la entrega de un bono de renta fija a ser emitido por un monto, al menos, equivalente al Monto de Prepago Renta Fija B (en adelante, el "***Bono Renta Fija B***"), pagadero en un plazo de 10 años contado desde la fecha de la Junta Deliberativa. De existir fracciones de Bonos Renta Fija B como resultado de la diferencia entre el Monto de Prepago Renta Fija B, y el monto de corte del Bono Renta Fija B, la diferencia se pagará en dinero por la Empresa Deudora al respectivo Acreedor Valista en la Fecha de Prepago.

El Bono Renta Fija B tendrá las siguientes características:

i.- <u>Moneda</u>:

El Bono Renta Fija B será emitido en pesos chilenos.

  ii.- <u>Amortización de capital</u>:

16



Las fechas de pago de intereses y amortizaciones de capital de los Bonos Renta Fija B, lo mismo que los montos a pagar en cada caso, son los que aparecen en la Tabla de Desarrollo que se indica en el literal c.iv.- siguiente.

iii.- Interés:

Los intereses serán determinados y pagados aplicando una tasa de interés nominal efectiva anual, que aumentará progresivamente como se detalla a continuación:

- **1,5%** nominal efectivo anual base 360 días y semestres iguales de 180 días, los **primeros dos años y seis meses** contados desde la fecha en que se celebre la Junta Deliberativa. Estos intereses se devengarán y se capitalizarán semestralmente, conforme a la tabla de desarrollo que se indica en el literal c.iv.- siguiente.

- **6,5%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el término del **sexto semestre** contado desde la fecha en que se celebre la Junta Deliberativa en adelante. Estos intereses se devengarán y pagarán semestralmente, conforme a la tabla de desarrollo que se indica en el literal c.iv.- siguiente.

iv.- Tabla de desarrollo Bono Renta Fija B[4]:

**Bono Renta Fija B (CLP millones)**

| Cuota | Vencimiento | Capital insoluto | Interés (100%) | Interés capitalizado | Amortización capital | Valor cuota |
|---|---|---|---|---|---|---|
|  | 14-08-2020 | 38.031 | 0 | 0 | 0 | 0 |
| 1 | 14-02-2021 | 38.315 | 284 | 284 | 0 | 0 |
| 2 | 14-08-2021 | 38.601 | 286 | 286 | 0 | 0 |
| 3 | 14-02-2022 | 38.890 | 288 | 288 | 0 | 0 |
| 4 | 14-08-2022 | 39.180 | 291 | 291 | 0 | 0 |
| 5 | 14-02-2023 | 39.473 | 293 | 293 | 0 | 0 |
| 6 | 14-08-2023 | 39.473 | 1.263 | 0 | 0 | 1.263 |
| 7 | 14-02-2024 | 39.473 | 1.263 | 0 | 0 | 1.263 |
| 8 | 14-08-2024 | 39.473 | 1.263 | 0 | 0 | 1.263 |
| 9 | 14-02-2025 | 39.473 | 1.263 | 0 | 0 | 1.263 |
| 10 | 14-08-2025 | 39.473 | 1.263 | 0 | 0 | 1.263 |
| 11 | 14-02-2026 | 38.486 | 1.263 | 0 | 987 | 2.250 |
| 12 | 14-08-2026 | 37.499 | 1.231 | 0 | 987 | 2.218 |
| 13 | 14-02-2027 | 35.526 | 1.200 | 0 | 1.974 | 3.173 |
| 14 | 14-08-2027 | 33.552 | 1.136 | 0 | 1.974 | 3.110 |
| 15 | 14-02-2028 | 30.592 | 1.073 | 0 | 2.960 | 4.034 |
| 16 | 14-08-2028 | 27.631 | 979 | 0 | 2.960 | 3.939 |
| 17 | 14-02-2029 | 22.697 | 884 | 0 | 4.934 | 5.818 |
| 18 | 14-08-2029 | 17.763 | 726 | 0 | 4.934 | 5.660 |
| 19 | 14-02-2030 | 8.881 | 568 | 0 | 8.881 | 9.450 |
| 20 | 14-08-2030 | 0 | 284 | 0 | 8.881 | 9.166 |

v.- Rescate Anticipado:

A partir de la fecha en que se paguen íntegramente los Nuevos Bonos Internacionales la Empresa Deudora podrá rescatar anticipadamente, en forma total o parcial, los Bonos Renta

---

[4] Esta tabla es para efectos referenciales, con el valor de UF del día 02 de julio de 2020. Dicho valor deberá ser actualizado conforme al valor que tenga la UF al día de la Junta Deliberativa, esto es, al 14 de agosto de 2020.



Versión Presentación 08-08

Fija B al equivalente al monto del capital insoluto a ser prepagado a la fecha fijada para el rescate, más los intereses devengados y no pagados en el período que media entre el día siguiente al de la fecha de vencimiento de la última cuota de intereses pagada y la fecha fijada para el rescate (a la par).

vi.- Covenant Financiero:

En adición a las obligaciones de hacer y no hacer señaladas en el Capítulo XIII del presente Acuerdo de Reorganización Judicial, en el Bono Renta Fija B la Empresa Deudora se obligará a mantener una razón Deuda Financiera Neta / EBITDA no superior a: **(a)** 6,5 veces medido y calculado sobre los estados financieros consolidados de Enjoy reportados trimestralmente a la CMF (los "***Estados Financieros***") al 31 de marzo de 2024 y hasta los Estados Financieros al 31 de diciembre de 2025; **(b) 6,0 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2026 y hasta los Estados Financieros al 31 de diciembre de 2026; **(c) 5,5 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2027 y hasta los Estados Financieros al 31 de diciembre de 2027; **(d) 5,0 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2028 y hasta los Estados Financieros al 31 de diciembre de 2028; y **(e) 4,5 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2029 en adelante.

La razón Deuda Financiera Neta / EBITDA no será medida sobre los Estados Financieros anteriores al 31 de marzo de 2024.

Para estos efectos:
   a.  Deuda Financiera Neta: corresponderá a: /i/ La suma de las partidas registradas en los rubros "Otros pasivos financieros Corrientes", "Otros pasivos financieros no corrientes", "Pasivos por Arrendamientos corrientes", "Pasivos por Arrendamientos no corrientes"; menos /ii/ la partida registrada en el rubro como "Efectivo y equivalentes al efectivo"; todo lo anterior, del Estado de Situación Financiera Consolidado de Enjoy, que forma parte integral de los Estados Financieros.
   b.  EBITDA: corresponderá al resultado de las siguientes partidas del Estado de Resultado por Función de los Estados Financieros: /i/ Ingresos de actividades ordinarias; menos /ii/ Costo de ventas; menos /iii/ Gastos de administración; más /iv/ depreciación del ejercicio; más /v/ Amortización del ejercicio.

vii.- Otros términos y condiciones:

Otros términos y condiciones aplicables a los Bonos Renta Fija B se adjuntan como **Anexo N°4** a esta Propuesta entendiéndose que dicho Anexo formará parte de la Propuesta para todos los efectos legales.

**4.- Prepago Obligatorio de los Créditos Valistas Reprogramados:**

18



El procedimiento que será aplicable para efectos de efectuar el prepago obligatorio del Monto de Prepago de los Créditos Valistas reprogramados será el siguiente:

**a.- Fecha de Prepago:**

Dentro de un plazo de 15 días hábiles bancarios contado desde el término del Período de Oferta Preferente, la Empresa Deudora deberá proceder a efectuar el prepago obligatorio de los Créditos Valistas reprogramados (en adelante la "***Fecha de Prepago***"). Para estos efectos, Enjoy deberá otorgar un aviso de prepago a los Acreedores Valistas, mediante el envío de un Hecho Esencial con a lo menos 5 Días Hábiles Bancarios de anticipación a la Fecha de Prepago.

**b.- Acreencias que sean títulos de deuda de oferta pública desmaterializados** :

Tratándose de Créditos Valistas reprogramados que correspondan a títulos de deuda de oferta pública, su prepago se efectuará en la Fecha de Prepago mediante transferencias electrónica de fondos, tratándose pagos en dinero, y mediante la entrega de los respectivos Bonos Convertibles A-1 y/o A-2, según corresponda, y del Bono Renta Fija B, a través del DCV mediante su transferencia y/o depósito en las cuentas que los respectivos Acreedores Valistas tengan registradas en el DCV, previa instrucción de la Empresa Deudora e información al Interventor.

Asimismo, en la Fecha de Prepago, la Empresa Deudora, enviará una instrucción al DCV a efectos de que éste deje sin efecto las posiciones correspondientes a los títulos de deuda desmaterializados que hubieren sido objeto del prepago.

**c.- Otras Acreencias**:

Tratándose de otras acreencias distintas de las señaladas en el literal 4.b anterior y de aquellos títulos de deuda de oferta pública que se encuentren materializados, sus Acreedores Valistas deberán dirigirse en la Fecha de Prepago a las oficinas de Enjoy, ubicadas en calle Rosario Norte Nº555, piso 10, comuna de Las Condes, Santiago en horario hábil debiendo acompañar los antecedentes y títulos que acrediten su calidad de Acreedor Valista. En dicha oportunidad, Enjoy efectuará el prepago de aquellos montos que correspondan en dinero mediante fondos de inmediata disponibilidad, a las cuentas bancarias informadas por los respectivos Acreedores Valistas a Enjoy con, a los menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago, junto con instruir al DCV para que realice la transferencia y/o depósito de los Bonos Convertibles A-1 y/o A-2, según corresponda, y del Bono Renta Fija B que también corresponda a dichos acreedores en las cuentas que los respectivos Acreedores Valistas tengan registradas en el DCV y hayan informado a Enjoy con, a lo menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago, debiendo los respectivos Acreedores Valistas suscribir un documento que dé cuenta del prepago total de su Crédito Valista reprogramado.

## VI. PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES BANCARIOS (TRAMO C).

De conformidad a lo previsto en el artículo 64 de la Ley Nº 20.720, se proponen condiciones



más favorables para aquellos Acreedores Bancarios que se comprometan a otorgar a la Empresa Deudora, o a una o más de sus filiales, a ser acordado con la Empresa Deudora, una o más líneas de crédito rotativas dentro de un plazo máximo de 15 días hábiles bancarios contado desde la fecha de entrada en vigencia del Acuerdo, con las siguientes características:

> 1.- Plazo:  3 años contado desde la fecha en que se celebre la Junta Deliberativa.
>
> 2.- Tasa de interés: acorde al mercado.
>
> 3.- Monto: el equivalente a, al menos, 40% de su correspondiente crédito en contra de la Empresa Deudora, afecto al presente Acuerdo de Reorganización.
>
> 4.- Otras condiciones: las habituales de mercado para este tipo de operaciones.

Los Acreedores Bancarios que opten por el presente Capítulo VI del Acuerdo, deberán otorgar su compromiso vinculante de abrir las mencionadas línea al Interventor dentro de un plazo de 5 días hábiles bancarios siguientes a la fecha de la Junta Deliberativa.

La condición más favorable que se propone consiste en el prepago, sin costos de prepago, del 100% del capital insoluto e intereses devengados de los créditos del respectivo Acreedor Bancario mediante la entrega de un bono de renta fija, por el total de dicho monto para cuyos efectos la Empresa Deudora propone asumir la obligación de emitir un bono de renta fija con las características que se describen en este **Capítulo VI** e inscribirlo en el Registro de Valores que lleva la CMF (en adelante, el "***Bono Renta Fija C***"), pagadero en un plazo de 12 años contado desde la aprobación del presente Acuerdo de Reorganización. De existir fracciones de Bonos Renta Fija C como resultado de la diferencia entre el monto del crédito de un Acreedor Bancario, y el monto de corte del Bono Renta Fija C, la diferencia se pagará en dinero por la Empresa Deudora. Estos créditos, previo a la entrega de Bonos Renta Fija C, serán prorrogados y capitalizarán intereses en la forma estipulada en los numerales 1.- y 2.- del **Capítulo V**, en lo que resulten aplicables.

El prepago de los créditos de los Acreedores Bancarios se efectuará dentro de los 15 días hábiles bancarios siguientes a la fecha en que se obtenga la inscripción en el Registro de Valores de la CMF de los Bonos Renta Fija C. Para estos efectos, Enjoy deberá otorgar un aviso de prepago a los Acreedores Bancarios, mediante el envío de un Hecho Esencial con una anticipación de a lo menos 5 Días Hábiles Bancarios de anticipación a su fecha de prepago. El prepago se efectuará a través del DCV mediante su transferencia y/o depósito en las cuentas que los respectivo Acreedores Bancarios tengan registradas en el DCV, previa instrucción de la Empresa Deudora e información al Interventor.

Los Acreedores Bancarios que no se acojan a lo dispuesto por este **Capítulo VI**, se regirán por lo dispuesto en el **Capítulo V** precedente.

Estos Acreedores Bancarios representan **5** acreedores, por un monto total de **$19.629.681.603, 94** (diecinueve mil seiscientos veintinueve millones seiscientos ochenta y un mil seiscientos tres pesos).

El Bono Renta Fija C tendrá las siguientes características:
i.- <u>Moneda</u>:

El Bono Renta Fija C será emitido en pesos chilenos.



ii.- <u>Amortización de capital</u>:

El pago del Bono Renta Fija C se efectuará en una sola cuota al final de 12 años contados desde la fecha de la Junta Deliberativa, conforme a la Tabla de Desarrollo que se indica en el literal iv.- siguiente.

iii.- <u>Interés</u>:

Los intereses serán determinados y pagados aplicando una tasa de interés nominal efectiva anual, que aumentará progresivamente como se detalla a continuación:

- **1,5%** nominal efectivo anual base 360 días y semestres iguales de 180 días, los **primeros cinco semestres** contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y pagarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica.

- **2,0%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el **sexto semestre** y hasta el **doceavo semestre**, ambos inclusive, contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y capitalizarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica.

- **3,0%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el **treceavo semestre** y hasta el **dieciochoavo semestre**, ambos inclusive, contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y capitalizarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica.

- **4,0%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el **diecinueveavo semestre** y hasta el **vigésimo cuarto semestre**, ambos inclusive, contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y capitalizarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica

iv.- <u>Tabla de desarrollo de capital e intereses Bono Renta Fija C</u>:

| Cuota | Vencimiento | Capital insoluto | Interés (100%) | Interés capitalizado | Amortización capital (%) | Valor cuota |
|---|---|---|---|---|---|---|
| | 14-08-2020 | 100,0 | | | | |
| 1 | 14-02-2021 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 2 | 14-08-2021 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 3 | 14-02-2022 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 4 | 14-08-2022 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 5 | 14-02-2023 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 6 | 14-08-2023 | 101,0 | 1,0 | 1,0 | 0,0 | 0,0 |
| 7 | 14-02-2024 | 102,0 | 1,0 | 1,0 | 0,0 | 0,0 |
| 8 | 14-08-2024 | 103,0 | 1,0 | 1,0 | 0,0 | 0,0 |
| 9 | 14-02-2025 | 104,1 | 1,0 | 1,0 | 0,0 | 0,0 |
| 10 | 14-08-2025 | 105,1 | 1,0 | 1,0 | 0,0 | 0,0 |
| 11 | 14-02-2026 | 106,2 | 1,1 | 1,1 | 0,0 | 0,0 |
| 12 | 14-08-2026 | 107,2 | 1,1 | 1,1 | 0,0 | 0,0 |

21

NELSON CONTADOR
A B O G A D O S  &  C O N S U L T O R E S

Versión Presentación 08-08

| 13 | 14-02-2027 | 108,8 | 1,6 | 1,6 | 0,0 | 0,0 |
| 14 | 14-08-2027 | 110,5 | 1,6 | 1,6 | 0,0 | 0,0 |
| 15 | 14-02-2028 | 112,1 | 1,7 | 1,7 | 0,0 | 0,0 |
| 16 | 14-08-2028 | 113,8 | 1,7 | 1,7 | 0,0 | 0,0 |
| 17 | 14-02-2029 | 115,5 | 1,7 | 1,7 | 0,0 | 0,0 |
| 18 | 14-08-2029 | 117,2 | 1,7 | 1,7 | 0,0 | 0,0 |
| 19 | 14-02-2030 | 119,6 | 2,3 | 2,3 | 0,0 | 0,0 |
| 20 | 14-08-2030 | 122,0 | 2,4 | 2,4 | 0,0 | 0,0 |
| 21 | 14-02-2031 | 124,4 | 2,4 | 2,4 | 0,0 | 0,0 |
| 22 | 14-08-2031 | 126,9 | 2,5 | 2,5 | 0,0 | 0,0 |
| 23 | 14-02-2032 | 129,4 | 2,5 | 2,5 | 0,0 | 0,0 |
| 24 | 14-08-2032 | 0,0 | 2,6 | 0,0 | 129,4 | 132,0 |

v.- Rescate Anticipado:

A partir de la fecha en que se paguen íntegramente los Nuevos Bonos Internacionales la Empresa Deudora podrá rescatar anticipadamente, en forma total o parcial, los Bonos Renta Fija C al equivalente al monto del capital insoluto a ser prepagado a la fecha fijada para el rescate, más los intereses devengados y no pagados en el período que media entre el día siguiente al de la fecha de vencimiento de la última cuota de intereses pagada y la fecha fijada para el rescate (a la par).

v.- Otros términos y condiciones: Otros términos y condiciones aplicables a los Bonos Renta Fija C se adjuntarán como **Anexo Nº4** a esta Propuesta con anticipación a la fecha de la Junta Deliberativa entendiéndose que dicho Anexo formará parte de la Propuesta para todos los efectos.

## VII. PROPUESTA DE PAGO DE CAPITAL A ACREEDORES PROVEEDORES.

De conformidad a lo previsto en el artículo 64 de la Ley Nº 20.720, se proponen condiciones más favorables para algunos de los acreedores valistas Proveedores. La condición más favorable que se propone consiste en el pago del 100% del capital de los créditos provenientes de facturas o boletas emitidas por Proveedores, en los mismos términos en que deben ser pagadas, en un plazo de hasta 12 meses contado desde la aprobación del presente Acuerdo de Reorganización Judicial.

Estos Proveedores representan **18** acreedores, por un monto total de **$382.029.349.-** (trescientos ochenta y dos millones veintinueve mil trescientos cuarenta y nueve pesos).

## VIII. NUEVO FINANCIAMIENTO (TRAMO D).

Los Tenedores de Bonos Internacionales y los Acreedores Valistas tendrán la opción preferente de otorgar un Nuevo Financiamiento a Enjoy ascendente a, aproximadamente, $50.000.000.000.- (cincuenta mil millones de pesos) (en adelante, los Tenedores de Bonos Internacionales y los Acreedores Valistas que participen en el Nuevo Financiamiento serán referidos conjuntamente como los "*Nuevos Financistas*").

El Nuevo Financiamiento se documentará en un único contrato de apertura de crédito no rotativo a ser celebrado entre Enjoy y los Nuevos Financistas en términos sustancialmente similares a los que se adjuntan como **Anexo Nº5** a este Acuerdo, el que se entiende formar parte del mismo

para todos los efectos legales (el "***Crédito Puente***"), que se prepagará en forma obligatoria (tanto para la Empresa Deudora como para el respectivo Nuevo Financista) sin costo de prepago, y considerando como monto a prepagar el saldo insoluto de capital sumado a los intereses devengados y que se capitalizan a la Fecha de Prepago (en adelante el "***Monto de Prepago del Nuevo Financiamiento***"), mediante la entrega de (i) de bonos convertibles en acciones de Enjoy ("***Bono Convertible D***") no colocados durante el Periodo de Oferta Preferente, en una cantidad equivalente a la necesaria para prepagar el Monto de Prepago del Nuevo Financiamiento considerando para estos efectos el valor nominal del Bono Convertible D, el cual en ningún caso podrá ser a valores inferiores o en condiciones más ventajosas que las ofrecidas Accionistas durante el Período de Oferta Preferente; y (ii) en caso de existir un saldo de Monto de Prepago del Nuevo Financiamiento pendiente de prepago luego de aplicar lo señalado en el número (i) anterior, con el producto de la suscripción y pago de los Bonos Convertibles D que hubieren sido adquiridos durante su Período de Oferta Preferente por los Accionistas (según se describe en el **Capítulo X** siguiente), hasta completar el Monto de Prepago del Nuevo Financiamiento; todo lo anterior, a prorrata de la participación de los Nuevos Financistas en el Nuevo Financiamiento.

**1.- Crédito Puente**.

a.- Con el objeto de participar en el Nuevo Financiamiento, los Nuevos Financistas suscribirán un contrato de apertura de crédito no rotativo, en idénticos términos y condiciones, con vencimiento a 18 meses, cuyos desembolsos se documentarán mediante la suscripción de pagarés a la orden de cada uno de los respectivos Nuevos Financistas. El desembolso tendrá lugar el día hábil bancario siguiente a la fecha de suscripción del Crédito Puente, o al día hábil bancario siguiente a que se haya cumplido la Condición de Financiamiento (según este término se define más adelante), si ésta se hubiere cumplido con posterioridad a la celebración del Crédito Puente, oportunidad en la cual se hará entrega del respectivo pagaré autorizado ante Notario.

Los créditos que se otorguen bajo el Crédito Puente devengarán una tasa de interés de un 5,7% anual (base 360 días y semestres iguales de 180 días), salvo que dicha tasa exceda la tasa máxima convencional vigente aplicable a los créditos de estas características vigente a la fecha de suscripción del Crédito Puente, en cuyo caso regirá la tasa máxima convencional.

El Crédito Puente será prepagado obligatoriamente para el deudor y el acreedor en la Fecha de Prepago, sin costos de prepago, mediante la entrega de Bonos Convertibles D no colocados durante el Período de Oferta Preferente cuyas características se indican en el numeral 3.- de este **Capítulo VIII** y, en la diferencia, con el producto de la suscripción y pago de los Bonos Convertibles D que hubieren sido adquiridos durante su Período de Oferta Preferente por los Accionistas, según se indica más adelante.

b.- La posibilidad de participar en el Crédito Puente será ofrecida preferentemente a los grupos y en las proporciones que se señalan a continuación (en adelante, los "***Grupos***"):

i.- A los Tenedores de Bonos Internacionales: hasta $10.000.000.000.- (diez mil millones de pesos) (en adelante, el "***Grupo A***") o su equivalente en Dólares, según el tipo de cambio Dólar Observado publicado por el Banco Central de Chile correspondiente al día en que se celebre la Junta Deliberativa.

23



ii.- A los Acreedores Valistas: hasta $40.000.000.000.- (cuarenta mil millones de pesos) (en adelante, el "***Grupo B***").

c.- Los interesados en participar en el Nuevo Financiamiento deberán manifestarlo por escrito al Interventor Concursal, mediante un compromiso de financiamiento (en adelante, el "***Compromiso de Financiamiento***"), cuyos resultados y los montos totales serán informados posteriormente por el Interventor Concursal. Tratándose de los Tenedores de Bonos Internacionales, estos deberán manifestar su interés enviando una comunicación escrita al Representante de los Tenedores de Bonos Internacionales. El Representante de los Tenedores de Bonos Internacionales remitirá al Interventor Concursal los Compromisos de Financiamiento que reciba de los Tenedores de Bonos Internacionales.

i.- Los Compromisos de Financiamiento recibidos al interior de un determinado Grupo se asignarán al monto de participación en el Nuevo Financiamiento ofrecido al correspondiente Grupo, a prorrata de acuerdo a la participación en el pasivo del respectivo Grupo que tuvieren todos los acreedores del Grupo que hayan manifestado interés, hasta llegar a asignar a cada acreedor participante dentro del Grupo el monto menor entre el 100% de lo que le correspondería a dicho acreedor de acuerdo a su prorrata y su oferta de compromiso. Si quedare un remanente de participación en el Nuevo Financiamiento luego de la asignación anterior, este se distribuirá entre los acreedores del respectivo Grupo que hubiesen entregado Compromisos de Financiamiento por sobre su prorrata en el pasivo del respectivo Grupo, a prorrata de estas ofertas de compromiso en excesos. Si los Compromisos de Financiamiento recibidos al interior de un determinado Grupo superan el monto de participación en el Nuevo Financiamiento ofrecido al correspondiente Grupo, dicho exceso se destinará a cubrir déficits en el otro Grupo, en caso de haberlos, a prorrata (entre todos ellos considerando sólo el exceso), hasta completar el monto total de $50.000.000.000.- (cincuenta mil millones de pesos).

ii.- En caso que no se logre obtener Compromisos de Financiamiento por un monto equivalente al 100% del Nuevo Financiamiento en una primera ronda, se podrán realizar rondas sucesivas entre aquellos interesados que hayan presentado Compromisos de Financiamiento en una ronda anterior, las que se asignarán a prorrata de la nueva demanda hasta agotar el monto de déficit.

iii.- Si, a pesar de haber sido ofrecido en la forma indicada en los literales i.- y ii.- anteriores, quedare parte del Nuevo Financiamiento sin recibir Compromisos de Financiamiento, la Compañía podrá ofrecer dicho remanente del Nuevo Financiamiento a terceros en términos no más favorables a los ofrecidos a los Grupos.

iv.- Las rondas y ofertas del Nuevo Financiamiento que sucedan a la primera, deberán concluirse en un plazo máximo de 10 días hábiles bancarios.

d.- No obstante lo anterior, y previo a la Junta Deliberativa, los llamados a participar en el Nuevo Financiamiento podrán manifestar anticipadamente su voluntad de concurrir a éste,



mediante una nota vinculante que se enviará al Veedor Concursal, para que éste dé cuenta sobre ésta en la respectiva Junta. En la respectiva Junta Deliberativa se podrá dejar constancia de los compromisos recibidos con anterioridad, pudiendo comparecer los acreedores que los hayan manifestado, para reiterar dicho compromiso, lo cual en ningún caso afectará la vigencia o ejecutabilidad del compromiso por escrito entregado al Veedor Concursal.

**e.- Monto Mínimo de Compromisos de Financiamiento:**

i.- En caso de que, concluidas las rondas y ofertas de Nuevo Financiamiento descritas en el literal c. anterior, los Compromisos de Financiamiento no superen los $25.000.000.000.- (veinticinco mil millones de pesos) ("***Monto Mínimo de Financiamiento***"), la Condición de Financiamiento (según este término se define más adelante) se entenderá incumplida y, consecuente a ello, se producirá una causal de incumplimiento del Acuerdo de Reorganización y Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

ii.- En caso de que, concluidas las rondas y ofertas de Nuevo Financiamiento descritas en el literal c. anterior, los Compromisos de Financiamiento sean iguales o superiores a $25.000.000.000.- (veinticinco mil millones de pesos), pero inferiores a $45.000.000.000.- (cuarenta y cinco mil millones de pesos), los Nuevos Financistas que hayan entregado a la Compañía Compromisos de Financiamiento no estarán obligados a mantener tales compromisos, pudiendo informar a la Compañía y al Interventor el retiro, mantención u aumento de los mismos en un plazo de dos días hábiles con posterioridad al comunicado entregado por el Interventor a los Nuevos Financistas con los resultados finales de las rondas y ofertas de Nuevo Financiamiento. Aquellos Nuevos Financistas que nada indiquen dentro de dicho plazo se entenderá que mantienen su respectivo Compromiso de Financiamiento. Cumplido el plazo de retiro de los Compromisos de Financiamiento, la Compañía y el Interventor calcularán el monto total de Compromisos de Financiamiento neto de aquellos retirados (los "***Compromisos de Financiamiento Netos***"). Si los Compromisos de Financiamiento Netos no superan el Monto Mínimo de Financiamiento, la Condición de Financiamiento se entenderá incumplida y, consecuente a ello, se producirá una causal de incumplimiento del del Acuerdo de Reorganización y Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria. Si los Compromisos de Financiamiento Netos son iguales o superiores a $25.000.000.000.- (veinticinco mil millones de pesos), pero inferiores a $45.000.000.000. (cuarenta y cinco mil millones de pesos) se entenderá cumplida la Condición de Financiamiento en este aspecto, a menos que la Comisión de Acreedores resuelva lo contrario mediante el voto de cuatro de sus miembros, en cuyo caso se entenderá incumplido el Acuerdo de Reorganización y Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

iii.- En caso de que los Compromisos de Financiamiento sean iguales o superiores a $45.000.000.000.- (cuarenta y cinco mil millones de pesos) se tendrá por cumplida la Condición de Financiamiento en este respecto.

iv.- Para los efectos del cálculo de los montos que se establecen en esta letra **e.-**, los montos comprometidos por los Nuevos Financistas que sean Tenedores de Bonos Internacionales se



Versión Presentación 08-08

considerara en su monto equivalente en pesos, utilizando el tipo de cambio Dólar Observado publicado por el Banco Central de Chile que rija para el día en que se celebre la Junta Deliberativa, sin perjuicio del valor a que efectivamente se liquiden las divisas que se reciban de ellos a la fecha de desembolso respectivo.

f.- Una vez vencidos los plazos de recepción de los Compromisos de Financiamiento según lo señalado en la letra **c.-** anterior, los Nuevos Financistas deberán suscribir el contrato de apertura de crédito no rotativo y los demás documentos del Nuevo Financiamiento dentro del segundo día hábil bancario contado desde la fecha en que se informe por el Interventor la participación de cada Nuevo Financista en el Crédito Puente. Para efectos de celebrar el contrato de apertura de crédito no rotativo, los Nuevos Financistas otorgarán mandato al Interventor, a fin que suscriba a su nombre y representación el referido contrato, al momento de ejercer su opción de otorgar el Nuevo Financiamiento. Los plazos definitivos del proceso de asignación de la participación de cada Nuevo Financista en el Crédito Puente y la celebración y desembolso del mismo serán informado por el Veedor y/o el Interventor, según corresponda.

g.- Los fondos desembolsados por cada Nuevo Financista se mantendrán depositados en los agentes de retención que se designarán en el Crédito Puente (en adelante los "*Agentes de Retención*"), hasta que corresponda su liberación y entrega a Enjoy de conformidad con lo dispuesto en el Crédito Puente.

h.- Si dentro del segundo día hábil bancario siguiente a la fecha de desembolso del Crédito Puente, uno o más de los Nuevos Financistas no dieren cumplimiento a su Compromiso de Financiamiento y en consecuencia no se hubieran entregado a los Agentes de Retención un monto equivalente a aquellos que permitieron dar por cumplida la condición establecida en la letra h de la Condición de Financiamiento, la Empresa Deudora deberá así informarlo al Interventor y a la Comisión de Acreedores con el objeto que esta última decida si el monto efectivamente desembolsado es suficiente para efectuar la liberación de los fondos a la Compañía por parte de los Agentes Retenedores. Si la Comisión de Acreedores mediante el voto de cuatro de sus miembros no acepta el monto efectivamente desembolsado, la Compañía deberá proponer, dentro de un plazo de 10 días hábiles bancarios contados desde la fecha de la resolución de la Comisión de Acreedores, una nueva alternativa de financiamiento para completar el monto faltante, en los mismos términos que el Crédito Puente. Si la Comisión de Acreedores acepta la propuesta de la Compañía, se procederá a la liberación de los fondos a la Compañía por parte de los Agentes Retenedores. En caso contrario, se entenderán como suficientes los montos desembolsados, a menos que la Comisión de Acreedores resuelva lo contrario mediante el voto de cuatro de sus miembros y los montos desembolsados serán devueltos por los Agentes de Retención al respectivo Nuevo Financista.

i.- La Empresa Deudora pagará a cada Nuevo Financista (en la medida que efectivamente realice el desembolso respectivo bajo el Crédito Puente), una comisión (*commitment fee*) ascendente al 2% del monto total efectivamente desembolsado por el respectivo Nuevo Financista bajo el Crédito Puente, la que será reducida del monto de su desembolso cuando éste sea exigible.

26



j.- Los fondos desembolsados bajo el Crédito Puente se destinarán al pago de las obligaciones propias del giro operacional de la Empresa Deudora y sus filiales, conforme las condiciones y restricciones que se convienen en el presente Acuerdo. Al respecto, la Empresa Deudora deberá presentar a la Comisión de Acreedores un Plan de Uso de Fondos para su aprobación en general, quedando la atribución y responsabilidad específica de su implementación en la Empresa Deudora, cuyo cumplimiento será supervisado por el Interventor.

k.- Las acreencias de los Acreedores Valistas y a los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa (con excepción de los Bonos Internacionales y los Nuevos Bonos Internacionales, que son preferentes, del"Contrato de arrendamiento con Opción de Compra" celebrado entre Enjoy y Banco Security, mediante escritura pública de fecha 5 de octubre de 2016, Repertorio N° 21.180-2016, otorgada en la Notaría de Santiago de don Eduardo Diez Morello y de las boletas de garantía de que da cuenta el **Capítulo XII** siguiente), se entenderán subordinados respecto al Crédito Puente y los Bonos Convertibles D. Los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa, exceptuando los ya señalados, así como los créditos respecto de proveedores no financieros que se generen en el curso ordinario de los negocios de Enjoy, deberán contener expresamente esta subordinación en sus títulos. Sin perjuicio de la subordinación antes indicada respecto a todos los Acreedores Valistas, aquellos Acreedores Valistas que participen en el Crédito Puente facultan al Interventor para que confirme y ratifique, en su representación, por escritura pública, los convenios de subordinación antes referidos.

l.- La opción de otorgar el Nuevo Financiamiento podrá ser cedida por el respectivo acreedor, para lo cual así lo informará en la comunicación en que manifieste su Compromiso de Financiamiento, la cual también deberá ser firmada por el respectivo cesionario.

**2.- Condición de Financiamiento**.

La obligación de efectuar los desembolsos bajo el Crédito Puente estará sujeta al cumplimiento, dentro de un plazo máximo de 90 días corridos de la fecha de la Junta Deliberativa, de las siguientes condiciones suspensivas y copulativas (la "*Condición de Financiamiento*"):

a.- Que Enjoy cuente con las autorizaciones societarias que sean pertinentes para suscribir, desembolsar y cumplir el Crédito Puente;

b.- La aprobación por parte de los Accionistas en una junta extraordinaria de accionistas de Enjoy de un aumento de capital, mediante la emisión de acciones y la emisión de bonos convertibles en acciones de Enjoy, en una cantidad suficiente para respaldar la emisión de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D, las acciones que serán destinadas a la Opción y las Acciones de Respaldo (según estos términos se definen en el **Capítulo X**), así como las modificaciones del estatuto social que fueren necesarias para estos efectos;

27



Versión Presentación 08-08

c.- La obtención del compromiso de, al menos, el 60% de los actuales Accionistas, de renunciar a sus derechos de opción preferente para suscribir el Bono Convertible A-1 y el Bono Convertible A-2, en los términos que se estipulen en el Acuerdo de Soporte.

d.- La obtención del compromiso de, al menos, el 60% de los actuales Accionistas de renunciar a un 90.88% de sus derechos de opción preferente para suscribir el Bono Convertible D, en los términos que se estipulen en el Acuerdo de Soporte;

e.- La obtención de un compromiso de, al menos, el 60% de los actuales Accionistas, de no vender sus acciones en la Sociedad en los términos que se estipulen en el Acuerdo de Soporte.

f.- Que el presente Acuerdo de Reorganización se entienda aprobado y entre a regir, de conformidad a lo previsto en el art. 89 de la Ley Nº 20.720;

g.- Que el Interventor certifique que, salvo por la condición consistente en el desembolso del Crédito Puente, se han cumplido las condiciones para la liberación en favor de la Empresa Deudora de los depósitos a plazo por $9.300.000.000 que actualmente mantienen en garantía los bancos emisores de las boletas de garantía a que hace referencia el **Capítulo XII** de este Acuerdo, distinta de la condición del desembolso efectivo de, al menos, $25.000.000.000 del Nuevo Financiamiento;

h.- (i) Que la Empresa Deudora reciba Compromisos de Financiamiento por, al menos, el Monto Mínimo de Financiamiento y (ii) que la Comisión de Acreedores no resuelva el incumplimiento de la Condición de Financiamiento en caso que los Compromisos de Financiamiento sean inferiores a $45.000.000.000.- (cuarenta y cinco mil millones de pesos), según lo indicado en la letra e, literal ii, del numeral 1 anterior; y

i.- . Que el Tribunal de Quiebras del Distrito Sur de Nueva York (del estado Nueva York de los Estados Unidos de América) reconozca el Acuerdo en el procedimiento denominado *Chapter 15* que la Compañía está tramitando en dicho tribunal con motivo de su Procedimiento de Reorganización, Caso N° 20-11411 (MG), en la forma descrita en el Anexo1.

**3.- Bono Convertible D**.

a.- Enjoy se obliga de manera incondicional e irrevocable a emitir el Bono Convertible D, el que tendrá un monto de emisión, igual a $65.000.000.000.- (sesenta y cinco mil millones de pesos). De existir fracciones de Bonos Convertibles D como resultado de la diferencia entre el Monto de Prepago del Nuevo Financiamiento de un Nuevo Financista y el monto de corte de un Bono Convertible D, la diferencia se pagará en dinero por la Empresa Deudora a los respectivos Nuevo Financistas, a prorrata de su participación en el Nuevo Financiamiento, en la Fecha de Prepago.

b.- Dado que los Bonos Convertibles D deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley Nº 18.046 sobre Sociedades Anónimas, la mecánica para ello se regula en el Capítulo X.

c.- El Bono Convertible D tendrá las siguientes características:

**i.- Moneda**:

 El Bono Convertible D será emitido en pesos chilenos.

**ii.- Amortización de capital**:

El Bono Convertible D será pagado mediante una única cuota en un plazo de 99 años a partir de la fecha de la Junta Deliberativa que apruebe la Propuesta (*bullet*).

**iii.- Interés:**

Los intereses serán determinados y capitalizados aplicando una tasa de interés nominal efectiva anual (base 360 días y semestres iguales de 180 días) hasta la fecha de su conversión en acciones, que disminuirá según se detalla a continuación:

- **5,7%** anual, para el período que se inicia en la Fecha de Prepago del Crédito Puente y que termina el día 540 después desde la fecha del desembolso del Crédito Puente.

- **0,0%** nominal efectivo anual desde el día 541 después de la fecha de la fecha del desembolso del Crédito Puente.

**iv.- Período de Conversión**:

El Bono Convertible D podrá ser convertido en acciones de Enjoy durante un plazo que se iniciará en la Fecha de Prepago, y terminará al día 540 después de la fecha de desembolso del Crédito Puente. En cualquier momento dentro de la vigencia del plazo de conversión antes señalado, los tenedores del Bono Convertible D podrán ejercer la opción de conversión del Bono Convertible D por acciones de Enjoy, mediante comunicación escrita dirigida a Enjoy manifestando en ella su intención de ejercer la opción de conversión, en los términos y conforme al formato de comunicación que se detallarán en el contrato de emisión de los Bonos Convertibles D.

**v.- Relación de Conversión**:

El Bono Convertible D tendrá una relación de conversión de 266,67 (doscientas sesenta y seis coma sesenta y siete) nuevas acciones de Enjoy por cada $1.000.- (mil pesos) de capital vigente e intereses devengados hasta la última fecha de capitalización de intereses anterior a la fecha de conversión.

En caso que producto de este cálculo exista una fracción de acción, ésta se redondeará al entero más próximo y, si la fracción fuere 0,5, se redondeará al entero siguiente, y de haber una diferencia, ésta la diferencia se pagará en dinero por la Empresa Deudora considerando como precio de la acción la suma de $3,75, cuyo pago se efectuará por la Empresa Deudora en la fecha

29



Versión Presentación 08-08

de conversión.

**vi.- Preferencia**:

El Bono Convertible D será considerado como preferente para el pago de capital e intereses, y en caso de liquidación concursal, respecto de los Acreedores Valistas (con excepción de los Bonos Internacionales y los Nuevos Bonos Internacionales, que son preferentes, del"Contrato de arrendamiento con Opción de Compra" celebrado entre Enjoy y Banco Security, mediante escritura pública de fecha 5 de octubre de 2016, Repertorio N° 21.180-2016, otorgada en la Notaría de Santiago de don Eduardo Diez Morello y de las boletas de garantía de que da cuenta el **Capítulo XII** siguiente) y a los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa (con excepción de aquellos créditos expresamente convenidos por medio del presente Acuerdo de Reorganización Judicial), cuyos créditos por tanto, se entenderán subordinados respecto a al Bono Convertible D. Los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa, exceptuando los ya señalados, deberán contener expresamente esta subordinación en sus títulos. Sin perjuicio de la subordinación establecida en el presente Acuerdo respecto a todos los Acreedores Valistas, aquellos Acreedores Valistas que participen en el Crédito Puente facultan al Interventor para que confirme y ratifique, en su representación, por escritura pública, los convenios de subordinación antes referidos.

**vii.- Uso de fondos**:

El uso de fondos del Bono Convertible D será exclusivamente el prepago del Crédito Puente, y en caso de existir un remanente, luego de efectuado lo anterior, dichos recursos se destinarán al pago de las obligaciones propias del giro operacional de la Empresa Deudora y sus filiales.

**viii.- Otros términos y condiciones**:
Otros términos y condiciones del Bono Convertible D se adjuntan como **Anexo N°2** a esta Propuesta entendiéndose que dicho Anexo formará parte de la Propuesta para todos los efectos legales.

**4.- Prepago del Crédito Puente**

El prepago del Crédito Puente a los Nuevos Financistas se efectuará en la Fecha de Prepago, para cuyos efectos Enjoy deberá otorgar un aviso de prepago a los Nuevos Financistas, mediante el envío de un Hecho Esencial con una anticipación de a lo menos 5 días hábiles bancarios de anticipación a la Fecha de Prepago, y en tal fecha Enjoy efectuará el prepago de aquellos montos que correspondan en dinero mediante fondos de inmediata disponibilidad, a las cuentas bancarias informadas por los respectivos Nuevos Financistas a Enjoy con, a los menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago, y tratándose de la entrega de los Bonos Convertibles D, mediante la entrega de los mismos, a través del DCV, mediante su transferencia y/o depósito en las cuentas que los respectivos Nuevos Financistas tengan registradas en el DCV y hayan informado a Enjoy con, a lo menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago. Para estos efectos, los Nuevos Financistas deberán hacer entrega en esa misma fecha a Enjoy de los pagarés que les fueran entregados

**NELSON**CONTADOR
ABOGADOS & CONSULTORES

Versión Presentación 08-08

bajo el Crédito Puente, con constancia de pago de los mismos.

## IX. OPCIÓN DE SUSCRIPCIÓN CONDICIONAL DE ACCIONES A ACTUALES ACCIONISTAS.

En virtud del presente Acuerdo de Reorganización, y sujeto a las aprobaciones estatutarias correspondientes, se otorgará a los Accionistas de manera simultánea con la apertura del Período de Ofertas Preferente, una opción (en adelante, la "*Opción*") para suscribir 9.389.919.856 nuevas acciones de pago de la Compañía, por un plazo de 24 meses contado desde la fecha de la Junta Deliberativa que apruebe la Propuesta, a un precio de suscripción de $5,75 por acción (lo que da una razón de 2,00 nuevas acciones por cada acción vigente actualmente).

Para materializar la Opción, Enjoy acordará, en el mismo aumento de capital que respalde la emisión de los Bonos Convertibles A-1, los Bonos Convertibles A-2 y los Bonos Convertibles D, la emisión de las acciones de pago de la Opción. La Opción sobre estas nuevas acciones de pago se ofrecerá preferentemente a los Accionistas con derecho a suscribirlas (aquellos inscritos en el Registro de Accionistas de Enjoy a la medianoche del quinto día hábil anterior a la fecha de inicio del Período de Oferta Preferente), a un precio de suscripción de $5,75 (cinco coma setenta y cinco pesos) por acción, quienes podrán ejercer la Opción (y en definitiva suscribir las acciones al mencionado precio de $5,75) dentro de un plazo de 24 meses contado desde la fecha de la Junta Deliberativa. La Opción se instrumentalizará a través de la celebración de un contrato de opción de suscripción de acciones de Enjoy que dé cuenta de los términos antes señalados en cuanto al precio de suscripción y plazo de ejercicio de la opción, estableciéndose expresamente que la referida opción podrá ser libremente cedida por el respectivo accionista.

La oferta preferente de suscripción de las acciones objeto de la Opción se efectuará en los términos indicados en el **Capítulo X** siguiente.

## X. MODALIDAD JURIDICA PARA LOS PROCESOS DE FINANCIAMIENTO Y CONVERSIÓN.

1.- Antes de la Junta Deliberativa, la Empresa Deudora podrá complementar la estructura legal para la implementación de la repactación de créditos convenida en el presente Acuerdo y, en particular, para la implementación del Nuevo Financiamiento, el prepago obligatorio de los créditos valistas con los Bonos Convertibles A-1 y Bonos Convertibles A-2 y Bono Renta Fija B, el pago del Crédito Puente con los Bonos Convertibles D, entre otros.

2.- Sin perjuicio de la entrada en vigencia del presente Acuerdo, el Interventor Concursal citará a la Comisión de Acreedores para que, conjuntamente con la Empresa Deudora y los asesores técnicos que los asistan, adopten los acuerdos necesarios para la adecuada implementación de los distintos pasos contemplados en el Acuerdo de Reorganización en caso de ser ello necesario, con plenas facultades. Dicha reunión de la Comisión de Acreedores deberá celebrarse a más tardar el quinto día hábil siguiente a la fecha de la celebración de la Junta Deliberativa.

3.- No obstante lo señalado anteriormente, a continuación se fijan los lineamientos generales propuestos para alguno de los pasos contemplados en esta Propuesta:



Versión Presentación 08-08

a.- Todos los bonos convertibles en acciones que emita la Compañía deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley N° 18.046 sobre Sociedades Anónimas (en adelante el "*Período de Oferta Preferente*"). Si ningún Accionista ejerce su opción preferente durante el Período de Oferta Preferente, la Compañía destinará Bonos Convertibles A-1, Bonos Convertibles A-2 y Bonos Convertibles D que sean necesarios para ser entregados en prepago del Monto de Prepago Convertible y del Monto de Prepago del Nuevo Financiamiento, conforme a lo establecido en el presente Acuerdo de Reorganización. Si Accionistas ejercen su opción preferente de suscripción antes señalada, se procederá de la siguiente manera:

i.- Los Bonos Convertibles A-1, que no sean colocados durante el Periodo de Oferta Preferente, serán destinados en una cantidad de bonos equivalente a la necesaria para prepagar el Monto de Prepago Convertible de los Créditos Valistas reprogramados con derecho a recibir en pago Bonos Convertibles A-1, a prorrata;

ii.- En caso de existir un saldo de Monto de Prepago Convertible luego de aplicar lo señalado en el número i.- anterior, el producto neto que obtenga la Compañía por la suscripción y pago de los Bonos Convertibles A-1 durante el Período de Oferta Preferente se destinará a pagar el saldo del Monto de Prepago Convertible de los Créditos Valistas reprogramados con derecho a recibir en pago Bonos Convertibles A-1, a prorrata.

iii.- Los Bonos Convertibles A-2, que no sean colocados durante el Periodo de Oferta Preferente, serán destinados en una cantidad de bonos equivalente a la necesaria para prepagar el Monto de Prepago Convertible de los Créditos Valistas reprogramados con derecho a recibir en pago Bonos Convertibles A-2, a prorrata.

iv.- En caso de existir un saldo de Monto de Prepago Convertible con derecho a recibir en pago Bonos Convertibles A-2 luego de aplicar lo señalado en el número iii.- anterior, el producto neto que obtenga la Compañía por la suscripción y pago de los Bonos Convertibles A-2 durante el Período de Oferta Preferente, se destinará a pagar el saldo del Monto de Prepago Convertible con derecho a recibir en pago Bonos Convertibles A-2, a prorrata.

v.- Los Bonos Convertibles D, que no sean colocados durante el Periodo de Oferta Preferente, serán destinados en una cantidad de bonos equivalente a la necesaria para prepagar el Monto de Prepago del Nuevo Financiamiento, a prorrata.

vi.- En caso de existir un saldo de Monto de Prepago del Nuevo Financiamiento con derecho a recibir en pago Bonos Convertibles D luego de aplicar lo señalado en el número v.- anterior, el producto neto que obtenga la Compañía por la suscripción y pago de los Bonos Convertibles D durante el Período de Oferta Preferente, se destinará a pagar el saldo del Monto de Prepago del Nuevo Financiamiento, a prorrata.

32



vii.- En los tres casos previstos anteriormente, la Compañía podrá emitir Bonos Convertibles A-1, Bonos Convertibles A-2 y Bonos Convertibles D, según corresponda, por un monto superior al requerido para cubrir el pago previsto en el presente Acuerdo de Reorganización.

b.- El Período de Oferta Preferente de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D y de las acciones para el ejercicio de la Opción se realizará de manera simultánea (al mismo tiempo). Los Períodos de Oferta Preferente de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D y de las acciones para el ejercicio de la Opción deberá iniciarse dentro de los 15 días hábiles siguientes a la última fecha en que se efectúe la inscripción en el Registro de Valores de la CMF de estas emisiones.

c.- Con el objeto de facilitar la viabilidad de los acuerdos contenidos en la presente Propuesta de Reorganización:

i.- Las sociedades Entretenciones Consolidadas SpA, Inversiones e Inmobiliaria Almonacid Limitada e Inversiones Cumbres Limitada, que representan el 60.52% del capital accionario de Enjoy suscribirán un acuerdo de soporte con Enjoy (en adelante el "*Acuerdo de Soporte*") por el que: (i) se obliga a asistir y participar con la totalidad de sus acciones en la junta extraordinaria de accionistas de que da cuenta el literal e siguiente, aprobando en ella la emisión de los Bonos Convertibles A-1, Bonos Convertibles A-2 y Bonos Convertibles D, el aumento de capital indicado en la referida letra e, las modificaciones de estatutos que sean necesarias para estos efectos, y las demás materias que sean necesarias para la implementación de la Propuesta en el contexto del Acuerdo de Reorganización Judicial de Enjoy; (ii) prometen renunciar a sus derechos de suscripción preferente para suscribir los Bonos Convertibles A-1 y los Bonos Convertibles A-2 y renunciar a un 90.88% de sus derechos para suscribir preferentemente de los Bonos Convertibles D, cuando tales derechos nazcan, en los términos estipulados en el Acuerdo de Soporte; y (iii) se obliga a no enajenar sus acciones, en los términos indicados en el Acuerdo de Soporte. El Acuerdo de Soporte deberá ser celebrado y entregado al Veedor con anticipación a la fecha de la Junta Deliberativa, para que éste dé cuenta sobre el Acuerdo de Soporte en la referida Junta; y

ii.- Acreedores de la Compañía, deberán manifestar y hacer llegar al Veedor con anticipación a la fecha de la Junta Deliberativa su compromiso de participar en el Nuevo Financiamiento sujeto a los términos y condiciones de este Acuerdo de Reorganización, con un monto de $25.000.000.000.- (veinticinco mil millones de pesos).

d.- Los Compromisos de Financiamiento deberán formalizarse mediante un documento vinculante estandarizado, cuyo formato será remitido a cada acreedor por el Veedor, con anterioridad a la Junta Deliberativa, y que deberá ser entregado por el respectivo acreedor al

33



Interventor Concursal. El procedimiento para formalizar este compromiso será informado por el Veedor con anterioridad a la Junta Deliberativa, el que en todo caso deberá ser consistente con el procedimiento descrito en la letra c), del número 1, del **Capítulo VIII** del presente Acuerdo.

e.- Dentro de los 60 días corridos siguientes a la fecha de entrada en vigencia del Acuerdo de Reorganización, se deberá realizar una Junta Extraordinaria de Accionistas, en la que se someterá a consideración de los Accionistas lo siguiente:

i.- Un único aumento de capital, mediante la emisión de nuevas acciones, que permitan dar cumplimiento a lo siguiente:

- Emisión de acciones necesarias para el respaldo de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D;

- Emisión de acciones necesarias para poder otorgar la Opción a los Accionistas; y

- La emisión de acciones de pago por hasta $10.000.000.000.- (diez mil millones de pesos) adicionales, como mecanismo de protección frente a necesidades de caja, cuyas condiciones (incluyendo su precio de colocación) podrán ser determinadas por el Directorio dentro de los plazos legales (en adelante las "***Acciones de Reserva***"), pudiendo ser destinada una parte de ellas a planes de compensación de trabajadores de la Compañía y sus filiales, en los términos que determine el Directorio (en adelante el "***Stock Option***").

ii.- La emisión de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D señalados precedentemente en el presente Acuerdo de Reorganización.

iii.- Todas las demás materias que sea necesario someter a consideración de los Accionistas en la referida Junta, para la correcta implementación del presente Acuerdo.

4.- En todo caso, el número de acciones en que se puedan convertir los Bonos Convertibles A-1, los Bonos Convertibles A-2 y los Bonos Convertibles D incluidos en el presente Acuerdo, serán determinadas para cumplir la condición de que los Accionistas actuales no disminuyan su participación accionaria en Enjoy a un porcentaje menor a un 10% una vez convertidos todos los referidos bonos. Sin embargo, este mínimo de 10% se enmarca exclusivamente en el contexto de la Reorganización Judicial de Enjoy y, por lo tanto, no es aplicable en caso de que Enjoy, concluida la Reorganización, requiera nuevo capital, en cuyo caso, los referidos Accionistas y sus diluciones (si aplican) quedarán sujetas a las condiciones particulares de dicho nuevo aumento de capital o financiamiento.

## XI.  ADMINISTRACIÓN.

Versión Presentación 08-08

La administración de Enjoy, será ejercida por los actuales órganos que establecen sus estatutos, durante la vigencia del presente Acuerdo.

Sin perjuicio de lo señalado y, de conformidad a lo establecido en el artículo 69 de la Ley N° 20.720, se propone que los acreedores en la Junta Deliberativa designen a un Interventor Concursal con las atribuciones que se señalan más adelante y por el plazo previsto en la disposición antes citada. Sus honorarios los fijará la Comisión de Acreedores, que más adelante se regula, en conjunto con la Empresa Deudora.

## XII. RENOVACIÓN DE BOLETAS DE GARANTIAS.

1.- Con el objeto de garantizar ante la Superintendencia de Casinos de Juego el cumplimiento de la oferta técnica; la construcción y desarrollo los proyectos en tiempo y forma en los casinos de Coquimbo, Viña del Mar, Puerto Varas y Pucón y, finalmente, para cumplir íntegramente la oferta económica contenidas en los procesos de licitación que realizó la autoridad reguladora, los bancos Banco BTG Pactual Chile, Banco Internacional y Banco Security emitieron en 2018 Boletas de Garantía por aproximadamente UF4.800.000.- (cuatro millones ochocientas mil Unidades de Fomento), en favor de Casino de la Bahía S.A., Casino del Mar S.A., Casino de Lago S.A., y Casino de Puerto Varas S.A. Parte de dichas Boletas de Garantía se encuentran garantizadas por pólizas de seguro, emitidas por CESCE Chile Aseguradora S.A.

2.- El total de aquellas boletas de garantía -que no se encontraban aseguradas por las pólizas de garantía antes indicadas- y las obligaciones bajo tales pólizas se encontraban, a su turno, garantizadas: (i) Con el aval, fianza solidaria y codeuda solidaria de Enjoy; (ii) Con una hipoteca sobre un inmueble de propiedad de una filial de Enjoy ubicado en la ciudad de Castro; (iii) Con Depósitos a Plazo endosados en garantía por aproximadamente $32.000.000.000.- (treinta y dos mil millones de pesos) tomados por Enjoy en favor de los Bancos, títulos que se encontraban en poder de Banco BTG Pactual Chile, como banco agente del sindicato de bancos y agente de garantías.

3.- Con fecha 14 de julio de 2020, la Administración y los otorgantes de las boletas de garantías antes señaladas, suscribieron nuevos contratos para la renovación de las referidas boletas y pólizas, y acordaron las condiciones para la liberación de los mencionados depósitos en garantía, sujeto al cumplimiento de ciertos hitos, que incluyeron el otorgamiento y posterior inscripción de una hipoteca sobre ciertos inmuebles de propiedad de una filial de Enjoy, ubicados en la comuna de Rinconada de Los Andes, correspondiente a catorce lotes (en conjunto el "**Inmueble Rinconada**").

4.- La liberación de los depósitos en garantía, está sujeta al cumplimiento de las siguientes condiciones:

**a.- Para la liberación de $5.200.000.000.- (cinco mil doscientos millones de pesos)**: Cuando copulativamente se encuentren cumplidas las siguientes condiciones: (i) Se hayan obtenido las autorizaciones de los acreedores de Enjoy en los términos requeridos por el artículo 74 inciso segundo de la Ley N° 20.720, y tratándose de los tenedores de bonos locales, que además, éstos hayan aprobado todas las materias previstas en las letras c) y d) de la citación a junta de tenedores de bonos cuyo primer aviso fue publicado el 27 de junio de 2020, y que debe celebrarse el día 13 de julio a las 12.00 PM; (ii) Se haya suscrito por todas

35



las partes el contrato de hipoteca y prohibiciones sobre el Inmueble Rinconada en favor de Banco BTG Pactual Chile, como agente de garantías junto a toda la Documentación del Préstamo, según este término se define más adelante a satisfacción de los financistas; y (iii) Pago total de la o las primas correspondientes a las pólizas de seguro de garantía. Estas condiciones ya se han cumplido, y por tanto estos depósitos fueron liberados con fecha 14 de julio;

**b.- Para la liberación por $18.600.000.000.- (dieciocho mil seiscientos millones de pesos)**:

i.-     Se liberarán $9.300.000.000.- (nueve mil trescientos millones de pesos) cuando copulativamente se encuentren cumplidas las siguientes condiciones:

- Cuando el Tribunal certifique que el Acuerdo de Reorganización Judicial de la Empresa Deudora se encuentre aprobado según los términos del artículo 89 de la Ley Nº 20.720 y que puede ser cumplido y comenzar a regir, en conformidad con el inciso cuarto de dicho artículo.

- Que dicho Acuerdo de Reorganización Judicial incorpore y acuerde las siguientes materias: (a) Restructuración total del bono internacional de Enjoy; y (b) Capitalización de al menos un 70% de los créditos valistas verificados en el procedimiento de reorganización, con un mínimo de $115.000.000.000.- (ciento quince mil millones de pesos); y c) Que se hayan incorporado al texto del Acuerdo de Reorganización que se acuerde, declaraciones en orden a confirmar y ratificar expresamente (c.i) todos los otorgamientos de créditos; (c.ii) restructuración de pasivos; y (c.iii) operaciones entre los bancos, Banco BTG Pactual Chile, Banco Internacional y Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos, y sus fondos administrados, incluyendo, sin limitación, a BTG Pactual Deuda Privada Fondo de Inversión, y sus respectivas filiales y demás personas relacionadas, con Enjoy y sus sociedades filiales, en los 2 años anteriores al inicio del Procedimiento de Reorganización Judicial, dejándose constancia en el texto del acuerdo del retiro y renuncia definitiva por los acreedores de toda acción judicial o de otra naturaleza que pretenda impugnar o cuestionar la eficacia y/u oponibilidad de los actos y contratos ejecutados o celebrados a que se refieren los puntos (c.i), (c.ii) y (c.iii) anteriores y que las condiciones indicadas en la letra c) anterior, no hayan sido objeto de impugnación.

En cumplimiento de los términos y condiciones antes señalados, mediante este Acuerdo se confirman y ratifican expresamente las materias a que se refieren los puntos (c.i), (c.ii) y (c.iii) anteriores. Asimismo, mediante este Acuerdo, los Acreedores dejan constancia del retiro y renuncia definitiva de toda acción judicial o de otra naturaleza que pretenda impugnar o cuestionar la eficacia y/u oponibilidad de los actos y contratos ejecutados o celebrados a que se refieren los puntos (c.i), (c.ii) y (c.iii) anteriores.

36

Versión Presentación 08-08

- Para los efectos de lo anterior y, sin perjuicio que la Junta de Tenedores de Bonos celebrada con fecha 13 de Julio del año en curso, aprobó y ratificó entre otras materias la validación de las operaciones antes señaladas, los acreedores presentes en esta Junta Deliberativa, confirman y ratifican expresamente (i) todos los otorgamientos de créditos; (ii) las reestructuraciones de pasivos; y (iii) las operaciones celebradas o ejecutadas entre los bancos, Banco BTG Pactual Chile, Banco Internacional y Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos, y sus fondos administrados, incluyendo, sin limitación, a BTG Pactual Deuda Privada Fondo de Inversión, y sus respectivas filiales y demás personas relacionadas, con Enjoy y sus sociedades filiales, en los 2 años anteriores al inicio del Procedimiento de Reorganización Judicial, y declararan que renuncian expresamente a ejercer cualquier acción judicial o de otra naturaleza que pretenda impugnar o cuestionar la eficacia y/u oponibilidad de los actos y contratos ejecutados o celebrados a que se refieren los puntos (i), (ii) y (iii) antes referidos o requerir la revocación de los mismos.

- Se produzca el desembolso efectivo de al menos $25.000.000.000.- (veinticinco mil millones de pesos) en virtud del Nuevo Financiamiento otorgado a Enjoy, por uno o más acreedores, ingresando efectivamente dicho monto a la caja de la compañía.

ii.- Se liberan $9.300.000.000.- (nueve mil trescientos millones de pesos) cuando copulativamente se encuentren cumplidas las condiciones anteriores y se haya inscrito legalmente en favor del Banco Agente, como acreedor y agente de garantías, la hipoteca específica y prohibiciones constituidas sobre el Inmueble Rinconada, en el Conservador de Bienes Raíces respectivo.

**c.- Para la liberación de $8.300.000.000.- (ocho mil trescientos millones):** Habiéndose cumplido todas y cada una de las condiciones copulativas mencionadas precedentemente en los literales a.- y b.- precedentes, se procederá a: (a) La liberación de $4.150.000.000.- (cuatro mil ciento cincuenta millones de pesos), contra el ingreso efectivo a la caja de Enjoy de al menos otros $10.000.000.000.- (diez mil millones de pesos) adicionales a los $25.000.000.000.- (veinticinco mil millones de pesos) referidos precedentemente; (b) La liberación de $4.150.000.000.- (cuatro mil ciento cincuenta millones de pesos), contra el ingreso efectivo a la caja de Enjoy de al menos otros $5.000.000.000.- (cinco mil millones de pesos), adicionales a los $25.000.000.000.- (veinticinco mil millones de pesos) y $10.000.000.000.- (diez mil millones de pesos) mencionados anteriormente.

**d.- Para la liberación de la hipoteca y prohibiciones sobre Inmueble Rinconada:** Se podrá liberar sólo a partir del mes 18 contado desde la fecha de emisión de las respectivas boletas de garantía y/o pólizas, sujeto a ciertas condiciones que se indican en los respectivos documentos del financiamiento suscritos con ocasión de la emisión de las nuevas boletas de garantía, incluyendo que la sentencia que apruebe el Acuerdo de Reorganización Judicial se encuentra firme y ejecutoriada.

NELSON CONTADOR
A B O G A D O S  &  C O N S U L T O R E S

## XIII. OBLIGACIONES DE HACER Y NO HACER.

Según lo señalado en el **Capítulo IV**, se mantendrán las obligaciones de hacer y de no hacer para con los Tenedores de Bonos Internacionales contenidas en el **Indenture** -con los cambios descritos en el **Anexo N° 1** respecto de los Nuevos Bonos Internacionales. Por su parte, se establecen exclusivamente las siguientes obligaciones de hacer y no hacer para con el resto de los Acreedores afectos al presente Acuerdo:

1.- **Obligaciones de Hacer**.

a.- Realizar o hacer que se realice todo lo necesario para preservar y mantener en pleno vigor y efecto su existencia societaria y validez, sin alterar su forma societaria, lo que incluye su carácter de sociedad anónima abierta, inscrita en el Registro de Valores que lleva para estos efectos la CMF y, además, incluyendo, sin carácter limitativo, su disolución o transformación, y sin incurrir en causas legales de disolución; como asimismo, preservar y mantener todos aquellos derechos, propiedades, licencias, marcas, permisos, franquicias, servidumbres, concesiones o patentes que sean necesarios para el normal funcionamiento de la Empresa Deudora y el desarrollo de su giro; y mantener todos sus activos relevantes en buen estado de conservación conforme a su natural uso y desgaste.

b.- Pagar todos los impuestos y otras obligaciones tributarias aplicables, como asimismo aquellas de origen laboral u otras preferentes de acuerdo a la legislación vigente, salvo aquéllas que sean impugnadas de buena fe y conforme a los procedimientos legales apropiados.

c.- Cumplir en todos los aspectos con las leyes, reglamentos y disposiciones y órdenes aplicables, incluyéndose especialmente en dicho cumplimiento, sin limitaciones, el pago oportuno de todos los impuestos, contribuciones, gravámenes y cargas fiscales o de otro tipo que afecten a la Empresa Deudora o a sus bienes, y dar oportuno cumplimiento a las obligaciones tributarias, laborales, previsionales y medioambientales a que pudiere estar afecta, si corresponde, salvo aquellas respecto de las cuales se hayan presentado de buena fe los recursos legales apropiados.

d.- Proporcionar al Interventor Concursal toda la información financiera y/o contable adicional, que sea solicitada por el mismo.

e.- Asegurar que, en cualquier tiempo, sus obligaciones bajo el presente Acuerdo de Reorganización tengan, al menos, la misma prelación y prioridad de pago bajo la ley que sus restantes obligaciones de pago, actuales o futuras, con otros acreedores de la misma clase, de acuerdo con la ley. Lo anterior es sin perjuicio de las preferencias establecidas en el presente Acuerdo de Reorganización.

f.- Realizar, suscribir, ejecutar y celebrar todos los actos y contratos para dar íntegro cumplimiento al Acuerdo de Reorganización, que le requiera el Interventor Concursal, mientras éste se encuentre vigente.



Versión Presentación 08-08

2.- **Obligaciones de No Hacer**.

a.- Otorgar préstamos o créditos o cualquier clase de financiamiento a terceros, excluyendo filiales, salvo que se trate de financiamiento dentro del giro ordinario del negocio del Emisor el que en todo caso deberá siempre realizarse en condiciones de mercado.

b.- Efectuar operaciones con partes relacionadas sin dar cumplimiento a lo dispuesto en el Título XVI de la Ley de Sociedades Anónimas. Para todos los efectos, se entenderá por "operaciones con partes relacionadas" a las definidas como tales en el artículo ciento cuarenta y seis de la Ley de Sociedades Anónimas, o aquél que lo modifique o reemplace en el futuro.

c.- A partir de la fecha de la Junta Deliberativa que apruebe la Propuesta constituirse en aval, fiador, codeudor solidario, o comprometer su patrimonio por obligaciones de terceros, salvo que dichos terceros fueren filiales del Emisor.

## XIV.  APROBACIÓN Y VIGENCIA DEL ACUERDO.

1.- De conformidad a lo previsto en el art. 89 de la Ley Nº 20.720, el presente Acuerdo se entenderá aprobado y entrará a regir desde que:

a.- Una vez vencido el plazo para impugnarlo, sin que se hubiere impugnado, el tribunal competente lo declare así de oficio o a petición de cualquier interesado o del Veedor.

b.- Si se hubiere impugnado y las impugnaciones fueren desechadas, desde que cause ejecutoria la resolución que deseche la o las impugnaciones y declare aprobado el Acuerdo.

c.- Si se hubiere impugnado y las impugnaciones fueren interpuestas por acreedores de una determinada clase o categoría, que representen menos del 30% del pasivo con derecho a voto de su respectiva clase o categoría y el tribunal así lo declare.

2.- El Acuerdo de Reorganización tendrá vigencia hasta la última de las siguientes fechas: (i) lo primero que ocurra entre: (a) la fecha de término del período de conversión de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bono Convertible D o (b) la fecha en que se hayan convertido la totalidad de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y los Bonos Convertibles D, para el caso de que este último evento ocurra con anterioridad al término del referido período de conversión y (ii) la fecha en que ocurra el intercambio de los Bonos Internacionales por los Nuevos Bonos Internacionales.

## XV. COMISIÓN DE ACREEDORES.

1.- Para supervigilar el cumplimiento de las estipulaciones del Acuerdo de Reorganización Judicial y la actuación de los Órganos de Administración de la Compañía, se designa a una Comisión de Acreedores -no remunerada, salvo la excepción que se indica más adelante- integrada por cinco miembros titulares y sus respectivos suplentes (uno por cada miembro titular de la Comisión de Acreedores), que ejercerá sus funciones mientras se encuentre vigente el presente Acuerdo. La

39



Versión Presentación 08-08

Comisión de Acreedores estará compuesta por dos representantes de los Tenedores de Bonos Internacionales, dos representantes de los tenedores de bonos nacionales y un quinto miembro no acreedor ni representante de un acreedor y su respectivo suplente, que será elegido por los restantes miembros de la Comisión de Acreedores en su primera sesión, en la que además podrán determinarle una remuneración. Cada acreedor de los recién mencionados tendrá el derecho de remover a su representante en la Comisión de Acreedores y designar su reemplazo. Los cuatro miembros titulares y suplentes de la Comisión de Acreedores que serán representantes de los acreedores serán elegidos en la Junta de Acreedores, respectivamente, por los Tenedores de Bonos Internacionales (dos miembros titulares y dos suplentes) y los tenedores de bonos nacionales (dos miembros titulares y dos miembros suplentes).

2.- Los miembros de la Comisión de Acreedores tendrán la obligación de mantener en absoluta reserva toda información que, por la naturaleza de su contenido, tenga el carácter de confidencial, debiendo abstenerse de divulgarla a terceros. Para estos efectos, deberán suscribir un Acuerdo de Confidencialidad que contenga la obligación antes señalada.

3.- La Comisión de Acreedores fijará su forma funcionamiento y determinará la periodicidad de sus reuniones. Habrá miembros titulares y suplentes. Con todo, la administración de la Empresa Deudora o el Interventor Concursal, en su caso, podrán requerir que la Comisión de Acreedores se reúna para conocer y resolver materias específicas. Para estos efectos, se despachará carta certificada al domicilio del representante legal de los respectivos miembros de la Comisión de Acreedores o a sus correos electrónicos (registrado en la primera sesión constitutiva de esta Comisión), con a lo menos dos días hábiles bancarios de antelación, requiriendo la reunión, con indicación de la materia a consultar o discutir. Las citaciones consecutivas deberán tener, a lo menos, dos días hábiles bancarios de diferencia entre la primera y segunda citación. Si a requerimiento de éstos, la Comisión de Acreedores no se reúne habiendo mediado dos citaciones consecutivas, se solicitará las autorizaciones que corresponda al Tribunal competente.

4.- Respecto a los quórums para sesionar y mayorías para adoptar acuerdos, la Comisión de Acreedores sesionará con la participación de la mayoría simple de sus miembros (a lo menos 3), y los acuerdos se adoptarán por mayoría simple de sus miembros asistentes a la respectiva sesión (a lo menos 2), salvo en lo que respecta a las Condiciones de Repactación, las Condiciones para la Reprogramación y/o la Condición de Financiamiento o a las materias indicadas en el numeral 6.g y 6.j siguientesh siguiente, para lo cual se requerirá de un quórum de asistencia de a lo menos 4 (cuatro) de sus miembros y una mayoría de a lo menos 4 de los asistentes para adoptar acuerdos.

5.- La Comisión de Acreedores designará a un Presidente de la misma, que tendrá las siguientes facultades:

a.- Citar a reunión a los miembros de la Comisión de Acreedores, a requerimiento de cualquier miembro de la Comisión; del Interventor Concursal o de la Empresa Deudora.

b.- Citar a Junta de Acreedores en todos los casos que la Comisión de Acreedores lo estime necesario o conveniente.



Versión Presentación 08-08

c.- Comunicar a la Empresa Deudora las decisiones adoptadas por la Comisión de Acreedores.

6.- La Comisión de Acreedores tendrá las siguientes facultades:

a.- Remover y reemplazar al Interventor y requerir de él la información y gestiones que estime pertinentes.

b.- Fijar los honorarios del Interventor en cuanto a sus actividades de intervención propiamente tal. Dichos honorarios deberán ajustarse a la remuneración corriente del mercado, de acuerdo con la complejidad y responsabilidad del cargo y capacidad de pago de la Compañía.

c.- Tomar conocimiento de los antecedentes que le proporcione el Interventor, en especial, de la cuenta de su gestión, cuya periodicidad será determinada por la Comisión de Acreedores.

d.- Proveer las autorizaciones establecidas en el presente Acuerdo de Reorganización.

e.- Reemplazar al Presidente y/o Vicepresidente de la Comisión de Acreedores.

f.- Solicitar a la Empresa Deudora por intermedio del Interventor, la información del giro y sus planes y programas de operación.

g.- De conformidad al inciso segundo del art. 83 de la Ley Nº 20.720, la Comisión de Acreedores podrá modificar todo o parte del contenido del Acuerdo de Reorganización, salvo lo referente a la calidad de acreedor, su clase o categoría, diferencias entre acreedores de igual clase o categoría, monto de sus créditos y su preferencia. Se deja constancia que, cualquier modificación a los derechos de los Tenedores de Bonos Internacionales bajo el Indenture o el Nuevo Indenture requerirá de la modificación de dicho contrato, según corresponda, con el acuerdo previo de la Compañía y de los Tenedores de Bonos Internacionales bajo las reglas del Indenture o Nuevo Indenture.

h.- Autorizar excepcionalmente a Enjoy a no cumplir una determinada, obligación de hacer y/o de no hacer del presente Acuerdo de Reorganización.

i.- En representación de los acreedores, renunciar fundadamente al cumplimiento de cualquiera de las condiciones establecidas en su beneficio en el Acuerdo (sujeto al respectivo quórum fijado en este Acuerdo), o acordar su cumplimiento en una forma distinta a la originalmente contemplada o suspender su aplicación en forma temporal.

j.-En el evento que no se cumplan las *Condiciones de Repactación* previstas en el **Capítulo IV**, o bien las Condiciones de Financiamiento contenidas en el **Capítulo VIII** del presente Acuerdo de Reorganización, la Comisión de Acreedores analizará y determinará un mecanismo que permita implementar la repactación de los Bonos Internacionales en los términos previstos en el referido **Capítulo IV** o bien, en su caso, acordará la fórmula adecuada para la obtención de un financiamiento transitorio, pudiendo acordar con la Empresa

41



deudora los plazos y demás condiciones de este financiamiento. Estas materias deberán ser acordadas por a lo menos 4 miembros de la Comisión quienes, además, determinarán los plazos para dar cumplimiento a la ejecución de los actos y contratos que sean necesarios para implementar y desarrollar las referidas operacionesde Acreedores.

k.- Aprobar Plan de Uso de Fondos del Nuevo Financiamiento en general, quedando la atribución y responsabilidad específica de su implementación en la Empresa Deudora, cuyo cumplimiento será supervisado por el Interventor

l.- Las demás facultades que el presente Acuerdo le otorgue.

## XVI.  INTERVENTOR CONCURSAL.

1.- Sin perjuicio de la conformación de una Comisión de Acreedores, y de conformidad a lo establecido en el artículo 69 de la Ley N° 20.720, se propone que en la Junta Deliberativa de Acreedores se designe un Interventor (en adelante, el "*Interventor Concursal*" o el "*Interventor*"), que ejercerá sus funciones mientras se encuentre vigente el presente Acuerdo, quien tendrá las facultades establecidas en el citado artículo y las que más adelante se señalan.

2.- Esta designación deberá recaer en un veedor vigente de la Nómina de Veedores registrada en la Superintendencia de Insolvencia y Reemprendimiento.

3.- Sin perjuicio de las facultades que le corresponden de acuerdo al artículo 294 del Código de Procedimiento Civil, se propone que el Interventor Concursal designado tenga las siguientes facultades:

a.- Tener acceso a las oficinas e instalaciones de la Empresa Deudora para solicitar toda la información contable, financiera y comercial de esta, a fin de verificar o controlar el debido cumplimiento de las obligaciones contraídas en el presente Acuerdo de Reorganización.

b.- Informar a la Comisión de Acreedores de cualquier antecedente u operación que realice la Empresa Deudora y que pueda afectar el normal servicio de la deuda afecta al presente Acuerdo.

c.- Informar regularmente (a lo menos mensualmente) a la Comisión de Acreedores sobre los ingresos y gastos de la Empresa Deudora y en especial, sobre la eficiencia y gastos operacionales y pago de proveedores.

d.- Confeccionar actas de las reuniones de la Comisión.

e.- Aprobar todos los pagos que se realicen para el servicio de la deuda.

f.- Realizar una comprobación acerca del saldo de los créditos afectos al presente Acuerdo de Reorganización y determinar la procedencia de los pagos.



Versión Presentación 08-08

g.- Autorizar a la Empresa Deudora a otorgar garantías personales o reales para caucionar obligaciones propias y/o de terceros, en casos distintos a los ya permitidos mediante el presente Acuerdo, cuando éstas se encuentren ligadas al giro de la Compañía.

h.- Cumplir y ejecutar todas las facultades y obligaciones establecidas en el presente Acuerdo de Reorganización y aquellas que encomiende la Comisión de Acreedores.

i.- Informar regularmente (a lo menos mensualmente) a la Comisión de Acreedores sobre el uso de los fondos provenientes del Crédito Puente.

j.- Las demás facultades que se le otorgan en el presente Acuerdo de Reorganización.

## XVII. INCUMPLIMIENTO.

1.- De conformidad con lo dispuesto en los artículos 98 y siguientes de la Ley Nº 20.720, cualquier acreedor al que le afecte este Acuerdo podrá solicitar la declaración de incumplimiento, en caso de inobservancia de las estipulaciones del presente Acuerdo, y/o en caso de que se hubiere agravado el mal estado de los negocios de la Empresa Deudora en forma que haga temer un perjuicio para dichos acreedores.

2.- Será una causal expresa de incumplimiento del Acuerdo de Reorganización, en caso de que los Compromisos de Financiamiento no superen los $25.000.000.000.- (veinticinco mil millones de pesos). De ocurrir dicho incumplimiento, Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

3.- Será una causal expresa de incumplimiento (y un "*Bankruptcy Law Evento of Default*" bajo el Nuevo Indenture) uno cualquiera de los siguientes eventos: (i) que no se realice la junta extraordinaria de accionistas de aumento de capital señala en al **Capítulo X** anterior dentro de los 60 días siguientes a la fecha de la Junta Deliberativa; (ii) que en la junta extraordinaria de accionistas antes señalada no se aprueben todas las materias propuestas; (iii) que Enjoy no suscriba cada uno de los contratos de emisión de bonos dentro de los 90 días siguientes a la fecha de la de la Junta Deliberativa; (iv) que Enjoy no solicite a la CMF la inscripción en el Registro de Valores de los respectivos bonos dentro de los 120 días siguientes a la fecha de la Junta Deliberativa; (v) que Enjoy no obtenga de la CMF la inscripción de los respectivos bonos en el Registro de Valores dentro del plazo de un año contado desde la fecha de la Junta Deliberativa; (vi) que Enjoy no dé inicio al Período de Oferta Preferente dentro de los 30 días hábiles siguientes a la a la última fecha en que se efectúe la inscripción en el Registro de Valores de la CMF de las emisiones de bonos convertibles y de las acciones; y (vii) que Enjoy no efectúe los prepagos con los respectivos bonos en las fechas establecidas en este Acuerdo. De ocurrir cualquiera de los eventos anteriormente descritos, Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

4.- Por otra parte, los Acreedores también podrán individualmente ejercer todas las acciones que les confiere la ley para obtener el pago íntegro de sus créditos, todo ello dentro del marco del presente Acuerdo de Reorganización, salvo en el caso de las acciones de los Tenedores de Bonos Internacionales bajo el Indenture, que se ejercerán libremente sin sujeción a este Acuerdo conforme se explica en los Capítulos IV y XVIII.



## XVIII. GARANTÍAS.

Se ratifican las obligaciones de Enjoy contenidas en el **Indenture** y en los **Bonos Internacionales**, y por tanto se mantienen, ratifican y reservan, expresamente y en todas sus partes, las Garantías reales y personales establecidas en estos documentos para garantizar el pago de las obligaciones del Indenture, incluyendo, sin limitación, durante la Prórroga de los Bonos Internacionales. Asimismo, dichas Garantías reales y personales garantizarán todas las obligaciones de Enjoy bajo los Nuevos Instrumentos, debiendo otorgarse los documentos que pudieran ser requeridos bajo ley chilena y uruguaya para la debida reserva, ratificación y mantención de las mismas, o bien, para la creación de nuevas garantías en términos sustancialmente idénticos a las actuales.

Por el presente acto, o bien, mediante  Escritura Pública de Declaración (en adelante la "*Escritura de Declaración*") acompañada al 8° Juzgado Civil de Santiago, en la causa rol C-6.689-2020, con anterioridad a la celebración de la Junta Deliberativa, Enjoy Gestión Limitada., Inversiones Enjoy SpA, Inversiones Inmobiliarias Enjoy SpA., Enjoy Consultora S.A., Inversiones Andes Entretención Limitada., Inmobiliaria Proyecto Integral Coquimbo SpA, Operaciones Integrales Coquimbo Limitada, Inmobiliaria Kuden SpA, Campos del Norte S.A., Enjoy Caribe SpA, Inmobiliaria Proyecto Integral Castro SpA, Slots S.A., Masterline S.A., Kuden S.A., Operaciones Turísticas S.A., Operaciones Integrales Isla Grande S.A., Rantrur S.A., Casino de Iquique S.A., Casino de la Bahía S.A., Casino del Mar S.A., Casino del Lago S.A., Casino de Puerto Varas S.A., Yojne S.A. y Baluma S.A. (en adelante conjuntamente los "*Garantes*"), representadas por sus apoderados señores Esteban Rigo-Righi Baillie RUT Nº13.454.480-5 y Rodrigo Larraín Kaplan RUT Nº 10.973.139-0, comparecen y declaran expresamente que acceden a las obligaciones de Enjoy bajo el Indenture, este Acuerdo y los Nuevos Instrumentos, y declaran expresamente que las prendas, hipotecas, fideicomisos y codeudas solidarias constituidas por ellos en los términos señalados en el Indenture, según corresponda, se extenderán también a las obligaciones de la Empresa Deudora bajo el Indenture, este Acuerdo y los Nuevos Instrumentos, en los términos señalados en el presente Acuerdo.

Adicionalmente, por el presente acto o mediante la Escritura de Declaración, Inmobiliaria Proyecto Integral Coquimbo SpA e Inmobiliaria Kuden SpA, representadas por sus apoderados señores Esteban Rigo-Righi Baillie y Rodrigo Larraín comparecen y declaran que accederán expresamente a las nuevas obligaciones de Enjoy bajo el Indenture, este Acuerdo y los Nuevos Instrumentos aquí acordadas. Asimismo, para los efectos del artículo 1.642 del Código Civil, Inmobiliaria Proyecto Integral Coquimbo SpA, Inmobiliaria Kuden SpA, la Empresa Deudora, todos ellos representados por sus apoderados señores Esteban Rigo-Righi Baillie y Rodrigo Larraín Kaplan y los Tenedores de Bonos Internacionales convienen expresamente en la reserva de las hipotecas constituidas por Inmobiliaria Coquimbo SpA e Inmobiliaria Kuden SpA, en beneficio de los Tenedores de Bonos Internacionales.

Para ausencia de dudas, las Garantías reales y personales que garantizan las obligaciones de Enjoy bajo el Indenture y los Bonos Internacionales, reservadas y ratificadas en este acto o mediante la Escritura de Declaración, se extienden y acceden al pago total de la deuda de Enjoy con los Tenedores de Bonos Internacionales, sea en virtud de este Acuerdo, los actuales Bonos

44



Internacionales, del Indenture y sus *Security Documents*, o bien del Nuevo Indenture y los Nuevos Bonos Internacionales en el evento que el intercambio previsto en el **Capítulo IV** se lleve a efecto, extendiéndose en todos los casos a las sucesivas prórrogas, repactaciones o novaciones de dichos créditos, lo que es expresamente aceptado por los Garantes comparecientes.

Los Garantes, representados en la forma antes señalada, se obliga a suscribir todos los actos, contratos y documentos que sean necesarios o convenientes para la implementación del presente Acuerdo de Reorganización, incluyendo, en o antes del intercambio de los Bonos Internacionales por los Nuevos Instrumentos y como condición de dicho intercambio, el otorgamiento de escrituras públicas de reserva y ratificación de las Garantías, y el otorgamiento de las correspondientes autorizaciones corporativas, a satisfacción del Trustee de los Bonos Internacionales.

En el evento que el Trustee de los Bonos Internacionales considere que, para cualquiera de las Garantías, es más beneficioso para los Tenedores de Bonos Internacionales el otorgamiento de nuevos contratos de garantías que recaigan sobre los mismos bienes, muebles o inmuebles, en lugar de la ratificación y reserva de las existentes, los Garantes suscribirán todos los actos, contratos y documentos que sean necesarios o convenientes para la implementación de esas nuevas garantías, en términos sustancialmente iguales a las Garantías actuales, y la condición de intercambio se entenderá cumplida al otorgarse las nuevas garantías a satisfacción del Trustee de los Bonos Internacionales.

## XIX.  FORMALIDAD Y OTRAS ESTIPULACIONES.

1.- Según lo establece el artículo 90 de la Ley N° 20.720, una copia del acta de la Junta de Acreedores en la que conste el voto favorable del Acuerdo y su texto íntegro, junto con la copia de la resolución judicial que lo aprueba y su certificado de ejecutoria, podrá ser autorizado por un ministro de fe o protocolizarse ante un notario público. Sin perjuicio de lo anterior, la Empresa Deudora estará obligada a suscribir los nuevos títulos que documenten los términos del presente Acuerdo.

2.- El presente Acuerdo de Reorganización debidamente aprobado tendrá el efecto de poner término inmediato a todos los juicios pendientes o de precaver la interposición de acciones de diversa índole, ya sea civiles, comerciales y otros, incluidos pero no limitados a juicios de notificación de cobro de facturas, juicios de notificación de protesto de cheque, querellas por giro doloso de cheque y/o juicios ejecutivos por cualquier título, que se sigan en contra de la Empresa Deudora o sus codeudores solidarios, avalistas o fiadores, iniciados por acreedores a quienes el presente Acuerdo de Reorganización afecte en los términos del artículo 66 de la Ley N° 20.720.

3.- Para estos efectos una copia autorizada de la resolución que tenga por aprobado el Acuerdo de Reorganización servirá como atento y suficiente oficio remisor para requerir al Tribunal correspondiente que disponga el término del juicio y el alzamiento de embargos, medidas precautorias y cualquier gravamen de diversa índole. Todo lo anterior es sin perjuicio de la instrucción directa que al efecto envíe el Tribunal llamado a conocer de la presente Propuesta mediante medios electrónicos de interconexión, donde se requiera el término de los procedimientos y los respectivos alzamientos.

El mismo efecto señalado en los párrafos anteriores, tendrá el Acuerdo que comience a regir, no obstante ser impugnado por acreedores que representen menos del 30% del pasivo con derecho a

45



Versión Presentación 08-08

voto de su respectiva clase o categoría, según lo dispuesto en el inciso cuarto del artículo 89 de la Ley Nº 20.720. Para efectos de determinar el porcentaje señalado anteriormente, será necesaria una certificación que realice la Secretaría de este Tribunal.

4.- Los acreedores de la Empresa Deudora que hayan publicado sus acreencias morosas en los respectivos registros que mantengan diversas instituciones, ya sea públicos o privados, tales como DICOM EQUIFAX, Boletín Comercial dependiente de la Cámara de Comercio de Chile, registro de morosidad de la Comisión para el Mercado Financiero, y en general cualquier registro de morosidades existente en nuestro País, autorizan por este acto a la Empresa Deudora a solicitar la eliminación de todas las anotaciones de morosidades y en general cualquier publicación relacionada al efecto, que tengan relación con acreencias anteriores a la Resolución de Reorganización y aquellas posteriores sobre créditos previamente devengados.

Asimismo, los acreedores por este acto se comprometen a no requerir nuevas publicaciones respectos a los créditos que forman parte del presente Acuerdo de Reorganización, mientras la Empresa Deudora se encuentre al día en el cumplimiento de sus obligaciones bajo este Acuerdo.

Los antecedentes señalados en el numeral primero del presente Capítulo servirán como atento y suficiente oficio remisor para efectos de requerir la eliminación de las publicaciones y publicaciones referidas precedentemente.

5.- Los acreedores y la Empresa Deudora dejan constancia que con posterioridad al cumplimiento de la Condición de Financiamiento no será aplicable la prohibición establecida en el artículo 67 de la Ley Nº 20.720, sin perjuicio de la restricción contractual para efectuar disminuciones de capital conforme a los términos del Nuevo Indenture.

## XX. DECLARACIONES Y SEGURIDADES A LA FECHA DE ESTE ACUERDO DE REORGANIZACIÓN JUDICIAL.

La Empresa Deudora debidamente representada en la forma indicada en la comparecencia de este instrumento, a esta fecha, declara y asegura lo siguiente a cada Acreedor de este Acuerdo de Reorganización Judicial:

1.- Que es una sociedad válidamente constituida y vigente bajo las leyes de Chile y que, tanto la celebración de este Acuerdo de Reorganización Judicial, como el cumplimiento y ejecución de todas las obligaciones en él contenidas, se encuentran dentro de sus facultades legales y societarias y que han sido aprobadas por sus órganos de administración competentes; y que quienes comparecen en este Acuerdo de Reorganización Judicial en su representación tienen los poderes y autoridades suficientes para celebrar este Acuerdo de Reorganización y cumplir las obligaciones contraídas en el mismo.

2.- Que la celebración de este Acuerdo de Reorganización Judicial no requiere de la aprobación o autorización de autoridad gubernamental o judicial adicional ninguna, ni de terceros, salvo aquéllas ya obtenidas y que permanecen en vigencia, y que no tiene información ni conocimiento que la celebración y el cumplimiento de este Acuerdo de Reorganización Judicial viola ni contraviene la legislación, normativa o resoluciones actualmente vigentes, ni sus respectivos



Versión Presentación 08-08

estatutos. Lo anterior es sin perjuicio de las aprobaciones y/o autorizaciones y/o procedimientos que puedan ser requeridos con motivo de la implementación del presente Acuerdo, conforme a /**i**/ los estatutos de Enjoy; /**ii**/ la Ley Nº 18.046 sobre Sociedades Anónimas y su Reglamento; /**iii**/ la Ley Nº 18.045 sobre Mercado de Valores, y normativa relacionada dictada por la Comisión para el Mercado Financiero, /**iv**/ el DL 211 que fija las normas para la defensa de la Libre Competencia; /**v**/ la Ley N° 19.995 que establece las bases generales para la autorización, funcionamiento y fiscalización de Casinos de Juego; /**vi**/ las regulaciones emitidas por la Superintendencia de Casinos de Juego; y /**vii**/ la normativa y legislación que sea aplicable de Uruguay y Argentina.

3.- Que el presente instrumento constituye documentación legal, válida, exigible, con mérito ejecutivo, obligatoria y suficiente para su cobro, y que en cualquier gestión de cobro de las obligaciones de que da cuenta este Acuerdo de Reorganización Judicial, reconocerá este instrumento como título suficiente para el cobro de las mismas.

4.- Ninguna renuncia a cualquier disposición de este Acuerdo de Reorganización Judicial, ni el consentimiento para que la Empresa Deudora actúe en forma diferente a ellos, tendrá efecto alguno a menos que haya sido otorgada por escrito y suscrita por la Comisión de Acreedores en este Acuerdo de Reorganización Judicial, y en tal caso esa renuncia o consentimiento tendrá efecto solamente en el caso específico y para el objeto específico para el cual se haya otorgado. En todo caso, toda modificación de este Acuerdo de Reorganización Judicial deberá ceñirse y respetar, en todo lo que fuere aplicable, las estipulaciones contenidas en este instrumento.

5.- Lo dispuesto en este Acuerdo de Reorganización Judicial será obligatorio para la Empresa Deudora y los acreedores afectos a este Acuerdo, y sus respectivos sucesores legales y cesionarios.

6.- Las denominaciones asignadas a las distintas estipulaciones de este Acuerdo de Reorganización Judicial han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener y que puedan ser distintos que dicha denominación.

## XXI.  DOMICILIO Y JURISDICCIÓN COMPETENTE.

El domicilio especial del Acuerdo será la ciudad de Santiago, por lo que se someterá a la competencia de sus tribunales ordinarios para conocer sobre cualquier dificultad que se suscite en cualquiera de las clases o categorías del presente Acuerdo, sin excluir la posibilidad de que los Tenedores de Bonos Internacionales recurran para el cumplimiento del Indenture a las jurisdicciones que correspondan bajo ese contrato.

47

**<u>Exhibit C</u>**

**Confirmation Order**



STATE OF NEW YORK )
)
)
COUNTY OF NEW YORK ) ss

## **CERTIFICATION**

This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate

translation from Spanish into English of the Hearing Minutes of the Creditors Meeting Judicial Reorganization

Agreement [JRA] of ENJOY S.A., dated Friday, August 14, 2020.


Edward J. Jacob
Divergent Language Solutions, LLC


State of New York

County of New York

Subscribed to and sworn before me this 17ᵗʰ day of _August_, 2020,

by Edward J. Jacob.


Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, State of New York
No. 01ZE6350239
Qualified in New York County
Commission Expires November 7, 2020

183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11ᵗʰ Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

NOMENCLATURE          : 1. [1100]Creditors Meeting
COURT                 : 8th Civil Court of Santiago
CASE NO.              : C-6689-2020
TITLE                 : /ENJOY S.A.

## HEARING MINUTES LAW 20,720

## CREDITORS MEETING JUDICIAL REORGANIZATION

## AGREEMENT [JRA] OF DEBTOR COMPANY

| | |
|---|---|
| DATE | Friday, August fourteenth, two thousand twenty |
| COURT | 8th Civil Court of Santiago |
| CASE | C-6.689-2020 |
| JUDGE | **Sylvia Josefina Papa Beletti** |
| AUTHENTICATING OFFICER | Leonardo Wlodawsky Malschafsky |
| SECRETARY | Karen Georges Catalán // Ximena Araya Pino |
| START TIME | 03:15 PM |
| END TIME | 05:03 PM |
| **DEBTOR COMPANY** | **ENJOY S.A.** |
| AUDITOR | Patricio Jamarne Banduc |
| AUDITOR'S LEGAL REPRESENTATIVE | Francisco Game, Juan Ignacio Jamarne |

| ACTIONS TAKEN | YES | NO |
|---|---|---|
| START | X | |
| PARTICIPANT IDENTIFICATION | X | |
| DETAILS AND DISCUSSION OF AGREEMENT | X | |
| RECORDING OF SIGNATURES | X | |
| CREDITORS' VOTE BY VIDEOCONFERENCE | | |
| CLOSE OF MEETING | | X |
| APPROVAL OF RESOLUTION | X | |
| REJECTION OF RESOLUTION – NEW JRA PROPOSAL – NEW CONVOCATION OF CREDITORS MEETING | | X |



| REJECTION OF RESOLUTION – LIQUIDATION | | X |
| --- | --- | --- |

**Santiago, Friday, August fourteenth, two thousand twenty.**

On the date and time noted in the bankruptcy reorganization proceeding for the debtor company **"ENJOY S.A."** pursuant to Articles 77 and thereafter of Law 20,720, in addition to Minutes 42-2020 and Minutes 53-2020 and Law 21,226 establishing a legal regime of exception for judicial proceedings, at the judicial hearings and procedures, and for the terms and exercise of the specified actions, due to the impact of the Covid-19 disease in Chile, the creditors meeting convened to hear and approve the proposed judicial reorganization agreement which was held by videoconference, in the presence of the Acting Judge of this Eighth Civil Court of Santiago, Mrs. **Sylvia Josefina Papa Beletti** and authenticating officer Mr. **Leonardo Wlodawsky Malschafsky**, with the assistance of auditor [*veedor*] Mr. Patricio Jamarne Banduc, legal representatives Mr. Francisco Gamé Hardessen and Mr. Juan Ignacio Jamarne, the legal representative of the debtor company Mr. Rodrigo Larrain Kaplan, Mr. Esteban Rigo-Righi, and debtor representatives Mr. Nelson Contador Rosales, Mrs. María Ignacia Contador Astrosa and Mr. Iván Caldery Hasche.

Prior to the start of the hearing, the Court acknowledged that for procedural purposes, all microphones will be silenced, and the floor will be yielded as it is requested through the videoconference system (once the Auditor has provided his report).

The Court requests that the participants appearing in the hearing by videoconference identify themselves by indicating their



name and whom they represent, displaying their identification card to the
Secretary:

| Creditor | Loan | Legal Rep. |
|---|---|---|
| Citibank N.A. (Representative International Bondholders) | $172,711,806,188 | Ricardo Reveco. |
| Banco del Estado de Chile | $3,017,480,000 | Luis Eduardo Montes Montes. |
| Banco de Creditos e Inversiones | $4,036,304,601 | Juan Pablo Dominguez Balmaceda. |
| Banco Security | $39,241,319 | Esteban Garcia Nadal. |
| Banco Santander Chile | $7,789,780,000 | Jose Antonio Morales Miranda. |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Mediano Plazo | $1,715,000,000 | Juan Esteban Puga. |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Corto Plazo | $4,696,867,808 | Juan Esteban Puga |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Vision Money Market | $1,525,607,222 | Juan Esteban Puga, Luis Gutierrez |
| Tanner Corredores de Bolsa S.A. | $7,850,541,089 | Jose Joaquin Meza |
| Banco Itau Corpbanca | $1,976,254,108 | Marcelo Contreras Cerda |



| | | |
|---|---|---|
| Banco Santander Chile (Representative of 18 Series J Domestic Bondholders according to a certificate from Depósito Central de Valores S.A.) | $58,115,530,396 | Panlo Montt Rettig and Manuel De La Prida |
| Credicorp Capital S.A. Corredores de Bolsa | $27,153,446 | Jose Miguel Diez Ihnen; Luis Horacio Rojas Soto |
| Banco Santander Chile (Representative of 27 Series I Domestic Bondholders according to a certificate from Depósito Central de Valores S.A.) | $87,458,493,271 | Cristian Gandarillas, Sebastian Fuentes |
| Banco Consorcio | $2,447,985,680 | Diego Benavente |
| Banchile Administradora General de Fondos S.A. | $2,750,000,000 | Francisco Thorn |
| Ameris Capital Administradora General de Fondos S.A. on behalf of Ameris Deuda Chile Fondo de Inversión | $80,000,000 | Adacila Andrea Carraco Valenzuela |
| Fynsa Administradora General de Fondos S.A. on behalf of Fondo de Inversión Fynsa Deuda Chile | $100,000,000 | Ignacio Frias |

Total liabilities with right to vote at this meeting correspond to **63** creditors, yielding a total of **$356,924,433,850**, of which 60 creditors were present at this meeting, representing a total



of **$356,338,045,128**, equivalent to **99.84%** of total liabilities with recognized right to vote.

Said total liabilities are broken down among total liabilities of PREFERRED class with right to vote, corresponding to one creditor representing a total of $172,711,806,188, of which one creditor was present, representing 100%, which in turn is equivalent to 100% of total liabilities with right to vote recognized for the preferred class.

Further, the total recognized for the UNSECURED class with right to vote corresponded to 62 creditors, representing a total of $184,212,627,662, of which 59 creditors were present, representing a total of $183,626,238,940, which in turn is equivalent to 99.68% of total liabilities with recognized right to vote for the unsecured class.

Having called the Meeting to order and confirmed the legally required quorum, **the Court offered the floor to the legal representative of the Debtor Company**, for purposes of briefly setting out the essential issues covered in the Proposed Reorganization Agreement and to mention the assumptions incorporated into the text of the Agreement.

The legal representative of the Debtor Company, Mr. Nelson Contador Rosales, took the floor and, after thanking those present, stated that the purpose of the proposed Reorganization Agreement is the following:

1.- The effective and total continuation of the regular commercial activities of **ENJOY S.A.**, as from the date of presentation of this Proposal, with a view to pursuing a payment method consistent with its projected cash flows, restoring the operational level of the



Company and providing for repayment of its obligations.

2.- The granting of new conditions for the repayment of all loans subject to the Reorganization Agreement, under the conditions set forth in this instrument;

3.- A reduction in the Company's debt level, through the conversion of at least 70% of the unsecured debt to bonds convertible to shares, with a strong incentive for conversion.

4.- Obtaining fresh funds for the Company totaling up to $55,000,000,000 (fifty-five billion Chilean pesos), through a loan agreement to be prepaid through the issuance of a bond convertible to shares, with a strong incentive for conversion.

Additionally, the Debtor Company's attorney noted that after various meetings held with the Creditors and the Auditor, some assumptions were incorporated into the proposal originally drawn up, which have already been presented in the case files, and which are acknowledged in these minutes, in the complete text of the Reorganization Agreement.

With the scope of the proposal having been set forth, the Court yielded the floor to the **Auditor**, to briefly explain the essential topics of the submitted report and to offer an opinion as to the likelihood of the agreement's being fulfilled or the feasibility of the agreement and the other requirements considered in Numeral 8, Article 57 of the law.



The auditor further added that pursuant to Item i.-, Letter c.-, No. 3, Chapter X of the Proposed Reorganization Agreement, both the company and shareholders representing 60.52% of Enjoy's share capital have entered into a support agreement with Enjoy in which they promise to approve the bond issuances, capital increase and other changes that might be required for execution of the JRA, and also waive their preferred right to subscribe the bonds convertible to shares in the form indicted in the proposal.

Finally, the auditor added that pursuant to Letter d), No. 1, Chapter VIII of the agreement, the bankruptcy administrator [*interventor*] informs Your Honors and the creditors that a financing commitment totaling 25,000,000,000 pesos has been filed by a group of creditors.

The Court then offered the floor to the creditors to discuss the proposed reorganization agreement or to clarify any doubts with respect to the Auditor's report and its opinion thereon.

Participating in the discussion were Mr. Juan Pablo Domínguez on behalf of Banco Créditos e Inversiones, Mr. José Antonio Morales for Banco Santander, Mr. Ignacio Frías for Fondo de Inversión Fynsa Deuda Chile, and Mr. Luis Eduardo Montes for Banco del Estado de Chile.

Finally, finding the proposal and its amendments to be capable of being voted on, the Court ordered that a vote on the agreement be carried out by the creditors in their respective class or category.

The Bondholders Representative confirmed at this meeting having received the results of the ballot process from the Bondholders, organized by the Debtor Company, in accordance with the applicable provisions of US law. Under US law



and as represented by the Debtor Company in the voting process, the Reorganization Plan will be understood as having been approved if favorable votes are received from Bondholders representing more than 2/3 of the total and 50% of the number of said Holders. According to the official ballot report received by the Trustee, the necessary favorable votes have been received from the International Bond[holder]s, and thus the Plan was APPROVED by the class of International Bondholders.

Vote on the reorganization agreement

**1.- SECURED CREDITOR VOTES FOR APPROVAL:**

| CREDITOR | AMOUNT | YES | NO | S/A |
|---|---|---|---|---|
| Citibank N.A. (Representative International Bondholders) | $172,711,806,188 | X | | |

Consequently, with the one secured creditor having voted in favor of the agreement, i.e., 100% of the creditors present, in turn representing 100% of total liabilities with right to vote in the class or category, i.e., a total of $172,711,806,188, the category of secured creditors is considered as having approved the Agreement.

**2.- UNSECURED CREDITORS VOTE FOR APPROVAL:**

| CREDITOR | YES | NO | S/A |
|---|---|---|---|
| Banco del Estado de Chile | | X | |



| | | |
|---|---|---|
| Banco de Créditos e Inversiones | X | |
| Banco Security | X | |
| Banco Santander Chile | | X |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Mediano Plazo | X | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Corto Plazo | X | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Vision Money Market | X | |
| Tanner Corredores de Bolsa S.A. | X | |
| Banco Itau Corpbanca | | X |
| Banco Santander Chile (Representative of 18 Series J Domestic Bondholders according to a certificate by Depósito Central de Valores S.A.) | X | |
| Credicorp Capital S.A. Corredores de Bolsa | X | |
| Banco Santander Chile (Representative of 27 Series I Domestic Bondholders according to a certificate by Depósito Central de Valores S.A.) | X | |
| Banco Consorcio | X | |
| Banchile Administradora General de Fondos S.A. | X | |
| Ameris Capital Administradora General de Fondos S.A. on behalf of Ameris Deuda Chile Fondo de Inversión | X | |
| Fynsa Administradora General de Fondos S.A. on behalf of Fondo de Inversión Fynsa Deuda Chile | X | |

Consequently, with 56 unsecured creditors having voted in favor of the agreement, i.e., 93.04% of the creditors present, which



in turn represent 92.74% of total liabilities recognized with right to vote in the class or category, i.e., a total of $170,842,724,832, the category of unsecured creditors is considered as having approved the Agreement.

It was confirmed that the creditor Tanner Corredores de Bolsa S.A. is participating, notifying the meeting that it represents a total of $6,015,412,621, pursuant to which it was informed that it must participate on behalf of its entire outstanding loan, and may not split it.

The vote was then held in accordance with Article 634 of Law 20,720 with respect to the clause established in Numerals VI and VII of the agreement:

1.- With respect to the Banking Creditors who commit to granting to the Debtor Company, or to one or more of its subsidiaries, one or more revolving lines of credit within a maximum of five banking days after the date of entry into force of the Agreement, with the features noted in the Agreement:

| CREDITOR | YES | NO | S/A |
|---|---|---|---|
| Banco Security | X | | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Mediano Plazo | X | | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Corto Plazo | X | | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Vision Money Market | X | | |



| | | | |
|---|---|---|---|
| Tanner Corredores de Bolsa S.A. | X | | |
| Banco Santander Chile (Representative of 18 Series J Domestic Bondholders according to a certificate by Depósito Central de Valores S.A.) | X | | |
| Credicorp Capital S.A. Corredores de Bolsa | X | | |
| Banco Santander Chile (Representative of 27 Series I Domestic Bondholders according to a certificate by Depósito Central de Valores S.A.) | X | | |
| Banchile Administradora General de Fondos S.A. | X | | |
| Ameris Capital Administradora General de Fondos S.A. on behalf of Ameris Deuda Chile Fondo de Inversión | X | | |
| Fynsa Administradora General de Fondos S.A. on behalf of Fondo de Inversión Fynsa Deuda Chile | X | | |

Consequently, having received a favorable vote for the most favorable condition set forth in Chapter VI of the Agreement with respect to unsecured bank creditors, by 11 unsecured creditors, i.e., 100% of the creditors present, in turn representing 100% of total liabilities with right to vote in the class or category, i.e., a total of **$164,358,434,551**, the most favorable condition with respect to bank creditors in the Reorganization Agreement is considered as **Approved**.

2.- With respect to the unsecured supplier creditors noted in the agreement:

| CREDITOR | YES | NO | S/A |
|---|---|---|---|
| Banco del Estado de Chile | X | | |



| | | | |
|---|---|---|---|
| Banco de Creditos e Inversiones | X | | |
| Banco Santander Chile | X | | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Mediano Plazo | X | | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Deuda Corto Plazo | X | | |
| Principal Administradora General de Fondos S.A. on behalf of Fondo Mutuo Principal Vision Money Market | X | | |
| Tanner Corredores de Bolsa S.A. | X | | |
| Banco Itau Corpbanca | X | | |
| Banco Santander Chile (Representative of 18 Series J Domestic Bondholders according to a certificate by Depósito Central de Valores S.A.) | X | | |
| Banco Santander Chile (Representative of 27 Series I Domestic Bondholders according to a certificate by Depósito Central de Valores S.A.) | X | | |
| Banco Consorcio | X | | |
| Banchile Administradora General de Fondos S.A. | X | | |
| Ameris Capital Administradora General de Fondos S.A. on behalf of Ameris Deuda Chile Fondo de Inversión | X | | |
| Fynsa Administradora General de Fondos S.A. on behalf of Fondo de Inversión Fynsa Deuda Chile | X | | |

Consequently, having received a favorable vote for the most favorable condition set forth in Chapter VII of the Agreement with respect to the unsecured creditors listed in the agreement, by 100% of the creditors representing all liabilities with right to vote in the class or category, i.e., a total of $183,559,844,175,



the most favorable condition with respect to supplier creditors listed in the Reorganization Agreement is considered as **Approved**.

It is also set forth that for purposes of fulfilling the provisions of Article 79 of Law 20,720, the debtor company, through its representative, provides its express consent with respect to the agreement and its modifications previously agreed to by the creditors.

For their part, Messrs. Esteban Rigo-Righi Baillie and Rodrigo Larraín Kaplan were in attendance, who on behalf of the companies Enjoy Gestión Limitada., Inversiones Enjoy SpA, Inversiones Inmobiliarias Enjoy SpA., Enjoy Consultora S.A., Inversiones Andes Entretención Limitada., Inmobiliaria Proyecto Integral Coquimbo SpA, Operaciones Integrales Coquimbo Limitada, Inmobiliaria Kuden SpA, Campos del Norte S.A., Enjoy Caribe SpA, Inmobiliaria Proyecto Integral Castro SpA, Slots S.A., Masterline S.A., Kuden S.A., Operaciones Turísticas S.A., Operaciones Integrales Isla Grande S.A., Rantrur S.A., Casino de Iquique S.A., Casino de la Bahía S.A., Casino del Mar S.A., Casino del Lago S.A., Casino de Puerto Varas S.A., Yojne S.A. and Baluma S.A stated that they accept the postponement of their receivables in accordance with the terms of the bankruptcy reorganization agreement, and that they also ratify in all their parts the obligations assumed in the bankruptcy reorganization agreement of Enjoy S.A.

The court resolves in this regard that:

**Having held a vote by the creditors meeting, and in addition with the express consent of the debtor, and in view of the provisions of Article 79 of Law 20,720, it considers as Approved the**



**bankruptcy reorganization agreement of the debtor company Enjoy S.A. and its respective modifications.**

The Court acknowledges that the required legal majorities have been met, and that the Debtor Company, through its representative, has consented to the proposed Reorganization Agreement, pursuant to Article 79 of Law No. 20,720 on Insolvency and Recovery.

**WHEREAS:**

Having addressed the merit of the matters set forth above and in accordance with the provisions of Article 79 of Law 20,720 of the Chilean Insolvency and Recovery Act [*Ley [de] Insolvencia y Reemprendimiento*], and having attained legal quorum on the aforementioned ballot, the proposed Judicial Reorganization Agreement of Enjoy S.A. is considered as **AGREED UPON** and as approved, if it is not disputed within the legal deadline or pursuant to the cases of Article 89 of the law in question, and it thereby orders, at the appropriate time, the lifting of the annotations made pursuant to Article 92 of said law, and orders the auditor to provide notice of these minutes and of the complete text of the Agreement, which may be found in an additional file and is considered an integral part of these minutes for all legal purposes, in the *Boletín Concursal* [Bankruptcy Bulletin], pursuant to Article 84 of Law 20,720 on Insolvency and Recovery.

The court then noted that, as stipulated in the agreement, it is now necessary for the creditors meeting to appoint the **creditors commission**, noting that five representatives may participate therein, two of which are to be appointed by the International Bondholders, two by the



domestic bondholders and one person who shall be appointed by the four remaining members of the commission.

The auditor reported that the following individuals have been proposed for appointment as acting members by the international bond[holder]s:

(a) Felipe Claro Edwards, on behalf of Moneda Renta CLP Fondo de Inversión;

(b) Salvador Valdés Correa, on behalf of Moneda Deuda Latinoamericana Fondo de Inversión.

The following are proposed as alternates:

(a) Andrés Eyzaguirre Gubbins, on behalf of Moneda Deuda Chile Fondo de Inversión;

(b) Ricardo Reveco Urzúa, on behalf of Moneda Latin American Corporate Debt.

The Representative of Banco Santander on behalf of the domestic Series I Bondholders, and the Representative of Banco Santander on behalf of the domestic Series J Bondholders, indicates that they are appointing:

1. As Acting Members of the creditors commission

(a) Penta Vida Compañía de Seguros de Vida S.A.

(b) Euroamérica Seguros de Vida S.A.

2. Alternate Members of the creditors commission



(a) Penta Hipotecario Administradora de Mutuos Hipotecarios S.A.

(b) Euroamérica Corredores de Bolsa S.A.


Next, having addressed the provisions of Article 69 of the law, it is necessary that the creditors meeting **appoint an administrator** [*interventor*], noting that said appointment must fall to an auditor currently registered on the list of auditors maintained by the Superintendency of Insolvency and Recovery [*Superintendencia de Insolvencia y Reemprendimiento*] and that the corresponding compensation shall be approved by the creditors meeting.-

After the creditors had deliberated and voted, **Patricio Jamarne Banduc** was ratified and appointed **as Acting Administrator of this Reorganization.**

Finally, the Court informed the auditor that in order to comply with the court's orders pursuant to the resolution of June 24, 2020, and the instructions by the Superintendency of Insolvency and Recovery, to inform the creditors meeting and the court with respect to the foreign recognition process being heard by the United States Bankruptcy Court Southern District of New York, it must make a brief summary of this matter, to which end it reported:

- That pursuant to Superior Entry No. 22,912 of June 19, 2020, in my capacity of acting auditor of the bankruptcy proceeding for the reorganization of the debtor company Enjoy S.A., it requested the Superintendency of Insolvency and Recovery to authorize the filing of an action with the United States Bankruptcy Courts of New York, in order for them to grant to



the debtor company a measure similar to [*simil*] Financial Protection in Bankruptcy, so long as the Bankruptcy Reorganization Procedure with its respective extensions is underway.

- That pursuant to Exempt Resolution No. 5893 of June 19, 2020, as handed down by the Superintendency of Insolvency and Recovery, and pursuant to Art. 304 of Law No. 20,720, the Superintendent of Insolvency and Recovery, Mr. Hugo Sánchez Ramírez, has authorized the undersigned to act abroad with respect to the Bankruptcy Reorganization Proceeding of the debtor company Enjoy S.A., and has authorized him to take the necessary actions vis-à-vis the jurisdiction of the United States of America.

- That pursuant to Chapter XV of the United States Bankruptcy Code, the duly represented auditor appeared before the "United States Bankruptcy Court Southern District of New York," and requested that the bankruptcy proceeding for the reorganization of Enjoy S.A., being heard by the 8th Civil Court of Santiago, Case No. C-6689-2020, be recognized as a principal foreign proceeding, in order for the United States Bankruptcy Court Southern District of New York to grant the debtor company a measure similar to financial protection under US law and thereby protect the assets of Enjoy S.A. located in the United States of America.

- In this regard it is reported that in order to file legal action with the United States Bankruptcy Court Southern District of New York, it was necessary to engage the law firm of "Paul Hastings," agreeing that the aforementioned attorneys' fees would be assumed by Enjoy S.A.



- It is set forth that, as noted in the resolution dated July 27, 2020, the United States Bankruptcy Court Southern District of New York acknowledged the bankruptcy proceeding for the reorganization of Enjoy S.A. as a principal foreign proceeding, and once the Deliberative Meeting of Creditors was convened to hear the proposed reorganization agreement, it was necessary that its results be reported to the United States Bankruptcy Court Southern District of New York.

- It is expressly set forth that in fulfillment of the regulations of Chapter VIII of Law No. 20,720, the undersigned informed the Superintendency of Insolvency and Recovery and the Court, on a timely basis, of all actions and the status of the proceeding with the United States Bankruptcy Court Southern District of New York, remitting the aforementioned information to the Superintendency of Insolvency and Recovery, which information was attached to the proceeding.

- With respect to the expenses incurred by reason of exercise of the authorization to file an action with the United States of America Bankruptcy Courts, the auditor reports that, to date, the fees of the attorneys engaged to file action with the United States Bankruptcy Court Southern District of New York have accrued to a total of USD $81,678.75 (eighty-one thousand, six hundred seventy-eight US dollars and seventy-five cents), and that said fees are the responsibility of Enjoy S.A.

- Finally, the auditor noted that the attorneys engaged in the United States have projected future expenses totaling approximately USD 75,000.00 (seventy-five thousand dollars).



**The creditors meeting unanimously acknowledged the above and approved and ratified the auditor's actions, and further approved all expenses of the proceeding.**

It is set forth that the arguments provided by the parties and the grounds for the resolution, as the case may be, are recorded in their entirety in the respective audio recording, and that having addressed the contingency and conditions under which the hearing is being carried out, these minutes shall be signed solely by the Acting Judge.

There being no further matters to discuss, the hearing was closed.

This hearing was chaired and closed by Mrs. **Sylvia Josefina Papa Beletti**, Acting Judge.



SYLVIA JOSEFINA PAPA BELETTI
Date: 8/14/2020 08:14:34 PM

This document has an electronic signature and its original may be validated at http://verificadoc.pjud.cl or in the processing of the case.
As from April 5, 2020, the viewed time corresponds to winter time in Continental Chile. For the Magallanes Region and Chilean Antarctica, add one hour, while for Western Insular Chile, Easter Island and Salas y Gómez Island, subtract two hours. For further information consult http://www.horaoficial

NOMENCLATURA          : 1. [1100]Junta de acreedores
JUZGADO               : 8º Juzgado Civil de Santiago
CAUSA ROL             : C-6689-2020
CARATULADO            : /ENJOY S.A.

## ACTA AUDIENCIA LEY 20.720

## JUNTA DE ACREEDORES ACUERDO DE REORGANIZACIÓN

## JUDICIAL DE EMPRESA DEUDORA

| | |
|---|---|
| FECHA | Viernes catorce de agosto de dos mil veinte |
| TRIBUNAL | 8° Juzgado Civil de Santiago |
| ROL | C-6.689-2020 |
| MAGISTRADO | **Sylvia Josefina Papa Beletti** |
| MINISTRO DE FE | Leonardo Wlodawsky Malschafsky |
| ENCARGADA DE ACTA | Karen Georges Catalán // Ximena Araya Pino |
| HORA DE INICIO | 15:15 |
| HORA DE TÉRMINO | 17:03 |
| **EMPRESA DEUDORA** | **ENJOY S.A.** |
| VEEDOR | Patricio Jamarne Banduc |
| APODERADO      DEL VEEDOR | Francisco Game, Juan Ignacio Jamarne |

| ACTUACIONES EFECTUADAS | SI | NO |
|---|---|---|
| INICIO | X | |
| INDIVIDUALIZACIÓN | X | |
| DETALLES Y DELIBERACIÓN DEL ACUERDO | X | |
| REGISTRO DE FIRMAS | X | |
| VOTACIÓN DE ACREEDORES POR VIDEOCONFERENCIA | | |
| SUSPENSIÓN JUNTA | | X |
| APROBACIÓN ACUERDO | X | |
| RECHAZO ACUERDO – NUEVA PROPUESTA ARJ – CITACIÓN NUEVA JUNTA DE ACREEDORES | | X |



| RECHAZO ACUERDO – LIQUIDACIÓN | | X |
| --- | --- | --- |

**Santiago, viernes catorce de agosto de dos mil veinte.**

En el día y a la hora señalada en el procedimiento de reorganización concursal de la empresa deudora **"ENJOY S.A."** de conformidad a lo dispuesto en los artículos 77 y siguientes de la ley 20.720, además de la Acta 42-2020 y Acta 53-2020 y Ley 21.226 que establece un régimen jurídico de excepción para los procesos judiciales, en las audiencias y actuaciones judiciales, y para los plazos y ejercicio de las acciones que indica, por el impacto de la enfermedad Covid-19 en Chile, se lleva a efecto vía videoconferencia la junta de acreedores llamada a conocer y pronunciarse sobre la propuesta de acuerdo de reorganización judicial, en presencia de la Juez Titular de este Octavo Juzgado Civil de Santiago, doña **Sylvia Josefina Papa Beletti** y del ministro de fe don **Leonardo Wlodawsky Malschafsky**, con la asistencia del veedor don Patricio Jamarne Banduc, sus apoderados don Francisco Gamé Hardessen y don Juan Ignacio Jamarne el representante legal de la empresa deudora don Rodrigo Larrain Kaplan, don Esteban Rigo-Righi , y los apoderados de la deudora don Nelson Contador Rosales, doña María Ignacia Contador Astrosa y don Iván Caldery Hasche.

Previo al inicio de la audiencia, el Tribunal hace presente que para efectos de orden todos los micrófonos se encontrarán silenciados, y se otorgará la palabra conforme se vaya solicitando a través del sistema de videoconferencia (una vez que haya expuesto el Sr. Veedor su informe).

El Tribunal solicita a los intervinientes que comparecen a la audiencia por videoconferencia, se individualicen con indicación de su



nombre y a quién representan, exhibiendo su cédula de identidad al señor secretario:

| Acreedor | Crédito | Apoderado |
|---|---|---|
| Citibank N.A. (Representante Tenedores de Bonos Internacionales) | $172.711.806.1 88 | Ricardo Reveco. |
| Banco del Estado de Chile | $3.017.480.000 | Luis Eduardo Montes Montes. |
| Banco de Creditos e Inversiones | $4.036.304.601 | Juan Pablo Dominguez Balmaceda. |
| Banco Security | $39.241.319 | Esteban Garcia Nadal. |
| Banco Santander Chile | $7.789.780.000 | Jose Antonio Morales Miranda. |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Deuda Mediano plazo | $1.715.000.000 | Juan Esteban Puga. |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Deuda Corto Plazo | $4.696.867.808 | Juan Esteban Puga |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Vision Money Market | $1.525.607.222 | Juan Esteban Puga, Luis Gutierrez |
| Tanner Corredores de Bolsa S.A. | $7.850.541.089 | Jose Joaquin Meza |
| Banco Itau Corpbanca | $1.976.254.108 | Marcelo Contreras Cerda |



| | | |
|---|---|---|
| Banco Santander Chile (Representante de 18 Tenedores de Bonos Nacionales Serie J según certificado Depósito Central de Valores S.A.) | $58.115.530.396 | Panlo Montt Rettig Y Manuel De La Prida |
| Credicorp Capital S.A. Corredores de Bolsa | $27.153.446 | Jose Miguel Diez Ihnen; Luis Horacio Rojas Soto |
| Banco Santander Chile (Representante de 27 Tenedores de Bonos Nacionales Serie I según certificado Depósito Central de Valores S.A.) | $87.458.493.271 | Cristian Gandarillas, Sebastian Fuentes |
| Banco Consorcio | $2.447.985.680 | Diego Benavente |
| Banchile Administradora General de Fondos S.A. | $2.750.000.000 | Francisco Thorn |
| Ameris Capital Administradora General de Fondos S.A. en representacion de Ameris Deuda Chile Fondo de Inversión | $80.000.000 | Adacila Andrea Carraco Valenzuela |
| Fynsa Administradora General de Fondos S.A. en representación de Fondo de Inversión Fynsa Deuda Chile | $100.000.000 | Ignacio Frias |

El pasivo total con derecho a voto para la presente junta corresponde a **63** acreedores, lo cual hace un total de **$356.924.433.850**.-, de los cuales se encuentran presente en esta junta 60 acreedores, que representa la suma



de **$356.338.045.128** que equivale al **99.84%,** del pasivo total con derecho a voto reconocido.

Dicho total pasivo se descompone en el pasivo total de clase PREFERENTE con derecho a voto que corresponde a 1 acreedor lo que representa la suma de $172.711.806.188.-, de los cuales se encuentra presentes 1 acreedores, que representan 100%.-, que a su vez equivale al 100% del pasivo total con derecho a voto reconocido de la clase preferente.

Asimismo, el total de la clase VALISTA reconocido con derecho voto corresponde a 62 acreedores, lo que representa la suma de $184.212.627.662.-,  de los cuales se encuentran presentes 59  acreedores, lo que representan la suma de $183.626.238.940.-, que a su vez equivale al 99.68 % del pasivo total con derecho a voto reconocido de la clase valista.

Teniendo conformada la Junta y concurriendo el quórum requerido legalmente, **el Tribunal ofrece la palabra al apoderado de la Empresa Deudora**, para efectos que exponga en forma breve los tópicos esenciales que se encuentran contenidos en la Propuesta de Acuerdo de Reorganización y haga mención a las consideraciones que fueron incorporadas al Texto del Acuerdo.

Toma la palabra el apoderado de la Empresa Deudora don Nelson Contador Rosales quien, junto con agradecer a todos los presentes, expresa que la Propuesta de Acuerdo de Reorganización tiene el siguiente objeto:

1.- La continuación efectiva y total del giro de las actividades comerciales de **ENJOY S.A.,** a contar de la fecha de presentación de esta Propuesta, con el objeto de dar cumplimiento a una modalidad de pagos acorde a sus flujos proyectados, recuperando el nivel operacional de la



Compañía y la disposición para el pago de sus obligaciones.

2.- El otorgamiento de nuevas condiciones para el pago de la totalidad de los créditos afectos al Acuerdo de Reorganización, bajo las modalidades que se indican en el presente instrumento;

3.- Una reducción del nivel de endeudamiento de la Compañía, mediante la conversión de al menos un 70% de la deuda valista en bonos convertibles en acciones, con un fuerte incentivo a la conversión.

4.- La obtención de recursos frescos para la Compañía por un monto de hasta $55.000.000.000.- (cincuenta y cinco mil millones de pesos), mediante un contrato de crédito que será prepagado con la emisión de un bono convertible en acciones, con un fuerte incentivo a la conversión.

Adicionalmente, el abogado de la Empresa Deudora señala que luego de diversas reuniones sostenidas con los Acreedores y el Sr. Veedor, se incorporaron algunas consideraciones a la propuesta planteada originalmente, que ya fueron presentadas en autos, y de las cuales se da cuenta en la presente acta, en el Texto íntegro del Acuerdo de Reorganización.

Habiendo sido efectuados los alcances de la propuesta, el Tribunal otorga la palabra al Sr. **Veedor**, para que exponga en forma breve los tópicos esenciales del informe evacuado, y se pñronincie respecto a lña susceptibilidad de ser cumplido el acuerdo o su viabilidad del acuerdo y los demás requisitos que se contemplan en el numeral 8° del artículo 57 de la ley.



El veedor agrega ademas que de conformidad a lo dispuesto en en el literal i.-, letra c.-, N° 3 del Capítulo X de la Propuesta de Acuerdo de Reorganización tanto la empresa como los accionistas que representan 60.52% del capital accionario de Enjoy suscribieron un acuerdo de soporte con Enjoy en el cual comprometen su aprobacion de las emisiones de bonos, aumentos de capital y demas modificaciones que se requieran para la ejecucion del arj y además renuncian a su derecho de suscripcion preferente respecto de los bonos convertibles en acciones en la forma señalada en la propuesta,

Finalmente el veedor agrega que de conformidad a la letra d) n° 1 del Capitulo VIII del acuerdo el interventor informa a a S.S y a los acreedores que se le ha remitido por parte de un grupo de acreedores un compromiso de financiamiento por la suma de 25.000.000.000 de pesos.

Luego, el Tribunal ofrece la palabra a los acreedores a fin de que se manifiesten respecto de la propuesta de acuerdo de reorganización o aclaren dudas respecto del informe del Veedor que se pronuncia de aquél.

Intervienen en el debate don Juan Pablo Domínguez en representación de Banco Créditos e Inversiones, don Jose Antonio Morales por Banco Santander, don Ignacio Frías por Fondo de Inversión Fynsa Deuda Chile, y don Luis Eduardo Montes por Banco del Estado de Chile.

Finalmente encontrándose la propuesta y sus modificaciones en condiciones de ser votada, el Tribunal ordena que se proceda a la votación del acuerdo por parte de los acreedores en su respectiva clase o categoría.

El representante de los Tenedores de Bonos deja constancia en esta junta de haber recibido el resultado del proceso de votación de los Tenedores de Bonos, organizado por la Empresa Deudora, siguiendo las disposiciones aplicables del derecho americano. Bajo el derecho americano



y conforme a lo representado por la Empresa Deudora en el proceso de votación, el Plan de Reorganización se entenderá aprobado si se reciben votos favorables de Tenedores de Bonos que representen más de 2/3 del monto y 50% del número de dichos Tenedores. De acuerdo al informe de votación oficial recibido por el Trustee, se han recibido los votos necesarios favorables de los Bonos Internacionales, de forma que el Plan fue APROBADO por la clase de los Tenedores de Bonos Internacionales.

<u>Votacion Acuerdo de reorganización</u>

**1.- ACREEDOR GARANTE VOTA ACUERDO:**

| ACREEDOR | MONTO | SI | NO | S/A |
|---|---|---|---|---|
| Citibank N.A. (Representante Tenedores de Bonos Internacionales) | $172.711.806.188 | X | | |

En consecuencia, habiéndose votado a favor el acuerdo por 1 acreedor garantizados, es decir el 100% de los acreedores presentes, que representan a su vez el 100% del pasivo total con derecho a voto de la clase o categoría, es decir, la suma de $172.711.806.188 se tiene por aprobada la categoría de acreedores garantizados del Acuerdo.

**2.- <u>ACREEDORES VALISTAS VOTAN ACUERDO:</u>**

| ACREEDOR | SI | NO | S/A |
|---|---|---|---|
| Banco del Estado de Chile | | X | |



| | | | |
|---|---|---|---|
| Banco de Créditos e Inversiones | X | | |
| Banco Security | X | | |
| Banco Santander Chile | | X | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Deuda Mediano plazo | X | | |
| Principal Administradora General de Fondos S.A. en representación de  Fondo Mutuo Principal Deuda Corto Plazo | X | | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Vision Money Market | X | | |
| Tanner Corredores de Bolsa S.A. | X | | |
| Banco Itau Corpbanca | | **X** | |
| Banco Santander Chile (Representante de 18 Tenedores de Bonos Nacionales Serie J según certificado Depósito Central de Valores S.A.) | X | | |
| Credicorp Capital S.A. Corredores de Bolsa | X | | |
| Banco Santander Chile (Representante de 27 Tenedores de Bonos Nacionales Serie I según certificado Depósito Central de Valores S.A.) | X | | |
| Banco Consorcio | X | | |
| Banchile Administradora General de Fondos S.A. | X | | |
| Ameris Capital Administradora General de Fondos S.A. en representacion de Ameris Deuda Chile Fondo de Inversión | X | | |
| Fynsa Administradora General de Fondos S.A. en representación de Fondo de Inversión Fynsa Deuda Chile | X | | |

En consecuencia, habiéndose votado a favor el acuerdo por 56 acreedores valistas, es decir el 93.04 % de los acreedores presentes, que



representan a su vez el 92.74% del pasivo total reconocido con derecho a voto de la clase o categoría, es decir, la suma de $170.842.724.832.-, se tiene por aprobada la categoría de acreedores valistas del Acuerdo.

Se deja constancia que el acreedor Tanner Corredores de Bolsa S.A interviene señalando a la junta que viene en representar la suma $6.015.412.621.- , ante lo cual, se le hace presente que debe concurrir por el total de su crédito, no pudiendo fraccionarlo.

Acto seguido, se procede a realizar la votación de conformidad al artículo 64 de la Ley 20.720 respecto de la cláusula establecida en el numeral VI y VII del acuerdo:

1.- Respecto de los acreedores Acreedores Bancarios que se comprometan a otorgar a la Empresa Deudora, o a una o más de sus filiales, una o más líneas de crédito rotativas dentro de un plazo máximo de 5 días hábiles bancarios contado desde la fecha de entrada en vigencia del Acuerdo, con características indicadas en el Acuerdo:

| ACREEDOR | SI | NO | S/A |
|---|---|---|---|
| Banco Security | X | | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Deuda Mediano plazo | X | | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Deuda Corto Plazo | X | | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Vision Money Market | X | | |



| | | | |
|---|---|---|---|
| Tanner Corredores de Bolsa S.A. | X | | |
| Banco Santander Chile (Representante de 18 Tenedores de Bonos Nacionales Serie J según certificado Depósito Central de Valores S.A.) | X | | |
| Credicorp Capital S.A. Corredores de Bolsa | X | | |
| Banco Santander Chile (Representante de 27 Tenedores de Bonos Nacionales Serie I según certificado Depósito Central de Valores S.A.) | X | | |
| Banchile Administradora General de Fondos S.A. | X | | |
| Ameris Capital Administradora General de Fondos S.A. en representacion de Ameris Deuda Chile Fondo de Inversión | X | | |
| Fynsa Administradora General de Fondos S.A. en representación de Fondo de Inversión Fynsa Deuda Chile | X | | |

En consecuencia, habiéndose votado a favor el de la condicion más favorable establecida en el capitulo VI del Acuerdo  respecto de los acreedores valistas Bancarios, por 11 acreedores valistas, es decir el 100% de los acreedores presentes, que representan a su vez el 100% del pasivo total con derecho a voto de la clase o categoría, es decir, la suma de **$164.358.434.551**.-, se tiene por **Aprobada** la condicion más favorable respecto de los acreedores bancarios  del Acuerdo de Reorganizacion

2.- Respecto  de  los  acreedores    de  los  acreedores  valistas Proveedores indicados en el acuerdo:

| ACREEDOR | SI | NO | S/A |
|---|---|---|---|
| Banco del Estado de Chile | X | | |



| | | | |
|---|:---:|---|---|
| Banco de Creditos e Inversiones | X | | |
| Banco Santander Chile | X | | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Deuda Mediano plazo | X | | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Deuda Corto Plazo | X | | |
| Principal Administradora General de Fondos S.A. en representación de Fondo Mutuo Principal Vision Money Market | X | | |
| Tanner Corredores de Bolsa S.A. | X | | |
| Banco Itau Corpbanca | X | | |
| Banco Santander Chile (Representante de 18 Tenedores de Bonos Nacionales Serie J según certificado Depósito Central de Valores S.A.) | X | | |
| Banco Santander Chile (Representante de 27 Tenedores de Bonos Nacionales Serie I según certificado Depósito Central de Valores S.A.) | X | | |
| Banco Consorcio | X | | |
| Banchile Administradora General de Fondos S.A. | X | | |
| Ameris Capital Administradora General de Fondos S.A. en representacion de Ameris Deuda Chile Fondo de Inversión | X | | |
| Fynsa Administradora General de Fondos S.A. en representación de Fondo de Inversión Fynsa Deuda Chile | X | | |

En consecuencia, habiéndose votado a favor la condición mas favorable establecida en el capitulo VII del Acuerdo respecto de los acreedores valistas indicados en el acuerdo, por el 100% de los acreedores que representan a del pasivo total con derecho a voto de la clase o categoría, es decir, la suma de $183.559.844.175.-, se tiene por **Aprobada**



la condición mas favorable respecto de los acreedores proveedores señalados en el acuerdo de reorganizacion.

Se deja constancia además,    que, para los efectos de dar cumplimiento a lo dispuesto en el artículo 79 de la Ley 20.720, la empresa deudora, a través de su representante manifiesta su expreso consentimiento respecto del acuerdo y sus modificaciones acordado previamente por los acreedores.

A su vez, se encuentran presentes los señores señores Esteban Rigo-Righi Baillie  y Rodrigo Larraín Kaplan  quienes en representancion de las sociedades  Enjoy Gestión Limitada., Inversiones Enjoy SpA, Inversiones Inmobiliarias Enjoy SpA., Enjoy Consultora S.A., Inversiones Andes Entretención Limitada., Inmobiliaria Proyecto Integral Coquimbo SpA, Operaciones Integrales Coquimbo Limitada, Inmobiliaria Kuden SpA, Campos del Norte S.A., Enjoy Caribe SpA, Inmobiliaria Proyecto Integral Castro SpA, Slots  S.A., Masterline  S.A., Kuden  S.A., Operaciones Turísticas S.A., Operaciones Integrales Isla Grande S.A., Rantrur S.A., Casino de Iquique S.A., Casino de la Bahía S.A., Casino del Mar S.A., Casino del Lago S.A., Casino de Puerto Varas S.A., Yojne S.A. y Baluma S.A, quienes declaran aceptar la posposición de sus acreencias en los términos del acuerdo de reorganización concursal, como también ratifican en todas sus partes las obligaciones contraídas en el acuerdo de reorganización concursal de Enjoy S.A.

El tribunal resuelve en este aspecto que:

**Atendida la votación de la junta de acreedores, contando, además, con el consentimiento expreso del deudor  y, visto, lo dispuesto en el artículo 79 de la ley 20.720 se tiene por Aprobado el acuerdo de**



**reorganización concursal de la empresa deudora Enjoy S.A. y sus respectivas modificaciones.**

El Tribunal hace presente que han concurrido las mayorías legales exigidas, y que la Empresa Deudora a través de su representante ha consentido en la propuesta de Acuerdo de Reorganización, de conformidad con lo dispuesto en el artículo 79 de la Ley N° 20.720 sobre Insolvencia y Reemprendimiento.

**VISTOS:**

Atendido al mérito de lo expuesto precedente y de conformidad con lo dispuesto en el artículo 79 de la Ley 20.720, de la Ley Insolvencia y Reemprendimiento, y dándose el quórum legal en la votación precedente, se tiene por **ACORDADA** la propuesta de Acuerdo de reorganización Judicial de Enjoy S.A., y por aprobada, si no fuere impugnada dentro del plazo legal o en los casos del artículo 89 la ley del ramo, ordenándose en su oportunidad el alzamiento de las inscripciones que se hayan efectuado de conformidad al artículo 92 de dicho texto legal, y se ordena al veedor la notificación de la presente acta y del texto íntegro del Acuerdo, el que se encuentra en un archivo adicional y se tiene como parte integrante de la presente acta para todos los efectos legales, en el Boletín Concursal, en los términos que dispone el artículo 84 de la Ley 20.720, sobre Insolvencia y Reemprendimiento.

Acto seguido, el gtribunal hace presente, que corresponde ahora, que la junta de acreedores designe de conformidad a lo señalado en el acuerdo, la **comisión de acreedores**, haciéndose presente que en ella podrán participar 05 representantes, dos de los cuales son nombrados por parte de los tenedores de Bonos Internacionales, dos nombrados por parte de los



tenedores de bonos nacionales y una persona que sera designada por parte de los 4 miembros restantes de la comision.

El veedor informa que se ha propuesto para ser designado como miembros por parte de los bonos internacionales, a los siguientes como miembros titulares:

(a) Felipe Claro Edwards, por cuenta de Moneda Renta CLP Fondo de Inversión;

(b) Salvador Valdés Correa, por cuenta de Moneda Deuda Latinoamericana Fondo de Inversión.

Como suplentes, se proponen:

(a) Andrés Eyzaguirre Gubbins, por cuenta de Moneda Deuda Chile Fondo de Inversión;

(b) Ricardo Reveco Urzúa, por cuenta de Moneda Latin American Corporate Debt.

El representante de  Banco Santander en representancion de los bonos, Tenedores de Bonos Nacionales serie I  y el representante de Banco Santander en representacion de los tenedores de bonos Nacionales Serie J señalan que designan:

1. Como Miembros Titulares de la comisión de acreedores

(a) Penta Vida Compañía de Seguros de Vida S.A.

(b) Euroamérica Seguros de Vida S.A.

2. Miembros Suplentes de la comisión de acreedores



(a) Penta Hipotecario Administradora de Mutuos Hipotecarios S.A

(b) Euroamérica Corredores de  Bolsa S.A.

A continuación,  y atendido lo dispuesto en el artículo 69 de La Ley, corresponde que la junta de acreedores **designe interventor**, haciéndose presente que tal designación debe recaer en un veedor vigente de la nómina de veedores que registra la Superintendencia de Insolvencia y Reemprendimiento y que sus remuneraciones serán acordadas por la comisión de acreedores.-

Luego de haber deliberado y votado los acreedores, se ratifica y designa **como Interventor Titular de la presente Reorganización a Patricio Jamarne Banduc.**

Finalmente  el Tribunal hace ñprfesente al veedor que con el objeto de cumplir lo ordenado por parte del tribunal por resolución de fecha 24 de junio de 2020,  y lo   instruido por parte de la Superintedencia de Insolvencia y reemprendimiento, en el sentido de informar a la junta de acreedores  y al tribunal respecto de proceso de reconocimiento extranjero llevado ante Tribunal de Bancarrota del Distrito Sur de Nueva York de los Estados Unidos, haga una breve síntesis en esta materia,  para lo cual informa :

-   Que mediante Ingreso Superir N° 22.912 de 19 de junio de 2020, en mi calidad de veedor titular del procedimiento concursal de reorganización de la empresa deudora Enjoy S.A., solicitó a la Superintendencia de Insolvencia de Reemprendimiento, la autorización para actuar ante los Tribunales de Bancarrota de Nueva York, de los Estados Unidos, con el objeto de que estos otorgasen a



la empresa deudora un símil de la Protección Financiera Concursal, mientras dure el Procedimiento Concursal de Reorganización con sus respectivas prorrogas.

- Que según consta de Resolución Exenta Nº 6893, de fecha 19 de junio de 2020, dictada por la Superintendencia de Insolvencia y Reemprendimiento, y de conformidad a lo dispuesto en el art. 304 de la Ley Nº 20.720, el Superintendente de Insolvencia y Reemprendimiento señor Hugo Sánchez Ramírez, autorizó al suscrito para actuar en el extranjero respecto del Procedimiento Concursal de Reorganización de la empresa deudora Enjoy S.A., y lo facultó para ejercer las actuaciones necesarias ante la jurisdicción de los Estados Unidos de América.

- Que de conformidad al Capítulo XV de la Ley de Banca Rota de los Estados Unidos el veedor debidamente representado compareció ante "*United States Bankruptcy Court Southern District of New York*", y solicitó que el procedimiento concursal de reorganización de Enjoy S.A. tramitado ante el 8º Juzgado Civil de Santiago, autos Rol Nº C-6689-2020, fuese reconocido como procedimiento extranjero principal, a objeto de que la "*United States Bankruptcy Court Southern District of New York* otorgase a la empresa deudora un simil de protección financiera conforme a la legislación de los Estados Unidos y así proteger los bienes de Enjoy S.A. ubicados en los Estados Unidos de América.

- Al respecto se informa que para actuar ante la "*United States Bankruptcy Court Southern District of New York*" fue necesario contratar al estudio de abogados "Paul Hastings", acordándose que los honorarios de los referidos abogados serian de cargo de Enjoy S.A.



- Se hace presente que según consta de resolución de fecha 27 de julio de 2020 la "*United States Bankruptcy Court Southern District of New York*", reconoció el procedimiento concursal de reorganización de Enjoy S.A. como procedimiento extranjero principal, y una vez efectuada la Junta Deliberativa de Acreedores llamada a conocer la propuesta de acuerdo de reorganización, corresponde que se informe a la "*United States Bankruptcy Court Southern District of New York*" los resultados de la misma.

- Se deja expresa constancia que en cumplimiento a las normas del Capítulo VIII de la Ley N° 20.720, el suscrito informó oportunamente a la Superintendencia de Insolvencia y Reemprendiemiento, y al Tribunal, todos los actos y el estado del procedimiento ante "*United States Bankruptcy Court Southern District of New York*"; remitiendo los referidos antecedentes a la Superintendencia de Insolvencia y Reemprendiemiento, antecedentes que fueron acompañados al proceso.

- En relación a los gastos en los que se ha incurrido con motivo del ejercicio de la autorización para actuar ante los Tribunales de Bancarrota de los Estados Unidos de America, el veedor informa que a la fecha se han devengado honorarios de los abogados contratados para actuar ante la "*United States Bankruptcy Court Southern District of New York*" por la suma de USD $81,678.75 (ochenta y un mil seicientos setenta y ocho dólares con setenta y cinco centavos), y que dichos honorarios son de cargo de Enjoy S.A.

- Finalmente el veedor hace presente que los abogados contratados en los Estados Unidos han hecho una proyección de gastos futuros ascendentes aproximadamente a la suma de USD $75,000.00 (setenta y cinco mil dólares).



**La junta de acreedores, por la unanimidad de sus miembros tomó conocimiento de lo informado y aprueba y ratifica el actuar del veedor, asi como aprueba todos los gastos del proceso.**

Se hace presente que los argumentos vertidos por las partes y la fundamentación de la resolución en su caso, se encuentran íntegramente en el registro de audio respectivo, y que atendida la contingencia y la modalidad en la que se lleva a efecto la audiencia, la presente acta será suscrita únicamente por la Juez Titular.

No existiendo otras materias que tratar se pone término a la audiencia.

Dirigió la presente audiencia y resolvió, doña **Sylvia Josefina Papa Beletti**, Juez Titular.



Este documento tiene firma electrónica y su original puede ser validado en http://verificadoc.pjud.cl o en la tramitación de la causa.
A contar del 05 de abril de 2020, la hora visualizada corresponde al horario de invierno establecido en Chile Continental. Para la Región de Magallanes y la Antártica Chilena sumar una hora, mientras que para Chile Insular Occidental, Isla de Pascua e Isla Salas y Gómez restar dos horas. Para más información consulte http://www.horaoficial.cl

SYLVIA JOSEFINA PAPA BELETTI
Fecha: 14/08/2020 20:14:34

**<u>Exhibit D</u>**

**Supplemental Jamarne Declaration**

**PAUL HASTINGS LLP**
Pedro A. Jimenez
Andres C. Mena
Douglass Barron
200 Park Avenue
New York, NY 10166
(212) 318-6000 (Tel)
(212) 319-4090 (Fax)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| ENJOY S.A.[1] | Case No. 20-11411 (MG) |
| Debtor in a Foreign Proceeding. | |

## SUPPLEMENTAL DECLARATION OF THE FOREIGN REPRESENTATIVE PATRICIO JAMARNE BANDUC IN SUPPORT OF RECOGNITION MOTION

Patricio Jamarne Banduc hereby declares as follows:

1.    I am the duly authorized and appointed foreign representative of Enjoy S.A. (the "Foreign Debtor"), the above captioned Foreign Debtor that is subject to an insolvency proceeding in the 8th Civil Court of Santiago in Santiago, Chile (the "Foreign Proceeding"). I am a professor of commercial law at the University of Chile and am a founding partner of the law firm Jamarne & Cía, located in Santiago, Chile. I often serve as an overseer in Chile. In this regard, I was appointed as overseer by the *Superintendencia de Insolvencia y Reemprendimiento* (the "Superintendence") in some of the largest Chilean insolvency cases, including Isapre Masvida S.A., Hidroeléctrica Duqueco SpA, Hidroeléctrica El Paso SpA, Cooperativa Agrícola y Lechera Bio Bio Limitada, and Distribuidora de Industrias Nacionales S.A. among others. In addition, I served as President of the Chilean Association of Bankruptcy Trustees (*Asociación*

---

[1]    The Foreign Debtor's Chilean tax identification number is 96.970.380-7. The location of the Foreign Debtor's executive office is Av. Presidente Riesco 5711, 15th Floor, Borough of Las Condes, Santiago, Chile, Postal Code 7561114.

*Gremial de Síndicos de Quiebras*) from 2000-2008.  I graduated from the Liceo José Victorino

Lastarria de Santiago and received a Bachelor of Legal and Social Studies from the University of

Chile.

2.      I submit this declaration in support of the *Foreign Representative's Motion for*

*Order Granting Relief Pursuant to 11 U.S.C. §§ 105(a), 1145, 1507(a), 1521(a), and 1525(a) (I)*

*Recognizing and Enforcing the Reorganization Agreement and (II) Granting Related Relief* (the

"Motion")[2] filed on August 17, 2020.

3.      Each of the facts set forth below is true to the best of my knowledge, information

and/or belief based upon my personal knowledge from my personal involvement in the Foreign

Debtor's Foreign Proceeding, my review of the books and records of the Foreign Debtor, and/or

communications with the Foreign Debtor and its advisors.

4.      In my capacity as the Foreign Debtor's Overseer (defined below), I was

intimately involved in the Foreign Debtor's Foreign Proceeding, including with respect to the

formulation, negotiation, solicitation, and confirmation of the Foreign Debtor's Reorganization

Agreement and the subsequent entry of the Confirmation Order.

**I.      Foreign Proceeding**

5.      On April 24, 2020, the Foreign Debtor filed an application with the Chilean Court

to commence the Foreign Proceeding.  The Superintendence published a Certificate of

Nomination stating that I had been selected as the overseer (*veedor*) of the Foreign Proceeding

(in such capacity, the "Overseer") for the Foreign Proceeding and Enrique Marco Antonio Ortiz

D'amico had been selected as the alternate Overseer.  The Overseer, under Chilean law, was

tasked with, among other responsibilities, promoting agreements between debtors and creditors,

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

facilitating the filing of restructuring agreements, and protecting the interests of creditors while acting under the supervision of the Superintendence.

6.      The Chilean Court commenced the Foreign Proceeding by entering a stay order dated May 5, 2020, which provided the Foreign Debtor protection for a period of 30 business days.  On May 27, 2020, the stay was extended by creditor vote, including the vote of the indenture trustee under the Old International Bonds (the "Indenture Trustee"), until July 20, 2020.  The stay was subsequently extended to August 14, 2020.

7.      Over the course of the Foreign Proceeding and in the ordinary course of the Foreign Debtor's business, the Foreign Debtor paid all outstanding claims of employees, taxing authorities, and other creditors required to be paid in full on a priority basis pursuant to Chilean law (collectively, the "Priority Claims").  In addition, a deadline of June 25, 2020 was established for creditors to submit proofs of claim, creditors were provided notice of such deadline, and proofs of claim were reviewed and verified by me and those reporting to me based on my responsibilities under Chilean law.

8.      Following extensive negotiation with creditors, the Foreign Debtor filed an initial version of the Reorganization Agreement with the Chilean Court on July 4, 2020.  Following further negotiations, amended versions of the Reorganization Agreement were filed with the Chilean Court on July 31, August 8, and August 14, 2020.  The process for solicitation of votes from holders of Old International Bonds (the "International Bondholders") in connection with the Reorganization Agreement commenced on July 16, 2020.  To facilitate this process and ensure sufficient notice to all creditors and interested parties, the Foreign Debtor established a website (https://dm.epiq11.com/case/enjoy/info) with key documents, including a detailed summary of the Reorganization Agreement, filed SEC disclosures with respect to the planned

3

issuance of the New International Bonds under the Reorganization Agreement, and otherwise ensured that creditors had access to all relevant documents. The Foreign Debtor also solicited votes from and provided information and relevant documents regarding the Reorganization Agreement to the holders of unsecured claims. Thus, the notice provided comports with Chilean law and, as a matter of Chilean law, the International Bondholders received sufficient information and opportunity to provide their vote with respect to the Reorganization Agreement. The International Bondholders are the only group of creditors of the Foreign Debtor that include entities based in the United States.

9.       At the Reorganization Agreement Approval Hearing held on August 14, 2020, the Reorganization Agreement was approved by the overwhelming majority of creditors and/or their representatives present and entitled to vote on the Reorganization Agreement (including the Indenture Trustee). The creditors and/or their representatives voted in classes established under Chilean law, with (i) 100% in number and amount of the class of secured creditors (consisting exclusively of the Indenture Trustee, as the sole representative of the International Bondholders entitled to vote, who submitted its vote in favor of the Reorganization Agreement on their behalf),[3] and (ii) 93.04% in number and 92.74% in amount of the class of unsecured creditors, voting in favor of the Reorganization Agreement. These votes satisfied the requirements for the approval of the Reorganization Agreement under Chilean law. Pursuant to my responsibilities under Chilean law, I received and reviewed the votes of the creditors and/or their representatives and verified to the Chilean Court that the requirements for approval of the Reorganization

---

[3]    The Foreign Representative understands that the Foreign Debtor and Indenture Trustee collaborated closely to execute a solicitation process to allow the International Bondholders to determine whether the Indenture Trustee would vote to support the Reorganization Agreement and, further, that this solicitation process closely resembled a traditional solicitation of bondholders under an out-of-court exchange offer.

Agreement had been satisfied.  Upon the completion of the Reorganization Agreement Approval

Hearing, the Chilean Court issued the Confirmation Order.

10.    The Confirmation Order is the functional equivalent of an order confirming a

chapter 11 plan in the United States and as a matter of Chilean law is binding on the International

Bondholders, whose legal representative voted in favor of the Reorganization Agreement.

11.    In addition, while under Chilean law dissenting creditors have a period of five (5)

business days subsequent to the Reorganization Agreement Approval Hearing to file challenges

to the Reorganization Agreement on certain limited grounds, such challenges can only affect the

enforceability of the Reorganization Agreement if they are filed by creditors entitled to vote and

holding at least 30% in amount of the claims in their class.  Such challenges are an impossibility

where, as here, over 90% in amount of the unsecured class (the only class registering votes in

opposition to the Reorganization Agreement) supported the Reorganization Agreement.  Under

the circumstances of the Chilean Proceeding, I fully expect that the Chilean Court will issue an

order on August 24, 2020, confirming that no challenges to the Reorganization Agreement have

been filed.[4]

## II.    Terms of the Restructuring Agreement

12.    The Reorganization Agreement contains a restructuring and repayment proposal

for the Foreign Debtor's secured creditors (*i.e.*, the International Bondholders) and a

restructuring and payment proposal for unsecured creditors (the "Local Unsecured Creditors"),

along with special repayment proposals for certain Local Unsecured Creditors who are bank

lenders (the "Bank Lenders") and suppliers (the "Suppliers").  The purpose of the proposals, and

the Reorganization Agreement generally, was to promote the effective continuation of the

---

[4]    The Foreign Representative will file a copy of this order, along with a translation thereof, as soon as it is
available.

ongoing commercial activities of the Foreign Debtor, establish new conditions for the payment of all applicable loans, reduce the Foreign Debtor's debt level, and obtain fresh funding.

13.    Under the Reorganization Agreement, International Bondholders are to be paid in full through the issuance of new instruments, the New International Bonds, which replace the Old International Bonds issued under the indenture dated May 16, 2017 (the "Old International Bond Indenture").  The New International Bonds will be secured by first priority liens pursuant to amended security documents to the same extent and in the same manner as the Old International Bonds, and the guarantees provided under the Old International Bond Indenture by the Foreign Debtor's subsidiaries are maintained under the New International Bonds.  *Id.* Repayment of the New International Bonds' entire principal balance will occur on August 14, 2027.  *Id.*  International Bondholders also may be eligible to participate in new financing of the Foreign Debtor.  *Id.*

14.    Further, under the Reorganization Agreement, Local Unsecured Creditors shall be entitled to the payment of 80% of their claims through either (i) delivery of bonds convertible to shares in the Foreign Debtor, or, in the alternative, (ii) money received in connection with the subscription of such convertible bonds, with the remaining 20% payable through the issuance of a fixed income bond.

15.    Finally, under the Reorganization Agreement, Bank Lenders who elect to enter into certain lending arrangements with the Foreign Debtor immediately after the Reorganization Agreement Approval Hearing are to be provided with a preferential repayment of 100% of their claims through fixed income bonds, and the Suppliers are to be paid within a period of twelve (12) months from the approval of the Reorganization Agreement, consistent with Chilean law, the full principal of the loans deriving from invoices or vouchers issued by them.

### III.    Chapter 15 Case

16.    The Chapter 15 Case was commenced on June 12, 2020, with the filing of the

*Chapter 15 Petition for Recognition of Foreign Proceeding* [Docket No. 1].  On July 8, 2020, the

Court entered the *Stipulation and Agreed Order Substituting Foreign Representatives and

Related Counsel* [Docket No. 17] substituting the me as Foreign Representative in the Chapter

15 Case in replacement of Rodrigo C. Larrain and Esteban Rigo-Righi.

17.    On July 27, 2020, the Court held a hearing in connection with the Verified

Petition and entered the *Order Recognizing Foreign Proceeding* [Docket No. 24] granting the

Verified Petition and recognizing the Foreign Proceeding as a "foreign main proceeding"

pursuant to chapter 15 of the Bankruptcy Code, during which hearing counsel to both the

Indenture Trustee and International Bondholders appeared and expressed support for the

recognition of the Chilean Proceeding.  During the July 27, 2020 hearing, the Court also agreed

to schedule a hearing for August 25, 2020, to consider approval of this Motion.  On August 14,

2020, consistent with the colloquy at the July 27, 2020 hearing, the Foreign Debtor filed a status

letter reporting the approval of the Reorganization Agreement [Docket No. 26].

### IV.    Voting Process for Reorganization Agreement

18.    For a reorganization agreement to be approved under Chilean law, creditors

and/or their representatives present at the reorganization agreement approval hearing and entitled

to vote representing two-thirds of the total number of creditors in each class of creditors and two-

thirds of the total debt in each class of creditors must vote in favor of the plan.  The

comprehensive approval procedure, requiring a consensus among the various classes of creditors,

ensures just treatment of all holders of claims.  As mentioned above, the votes received in favor

of the Foreign Debtor's Reorganization Agreement were sufficient for the Reorganization

Agreement to be approved under Chilean law.

[*Remainder of page intentionally left blank.*]

19.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on August 17, 2020.
Santiago, Chile

_____
Patricio Jamarne Banduc
Foreign Representative

9