**PAUL HASTINGS LLP**
Pedro A. Jimenez
Andres C. Mena
Douglass Barron
200 Park Avenue
New York, NY 10166
(212) 318-6000 (Tel)
(212) 319-4090 (Fax)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ENJOY S.A.[1]<br><br>          Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 20-11411 (MG) |

### NOTICE OF SUPPLEMENTAL EXHIBIT TO RECOGNITION MOTION

Patricio Jamarne Banduc (the "Foreign Representative"),[2] the duly authorized and

appointed foreign representative of Enjoy S.A., (the "Foreign Debtor"), the above-captioned

Foreign Debtor that is subject to an insolvency proceeding pending in the 8th Civil Court of

Santiago in Santiago, Chile (the "Chilean Court"), by and through his undersigned counsel, filed

yesterday, August 17, 2020, the *Foreign Representative's Motion for Order Granting Relief*

*Pursuant to 11 U.S.C. § 105(a), 1145, 1507(a), 1521(a), and 1525(a) (I) Recognizing and*

*Enforcing the Reorganization Agreement and Confirmation Order and (II) Granting Related*

*Relief* (the "Motion") [Docket No. 28], in which the Foreign Representative indicated that a copy

of the final Reorganization Agreement (the "Approved Reorganization Agreement"), as filed

---

[1]    The Foreign Debtor's Chilean tax identification number is 96.970.380-7.  The location of the Foreign Debtor's executive office is Av. Presidente Riesco 5711, 15th Floor, Borough of Las Condes, Santiago, Chile, Postal Code 7561114.

[2]    Unless otherwise indicated herein, capitalized terms shall have the meaning ascribed to them in the Motion.

with the Chilean Court and approved on August 14, 2020, along with a certified translation

thereof, would be filed with this Court once the translation became available.  A copy of the

Approved Reorganization Agreement, along with a certified translation thereof, as referenced in

the Motion, is attached hereto as **Exhibit A**, and a redline comparing the Approved

Reorganization Agreement to the version of the Reorganization Agreement filed with the Motion

is attached hereto as **Exhibit B**.  In addition, Annex 1 to the Approved Reorganization

Agreement, consisting of a bilingual term sheet regarding the terms of the exchange of the Old

International Bonds for the New International Bonds (as such terms are defined in the Motion) is

attached hereto as **Exhibit C**.[3]

Dated: August 18, 2020
      New York, New York

                                 PAUL HASTINGS LLP

                                 */s/ Pedro A. Jimenez*
                                 Pedro A. Jimenez
                                 Andres C. Mena
                                 Douglass Barron
                                 200 Park Avenue
                                 New York, NY 10166
                                 Telephone: (212) 318-6000
                                 Facsimile: (212) 319-4090
                                 pedrojimenez@paulhastings.com

                                 *Counsel to the Foreign Representative*

---

[3]   The Approved Reorganization Agreement includes several other annexes relating to the treatment of local Chilean claims and the Foreign Debtor's new financing facilities (including an opportunity for creditors of the Foreign Debtor to participate in such new facilities).  The Foreign Representative is not seeking recognition of those portions of the Approved Reorganization Agreement.

## **Exhibit A**

**Approved Reorganization Agreement**



STATE OF NEW YORK

)
)
)
COUNTY OF NEW YORK               )        ss

## CERTIFICATION

This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate

translation from Spanish into English of the attached document *Enjoy S.A. Judicial Reorganization Agreement*.

_____
Edward J. Jacob
Divergent Language Solutions, LLC

State of New York

County of New York

Subscribed to and sworn before me this _17th_ day of _August_, 20_20_.

by Edward J. Jacob.

_____
Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, State of New York
No. 01ZE6350239
Qualified in New York County
Commission Expires November 7, 2020



183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11th Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

## JUDICIAL REORGANIZATION AGREEMENT
### ENJOY S.A.

### I.  BACKGROUND INFORMATION ON THE PETITIONING DEBTOR COMPANY

| | |
|---|---|
| **1.- Corporate name:** | ENJOY S.A. |
| **2.- R.U.T.:** | 96.970.380-7. |
| **3.- Domicile:** | Avenida Presidente Riesco N° 5.711, piso 15, comuna de Las Condes, Metropolitan Region. |
| **4.- Organization:** | Organized pursuant to a public instrument dated October 23, 2001. On June 9, 2009, the Company was registered with the Securities Registry of the Chilean Financial Market Commission (*Comisión para el Mercado Financiero*) (CMF) under No. 1033. |

### II.  CREDITORS ENROLLED IN THE REORGANIZATION AGREEMENT.

For purposes of this Judicial Reorganization Agreement, creditors (hereinafter, indiscriminately, the "***Creditors***") shall be considered all holders of direct loans against **ENJOY S.A.** (hereinafter, indiscriminately, "***Enjoy***," the "***Debtor Company***" or the "***Company***"), which originated prior to the Reorganization Resolution, pursuant to Article 66 of Law 20,720. Loans originating after the Reorganization Resolution shall be repaid in accordance with the agreed-upon terms and tenors.

Pursuant to Article 61 of the aforementioned bankruptcy law, this Judicial Reorganization Agreement (hereinafter, indiscriminately, "***Reorganization Agreement***," "***Agreement***" or the "***Proposal***") contains a restructuring and repayment proposal for secured creditors, which corresponds to International Bondholders (as said term is defined further below), a restructuring and payment proposal for unsecured creditors, excluding creditors that are related companies belonging to the Enjoy S.A. group of companies (hereinafter the "***Unsecured Creditors***"), a special repayment proposal for bank creditors (hereinafter the "***Bank Creditors***") and a special repayment proposal for unsecured creditors participating as suppliers to Enjoy of goods and services (hereinafter the "***Suppliers***") as these terms are defined in the following chapters.

Pursuant to Article 63 of Law No. 20,720, loans held by related companies belonging to the group of Enjoy S.A. subsidiary companies will be subject to postponed repayment, until expiration of this Reorganization Agreement. Nevertheless, all payments may be made to related companies that correspond to Enjoy's normal operational activities with its subsidiaries.

## III. DEVELOPMENT OF THE PURPOSE OF THE AGREEMENT.

The Reorganization Agreement shall have the following purpose and content:

1.- The effective and total continuation of the ongoing commercial activities of **ENJOY S.A.,** as from the date of presentation of this Proposal, with a view to fulfilling payment conditions consistent with projected cash flows, recovering the Company's operating levels and providing for the payment of its obligations.

2.- The granting of new conditions for the repayment of all loans enrolled in the Reorganization Agreement under the conditions set forth in this instrument;

3.- A reduction in the Company's debt level, through conversion of at least 70% of the unsecured debt consisting of bonds convertible to Enjoy shares, with a strong incentive for conversion.

4.- Obtaining fresh funds for the Company totaling approximately $50,000,000,000 (fifty billion Chilean pesos),[1] through the granting of loans to be prepaid through the issuance of a bond convertible to shares of Enjoy, with a strong incentive for conversion.

## IV. PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO SECURED CREDITORS.

---

[1] Hereinafter, all references to figures in pesos refer to Chilean pesos.

3

Guaranteed creditors are holders of debt issued under the instrument referred to as the "Indenture," dated May 16, 2017, supplemented by the instrument known as "Supplemental Indenture No. 1" dated May 30, 2017, entered into between the Company, as issuer, its guarantor subsidiaries ("***Guarantors***") and Citibank N.A. as International Bondholders Representative or Trustee[2] (hereinafter the "***Indenture***"), concerning the guaranteed bonds maturing in 2022 (10.50% Senior Secured Notes due to 2022) placed by the Company in the international markets under US Securities and Exchange Commission Rule 144A and Regulation S and the US Securities Act of 1933 (hereinafter the "***International Bonds***," with their holders or final beneficiaries being the "***International Bondholders***"[3])

As explained further below, under the Agreement the International Bonds will be extended and, subject to the Renegotiation Conditions (as this term is defined further below), renegotiated without intent to substitute, with said renegotiation reflected in a new Indenture, new bonds, and the guarantee documents needed in order to extend, ratify and reserve the International Bonds' current guarantees to the extended and restructured debt (hereinafter, the "**New Indenture**" and the "**New International Bonds**" and, together, the "**New Instruments**").

**1.- Extension.**

The due dates of the loans under this **Chapter IV** will be extended for a maximum of 90 days after the date of the Deliberative Meeting [*Junta Deliberative*] of Creditors, convened to hear and decide on the Proposal (hereinafter the "***Deliberative Meeting***"), unless it becomes certain prior to said deadline that the Renegotiation Conditions (as this term is defined further below) will not be fulfilled, in which case the extension period will expire on the day that said conditions failed (the "***Extension of the International Bonds***"), unless the Creditors Commission resolves to maintain the Extension of the International Bonds as provided for in **Chapter XV** of this Agreement.

Until such time as the Renegotiation Conditions are met, the International Bonds shall remain current in accordance with their original terms (including interest accrued after the request for reorganization); non-compliance events and rights and actions existing under the Indenture due to existing non-compliance events shall not be waived; and current real and personal guarantees of the International Bonds (hereinafter the "***Guarantees***" shall remain in full force and effect. So long as the International Bonds Extension is current, the above is without prejudice to International Bondholders' committing not to individually or collectively file any enforcement proceeding whatsoever, as long as the Renegotiation Conditions are pending.

**2.- Renegotiation Conditions.**

---

[2] Pursuant to the document titled "Agreement of Resignation, Appointment and Acceptance" dated July 9, 2020 entered into between the Company, UMB BANK, N.A. and CITIBANK, N.A., UMB BANK, N.A. was appointed as "Trustee" for purposes of the Indenture.

[3] After the exchange of the International Bonds for the New International Bonds, "International Bondholders" will mean the holders of the New International Bonds.

4

The International Bonds shall be renegotiated by means of their exchange for the New International Bonds, in the event of fulfillment of the following contingent and supplementary conditions, as established to the benefit of the International Bondholders (the "***Renegotiation Conditions***"):

(i) That this Reorganization Agreement is understood as approved and begins to apply pursuant to Art. 89 of Law No. 20,720;

(ii) That the New York Southern District Bankruptcy Court (New York State, United States of America) recognizes the Agreement in the Chapter 15 proceeding the Company is filing with said court by reason of its Reorganization Proceeding, Case No. 20-11411 (MG);

(iii) That the promissory notes to which Section 7 below refers, and the documents for the reserve and ratification of guarantees to which **Chapter XVIII** below refers, are granted simultaneously, in both cases to the satisfaction of the International Bonds' Trustee;

(iv) That collection expenses, fees and reimbursements owed to the Trustee under the Indenture have been paid to its satisfaction, including the Trustee's advisors fees, applicable under the rules of the Indenture;

(v) That the other terms of the Financing Condition (as this term is defined further below in **Chapter VIII** of this Agreement) and the release of the funds from the Bridge Loan to the Company have been met.

Having certified the fulfillment of the Renegotiation Conditions by the Bankruptcy Administrator [*Interventor Concursal*] or, absent the latter, by the Creditors Commission with the favorable vote of four of its members, the loans shall be renegotiated in the form set forth in Number 3 below.

In the event that the Bankruptcy Administrator determines that the Renegotiation Conditions have failed due to expiration of the International Bonds Extension without the latter's having been verified, or because it has become certain before expiration of the term of the Extension that none of the events comprising them will occur:

(i) International Bondholders may exercise all their rights under the Indenture to obtain payment of their receivables, with no restrictions whatsoever and without being subject to this Agreement;

(ii) non-fulfillment of the Renegotiation Conditions or expiration of the term without their verification shall be a *Bankruptcy Law Event of Default* under the Indenture; and

(iii) International Bondholders may judicially enforce and collect their loans individually under the rules of

the Indenture, with all their real or personal guarantees and in any jurisdiction, without need to obtain a declaration of breach of this Agreement and without its serving as defense for that enforcement.

To remove all doubt, in all aspects not modified by this Reorganization Agreement, the obligations contained in the Indenture and in the International Bonds are ratified, and therefore all International Bondholder rights under said agreement shall be maintained, as well as all real and personal guarantees established in the Indenture, the International Bonds and their related documents. Nothing in this Agreement may be interpreted as restricting or impeding the International Bondholders from exercising their rights and actions under the Indenture in the face of a breach of the Debtor Company's obligations under said agreement, as it is understood that all those rights and actions are expressly reserved.

All the above is without prejudice to the Creditors Commission's resolving to extend the Extension of the International Bonds in the event that the Renegotiation Conditions fail as set forth in **Chapter XV** below. As long as the International Bond Extension is current, International Bondholders undertake to not individually or jointly take any enforcement action whatsoever against Enjoy and its Guarantors (as this term is defined further below).

**3.- Renegotiation of the International Bonds:**

Having satisfied Renegotiation Conditions within the deadline for the International Bonds Extension, the International Bonds shall be renegotiated in the form indicated below, exchanging the current debt instruments for the New International Bonds, on the understanding that, for all legal purposes, the International Bonds' renegotiation date shall be the date of the Deliberative Meeting.

Having completed the exchange of the International Bonds for the New International Bonds, the Company will have to obtain CUSIP and ISIN numbers for the New international Bonds (separately for the Senior New International Bonds and the Junior New International Bond, as these terms are defined below).

The total principal value of the New International Bonds shall be equivalent to the sum of: (i) USD 195 million (equivalent to the total principal owed under the International Bonds); and (ii) total interest under the International Bonds (including Defaulted Interest and Post-Petition Interest, as these terms are defined in the Indenture), accrued and not paid as of the date of the Deliberative Meeting.

The New International Bonds shall be divided into two tranches, the "***Senior New International Bond***" and the "***Junior New International Bond***," which shall be identical in all aspects, except the following: (i) the Senior New International Bonds shall have priority to be redeemed early in the event of mandatory early redemption as a result of sale of the assets backing the New International Bonds, pursuant to **Appendix No. 1** of this Agreement,

which is understood as forming part of the same for all legal purposes; and (ii) in the event the Company enters into liquidation, the Senior New International Bonds shall have the right to comprehensive payment (both outstanding principal and interest accrued and not paid) before any payment is made to the Junior New International Bonds, all as described in **Appendix No. 1** of this Agreement.

Senior New International Bonds shall be issued and delivered, in exchange for the International Bonds, to International Bondholders who issue Financing Commitments (as this term is defined further below) for an amount greater than or equal to the prorated New Financing corresponding to the respective International Bondholder in accordance with that bondholder's proportion of principal of the International Bonds (the "***International Bondholder Financing Minimum Amount***"), and undertake the respective disbursement (directly or through the option assignee) from the Bridge Loan (as this term is defined further below) in an amount effectively assigned thereto; all the above is in accordance with **Chapter VIII** of this Agreement.

For their part, Junior New International Bonds will be issued to International Bondholders that (i) do not participate in the New Financing up to at least the International Bondholder Financing Minimum Amount, or who (ii) do not undertake the respective disbursement of the Bridge Loan up to at least the amount assigned in the Bridge Loan under the terms described in **Chapter VIII**.

The International Bondholder Financing Minimum Amount shall be calculated in pesos in accordance with the following formula:

$$\text{International Bondholder j Financing Minimum Amount (pesos)} = \frac{\text{International Bondholder j Principal}}{\text{(Total International Bond Principal)}} \times (10{,}000{,}000{,}000)$$

To this end, "International Bondholder j Principal" shall mean the unpaid balance of principal of the International Bonds of the respective International Bondholder (face value). For its part, "Total International Bond Principal" shall mean the total balance of unpaid principal of the International Bonds (face value), i.e., USD 195 million (one hundred ninety-five million US dollars) as of the date of the Deliberative Meeting.

The equivalent in US dollars of the International Bondholder Financing Minimum Amount shall be calculated by using the Observed Dollar published in the *Diario Oficial* [Official Daily Gazette] on the date of the Deliberative Meeting. Attached as **Appendix No. 3** to this Proposal are examples of calculations of the International Bondholder Financing Minimum Amount, solely for purposes of facilitating its understanding and application.

The New International Bonds shall be issued by the Company and be governed by the New Indenture. The New International Bonds and New Indenture shall be identical in all aspects to the current International Bonds and Indenture (including the fact of being subject to the laws of the State of New York of the United States of America), with the sole exception of those changes that will be incorporated into the New Indenture and the New International

7

Bonds as noted in **Appendix No. 1** of this Agreement. The initial Trustee, paying agent and Registrar and Transfer Agent for the New Indenture shall be UMB BANK, N.A. It is confirmed that the terms contained in the **Appendix No. 1** are those that must be reflected in the New Indenture.

The New International Bonds will be issued as one or more global amounts registered in the name of Cede & Co. as Holder of Record, and as nominee of The Depository Trust Company, in the same way as the International Bonds were issued.

Additionally, all Guarantees and Security Documents established in the Indenture and in the International Bonds will be maintained, to be reflected in the New Instruments, in accordance with the terms set forth in **Chapter XVIII** of this Agreement.

**4.- New term for repayment of the loans:**

The Debtor Company must pay the entire principal balance of the renegotiated loans in a single installment (bullet), on August 14, 2027**.** The above is without prejudice to any redemptions that may occur in accordance with the New Indenture.

**5.- Interest:**

**a.- Interest accrued up to the date of the Deliberative Meeting:**

All loans applied to this **Chapter IV** shall be set as of the date of the Deliberative Meeting, in accordance with the outstanding balance of principal and interest accrued and not paid to date. Contractual interest and any that might have accrued during the delinquency period, up to the date of holding of the Deliberative Meeting, shall be calculated in accordance with the rate originally agreed upon (including Defaulted Interest and Post-Petition Interest, as these terms are defined in the Indenture), excluding the payment of any penalty interest, fines and collection expenses, which shall be expressly forgiven, if they exist. Interest accrued up to the date of the Deliberative Meeting shall be capitalized on said date, as shown in the amortization table of Part d. below.

Any collection expenses, fees and reimbursements that may be owed under the Indenture to the Bondholders' Representative (Trustee), Paying Agent, Registrar and Transfer Agent or Guarantee Agent must be paid as set forth in the Indenture, including any advisory and attorney expenses applicable under the rules of the Indenture and those necessary for purposes of recording the guarantees in accordance with the new conditions set forth in the Agreement, which shall also be assumed by the Debtor Company.

In the event that stamp and recording taxes – if applicable – are to be owed for this reason, they shall be assumed solely by the Debtor Company, and must be paid in timely fashion at the request of any Creditor.

**b.- Calculation of the interest rate:**

Interest shall be calculated and paid on all loans described in this **Chapter IV**, applying an annual interest rate, subject to the increments detailed below:

i.    **6.0%** annual basis 30/360 days the **first year** of approval of this Reorganization Agreement.

ii.   **7.0%** annual basis 30/360 days the **second year** of approval of this Reorganization Agreement.

iii.  **7.5%** annual basis 30/360 days the **third year** of approval of this Reorganization Agreement.

iv.   **8.0%** annual basis 30/360 days the **fourth year** of approval of this Reorganization Agreement.

v.    **8.5%** annual basis 30/360 days the **fifth year** of approval of this Reorganization Agreement.

vi.   **9.0%** annual basis 30/360 days the **sixth year** of approval of this Reorganization Agreement.

vii.  **9.5%** annual basis 30/360 days the **seventh year** of approval of this Reorganization Agreement.

This interest shall accrue as from the date the Deliberative Meeting is held.

**c.- Interest payment schedule:**

Interest shall be paid in accordance with the following payment schedule:

**i.- First Period:** For the period running from the Deliberative Meeting to the fourth quarter after said date, i.e., between August 15, 2020 and August 14, 2021, interest shall accrue to be capitalized quarterly, i.e., on November 14, 2020, February 14, 2021, May 14, 2021 and August 14, 2021.

**ii.- Second Period:** For the period running between the fifth and sixth quarters after the Deliberative Meeting, i.e., between August 15, 2021 and February 14, 2022, interest shall accrue, 50% of which shall be paid and the remaining 50% capitalized quarterly, i.e., on November 14, 2021 and February 14, 2022.

**iii.- Third Period:** For the period running from the seventh quarter after the Deliberative Meeting and henceforth, i.e., from February 15, 2022, interest shall be paid quarterly, at the end of each three-month period.

Within five business days after each of the indicated interest payment dates, the Company shall provide to the Trustee and the New International Bondholders a report showing the amount of interest capitalized on said dates.

9

Interest not to be capitalized in accordance with Roman numerals ii or iii above shall be due and must be paid on the respective payment date, as indicated in the amortization schedule in Section d.- below.

**d.- Principal and interest amortization schedule:**

**Secured Loan (USD)**

| Installment | Maturity | Unpaid balance | Interest (100%) | Capitalized interest | Amortization of principal | Installment amount |
|---|---|---|---|---|---|---|
| | 8/14/2020 | 210,505,263 | 0 | 0 | 0 | 0 |
| 1 | 11/14/2020 | 213,662,841 | 3,157,579 | 3,157,579 | 0 | 0 |
| 2 | 2/14/2021 | 216,867,784 | 3,204,943 | 3,204,943 | 0 | 0 |
| 3 | 5/14/2021 | 220,120,801 | 3,253,017 | 3,253,017 | 0 | 0 |
| 4 | 8/14/2021 | 223,422,613 | 3,301,812 | 3,301,812 | 0 | 0 |
| 5 | 11/14/2021 | 225,377,561 | 3,909,896 | 1,954,948 | 0 | 1,954,948 |
| 6 | 2/14/2022 | 227,349,614 | 3,944,107 | 1,972,054 | 0 | 1,972,054 |
| 7 | 5/14/2022 | 227,349,614 | 3,978,618 | 0 | 0 | 3,978,618 |
| 8 | 8/14/2022 | 227,349,614 | 3,978,618 | 0 | 0 | 3,978,618 |
| 9 | 11/14/2022 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 10 | 2/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 11 | 5/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 12 | 8/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 13 | 11/14/2023 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 14 | 2/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 15 | 5/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 16 | 8/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 17 | 11/14/2024 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 18 | 2/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 19 | 5/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 20 | 8/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 21 | 11/14/2025 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 22 | 2/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 23 | 5/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 24 | 8/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 25 | 11/14/2026 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 26 | 2/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 27 | 5/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 28 | 8/14/2027 | 0 | 5,399,553 | 0 | 227,349,614 | 232,749,168 |

**6.- Participation in the New Financing:**

International Bondholders, subject to any restrictions that might apply to each of them in any relevant jurisdiction, shall have the preferential option to grant new financing to Enjoy (hereinafter the "*New Financing*"), pursuant to the terms described in **Chapter VIII** below, for a minimum amount totaling $10,000,000,000.- (ten billion pesos), subject to an exchange rate adjustment indicated further below in this Agreement.

**7.- Promissory Notes.**

Having fulfilled the Renegotiation Conditions, on the same date and provided that the renegotiation of the International Bonds and their exchange for the New International Bonds is realized, the Debtor Company will deliver promissory notes signed by Enjoy with the same maturity as the New International Bonds and for the total

amount owed under the New Indenture, to the satisfaction of the International Bondholders' Trustee.

## V.    PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO UNSECURED CREDITORS

**1.- Extension.**

The loans of Unsecured Creditors shall be restructured, subject to the Rescheduling Conditions (as this term is defined below), under the conditions set forth in this **Chapter V** (hereinafter the "*Unsecured Rescheduling*"), with the exception of those Unsecured Creditors who are Bank Creditors or Suppliers and who opt for the restructuring stipulated for them in **Chapter VI** and **Chapter VII** of this Agreement, respectively (hereinafter the "*Unsecured Loans*").

The maturity of Unsecured Loans under this **Chapter V** shall be extended for a maximum of 90 days as from the date the Deliberative Meeting is held (hereinafter, the "*Extension of the Unsecured Loans*"), unless it becomes certain before that date that the Rescheduling Conditions will not be verified, during the term of which the Extension of the Unsecured Loans will expire on the date that said conditions failed, unless the Creditors Commission resolves to maintain the Extension of the Unsecured Loans as provided for in **Chapter XV** of this Agreement. So long as the Extension of the Unsecured Loans remains current, the Unsecured Creditors subject to this **Chapter V** undertake to not individually or collectively file any enforcement proceeding whatsoever, to the extent that the Renegotiation Conditions remain pending.

The Unsecured Rescheduling shall be subject to fulfillment of the following contingent conditions: (i) that this Reorganization Agreement is understood as approved and enters into force, in accordance with the provisions of Art. 89 of Law No. 20,720; (ii) that the other terms of the Financing Conditions are fulfilled; and (iii) that the Bridge Loan funds are released to the Company, hereinafter referred to together as the "*Rescheduling Conditions*," are fulfilled. Having satisfied the Rescheduling Conditions, it shall be assumed, for all due purposes, that the date of the Unsecured Rescheduling shall be the date of the Deliberative Meeting.

Until such time as the Rescheduling Conditions are fulfilled, the Unsecured Loans shall remain current in accordance with their original terms (including interest accrued after the reorganization request).

Once the Rescheduling Conditions have been met, their fulfillment shall be certified by the Bankruptcy Administrator or, in the latter's absence, by the Creditors Commission with the favorable vote of four of its members, and the Unsecured Loans shall be set as if they had been rescheduled on the date of the Deliberative Meeting, consistent with the outstanding balance of principal and interest accrued up to that date. Contractual interest and that which had accrued during the delinquency period – i.e., up to the date of holding of the Deliberative Meeting – will be calculated in accordance with the rate originally agreed to therein, excluding the payment of any penalty interest, fines and collection expenses, which shall be expressly forgiven. Interest accrued up to the date of the     Deliberative     Meeting     shall     be     capitalized     on     said     date.

In the event that stamp and recording taxes – if any – are to be paid for this item, they shall be assumed solely by the Debtor Company, and must be paid in a timely fashion at the petition of any Creditor.

As of the date the Deliberative Meeting is held, Unsecured Loans, including those to Bank Creditors and excluding Suppliers, represent a total of $189,860,711,276 (one hundred eighty-nine billion, eight hundred sixty million, seven hundred eleven thousand, two hundred seventy-six pesos) on the date of the aforementioned Meeting.

**2.- Rescheduling of Unsecured Loans and Mandatory Prepayment.**

Once the Rescheduling conditions are fulfilled, the provisions of this Section 2 and thereafter of this **Chapter V** shall apply.

The Debtor Company must pay the entire principal of the rescheduled Unsecured Loans, in a single installment (bullet) within 7 years and one month from the date of the Deliberative Meeting. The above is without prejudice to the mandatory prepayment of these loans as regulated in this **Chapter V**.

As from the day after the date of the Deliberative Meeting, the rescheduled Unsecured Loans shall accrue interest during the periods and in accordance with the rate originally agreed to for them, to be capitalized on the maturity date of the rescheduled Unsecured Loans or on the Prepayment Date (as this term is defined below), as the case may be.

All rescheduled Unsecured Loans shall be required to be prepared (for both the Debtor Company and the respective Unsecured Creditor) at no prepayment cost, and assuming their par value on the Prepayment Date, i.e., the unpaid balance of principal and interest accrued and not capitalized up to the Prepayment Date, which shall be capitalized on said date (hereinafter the "*Prepayment Amount*") as follows: (a) 80% of the Prepayment Amount (hereinafter the "*Convertible Prepayment Amount*") shall be prepaid through delivery of (i) the bonds convertible to shares of Enjoy to which numerals 3.a.- and 3.b.- below refer, and (ii) the money received for the subscription of the aforementioned convertible bonds during their Preferential Offer Period (as this term is defined below) by shareholders of the Debtor Company (hereinafter the "*Shareholders*"), as detailed in **Chapter X** below; and (b) the remaining 20% of the Prepayment Amount shall be prepaid through the delivery of Fixed Income Bond B to which numeral 3.c below refers. Section 4 below of this **Chapter V** details how this prepayment shall be made.

The rescheduled Unsecured Loans that, before rescheduling, were denominated in *Unidades de Fomento* [Chilean Incentive Units], will be updated according to the change in the Unidad de Fomento from the date of the Deliberative Meeting to their due dates or up to the Prepayment Date, as applicable.

As from the date of the Deliberative Meeting, the obligations to do and not do as contained in Chapter XIII of this Agreement shall apply solely and exclusively to the rescheduled Unsecured Loans, and the default events

considered in the debt instruments containing the rescheduled Unsecured Loans, if applicable, shall not be valid.

To facilitate the recording in the Securities Registry of the changes in rescheduled Unsecured Loans that are publicly offered securities, which will be applicable thereto under this Agreement, the Debtor Company, together with the Administrator and the Bondholders Representative, if applicable, will be expressly entitled to sign all instruments, agreements and documents, whether public or private, that are necessary, appropriate or requested by a competent authority to afford confirmation of the terms of this Agreement in these instruments, including the execution of new issuances of securities that may be necessary in order to facilitate modification of the rescheduled Unsecured Loans, and the Extension of the Unsecured Loans, if applicable. The Debtor Company will also be expressly authorized to deliver instructions and information to Depósito Central de Valores S.A., Depósito de Valores (hereinafter "**DCV**"), that may be necessary for facilitating the rescheduled Unsecured Loans, their extension and execution of their prepayment, as described in Section 4 of this **Chapter V**.

### 3.- New issuance of bonds for mandatory prepayment of the Rescheduled Unsecured Loans:

To undertake the mandatory prepayment of the entire Prepayment Amount, the Debtor Company unconditionally and irrevocably assumes the obligation to issue bonds convertible to shares of Enjoy and fixed-income bonds and to record them with the Securities Registry maintained by the Financial Market Commission ("hereinafter the "**CMF**"), with the following characteristics:

#### a.- Convertible A-1 Bond:

As noted above, Unsecured Creditors are required to be prepaid the Convertible Prepayment Amount, through: (i) the delivery of bonds convertible to Enjoy A-1 shares ("**Convertible A-1 Bond**") not placed during the Preferential Offer Period, in an amount equivalent to that needed to prepay the Convertible Prepayment Amount, assuming for these purposes the par value of the Convertible A-1 Bond, which in no case may be for amounts less than or under conditions more advantageous than those offered to Shareholders during the Preferential Offer Period; and (ii) in the event of the existence of a balance in the Convertible Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible A-1 Bonds that would have been acquired during their Preferential Offer Period by the Shareholders (as described in **Chapter X** below), until the Convertible Prepayment Amount is realized.

The Convertible A-1 Bond will be payable in a single installment 99 years (bullet) after the date of the Deliberative Meeting, and will accrue interest at a nominal peso rate equal to zero. The other terms and conditions of the Convertible A-1 Bond will be attached as **Appendix No. 2** to this Proposal, on the understanding that said **Appendix No. 2** forms part of the Proposal for all legal purposes.

13

The exchange rate for converting the Convertible A-1 Bond shall be **66.67** (sixty-six point six seven) new common shares of Enjoy for every $1,000 (one thousand pesos) of principal owed on the Convertible Prepayment Amount. In the event that this calculation results in a fraction of a share, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next highest whole number, and should there be a difference, it shall be paid in cash by the Debtor Company, assuming the sum of $15 as the price per share. Should there exist fractions of Convertible A-1 Bonds as a result of the difference between the Convertible Prepayment Amount and the cutoff amount for the Convertible A-1 Bond, the difference shall be paid in cash by the Debtor Company. These payments shall be made by the Company on the Prepayment Date and the conversion date, respectively.

The option for conversion of the Convertible A-1 Bonds into Company shares must be exercised within 60 banking days from the Prepayment Date. Convertible A-1 Bondholders may exercise the option to convert the Convertible A-1 Bond to shares of Enjoy at any time during the validity of the aforementioned conversion period, by written communication sent to Enjoy expressing therein their intent to exercise the conversion option, under the terms and in accordance with the communication form to be described in the Convertible A-1 Bonds issuance agreement.

Since the Convertible A-1 Bonds must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanisms for doing so shall be regulated in **Chapter X**.

**b.- Convertible A-2 Bond:**

As an incentive for participating in the New Financing, once the Reorganization Agreement is approved, those Unsecured Creditors who participated in the New Financing and effected the disbursement of the respective Bridge Loan (directly or through their option assignee) shall be entitled to receive in payment of a "portion" of their Convertible Prepayment Amount, with said portion to be determined according to their Prorated Share (as this term is defined further below), through: (i) the delivery of bonds convertible to A-2 Enjoy shares ("***Convertible A-2 Bond***") not placed during the Preferential Option Period, in an amount equivalent to that which is necessary to prepay the aforementioned "portion" of their Convertible Prepayment Amount, assuming for these purposes the par value of the Convertible A-2 Bond, which under no circumstances may be less than or under conditions more advantageous than those offered [to?] Shareholders during the Preferential Offer Period; and (ii) should there exist a balance in the aforementioned "portion" of the Convertible Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible A-2 Bonds that had been acquired during the Preferential Offer Period by Shareholders (as described in **Chapter X** below), until completing the aforementioned "portion" of the Convertible Prepayment Amount.

The "portion" of the Convertible Prepayment Amount that each Unsecured Creditor shall be entitled to be

14

paid with Convertible A-2 Bonds (or with the proceeds of their placement during their preferential offer) shall be equal to their prorated share in the Bridge Loan (hereinafter, the "**_Prorated Share_**"), multiplied by a factor equal to 0.80. Should there exist fractions of Convertible A-2 Bonds, the difference will be paid in cash by the Debtor Company.

The **_Prorated Share_** shall be calculated as the quotient between (i) the amount effectively disbursed by the respective Unsecured Creditor ("**_unsecured creditor i_**") in the Bridge Loan, over (ii) the proportion represented by its receivable among total Unsecured Loans, excluding Suppliers, on the date of the Deliberative Meeting, multiplied by $40,000,000,000, in accordance with the following formula:

$$\text{Prorated Share of unsecured creditor i} = \frac{\text{(Total effectively disbursed by unsecured creditor i in the Bridge Loan)}}{\frac{\text{(Receivable of unsecured creditor i)}}{\text{(Unsecured Loans excluding Suppliers)}}} * (40,000,000,000)$$

where Unsecured Loans (excluding Suppliers) as of the date of the Deliberative Meeting total approximately $189,860,711,276 (one hundred eighty-nine billion, eight hundred sixty million, seven hundred eleven thousand, two hundred seventy-six pesos). Attached as **Appendix No. 3** to this Proposal are examples of the calculation of the "portion" of the Convertible Prepayment Amount that could be paid in Convertible A-2 Bonds, for the sole purpose of facilitating understanding and implementation.

The terms and conditions of the Convertible A-2 Bond shall be identical to the terms and conditions of the Convertible A-1 Bond, which are considered expressly reproduced herein, with the sole exception of the exchange rate for shares of Enjoy, which in the case of the Convertible A-2 Bond shall be **198.02** (one hundred ninety-eight point zero two) new common shares of Enjoy for each $1,000.- (one thousand pesos) of principal owed from Convertible Prepayment Amount. The other terms and conditions of the Convertible A-2 Bond are attached as **Appendix No. 2** to this Proposal, on the understanding that said **Appendix No. 2** forms part of the Proposal for all legal purposes.

In the event that the results of this calculation yield a fraction of shares, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next highest whole number, and should there be a difference, it will be paid in cash by the Debtor Company, considering the sum of $5.05 as the price per share. Should there be fractions of Convertible A-2 Bonds as a result of the difference between the Convertible Prepayment Amount to be prepaid with Convertible A-2 Bonds, and the cutoff amount of the Convertible A-2 Bond, the difference shall be paid in cash by the Debtor Company. These payments shall be made by the Debtor Company on the Prepayment Date and conversion date, respectively.

If, pursuant to the calculations noted above, the "portion" of an Unsecured Creditor's Convertible Prepayment Amount does not yield as a result the receipt of 100% of its Convertible Prepayment Amount in A-2 Convertible B, the difference shall be paid through the delivery of Convertible A-1 Bonds. Should fractions of Convertible A-1 Bonds exist, the difference shall be paid in cash by the Debtor Company.

15

Since Convertible A-2 Bonds must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanism for this is regulated in **Chapter X**.

With regard to Unsecured Loans in custody through an exchange broker or an entity legally authorized to hold securities in its own name on behalf of third parties (hereinafter the "Custodian"), solely for purposes of undertaking calculation of the Prorated Share, this shall be calculated by assuming as "unsecured creditor i" each person individually on behalf of whom the respective Custodian is holding the respective receivable (hereinafter the "Final Instruments") participating in the New Financing, depending on how that is reported by the Custodian in accordance with the terms noted in Chapter VIII of this Agreement.

**c.- Fixed Income Bond B (Tranche B)**:

The amortization of 20.0% of the total Prepayment Amount (whether or not they had participated in the New Financing) (hereinafter the "***Fixed Income Prepayment Amount B***") shall be required to be prepaid through delivery of a fixed income bond to be issued for an amount equivalent to at least the Fixed Income Prepayment Amount B (hereinafter the "***Fixed Income B Bond***"), payable within 10 years as from the date of the Deliberative Meeting. If fractions of Fixed Income B Bonds exist as a result of the difference between the Fixed Income Prepayment Amount B and the cutoff amount of the Fixed Income B Bond , the difference shall be paid in cash by the Debtor Company to the respective Unsecured Creditor on the Prepayment Date.

Fixed Income B Bond shall have the following features.

i.- Currency:

Fixed Income B Bond shall be issued in Chilean pesos.

ii.- Amortization of principal:

The dates of payment of interest and amortizations of principal of the Fixed Income B Bond, as well as the amounts to be paid in each case, are as shown in the Amortization Table indicated in Part c.iv.- below.

iii.- Interest:

Interest shall be calculated and paid by applying an annual effective nominal interest rate, which will gradually increase as described below:

- **1.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, the **first two years and six months** after the date the Deliberative Meeting is held. This interest shall accrue

and be capitalized semi-annually, all in accordance with the amortization table indicated in Part c.iv.- below.

- **6.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the end of the **sixth semi-annual period** after the date the Deliberative Meeting is held, and henceforth. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below in Part c.iv.-.

iv.- <u>Amortization table for Fixed Income Bond B</u>[4]:

**Fixed Income Bond B (CLP millions)**

| Installment | Maturity | Unpaid Principal | Interest | | | |
|---|---|---|---|---|---|---|
| (100%) installment | Capitalized interest | Amortization of principal | Value | | | |
| | 8/14/2020 | 100 | | | | |
| 1 | 2/14/2021 | 101 | 1 | 1 | 0 | 0 |
| 2 | 8/14/2021 | 102 | 1 | 1 | 0 | 0 |
| 3 | 2/14/2022 | 102 | 1 | 1 | 0 | 0 |
| 4 | 8/14/2022 | 103 | 1 | 1 | 0 | 0 |
| 5 | 2/14/2023 | 104 | 1 | 1 | 0 | 0 |
| 6 | 8/14/2023 | 104 | 3 | 0 | 0 | 3 |
| 7 | 2/14/2024 | 104 | 3 | 0 | 0 | 3 |
| 8 | 8/14/2024 | 104 | 3 | 0 | 0 | 3 |
| 9 | 2/14/2025 | 104 | 3 | 0 | 0 | 3 |
| 10 | 8/14/2025 | 104 | 3 | 0 | 0 | 3 |
| 11 | 2/14/2026 | 101 | 3 | 0 | 3 | 6 |
| 12 | 8/14/2026 | 99 | 3 | 0 | 3 | 6 |
| 13 | 2/14/2027 | 93 | 3 | 0 | 5 | 8 |
| 14 | 8/14/2027 | 88 | 3 | 0 | 5 | 8 |
| 15 | 2/14/2028 | 80 | 3 | 0 | 8 | 11 |
| 16 | 8/14/2028 | 73 | 3 | 0 | 8 | 10 |
| 17 | 2/14/2029 | 60 | 2 | 0 | 13 | 15 |
| 18 | 8/14/2029 | 47 | 2 | 0 | 13 | 15 |

v.- <u>Early Redemption</u>:

As from the date the New International Bonds are repaid in their entirety, the Debtor Company may redeem the Fixed Income B Bonds in advance, in whole or in part, at the equivalent of the amount of outstanding principal to be prepaid on the date set for the redemption, plus interest accrued and not paid during the period between the day after the due date of the final installment of paid interest and the date set for the redemption (at par).

vi.- <u>Financial Covenant</u>:

In addition to the obligations to do and not do as indicated in Chapter XIII of this Judicial Reorganization Agreement, in the Fixed Income B Bond the Debtor Company shall undertake to maintain a Net Financial Debt / EBITDA ratio not to exceed: **(a)** 6.5x measured and calculated on the consolidated financial statements of Enjoy

---

[4] This amortization table is illustrated on a base 100, while the final amounts to be considered will depend on the number of Bank Creditors who exercise the Unsecured Loans option.

reported quarterly to the CMF (the "***Financial Statements***") as of March 31, 2024, and up to the Financial Statements of December 31, 2025; **(b) 6.0 times** measured and calculated on the Financial Statements as of March 31, 2026 and up to the Financial Statements of December 2026; **(c) 5.5x** measured and calculated on the Financial Statements as of March 31, 2027 and up to the Financial Statements of December 31, 2027; **(d) 5.0x** measured and calculated on the Financial Statements as of March 31, 2028 and up to the Financial Statements of December 31, 2028; and **(e) 4.5 times** measured and calculated on the Financial Statements as of March 31, 2029 and henceforth.

The Net Financial Debt / EBITDA ratio shall not be measured on the Financial Statements prior to March 31, 2024.

For these purposes:

    a.   Net Financial Debt: shall correspond to: /i/ The sum of the items posted under "Other current financial liabilities," "Other non-current financial liabilities," "Current leasing liabilities" and "Non-current leasing liabilities," less /ii/ the item posted as "Cash and cash equivalents;" all the above are from the Enjoy Consolidated Statement of Financial Position, which forms an integral part of the Financial Statements.

    b.   EBITDA: corresponds to the results of the following items from the Income Statement by Function of the Financial Statements: /i/ Revenue from ordinary activities; less /ii/ Cost of sales; less /iii/ Administrative expenses; plus /iv/ Annual depreciation; plus /v/ Annual amortization.

vii.- Other terms and conditions:

Other terms and conditions applicable to the Fixed Income B Bonds are added as **Appendix No. 4** to this Proposal, on the understanding that said Appendix shall form part of the Proposal for all legal purposes.

**4.- Mandatory Prepayment of the Rescheduled Unsecured Loans:**

The procedure that shall apply for purposes of undertaking mandatory prepayment of the Prepayment Amount of the rescheduled Unsecured Loans shall be the following:

**a.- Prepayment Date:**

Within 15 banking days after expiration of the Preferential Offer Period, the Debtor Company must undertake to make mandatory prepayment of the rescheduled Unsecured Loans (hereinafter the "***Prepayment Date***"). To this end, Enjoy must grant a prepayment notice to the Unsecured Creditors, by reporting an essential Event as least five Banking Days prior to the Prepayment Date.

**b.- Receivables that are unrealized public debt offering instruments:**

18

Rescheduled Unsecured Loans that correspond to public debt offering instruments shall be prepaid on the Prepayment Date by means of electronic funds transfers, in the case of cash payments, and through delivery of the respective Convertible A-1 and/or A-2 Bonds, as applicable, and the Fixed Income B Bond, through DCV by means of their transfer and/or deposit to the accounts that the respective Unsecured Creditors have registered with DCV, subject to instruction from the Debtor Company and information to the Administrator.

Further, on the Prepayment Date, the Debtor Company shall send an instruction to DCV in order for the latter to leave as invalid the positions corresponding to the unrealized debt instruments that had been the object of the prepayment.

**c.- Other Receivables:**

In the case of receivables other than those indicated in Part 5.b above and those public debt offering instruments that are released, Unsecured Creditors must direct themselves on the Prepayment Date to the offices of Enjoy, located at calle Rosario Norte No. 555, piso 10, commune of las Condes, Santiago, during business hours, to monitor the information and instruments that attest to their capacity as Unsecured Creditors. On that occasion, Enjoy shall prepay those corresponding cash amounts through immediately available funds, to the bank accounts reported by the respective Unsecured Creditors to Enjoy, at least two banking days before the Prepayment Date, while instructing the DCV to make the transfer and/or deposit of the Convertible A-1 and/or A-2 Bonds, as applicable, and the Fixed Income B Bond that also corresponds to said creditors, into the accounts that the respective Unsecured Creditors have registered with DCV and reported to Enjoy at least two banking days before the Prepayment Date, and the respective Unsecured Creditors must sign a document acknowledging complete prepayment of their rescheduled Unsecured Loan.

## VI. PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO BANK CREDITORS (TRANCHE C).

Pursuant to Article 64 of Law No. 20,720, more favorable conditions are proposed for Bank Creditors who commit to granting to the Debtor Company, or to one or more of its subsidiaries, to be agreed to with the Debtor Company, one or more revolving lines of credit within a maximum of 15 banking days after the date of entry into force of the Agreement, with the following features:

1.- Term: 3 years after the date of holding of the Deliberative Meeting.

2.- Interest rate: consistent with the market.

3.- Amount: the equivalent of at least 40% of its corresponding loan against the Debtor Company, allocated to this Reorganization Agreement.

4.- Other conditions: those typical in the market for these types of transactions.

Bank Creditors that opt for this Chapter VI of the Agreement must grant their binding commitment to open the aforementioned lines to the Administrator within five banking days after the date of the Deliberative Meeting.

The most favorable condition offered consists of the prepayment, at no prepayment costs, of 100% of outstanding principal and accrued interest from the respective Bank Creditor's loans through issuance of a fixed income bond totaling said amount, for the purposes of which the Debtor Company proposes assuming the obligation to issue a fixed income bond with the characteristics described in this **Chapter VI** and to record it with the Securities Registry maintained by the CMF (hereinafter "***Fixed Income Bond C***"), payable within 12 years after approval of this Reorganization Agreement. Should there exist fractions of Fixed Income C Bonds as a result of the difference between the amount of the loan of a Bank Creditor, and the cutoff amount of the Fixed Income C Bond, the difference shall be paid in cash by the Debtor Company. These loans, prior to delivery of the Fixed Income C Bonds, shall be extended and shall capitalize interest in the form stipulated in numerals 1.- and 2.- of **Chapter V**, where applicable.

The Bank Creditors' loans shall be prepaid within 15 banking days after the date of acquisition of registration of the Fixed Income C Bonds with the CMF's Securities Registry. To this end, Enjoy must issue a prepayment notice to the Bank Creditors, by declaring an Essential Event at least five banking days before its prepayment date. Prepayment shall be made through the DCV by means of transfer and/or deposit to the accounts the respective Bank Creditors have registered with the DCV, subject to instructions of the Debtor Company and information to the Administrator.

Bank Creditors who do not conform to the provisions of this **Chapter VI** shall be governed by the provisions of **Chapter V** above.

These Bank Creditors represent **six** creditors, totaling **$19,629,732,671 (**nineteen billion, six hundred twenty-nine million, seven hundred thirty-two thousand, six hundred seventy-one pesos), and are detailed in Annex No. 6 of this Agreement.

The Fixed Income C Bond shall have the following features.

i.- Currency:

The Fixed Income C Bond shall be issued in Chilean pesos.

ii.- Amortization of principal:

Payment of the Fixed Income C Bond shall be made in a single installment after 12 years after the date of the Deliberative Meeting, in accordance with the Amortization Table provided in Part iv.- below.

iii.- Interest:

20

Interest shall be calculated and paid by applying an annual effective nominal interest rate, which will gradually increase as described below:

- **1.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, the **first five semi-annual periods** after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **2.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **sixth semi-annual period** to the **twelfth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **3.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **thirteenth semi-annual period** to the **eighteenth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **4.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **nineteenth semi-annual period** to the **twenty-fourth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

iv.- <u>Amortization table for Fixed Income Bond C</u>[5]:

| Installment | Maturity | Unpaid principal | Interest (100%) | Capitalized interest | Amortization of principal | Value of installment |
|---|---|---|---|---|---|---|
| | 8/14/2020 | 100.0 | | | | |
| 1 | 2/14/2021 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 2 | 8/14/2021 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 3 | 2/14/2022 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 4 | 8/14/2022 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 5 | 2/14/2023 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 6 | 8/14/2023 | 101.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 7 | 2/14/2024 | 102.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 8 | 8/14/2024 | 103.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 9 | 2/14/2025 | 104.1 | 1.0 | 1.0 | 0.0 | 0.0 |
| 10 | 8/14/2025 | 105.1 | 1.0 | 1.0 | 0.0 | 0.0 |
| 11 | 2/14/2026 | 106.2 | 1.1 | 1.1 | 0.0 | 0.0 |
| 12 | 8/14/2026 | 107.2 | 1.1 | 1.1 | 0.0 | 0.0 |
| 13 | 2/14/2027 | 108.8 | 1.6 | 1.6 | 0.0 | 0.0 |
| 14 | 8/14/2027 | 110.5 | 1.6 | 1.6 | 0.0 | 0.0 |
| 15 | 2/14/2028 | 112.1 | 1.7 | 1.7 | 0.0 | 0.0 |
| 16 | 8/14/2028 | 113.8 | 1.7 | 1.7 | 0.0 | 0.0 |
| 17 | 2/14/2029 | 115.5 | 1.7 | 1.7 | 0.0 | 0.0 |
| 18 | 8/14/2029 | 117.2 | 1.7 | 1.7 | 0.0 | 0.0 |
| 19 | 2/14/2030 | 119.6 | 2.3 | 2.3 | 0.0 | 0.0 |
| 20 | 8/14/2030 | 122.0 | 2.4 | 2.4 | 0.0 | 0.0 |

---

[5] This amortization table is illustrated on a base 100, while the final amounts to be considered will depend on the number of Bank Creditors who exercise the Unsecured Loans option.

| 21 | 2/14/2031 | 124.4 | 2.4 | 2.4 | 0.0 | 0.0 |
| 22 | 8/14/2031 | 126.9 | 2.5 | 2.5 | 0.0 | 0.0 |
| 23 | 2/14/2032 | 129.4 | 2.5 | 2.5 | 0.0 | 0.0 |
| 24 | 8/14/2032 | 0.0 | 2.6 | 0.0 | 129.4 | 132.0 |

v.- Early Redemption:

As from the date the New International Bonds are repaid in their entirety, the Debtor Company may redeem the Fixed Income C Bonds early, in whole or in part, at the equivalent of the total outstanding principal to be prepaid on the date set for the redemption, plus interest accrued and not paid during the period between the day after the due date of the final installment of paid interest and the date set for the redemption (at par).

v.- Other terms and conditions: Other terms and conditions applicable to the Fixed Income C Bonds shall be attached as **Appendix No. 4** to this Proposal before the date of the Deliberative Meeting, on the understanding that said Appendix shall form part of the Proposal for all due purposes.

## VII. PROPOSED PAYMENT OF PRINCIPAL TO SUPPLIER CREDITORS

Pursuant to Article 64 of Law 20,720, more favorable conditions are proposed for some of the unsecured creditors. The more favorable condition proposed consists in paying 100% of the principal of the loans originating from invoices or receipts issued by Suppliers under the same terms, which must be paid within 12 months as from approval of this Judicial Reorganization Agreement.

These Suppliers represent **18** creditors, totaling **$381,718,815.-** (three hundred eighty-one million, seven hundred eighteen thousand, eight hundred fifteen pesos) and are detailed in Appendix No. 6 of this Agreement.

## VIII. NEW FINANCING (TRANCHE D).

The International Bondholders and Unsecured Creditors shall have the preferential option of granting New Financing to Enjoy totaling approximately $50,000,000,000 (fifty billion pesos) (hereinafter, the International Bondholders and Unsecured Creditors participating in the New Financing shall be referred to jointly as the "***New Financers***").

The New Financing shall be documented in a single, non-revolving loan opening agreement to be entered into between Enjoy and the New Financers under terms substantially similar to those attached as **Appendix No. 5** of this Agreement, which is understood as forming a part thereof for all legal purposes (the "***Bridge Loan***"), which shall be required to be prepaid (for both the Debtor Company and the respective New Financer) at no prepayment cost, and assuming as the amount to be prepaid the outstanding balance of principal plus interest accrued and to be capitalized on the Prepayment Date (hereinafter the "***New Financing Prepayment Amount***"), through the delivery

22

of (i) bonds convertible to Enjoy shares ("*Convertible D Bond*") not placed during the Preferential Offer Period, in an amount equivalent to that which is necessary to prepay the New Financing Prepayment Amount, assuming for these purposes the par value of the Convertible D Bond, which under no circumstances may be for amounts less than or under conditions more advantageous than those offered to Shareholders during the Preferential Offer Period; and (ii) in the event there exists a balance of the New Financing Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible D Bonds that had been acquired during their Preferential Offer Period by the Shareholders (as described in **Chapter X** below), until completing the New Financing Prepayment Amount; all the above shall be prorated for the New Financers' Share in the New Financing.

**1.- Bridge Loan**.

a.- With a view to participating in the New Financing, the New Financers will sign a non-revolving loan opening agreement, under identical terms and conditions maturing at 18 months, the disbursements of which shall be documented by signing promissory notes to the order of each respective New Financer. The disbursement shall take place on the third banking day after the signing date of the Bridge Loan, or on the banking day after which the Financing Condition (as this term is defined below) has been fulfilled, if fulfilled after entering into the Bridge Loan, at which time the respective promissory note authorized by a Notary shall be issued.

Loans granted under the Bridge Loan shall accrue annual interest of 5.7% (base 360 days and semi-annual periods equal to 180 days), unless said rate exceeds the current maximum contractual rate applicable to loans with these characteristics current on the signing date of the Bridge Loan, in which case said contractual maximum rate shall apply.

It shall be required for the Bridge Loan to be prepaid for the debtor and creditor on the Prepayment Date, with no prepayment costs, through the issuance of Convertible D Bonds not placed during the Preferential Option Period, the characteristics of which are noted in Numeral 3 of this **Chapter VIII**, and in the event of a difference, with the proceeds from the subscription and paying of the Convertible D Bonds that had been acquired during its Preferential Offer Period by the Shareholders, as indicated below.

b.- The opportunity to participate in the Bridge Loan shall be offered preferentially to the groups and in the proportions specified below (hereinafter the "*Groups*"):

i.- To International Bondholders: up to $10,000,000,000.- (ten billion pesos) (hereinafter, "*Group A*") or its equivalent in US dollars, according to the Observed Dollar Exchange rate published by the Central Bank of Chile on the date the Deliberative Meeting is held.

ii.- To Unsecured Creditors: up to $40,000,000,000.- (forty billion pesos) (hereinafter, "*Group B*").

c.- Those interested in participating in the New Financing must express this in writing to the Bankruptcy Administrator, through a financing commitment (hereinafter the "***Financing Commitment***"), the results and total amounts of which must be subsequently reported by the Bankruptcy Administrator. With regard to International Bondholders, they must express their interest by sending a written communication to the International Bondholders Representative. Additionally, International Bondholders may express their commitment directly to the Bankruptcy Administrator, through a Financing Commitment. The International Bondholders Representative shall send to the Bankruptcy Administrator any Financing Commitments it might receive from International Bondholders. With regard to receivables held in custody through a Custodian, their Final Holders interested in participating in the New Financing must express this to their respective Custodian, who shall send to the Bankruptcy Administrator a written communication identifying Final Holders interested in participating in the New Financing while attaching custody certificates to identify the receivables of the aforementioned Final Holders. Additionally, Final Holders interested in participating in the New Financing must so state in writing to the Bankruptcy Administrator through a Financing Commitment, which they may deliver to the Bankruptcy Administrator either directly or through their respective Custodian.

i.- Financing Commitments received within a specified Group shall be allocated to the value of the share in the New Financing offered to the corresponding Group, prorated in accordance with the share in the liabilities of the respective Group held by all group creditors who have expressed interest, until the allocation to each participating creditor within the Group of 100% of what would correspond to each creditor in accordance with their prorating, or their commitment offer, whichever is less. If a share of the New Financing remains after the above allocation, it shall be distributed among the creditors of the respective Group that delivered Financing Commitments above their prorating for the respective Group's liabilities, prorated for these excess commitment offers. If the Financing Commitments received within a specific Group exceed the share in the New Financing offered to the Corresponding Group, said excess shall be allocated to cover shortfalls in the other Group, if any, prorated (among all those considering only the excess) until depletion of the total of $50,000,000,000 (fifty billion pesos).

ii.- In the event it is not possible to obtain Financing Commitments in an initial round for an amount equivalent to 100% of the New Financing, successive rounds may be held among interested parties who submitted Financing Commitments in previous rounds, which shall be allocated, prorated for the new request until the amount of the shortfall is depleted.

iii.- If, despite having been offered in the form indicated in Parts i.- and ii.- above, a portion of the New Financing remains without having received Financing Commitments, the Company may offer said

remainder of the New Financing to third parties under terms no more favorable than those offered to these three Groups.

iv.- Rounds and offerings of New Financing that follow the first must be concluded within a maximum of 10 banking days.

d.- Notwithstanding the above, and prior to the Deliberative Meeting, those convened to participate in the New Financing may state in advance their intent to participate therein, through a binding note to be sent to the Bankruptcy Auditor (*Veedor Concursal*), in order for the latter to acknowledge this at the respective meeting. At the respective Deliberative Meeting, a record may be left of the commitments received in advance, and the creditors may appear who expressed them, to repeat said commitment, which under no circumstances shall affect the validity or enforceability of the written commitment delivered to the Bankruptcy Auditor.

e.- **Minimum Amount of Financing Commitments:**

i.- In the event that, after completing the rounds and offerings of New Financing described in Part c. above, the Financing Commitments do not exceed $25,000,000,000 (twenty-five billion pesos) ("***Minimum Financing Amount***"), the Financing Condition (as this term is defined below) shall be understood as unfulfilled and, as a consequence, a cause for breach of the Reorganization Agreement shall occur and Enjoy must immediately request its own voluntary liquidation.

ii.- In the event that, after completing the New Financing rounds and offers as described in Part c. above, Financing Commitments are greater than or equal to $25,000,000,000 (twenty-five billion pesos) but less than $45,000,000,000 (forty-five billion pesos), the New Financers who delivered the Financing Commitments to the Company are not required to maintain said commitments, and may inform the Company and the Administrator of their withdrawal, maintenance or increase within two business days after the notice issued by the administrator to the New Financers with the final results of the New Financing rounds and offers. Those New Financers who indicate nothing within said period shall be understood as maintaining their respective Financing Commitment. After fulfilling the withdrawal period for the Financing Commitments, the Company and the Administrator shall calculate the total amount of Financing Commitments net of those withdrawn (the "***Net Financing Commitments***"). If Net Financing Commitments do not exceed the Minimum Financing Amount, the Financing Condition will be understood as unfulfilled and, consequently, a default event under the Reorganization Agreement shall occur and Enjoy must immediately request its own voluntary liquidation. If the Net Financing Commitments are greater than or equal to $25,000,000,000 (twenty-five billion pesos) but less than $45,000,000,000 (forty-five billion pesos), the Financing Condition

shall be understood as fulfilled in this aspect, unless the Creditors Commission resolves otherwise by vote of four of its members, in which case the Reorganization Agreement shall be understood as not fulfilled and Enjoy must immediately request its own voluntary liquidation.

iii.- In the event that the Financing Commitments meet or exceed $45,000,000,000 (forty-five billion pesos), the Financing Condition shall be considered as fulfilled in that respect.

iv.- For purposes of calculating the amounts set forth in this letter **e.-**, the amounts committed by New Financers who are International Bondholders shall be assumed in their peso-equivalent, using the Observed Dollar exchange rate published by the Central Bank of Chile applicable on the day the Deliberative Meeting is held, without prejudice to the amount at which the currencies received from them are effectively liquidated on the date of the respective disbursement.

f.- Once the periods for receiving the Financing Commitments have lapsed, as noted in letter **c.-** above, the New Financers must sign the non-revolving loan opening agreement and other New Financing documents by the second banking day after the date the Administrator reports each New Financer's share in the Bridge Loan. For purposes of entering into the non-revolving credit line agreement, the New Financers shall authorize the Administrator to sign the aforementioned agreement in their name and behalf, upon exercising their option to grant the New Financing. The terms defined in the process of allocating each New Financer's share in the Bridge Loan and entering and disbursing them shall be reported by the Auditor and/or Administrator, as applicable.

g.- Funds disbursed by each New Financer shall be kept on deposit with the withholding agents to be designated in the Bridge Loan (hereinafter the "***Withholding Agents***"), until their release and delivery to Enjoy in accordance with the Bridge Loan's provisions.

h.- If, by the second banking day after the Bridge Loan disbursement date, one or more New Financers fails to fulfill their Financing Commitment and consequently an amount has not been delivered to the Withholding Agents equivalent to those they permitted to give in fulfillment of the condition set forth in Letter h of the Financing Condition, the Debtor Company must so advise the Administrator and the Creditors Commission in order for the latter to determine whether the amount effectively disbursed is sufficient as to trigger the release of funds to the Company by the Withholding Agents. If the Creditors Commission, by vote of four of its members, fails to accept the amount effectively disbursed, the Company, within 10 banking days after the date of the Creditors Commission's resolution, must propose new alternative financing to supplement the missing amount, under the same terms as the Bridge Loan. If the Creditors Commission accepts the Company's proposal, it shall undertake release of the funds to the Company by the Withholding Agents. Otherwise, the disbursed amounts shall be considered sufficient,

unless the Creditors Commission resolves otherwise by vote of four of its members, and the disbursed amounts shall be returned by the Withholding Agents to the respective New Financer.

i.- The Debtor Company shall pay each New Financer (to the extent the respective disbursement is actually made under the Bridge Loan) a commitment fee totaling 2% of the total amount actually disbursed by the respective New Financer under the Bridge Loan, to be deducted from their total disbursement when the latter becomes due.

j.- Funds disbursed under the Bridge Loan shall be allocated to repaying obligations incurred during the course of the regular business activities of the Debtor Company and its subsidiaries, in accordance with the conditions and restrictions applying thereto under this Agreement. In this regard, the Debtor Company must submit to the Creditors Commission a Plan for the Use of Funds for general approval, with the Debtor Company retaining the allocation and specific responsibility for its implementation, the fulfillment of which shall be supervised by the Administrator.

k.- The Unsecured Creditors' receivables and the loans against Enjoy that arise after the date of the Deliberative Meeting (with the exception of the International Bonds and the New International Bonds, which are preferential, the "Lease Agreement with Purchase Option" entered into between Enjoy and Banco Security, pursuant to a public instrument dated October 5, 2016, Directory No. 21,180-2016 issued through the Santiago Notary office of Mr. Eduardo Diez Morello, and the guarantee vouchers referenced in **Chapter XII** below), shall be understood as subordinate to the Bridge Loan and the Convertible D Bonds, until the end of the Conversion Period, i.e., day 540 after the Bridge Loan disbursement date. Loans against Enjoy that arise after the date of the Deliberative Meeting, excepting those already noted, as well as loans with respect to non-financial providers generated during the ordinary course of Enjoy's business must expressly contain this subordination in its instruments. Without prejudice to the subordination specified above with respect to the Unsecured Creditors, Unsecured Creditors who participate in the Bridge Loan authorize the Administrator to confirm and ratify the aforementioned subordination agreements on their behalf, by public instrument.

l.- The option to grant the New Financing may be assigned by the respective creditor, in whole or in part, to which end it shall so note in the communication expressing its Financing Commitment, which must also be signed by the respective assignee.

m.- The assignment of a loan under the Bridge Loan by a creditor subject to this Agreement shall not in any way alter or affect the rights and preferences corresponding to said assigning creditor in that capacity, pursuant to this Agreement, for its participation in granting the New Financing.

**2.- Financing Condition.**

The obligation to undertake disbursements under the Bridge Loan shall be subject to fulfillment, within a maximum of 90 calendar days from the date of the Deliberative Meeting, of the following contingent and supplementary conditions (the "***Financing Condition***"):

a.- That Enjoy have the relevant corporate authorizations to subscribe, disburse and fulfill the Bridge Loan;

b.- Approval by part of the Shareholders at an extraordinary shareholders meeting of Enjoy for a capital increase, through the issuance of shares and of bonds convertible to shares of Enjoy, in an amount sufficient as to back the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the shares to be allocated to the Option and the Support Shares (as these terms are defined in **Chapter X**), and amendments of the corporate bylaws that might be needed for these purposes;

c.- Acquisition of the commitment of at least 60% of current Shareholders, to waive their preferential option rights to subscribe the Convertible A-1 Bond and Convertible A-2 Bond, under the terms stipulated in the Support Agreement.

d.- Acquisition of the commitment of at least 60% of current Shareholders to waive 90.88% of their preferential option rights to subscribe the Convertible D Bond, under the terms stipulated in the Support Agreement;

e.- Acquisition of a commitment of at least 60% of current Shareholders to not sell their shares in the Company under the terms stipulated in the Support Agreement.

f.- That this Reorganization Agreement be understood as approved and begin to apply pursuant to Art. 89 of Law No. 20,720;

g.- That the Administrator certify that, except for the disbursement of the Bridge Loan, the conditions have been fulfilled for the release in favor of the Debtor Company of time deposits totaling $9,300,000,000 currently held in guarantee by the banks issuing the guarantee vouchers to which **Chapter XII** of this Agreement refers, as opposed to the condition for the effective disbursement of at least $25,000,000,000 of the New Financing;

h.- (i) That the Debtor Company receive Financing Commitments totaling at least the Minimum Financing Amount and (ii) that the Creditors Commission not declare a violation of the Financing Condition in the event that Financing Commitments are less than $45,000,000,000 (forty-five billion pesos), as noted in Letter e, Part ii of Numeral 1 above; and

28

i.- That the New York Southern District Bankruptcy Court (New York State, United States of America) recognizes the Agreement in the so-called Chapter 15 proceeding the Company is filing with said court by reason of its Reorganization Proceeding, Case No. 20-11411 (MG), as described in Appendix 1.

**3.- Convertible D Bond**.

a.- Enjoy unconditionally and irrevocably undertakes to issue the Convertible D Bond, which shall have an issuance amount equal to $65,000,000,000 (sixty-five billion pesos). Should fractions of Convertible D Bonds exist as a result of the difference between a New Financer's New Financing Prepayment Amount and the Convertible D Bonds cutoff amount, this difference shall be paid in cash by the Debtor Company to the respective New Financers, prorated for their share in the New Financing, on the Prepayment Date.

b.- Since Convertible D Bonds must preferentially be offered to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanism for doing so shall be regulated in Chapter X.

c.- The Convertible D Bond shall have the following features:

**i.- Currency**:

The Convertible D Bond shall be issued in Chilean pesos.

**ii.- Principal amortization**:

The Convertible D Bond shall be repaid through a single installment within 99 years of the date of the Deliberative Meeting approving the Proposal (bullet).

**iii.- Interest:**

Interest shall be calculated and capitalized by applying an annual effective nominal rate (base 360 days and semi-annual periods equal to 180 days) up to the date of conversion to shares, which shall be reduced gradually as described below:

- **5.7%** for the period starting on the Prepayment Date of the Bridge Loan and ending 540 days after the date of disbursement of the Bridge Loan.

- **0.0%** nominal annual effective rate from day 541 after the date of disbursement of the Bridge Loan.

**iv.- Conversion Period**:

The Convertible D Bond may only be converted to shares of Enjoy during a period starting on the Prepayment Date, and ending 540 days after the date of disbursement of the Bridge Loan. At any time

during the lifetime of the aforementioned conversion period, Convertible D Bondholders may exercise the option to convert the Convertible D Bond to shares of Enjoy, subject to written communication sent to Enjoy expressing therein their intent to exercise the conversion option, under the terms and in accordance with the communication form to be described in the agreement for the issuance of the Convertible D Bonds.

**v.- Conversion Rate**:

The Convertible D Bond will have a conversion rate of 266.67 (two hundred sixty-six point six seven) new shares of Enjoy for each $1,000.- (one thousand pesos) of current principal and accrued interest up to the latest date of interest capitalization prior to the conversion date.

In the event that the results of this calculation yield a fraction of shares, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next whole number, and if there is a difference, this difference shall be paid in cash by the Debtor Company, assuming as share price the sum of $3.75, to be paid by the Debtor Company on the conversion date.

**vi.- Preference**:

The Convertible D Bond shall be considered preferential for the payment of principal and interest and in the event of bankruptcy settlement with respect to Unsecured Creditors (with the exception of the International Bonds and the New International Bonds, which are preferential, the "Lease Agreement with Purchase Option" entered into between Enjoy and Banco Security, pursuant to a public instrument dated October 5, 2016, Directory No. 21,180-2016, issued through the Notary Office of Mr. Eduardo Diez Morello, and the guarantee vouchers discussed in **Chapter XII** below) and loans against Enjoy that arise after the date of the Deliberative Meeting (with the exception of loans expressly agreed to by means of this Judicial Reorganization Agreement), which loans, therefore, shall be understood as being subordinate to the Convertible D Bond, until the end of the Conversion Period, i.e., day 540 after the Bridge Loan disbursement date. Loans against Enjoy that arise after the date of the Deliberative Meeting, excepting those already noted, must expressly contain this subordination in their instruments. Without prejudice to the subordination set forth in this Agreement with respect to all Unsecured Creditors, those Unsecured Creditors that participate in the Bridge Loan authorize the Administrator to confirm and ratify the aforementioned subordination agreements on their behalf, by public instrument,.

**vii.- Use of funds**:

Funds from the Convertible D Bond shall be used exclusively for prepaying the Bridge Loan, and in the event of a remainder after paying the above, said funds shall be allocated to repaying the obligations corresponding to the normal operations of the Debtor Company and its subsidiaries.

**viii.- Other terms and conditions**

Other terms and conditions of the Convertible D Bond are attached as __**Appendix No. 2**__ to this Proposal, on the understanding that said Appendix shall form part of the Proposal for all legal purposes.

**4.- Prepayment of the Bridge Loan**

Prepayment of the Bridge Loan to the New Financers shall be made on the Prepayment Date, to which end Enjoy must grant a prepayment notice to the New Financers, by declaring an Essential Event at least five banking days before the Prepayment Date, and on said date Enjoy shall prepay the corresponding amounts in cash through immediately available funds, to the bank accounts reported by the respective New Financers to Enjoy at least two banking days before the Prepayment Date, and for delivery of the Convertible D Bonds, by delivering the same through the DCV, by means of their transfer and/or deposit to the accounts that the respective New Financers have registered with the DCV or the account that their respective Custodian has registered with the DCV, and reported to Enjoy at least two banking days before the Prepayment Date. For these purposes, the New Financers must deliver to Enjoy on that same date the promissory notes delivered to them under the Bridge Loan, with confirmation of payment of the same.

## IX. OPTION FOR SUBSCRIPTION OF SHARES BY CURRENT SHAREHOLDERS.

Pursuant to this Reorganization Agreement, and subject to the corresponding statutory approvals, Shareholders shall be granted a preferential option, simultaneously with the opening of the Preferential Offer Period, to subscribe 9,389,919,856 new Company payment shares (hereinafter the "***Option***"), which may be paid within a term of 24 months after the date of the Deliberative Meeting approving the Proposal, at a subscription price of $5.42 per share (yielding a rate of 2.00 new shares for each current share).

To apply the Option, Enjoy shall grant, in the same capital increase as supports the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the issuance of shares for payment of the Option. The Option on these new payment shares shall be offered preferentially to Shareholders with right to subscribe them (those registered with the Enjoy Shareholders Registry as of midnight on the fifth business day prior to the start date of the Preferential Offer Period), at a subscription price of $5.42 (five point four two pesos) per share, who may exercise the Option by subscribing the shares during the Preferential Option Period, by paying the subscription price within 24 months after the date of the Deliberative Meeting. The outstanding balances of subscribed shares not paid-in shall be adjusted in the same proportion as the value of the Chilean *Unidad de Fomento* varies in accordance with the law. At the extraordinary shareholders meeting convened to approve the aforementioned capital increase, it shall be proposed that shareholders authorize the Board to not persevere in

31

collecting on subscribed shares that have not been paid-in within the aforementioned period, and to amend the bylaws to state that subscribed shares with value not totally paid-in (considered individually) shall not be entitled to vote so long as they remain unpaid.

The preferential subscription offering of the shares covered by the Option shall be undertaken in accordance with the terms set forth in **Chapter X** below.

## X.    LEGAL STRUCTURE FOR THE FINANCING AND CONVERSION PROCESSES.

1.- Prior to the Deliberative Meeting, the Debtor Company may supplement the legal structure for implementation of the loan renegotiation as agreed to in this Accord and, specifically, for implementation of the New Financing, mandatory prepayment of the unsecured loans with Convertible A-1 Bonds and Convertible A-2 Bonds and Fixed Income B Bond, repayment of the Bridge Loan with Convertible D Bonds, etc.

2.- Without prejudice to the entry into force of this Agreement, the Bankruptcy Administrator shall convene the Creditors Commission, together with the Debtor Company and the technical advisors assisting them, to adopt the necessary agreements for appropriate implementation of the various steps considered in the Reorganization Agreement if necessary, with full powers. Said meeting of the Creditors Committee must be held no later than the fifth business day after the date of holding of the Deliberative Meeting.

3.- Notwithstanding the above, following are the general guidelines proposed for some of the steps considered in this Proposal.

a.- All bonds convertible to shares issued by the Company must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations (hereinafter the "***Preferential Offer Period***"). If no Shareholder exercises their preferential option during the Preferential Offer Period, the Company shall allocate the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds that are necessary to be delivered in prepayment of the Convertible Prepayment Amount and the New Financing Prepayment Amount, as set forth in this Reorganization Agreement. If shareholders exercise their aforementioned preferential subscription option, the procedure shall be as follows:

i.- Convertible A-1 Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the Convertible Prepayment Amount of the rescheduled Unsecured Loans entitled to receive Convertible A-1 Bonds in payment, prorated.

ii.- Should there exist a balance in the Convertible Prepayment Amount after applying the amounts indicated in number i.- above, the net proceeds the Company obtains for the subscription and payment of the Convertible A-1 Bonds during the Preferential Offer Period shall be allocated for

paying off the balance of the Convertible Prepayment Amount of the rescheduled Unsecured Loans with right to receive Convertible A-1 Bonds in payment, prorated.

iii.- Convertible A-2 Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the Convertible Prepayment Amount of the rescheduled Unsecured Loans entitled to receive Convertible A-2 Bonds in payment, prorated.

iv.- Should there exist a balance in the Convertible Prepayment Amount right to receive Convertible A-2 Bonds in payment after applying the amounts indicated in Number iii.- above, the net proceeds the Company obtains for the subscription and payment of the Convertible A-2 Bonds during the Preferential Offer Period shall be allocated for paying off the balance of the Convertible Prepayment Amount with right to receive Convertible A-2 Bonds in payment, prorated.

v.- Convertible D Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the New Financing Prepayment Amount, prorated.

vi.- Should there exist a balance in the New Financing Prepayment Amount right to receive Convertible D Bonds in payment after applying the amounts noted in Number v.- above, the net proceeds the Company obtains for subscription and payment of the Convertible D Bonds during the Preferential Offer Period shall be allocated to paying off the balance of the New Financing Prepayment Amount, prorated.

vii.- In the three cases set forth above, the Company may issue Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, as applicable, for an amount greater than requested to cover the payment set forth in this Reorganization Agreement.

b.- The Preferential Offer Period for the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds and for shares to exercise the Option shall be realized simultaneously (at the same time). The Preferential Offer Period for the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds and for shares to exercise the Option must be initiated within [15] business days after the deadline for recording these issuances in the CMF's Securities Registry.

c.- With a view to facilitating the feasibility of the agreements contained in this Reorganization Proposal:

i.- The companies Entretenciones Consolidadas SpA, Inversiones e Inmobiliaria Almonacid Limitada and Inversiones Cumbres Limitada, which represent 60.52% of the Enjoy shareholder capital, shall sign a support agreement with Enjoy (hereinafter the "***Support Agreement***") pursuant

to which: (i) they undertake to assist and participate with all their shares in the extraordinary shareholders meeting addressing Part e below, approving there at the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the capital increase noted in the aforementioned Letter e, the changes of bylaws necessary for these purposes, and other matters necessary for implementation of the Proposal in the context of the Enjoy Judicial Reorganization Agreement; (ii) they promise to waive their preferential subscription rights to subscribe the Convertible A-1 Bonds and Convertible A-2 Bonds and waive 90.88% of their rights to preferentially subscribe the Convertible D Bonds, when said rights arise, under the terms stipulated in the Support Agreement; and (iii) they undertake not to transfer their shares, in accordance with the terms set forth in the Support Agreement. The Support Agreement must be entered into and delivered to the Auditor in advance of the date of the Deliberative Meeting, in order for the Auditor to address the Support Agreement at the aforementioned Meeting; and

ii.- Company Creditors must express and send to the Auditor, before the date of the Deliberative Meeting, their commitment to participate in the New Financing subject to the terms and conditions of this Reorganization Agreement, in the amount of $25,000,000,000 (twenty-five billion pesos).

d.- The Financing Commitments must be formalized through a standardized binding document, the format of which shall be sent to each creditor by the Auditor, prior to the Deliberative Meeting, which must be delivered by the respective creditor to the Bankruptcy Administrator in its first round, by August 20, 2020 at 5:00 p.m. The procedure for formalizing this commitment shall be reported by the Auditor prior to the Deliberative Meeting, which in any case must be consistent with the procedure described in Letter c), Number 1, **Chapter VIII** of this Agreement.

e.- Within 60 calendar days after the date of entry into force of the Reorganization Agreement, an Extraordinary Shareholders Meeting must be held, to which the following will be submitted for Shareholder consideration:

i.- A single capital increase, through the issuance of new shares, to allow fulfillment of the following:

- Issuance of the necessary shares to support the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds;

- Issuance of shares needed to be able to grant the Option to Shareholders; and

- Issuance of payment shares for up to an additional $10,000,000,000.- (ten billion pesos), as a mechanism to protect against cash flow needs, the conditions of which (including

34

their placement price) may be set by the board within the legal deadlines (hereinafter the "***Reserve Shares***"), a part of which may be allocated to compensation plans for workers of the Company and its subsidiaries, in accordance with the terms set by the Board (hereinafter the "***Stock Option***").

ii.- Issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds identified previously in this Reorganization Agreement.

iii.- Any other matters that may be necessary to submit for consideration of the Shareholders at the aforementioned Meeting, for correct implementation of this Agreement.

4.- In all cases, the number of shares into which the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds may be converted pursuant to this Agreement were set in order to fulfill the condition that current Company shareholders not reduce their equity stake in Enjoy to a percentage less than 10% after converting all the aforementioned bonds. However, this minimum of 10% falls exclusively within the context of the Judicial Reorganization of Enjoy, and therefore is not applicable in the event that Enjoy, after completing the Reorganization, requires new capital, in which case the shareholders and their dilutions (if applicable) shall be subject to the specific conditions of said new capital increase or financing.

## XI.  ADMINISTRATION.

The administration of Enjoy shall be exercised by the current entities that have established its bylaws, during the term of this Agreement.

Without prejudice to the above, and as set forth in Article 69 of Law No. 20,720, it is proposed that the creditors at the Deliberative Meeting appoint a Bankruptcy Administrator with the authority indicated below and for the term set forth in the aforementioned provision. The latter's fees shall be set by the Creditors Commission, which shall be regulated below, together with the Debtor Company.

## XII. RENEWAL OF GUARANTEE VOUCHERS (*BOLETAS DE GARANTIAS*).

1.- With a view to guaranteeing to the Superintendency of Gambling Casinos fulfillment of the technical offer; construction and development [of] the plans in timely and appropriate fashion at the Coquimbo, Viña del Mar, Puerto Varas and Pucón casinos; and finally, complete fulfillment of the economic offer contained in the tender proceedings carried out by the regulatory authority, in 2018 the banks Banco BTG Pactual Chile, Banco Internacional and Banco Security issued Guarantee Vouchers for approximately UF 4,800,000.0 (four million, eight hundred thousand Unidades de Fomento) in favor of Casino de la Bahía S.A., Casino del Mar S.A., Casino de Lago

35

S.A. and Casino de Puerto Varas S.A. Part of said Guarantee Vouchers are secured by insurance policies issued by CESCE Chile Aseguradora S.A.

2.- All guarantee vouchers – which are not secured by the security policies referenced above – and the obligations under said policies are, in turn, guaranteed (i) by the endorsement, joint and several surety and joint and several co-debt of Enjoy; (ii) by a mortgage on a property owned by an Enjoy S.A. subsidiary located in the city of Castro; (iii) by time deposits pledged in guarantee, totaling approximately $32,000,000,000 (thirty-two billion pesos), taken by Enjoy S.A. in favor of the Banks, which securities are in the possession of Banco BTG Pactual Chile, as the agent bank for the bank syndicate and as guarantee agent.

3.- On July 14, 2020, the Administration and issuers of the aforementioned guarantee vouchers entered into new agreements for renewal of the aforementioned vouchers and policies, and agreed to the conditions for the release of the aforementioned security deposits, subject to the meeting of certain milestones, including the granting and subsequent recording of a mortgage on certain properties owned by an Enjoy subsidiary located in the commune of Rinconada de Los Andes, corresponding to fourteen lots (together the "**Rinconada Property**").

4.- Release of the security deposits is subject to fulfillment of the following conditions:

**a.- For the release of $5,200,000,000 (five billion, two hundred million pesos):** When all the following conditions are found to be met: (i) Authorizations have been obtained from Enjoy creditors pursuant to Article 74, Section Two of Law No. 20,720, and with regard to local bondholders and, in addition, the latter have approved all the matters stipulated in Letters c) and d) of the convocation of the bondholders meeting, the first notice of which was published June 27, 2020, to be held July 13 at 12 noon; (ii) all parties have signed the mortgage agreement and restrictions on the Rinconada Property in favor of Banco BTG Pactual Chile, as guarantee agent, together with all the Loan Documentation, as this term is defined below to the satisfaction of the financers; and (iii) complete payment of the premium or premiums corresponding to the guarantee insurance policy. These conditions have already been met, and therefore these deposits were released on July 14;

**b.- For the release of $18,600,000,000 (eighteen billion, six hundred million pesos)**

i.- $9,300,000,000 (nine billion, three hundred million pesos) will be released when the following three conditions together are met:

- When the Court certifies that the Debtor Company's Judicial Reorganization Agreement is approved pursuant to Article 89 of Law No. 20,720 and that it may be fulfilled and begin to apply in accordance with Part Four of said article.

36

- That said Judicial Reorganization Agreement incorporates and agrees to the following matters: (a) Complete restructuring of the Enjoy international bond; and (b) Capitalization of at least 70% of the unsecured loans verified in the reorganization procedure, with a minimum of $115,000,000,000 (one hundred fifteen billion pesos); and c) That the text of the approved Reorganization Agreement includes statements aimed at confirming and expressly ratifying (c.i) all loans granted; (c.ii) the restructuring of liabilities; and (c.iii) transactions between the banks, Banco BTG Pactual Chile, Banco Internacional and Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos and their administered funds, including but not limited to BTG Pactual Deuda Privada Fondo de Inversión [Private Debt Investment Fund] and its respective subsidiaries and other related parties, with Enjoy and its subsidiary companies, in the two years prior to the start of the Judicial Reorganization Procedure, leaving confirmation in the text of the agreement of the withdrawal and final waiver by the creditors of all judicial or other types of actions seeking to dispute or question the efficacy and/or enforceability of the acts and agreements executed or entered into to which Points (c.1), (c.ii) and (c.iii) above refer, and the conditions noted in letter c) above, that have not been subject to dispute.

  In fulfillment of the above terms and conditions, by means of this Agreement, the matters to which Points (c.1), (c.ii) and (c.iii) above refer are expressly confirmed and ratified. Further, by means of this Agreement, the Creditors confirm the withdrawal and final abandonment of any judicial or other type of action that might seek to dispute or question the efficacy and/or enforceability of the instruments and agreements executed or entered into to which Points (c.1), (c.ii) and (c.iii) above refer.

- For purposes of the above, and without prejudice to the fact that the Bondholders Meeting held July 13 of this year approved and ratified the validation of the aforementioned deals, among other matters, the creditors present at this Deliberative Meeting expressly confirm and ratify (i) all grants of loans; (ii) the restructuring of liabilities; and (iii) arrangements entered into or executed between the banks, Banco BTG Pactual Chile, Banco Internacional and Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos, and their administrated funds, including but not limited to BTG Pactual Deuda Privada Fondo de Inversión and their respective subsidiaries and other related parties, with Enjoy and its subsidiary companies, in the two years before the start of the Judicial Reorganization Procedure, and have stated that they expressly waive the exercise of any judicial or other type of action seeking to dispute or question the efficacy and/or enforceability of the acts and agreements executed or entered into to which Points (i), (ii) and (iii) above refer, or request their revocation.

- The effective disbursement of at least $25,000,000,000 (twenty-five billion pesos) under the New Financing granted to Enjoy, by one or more creditors, effectively incorporating said amount into the company's coffers.

ii.- $9,300,000,000 (nine billion, three hundred million pesos) will be released when the above conditions, together, have been met and the specific mortgage and restrictions set on the Rinconada Property have been legally recorded in favor of the Agent Bank, as creditor and guarantee agent, in the respective Real Estate Registry.

**c.- For the release of $8,300,000,000 (eight billion, three hundred million [pesos]):** Having fulfilled each and every one condition, together, mentioned previously in Parts a.- and b.- above, the procedure shall be: (a) The release of $4,150,000,000 (four billion, one hundred fifty million pesos), against the effective incorporation into Enjoy's coffers of at least another $10,000,000,000 (ten billion pesos) in addition to the $25,000,000,000 (twenty-five billion pesos) referenced previously; (b) The release of $4,150,000,000 (four billion, one hundred fifty million pesos) against the effective incorporation into Enjoy's coffers of at least another $5,000,000,000 (five billion pesos) in addition to the $25,000,000,000 (twenty-five billion pesos) and $10,000,000,000 (ten billion pesos) mentioned above.

**d.- For the release of the mortgage and restrictions on the Rinconada Property:** This may only be released as of month 18 after the date of issuance of the respective guarantee vouchers and/or policies, subject to certain conditions noted in the respective financing documents signed on the occasion of the issuance of the new guarantee vouchers, including that the decision approving the Judicial Reorganization Agreement be final and enforceable.

## XIII.    OBLIGATIONS TO DO AND NOT DO.

As set forth in **Chapter IV**, the obligations to do and to not do shall be maintained vis-à-vis the International Bondholders as contained in the **Indenture** – with the changes described in **Appendix No. 1** with respect to the New International Bonds. In turn, the following obligations to do and not do shall be established exclusively vis-à-vis the rest of the Creditors enrolled in this Agreement:

1.- **Obligations to Do**.

a.- To carry out or cause to carry out all necessary measures to preserve and maintain in full force and effect its corporate existence and validity, without altering its corporate form, including its status as publicly traded, limited-liability corporation, registered with the Securities Registry maintained for these purposes by the CMF and, in addition, including but not limited to, its dissolution or transformation, without incurring legal grounds for dissolution; as well as to preserve and maintain all rights, properties, licenses, trademarks, permits, exemptions, easements, concessions or patents that may be necessary for the

normal functioning of the Debtor Company and the development of its business operations; and to maintain all its relevant assets in good state of repair consistent with their natural use and wear and tear.

b.- To pay all taxes and other applicable tax obligations as well as those of a labor-related origin or other preferential payments in accordance with current law, except those that may be disputed in good faith and in accordance with the appropriate legal procedures.

c.- To fulfill in all aspects the laws, regulations and provisions and applicable orders, specifically including, without restriction, the timely payment of all taxes, contributions, encumbrances and tax charges of any other kind affecting the Debtor Party or its assets, and to fulfill any tax, labor, social security and environmental obligations that may apply thereto in a timely fashion, as applicable, except those with respect to which the appropriate legal appeals have been filed in good faith.

d.- To provide the Bankruptcy Administrator with all additional financial and/or accounting information that might be requested thereby.

e.- To ensure that, at all times, its obligations under this Reorganization Agreement have at least the same prevalence and payment priority under the law as its remaining payment obligations, current or future, to other creditors of the same class, in accordance with the law. The above is without prejudice to the preferences set forth in this Reorganization Agreement.

f.- To complete, sign, execute and enter into any instruments and agreements to afford complete fulfillment of the Reorganization Agreement, as required of it by the Bankruptcy Administrator.

2.- **Obligations to Not Do**.

a.- Grant loans or credits or any type of financing to third parties, excluding subsidiaries, except in the case of financing within the Issuer's ordinary course of business, which must at all times and under all circumstances be carried out under market conditions.

b.- Enter into transactions with Related Parties, without fulfillment of the provisions of Title XVI of the Chilean Corporations Act [*Ley de Sociedades Anónimas*]. For all due purposes, "transactions with related parties" shall be understood as those defined as such in Article One Hundred Forty-Six of the Corporations Act, or that which may modify or replace it in the future.

c.- As of the date of the Deliberative Meeting approving the Proposal, to establish itself as endorser, guarantor, joint and several co-debtor or to commit its equity to fulfill third-party obligations, unless said third parties are subsidiaries of the Issuer.

39

## XIV. APPROVAL AND VALIDITY OF THE AGREEMENT.

1.- Pursuant to Art. 89 of Law 20,720, this Agreement shall be understood as approved and shall enter into force provided that:

a.- Upon expiration of the period for disputing it, without its having been disputed, the competent court so declares it at its own behest or at the petition of any interested party of the Auditor.

b.- If it has been disputed and the disputes are dismissed, provided that the resolution dismissing the dispute or disputes is enforceable and the Agreement is declared approved.

c.- If it had been disputed and the disputes were filed by creditors of a specified class or category, representing less than 30% of the liabilities with right to vote in their respective class or category and the court so states.

2.- The Reorganization Agreement shall be valid until the last of the following dates: (i) (a) the expiration date of the conversion period of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bond or (b) the date when all Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds have been converted, whichever occurs first, in the event that this latter event occurs before expiration of the aforementioned conversion period, and (ii) the date of occurrence of the exchange of the International Bonds for the New International Bonds.

## XV. CREDITORS COMMISSION.

1.- To oversee fulfillment of the stipulations of the Judicial Reorganization Agreement and the actions of the Company's Administrative Entities, a Creditors Commission is appointed (non-remunerated, except as noted further below), consisting of five acting members and their respective alternates (one for each acting member of the Creditors Commission), who shall exercise their duties so long as this Agreement remains in force. The Creditors Commission shall consist of two representatives of the International Bondholders, two representatives of the domestic bondholders and a fifth member, not a creditor nor a creditor representative, and its respective alternate, who shall be elected by the remaining members of the Creditors Commission at its first session, at which remuneration may also be set. Each creditor mentioned above shall be entitled to remove their representative from the Creditors Commission and appoint a replacement. The four acting members and alternates of the Creditors Commission who shall be creditor representatives shall be elected at the Creditors Meeting, respectively, by the International Bondholders (two acting members and two alternates) and domestic bondholders (two acting members and two alternate members). It is set forth that neither a renegotiation of International Bondholders nor a rescheduling of Unsecured Creditors shall involve a change or update in the members of the Creditors Commission.

2.- Members of the Creditors Commission shall be required to maintain absolute secrecy over all information that is confidential by nature of its content and must refrain from disclosing it to any person or entity. To

this end, they must sign a Confidentiality Agreement containing the obligation set forth above.

3.- The Enjoy S.A. Board of Directors has committed to adopting measures that, within the framework of the provisions of the Chilean Corporations Act [*Ley sobre Sociedades Anónimas*], allow it three (3) representatives on the Creditors Commission consisting of representatives of Enjoy's international and local bondholders, for them to be invited to Board sessions to discuss matters corresponding to the implementation and fulfillment of the Reorganization Agreement, in order to afford adequate coordination between matters submitted for the knowledge and approval of the Board of Directors, on the one hand, and fulfillment of the Reorganization Agreement and the powers of the Creditors Commission, on the other. For purposes of the above, members of the Creditors Commission must grant in advance a confidentiality agreement providing for due confidentiality of the Company's information on the part of those who might access it.

4.- The Commission shall set its form [of] functioning and determine the frequency of its meetings. There shall be acting and alternate members. Nevertheless, the management of the Debtor Company or the Bankruptcy Administrator, as the case may be, may request that the Creditors Commission meet to hear and decide upon specific matters. To this end, a certified letter shall be sent to the domicile of the legal representative of the respective members of the Creditors Commission or to their email addresses (registered at the first organizational session of this Commission), at least seven banking days in advance, requesting a meeting and noting the topics to be consulted or discussed. The resulting convocations must have at least two business day's difference between the first and second convocations. If, at the latter's request, the Creditor's Commission does not meet, having issued the two consecutive convocations, the corresponding authorizations shall be requested of the competent Court.

5.- As to quorums for sessions and majorities to approve resolutions, the Creditors Commission shall meet with the participation of a simple majority of its members (at least three) and resolutions shall be adopted by simple majority of its members attending the respective session (at least two), except with regard to the Renegotiation Conditions, Rescheduling Conditions and/or Financing Condition or the matters noted in Numbers 7.g and 7.j below, for which a quorum of attendance of at least 4 (four) of its members and a majority of at least four of those in attendance shall be required to approve resolutions.

6.- The Creditors Commission shall appoint a Chair thereof, which shall have the following powers:

a.- To convene the Commission members to meet, at the request of any Commission Member, the Bankruptcy Administrator or the Debtor Company.

b.- To convene the Creditors Meeting in all cases that the Commission deems necessary or appropriate.

c.- To communicate to the Debtor Company the decisions adopted by the Creditors Commission.

7.- The Creditors Commission shall have the following powers:

a.- To remove and replace the Administrator and request from it such information and actions as it deems relevant.

b.- To set the fees of the Administrator with regard to its administration activities as such. Said fees must be adapted to current market remuneration, in accordance with the complexity and responsibility of the position and the Company's payment capacity.

c.- To hear the background information provided by the Administrator, in particular the account of its management, the frequency of which shall be determined by the Commission.

d.- To provide the authorizations set forth in this Reorganization Agreement.

e.- To replace the Chair and/or Vice Chair of the Creditors Commission.

f.- To request the Debtor Company, through the Administrator's intermediation, for information on the regular course of business and its operations, plans and programs.

g.- Pursuant to Part Two, Art. 83 of Law 20,720, the Creditors Commission may amend all or part of the contents of the Reorganization Agreement, except with respect to the capacity of creditor, its class or category, differences between creditors of the same class or category, the amount of their loans and their preference. It is set forth that any modification to the rights of the International Bondholders under the Indenture or the New Indenture shall require the modification of said agreement, as applicable, with the prior consent of the Company and of the International Bondholders under the rules of the Indenture or the New Indenture.

h.- To authorize Enjoy, on an extraordinary basis, to not fulfill a specific obligation to do and/or to not do under this Reorganization Agreement.

i.- In representation of the creditors, to justifiably waive fulfillment of any of the conditions established to its benefit in the Agreement (subject to the respective quorum set in this Agreement), or to approve its fulfillment in a form other than that originally agreed to or to temporarily suspend its application.

j.- In the event that the Renegotiation Conditions stipulated in **Chapter IV**, or the Financing Conditions contained in **Chapter VIII** of this Reorganization Agreement are not fulfilled, the Creditors Commission shall analyze and identify a mechanism that permits implementing renegotiation of the International Bonds in

accordance with the terms stipulated in the aforementioned **Chapter IV** or, as the case may be, shall approve the appropriate formula for obtaining temporary financing, with the ability to agree with the Debtor Company on the terms and other conditions of this financing. These matters must be approved by at last four members of the Commission, who shall also set the terms for fulfilling execution of the instruments and agreements necessary for implementing and developing the aforementioned Creditor actions.

k.- To approve the Plan for the Use of Funds from the New Financing in general, with the Debtor Company to retain the allocation and specific responsibility for its implementation, the fulfillment of which will be supervised by the Administrator.

l.- Such other powers as this Agreement grants thereto.

m.- To attend Enjoy board of director sessions pursuant to No. 3 of this Chapter XV.

## XVI. BANKRUPTCY ADMINISTRATOR.

1.- Without prejudice to the formation of a Creditors Commission, and as set forth in Article 69 of Law 20,720, it is proposed that the Deliberative Creditors Meeting appoint an Administrator (hereinafter the '***Bankruptcy Administrator***' or '***Administrator***'), who shall exercise their duties so long as this Agreement remains in force, and shall have the powers set forth in the aforementioned article and those stipulated below.

2.- This appointment must fall to a current auditor from the List of Auditors registered with the Chilean Insolvency and Recovery Superintendency (*Superintendencia de Insolvencia y Reemprendimiento)*.

3.- Without prejudice to the powers corresponding thereto under Article 294 of the Chilean Civil Procedures Code [*Código de Procedimiento Civil*], it is proposed that the appointed Bankruptcy Administrator have the following powers:

a.- Have access to the offices and facilities of the Debtor Company to request all the latter's accounting, financial and commercial information, in order to verify or monitor due fulfillment of the obligations assumed in this Reorganization Agreement.

b.- Inform the Creditors Commission of any background information or transaction executed by the Debtor Company that might affect normal servicing of the debt assigned to this Agreement.

c.- Regularly (at least monthly) inform the Creditors Commission of the revenue and expenses of the Debtor Company, and in particular its operational efficiency and expenses and its payment of suppliers.

d.- Draw up minutes of the Commission's meetings.

e.- Approve all payments made for debt service.

43

f.- Undertake confirmation as to the balance of the loans assigned to this Reorganization Agreement and determine the priority of the payments.

g.- Authorize the Debtor Company to grant personal or real guarantees to secure own and/or third-party obligations, in cases other than those already permitted under this Agreement, when linked to the Company's operations.

h.- Fulfill and execute all powers and obligations set forth in this Reorganization Agreement and those assigned thereto by the Creditors Commission.

i.- Regularly (at least monthly) inform the Creditors Commission as to the use of the funds originating from the Bridge Loan.

j.- Such other powers as are granted thereto in this Reorganization Agreement.

## XVII. NON-COMPLIANCE.

1.- Pursuant to Articles 98 and thereafter of Law 20,720, any creditor to which this Agreement is applied may request a declaration of non-compliance, in the event of failure to comply with the stipulations of this Agreement, and/or in the event that the poor condition of the Debtor Company's businesses has been aggravated in such a way as to cause said creditors fear of loss.

2.- It shall be an express cause for violation of the Reorganization Agreement, if the Financing Commitments do not exceed $25,000,000,000 (twenty-five billion pesos). Should said violation occur, Enjoy must immediately request its own voluntary liquidation.

3.- The following events shall be express causes for violation of the Reorganization Agreement (and a "Bankruptcy Law Event of Default" under the New Indenture): (i) that the extraordinary shareholders meeting for capital increase is not held [as] indicated in **Chapter X** above within 60 days after the date of the Deliberative Meeting; (ii) that at the aforementioned extraordinary shareholders meeting not all proposed matters are approved; (iii) that Enjoy does not sign each bond issuance agreement within 90 days after the date of the Deliberative Meeting; (iv) that Enjoy does not request that the CMF record the respective bonds on the Securities Registry within 120 days after the date of the Deliberative Meeting; (v) that Enjoy does not obtain from the CMF the recording of the respective bonds in the Securities Registry within one year after the date of the Deliberative Meeting; (vi) that Enjoy does not initiate the Preferential Offer Period within 30 business days after the deadline for effecting the recording in the CMF Securities Registry of the issuances of convertible bonds and shares; and (vii) that Enjoy does not undertake prepayments of the respective bonds on the dates set in this Agreement. Should any of the above events transpire, Enjoy must immediately request its own voluntary liquidation.

44

4.- Moreover, the Creditors may also individually exercise any actions conferred thereon by the law to obtain complete repayment of their loans, all within the framework of this Reorganization Agreement, except in the case of the shares of the International Bondholders under the Indenture, which shall be freely exercised without being subject to this Agreement as explained in Chapters IV and XVIII.

## XVIII. GUARANTEES.

Enjoy's obligations under the **Indenture** and the **International Bonds** are ratified, and therefore all real and personal guarantees established in these documents are maintained, ratified and reserved, in all their parts, to guarantee payment of the Indenture obligations, including but not limited to during the Extension of the International Bonds. Further, said real and personal Guarantees shall guarantee all Enjoy's obligations under the New Instruments, and the documents that may be required under Chilean and Uruguayan law for the due reserve, ratification and maintenance of the same must be granted, or for the creation of new guarantees in accordance with terms substantially identical to the current ones.

By means of this instrument, or rather, through a Public Instrument of Declaration (hereinafter the "*Declaration Instrument*"), forwarded to the 8th Civil Court of Santiago, in Case C-6,689-2020, before holding the Deliberative Meeting, Enjoy Gestión Limitada., Inversiones Enjoy SpA, Inversiones Inmobiliarias Enjoy SpA., Enjoy Consultora S.A., Inversiones Andes Entretención Limitada., Inmobiliaria Proyecto Integral Coquimbo SpA, Operaciones Integrales Coquimbo Limitada, Inmobiliaria Kuden SpA, Campos del Norte S.A., Enjoy Caribe SpA, Inmobiliaria Proyecto Integral Castro SpA, Slots S.A., Masterline S.A., Kuden S.A., Operaciones Turísticas S.A., Operaciones Integrales Isla Grande S.A., Rantrur S.A., Casino de Iquique S.A., Casino de la Bahía S.A., Casino del Mar S.A., Casino del Lago S.A., Casino de Puerto Varas S.A., Yojne S.A. and Baluma S.A. (hereinafter jointly the "*Guarantors*"), represented by the legal representatives Messrs. Esteban Rigo-Righi Baillie, RUT No. 13.454.480-5 and Rodrigo Larraín Kaplan, RUT No. 10.973.139-0, appear and expressly represent that they are acceding to Enjoy's obligations under the Indenture, this Agreement and the New Instruments, and expressly represent that the pledges, mortgages, trusts and joint and several co-debts established thereby as set forth in the terms noted in the Indenture, as applicable, shall also be extended to the obligations of the Debtor Company under the Indenture, this Agreement and the New Instruments, as set forth in this Agreement.

Additionally, by means of this instrument or through the Declaration Instrument, Inmobiliaria Proyecto Integral Coquimbo SpA and Inmobiliaria Kuden SpA, represented by their legal representatives Messrs. Esteban Rigo-Righi Baillie and Rodrigo Larraín, appear and represent that they will expressly accede to Enjoy's new obligations under the Indenture, this Agreement and the New Instruments herein agreed to. Further, pursuant to Article 1,642 of the Chilean Civil Code [*Código Civil*], Inmobiliaria Proyecto Integral Coquimbo SpA, Inmobiliaria Kuden SpA and the Debtor Company, all of them represented by the legal representatives Messrs. Esteban Rigo-Righi Baillie and Rodrigo Larraín Kaplan, and the International Bondholders expressly agree to the reserve of the mortgages established by Inmobiliaria Coquimbo SpA and Inmobiliaria Kuden SpA, to the benefit of the International Bondholders.

45

To remove all doubt, real and personal guarantees covering Enjoy's obligations under the Indenture and the International Bonds, reserved and ratified by means of this instrument or through the Declaration Instrument, are extended and accede to the total payment of Enjoy's debt to the International Bondholders, under either this Agreement, the current International Bonds, the Indenture and its Security Documents, or the New Indenture and New International Bonds in the event that the exchange provided for in **Chapter IV** is carried out, extending in all cases to the successive extensions, renegotiations or substitutions of said loans, as expressly accepted by the appearing guarantors.

The Guarantors, represented in the form set forth above, undertake to sign all instruments, agreements and documents that may be necessary or appropriate for the implementation of this Reorganization Agreement, including on or before the exchange of the International Bonds by the new Instruments and as a condition for said exchange, the granting of public instruments of reserve and ratification of the Guarantees, and the granting of the corresponding corporate authorizations, to the satisfaction of the International Bonds Trustee.

In the event that the International Bonds Trustee believes that, for any of the Guarantees, it is more beneficial for the International Bondholders to be granted new guarantee agreements applying to those same assets, moveable or real, in place of the ratification and reserve of existing ones, the Guarantors shall sign all instruments, agreements and documents that may be necessary or appropriate for the implementation of those new guarantees, under terms substantially identical to those of the current Guarantees, and the exchange condition shall be understood as fulfilled upon granting the new guarantees to the satisfaction of the International Bonds Trustee.

## XIX. FORMAL RECORDING REQUIREMENTS AND OTHER STIPULATIONS.

1. As set forth in Article 90 of Law 20,720, a copy of the minutes of the Creditors Meeting declaring a vote in favor of the Agreement and its complete text, and a copy of the court resolution approving it and its execution certificate, may be authorized by a certifying officer or be notarized by a notary public. Without prejudice to the above, the Debtor Company shall be required to sign the new instruments documenting the terms of this Agreement.

2.- This Reorganization Agreement, duly approved, shall have the effect of immediately terminating all pending judgments or of preventing the filing of legal actions of various kinds, whether civil, commercial or other, including but not limited to judgments of notification of collection of invoices, judgments of notification of protest of check, complaints for fraudulent passing of checks and/or enforcement judgments of any kind, which have been filed against the Debtor Company or its joint and several co-debtors, endorsers or guarantors, by the creditors to whom this Reorganization Agreement applies pursuant to Article 66 of Law 20,720.

3.- To this end, an authorized copy of the resolution approved by the Reorganization Agreement shall serve as timely and sufficient official notice to request the corresponding Court to call for termination of the judgment and

the lifting of attachments, precautionary measures and any encumbrances of various kinds. All the above is without prejudice to the direct instruction sent electronically for this purpose by the Court convened to hear this Proposal, requesting termination of the procedures and the respective lifting.

The Agreement now starting to apply shall have the same effect as indicated in the preceding paragraphs notwithstanding any disputes by creditors representing fewer than 30% of the liabilities with right to vote in their respective class or category, as provided for in Part Four, Article 89 of Law 20,720. For purposes of determining the percentage stipulated above, a certification must be executed by the Secretary of this Court.

4.- The creditors of the Debtor Company that have published their delinquent receivables in the respective registries maintained by various institutions, whether public or private, such as DICOM EQUIFAX, the *Boletín Comercial* published by the Chile Chamber of Commerce, the delinquency registry of the Financial Market Commission, and in general any existing registry of delinquencies in our country, hereby authorize the Debtor Company to request the elimination of all records of delinquencies and in general any publication related to this purpose, with regard to receivables prior to the Reorganization Resolution and those subsequent thereto concerning previously assumed loans.

Further, the creditors hereby undertake to not request new publications with respect to the loans forming part of this Reorganization Agreement, so long as the Debtor Company is current with fulfillment of its obligations under this Agreement.

The background information specified in the first number of this Chapter shall serve as timely and sufficient official notice for purposes of requesting elimination of the publications referenced previously.

5. The creditors and the Debtor Company set forth that after fulfillment of the Financing Condition, the restriction set forth in Article 67 of Law No. 20,720 shall not apply, without prejudice to the contractual restriction on effecting capital reductions under the New Indenture.

## XX. REPRESENTATIONS AND ASSURANCES ON THE DATE OF THIS JUDICIAL REORGANIZATION AGREEMENT.

The Debtor Company, duly represented in the form stipulated in the body of this instrument, on this date, represents and assures the following to each Creditor of this Judicial Reorganization Agreement:

1.- That it is a corporation duly organized and current under the laws of Chile and that both the entering into of this Judicial Reorganization Agreement, and the fulfillment and execution of all the obligations contained therein fall within the legal and corporate powers that have been approved by its competent administrative entities; and that the parties appearing in this Judicial Reorganization Agreement on its behalf have sufficient power and

authority as to enter into this Reorganization Agreement and to fulfill the obligations assumed therein.

2.- That entering into this Judicial Reorganization Agreement does not require the approval or authorization of any additional government or judicial authority whatsoever, nor of third parties, except those already obtained and that remain current, and that it has no information or knowledge that entering into and fulfilling this Judicial Reorganization Agreement violates or contravenes current laws, regulations or resolutions, nor its respective bylaws. The above is without prejudice to any approvals and/or authorizations and/or procedures that may be required by reason of implementation of this Agreement, pursuant to /i/ the bylaws of Enjoy; /ii/ Law 18,046 on Corporations and its Regulation; /iii/ Law 18,045 on the Securities Market and related regulations decreed by the Financial Market Commission; /iv/ DL [Decree-Law] 211 setting the regulations for the protection of Free Trade; /v/ Law No. 19,995 establishing the general bases for the authorization, functioning and monitoring of gambling casinos; /vi/ regulations issued by the Chilean Superintendency of Gambling Casinos; and /vii/ the applicable regulations and laws in Uruguay and Argentina.

3.- That this instrument constitutes legal, valid, necessary, enforceable, mandatory and sufficient documentation for its collection, and in any collection action involving the obligations under this Judicial Reorganization Agreement, it will recognize this instrument as sufficient for their collection.

4.- No waiver of any provision of this Judicial Reorganization Agreement, nor the consent for the Debtor Company to act differently therefrom, shall have any effect whatsoever unless granted in writing and signed by the Creditors Commission in this Judicial Reorganization Agreement, and in said case that waiver or consent shall have effect only in the specific case and for the specific purpose for which it has been granted. In all cases, any changes to this Judicial Reorganization Agreement must adhere to and comply, in all applicable aspects, with the stipulations contained in this instrument.

5.- The provisions of this Judicial Reorganization Agreement shall be mandatory for and extended to the benefit of the Parties and their respective legal successors and assigns.

6.- The names signed by the Parties for the various stipulations of this Reorganization Agreement have been established solely for reference and ease of reading, without affecting the meaning or scope of the entire clause which might differ from said name.

## XXI. DOMICILE AND COMPETENT JURISDICTION.

The special domicile of the Agreement shall be the city of Santiago, and therefore the decision as to any difficulty that might arise in any of the classes or categories of this Agreement shall be submitted to the competency

of its ordinary courts, without excluding the possibility that the International Bondholders might resort for fulfillment of the Indenture to the corresponding jurisdictions under this agreement.

<u>ACUERDO DE REORGANIZACIÓN JUDICIAL</u>
<u>ENJOY S.A.</u>

## I. ANTECEDENTES DE LA EMPRESA DEUDORA PROPONENTE.

**1.- Razón social**          : ENJOY S.A.

**2.- R.U.T.**          : 96.970.380-7.

**3.- Domicilio**          : Avenida Presidente Riesco N° 5.711, piso 15, comuna de Las Condes, Región Metropolitana.

**4.- Constitución**          : Constituida mediante escritura pública de fecha 23 de octubre de 2001. Con fecha 9 de junio del año 2009 la Sociedad fue inscrita en el Registro de Valores, de la Comisión para el Mercado Financiero (CMF) bajo el N° 1033.

## II. ACREEDORES AFECTOS AL ACUERDO DE REORGANIZACIÓN.

Para los efectos del presente Acuerdo de Reorganización Judicial, se consideran acreedores (en adelante, indistintamente, los "*Acreedores*") todos los titulares de créditos directos en contra de **ENJOY S.A.** (en adelante, indistintamente, "*Enjoy*", la "*Empresa Deudora*" o la "*Compañía*"), cuyo origen sea anterior a la Resolución de Reorganización, conforme lo dispone el artículo 66 de la Ley N° 20.720. Los créditos que se originen con posterioridad a la Resolución de Reorganización se pagarán en los términos y plazos convenidos.

De conformidad a lo dispuesto en el artículo 61 de la citada ley concursal, este Acuerdo de Reorganización Judicial (en adelante, indistintamente, "*Acuerdo de Reorganización*", "*Acuerdo*" o la "*Propuesta*"), contiene una propuesta de reestructuración y pago para los acreedores garantizados, que corresponden a los Tenedores de Bonos Internacionales (según dicho término se define más adelante), una propuesta de reestructuración y pago para los acreedores valistas, excluyendo a los acreedores que son sociedades relacionadas que pertenecen al grupo de empresas de Enjoy S.A. (en adelante, los "*Acreedores Valistas*"), una propuesta de pago especial para los acreedores valistas bancarios (en adelante los "*Acreedores Bancarios*") y una propuesta de pago especial para los acreedores valistas que forman parte de los proveedores de bienes y servicios de Enjoy (en adelante, los "*Proveedores*") en los términos que se indican en los capítulos siguientes.

De acuerdo a lo previsto en el artículo 63 de la Ley N° 20.720, los créditos que posean las empresas relacionadas que pertenecen al grupo de empresas filiales de Enjoy S.A., quedarán pospuestos en su pago, hasta que termine la vigencia del presente Acuerdo de Reorganización. No obstante lo anterior, se podrán realizar todos los pagos a las empresas relacionadas que correspondan al normal desarrollo operacional que realiza Enjoy con sus filiales.

2

### III.  DESARROLLO DEL OBJETO DEL ACUERDO.

El Acuerdo de Reorganización tendrá el siguiente objeto y contenido:

1.- La continuación efectiva y total del giro de las actividades comerciales de **ENJOY S.A.,** a contar de la fecha de presentación de esta Propuesta, con el objeto de dar cumplimiento a una modalidad de pagos acorde a sus flujos proyectados, recuperando el nivel operacional de la Compañía y la disposición para el pago de sus obligaciones.

2.- El otorgamiento de nuevas condiciones para el pago de la totalidad de los créditos afectos al Acuerdo de Reorganización, bajo las modalidades que se indican en el presente instrumento;

3.- Una reducción del nivel de endeudamiento de la Compañía, mediante la conversión de, al menos, un 70% de la deuda valista en bonos convertibles en acciones de Enjoy, con un fuerte incentivo a la conversión.

4.- La obtención de recursos frescos para la Compañía por un monto de, aproximadamente, $50.000.000.000.- (cincuenta mil millones de pesos)[1], mediante el otorgamiento de créditos que serán prepagados con la emisión de un bono convertible en acciones de Enjoy, con un fuerte incentivo a la conversión.

### IV.  PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES GARANTIZADOS.

---

[1] En adelante, todas las referencias de cifras en pesos, se refieren a pesos chilenos.

3

Los acreedores garantizados son los tenedores de la deuda emitida bajo el instrumento denominado "*Indenture*", de fecha 16 de mayo de 2017, complementado por el instrumento denominado "*Supplemental Indenture No. 1*" de fecha 30 de mayo de 2017, celebrado entre la Compañía, como emisor, sus filiales garantes ("**Garantes**") y Citibank N.A. como Representante de los Tenedores de Bonos Internacionales o *Trustee*[2] (en adelante, el "**Indenture**"), relativo a los bonos garantizados con vencimiento al año 2022 (*10,50% Senior Secured Notes due to 2022*) que fueron colocados por la Compañía en los mercados internacionales al amparo de la Norma 144A y la Regulación S de la "*Securities and Exchange Commission*" (Comisión de Mercados y Valores) y de la "*Securities Act of 1933*" (Ley de Valores del año 1933) de los Estados Unidos de América (en adelante, los "**Bonos Internacionales**" y los tenedores de los mismos o sus beneficiarios finales los "**Tenedores de Bonos Internacionales**"[3]).

Según se explica más adelante, en virtud del Acuerdo los Bonos Internacionales serán prorrogados y, sujeto a las Condiciones de Repactación (según este término se define más adelante), repactados sin ánimo de novar, reflejándose dicha repactación en un nuevo Indenture, en nuevos bonos, y en los documentos de garantía necesarios para extender, ratificar y reservar las actuales garantías de los Bonos Internacionales a la deuda prorrogada y restructurada   (en adelante, el "**Nuevo Indenture**" y los "**Nuevos Bonos Internacionales**" y, en su conjunto los "**Nuevos Instrumentos**").

### 1.- Prórroga.

El vencimiento de los créditos afectos a este **Capítulo IV** se prorrogará por un plazo máximo de 90 días contado desde la fecha en que se celebre la Junta Deliberativa de Acreedores llamada a conocer y pronunciarse sobre la Propuesta (en adelante la "***Junta Deliberativa***"), salvo que con anterioridad a dicho plazo máximo llegue a ser cierto que las Condiciones de Repactación (según este término se define más adelante) no se verificarán, en cuyo caso el plazo de la prórroga vencerá el día en que hayan fallado dichas condiciones (la "***Prórroga de los Bonos Internacionales***"), a menos que la Comisión de Acreedores resuelva mantener la Prórroga de los Bonos Internacionales según lo dispuesto en el **Capítulo XV** de este Acuerdo.

Mientras no se cumplan las Condiciones de Repactación, los Bonos Internacionales se mantendrán vigentes de acuerdo a sus términos originales (incluyendo los intereses devengados después de la solicitud de reorganización),  los eventos de incumplimiento y los derechos y acciones existentes bajo el Indenture por eventos de incumplimiento existentes no serán renunciados; y las actuales garantías reales y personales de los Bonos Internacionales (en adelante las "**Garantías**") se mantendrán plenamente vigentes. Lo anterior es sin perjuicio que, mientras se encuentre vigente la Prórroga de los Bonos Internacionales, los Tenedores de Bonos Internacionales se comprometen a no ejecutar individual ni colectivamente procedimiento de ejecución alguno, en la medida que se encuentre pendiente la Condiciones de Repactación.

---

[2] Conforme al documento denominado "Agreement of Resignation, Appointment and Acceptance" de fecha 9 de julio de 2020 celebrado entre la Compañía, UMB BANK, N.A. y CITIBANK, N.A., UMB BANK, N.A. fue designado como "Trustee" para efectos del Indenture.
[3] Después del intercambio de los Bonos Internacionales por los Nuevos Bonos Internacionales, los "Tenedores de Bonos Internacionales" significará los tenedores de los Nuevos Bonos Internacionales.

4

**2.- Condiciones de Repactación.**

Los Bonos Internacionales serán repactados mediante su intercambio por los Nuevos Bonos Internacionales, en el evento de cumplirse las siguientes condiciones suspensivas y copulativas, establecidas en beneficio de los Tenedores de Bonos Internacionales (las "*Condiciones de Repactación*"):

(i) Que el presente Acuerdo de Reorganización se entienda aprobado y entre a regir, de conformidad a lo previsto en el art. 89 de la Ley Nº 20.720;

(ii) Que el Tribunal de Quiebras del Distrito Sur de Nueva York (del estado Nueva York de los Estados Unidos de América) reconozca el Acuerdo en el procedimiento denominado *Chapter 15* que la Compañía está tramitando en dicho tribunal con motivo de su Procedimiento de Reorganización, Caso N° 20-11411 (MG);

(iii) Que se otorguen simultáneamente los pagarés a que se hace referencia en la sección 7 siguiente y los documentos de reserva y ratificación de garantías a que hace referencia el **Capítulo XVIII** siguiente, en ambos casos a satisfacción del *Trustee* de los Bonos Internacionales;

(iv) Que se hayan pagado a satisfacción del Trustee los gastos de cobranza, comisiones y reembolsos que se le deban bajo el Indenture, incluyendo honorarios de asesores del Trustee que procedan bajo las reglas del Indenture;

(v) Que se cumplan los demás términos de la Condición de Financiamiento (según este término se define más adelante en el **Capítulo VIII** de este Acuerdo) y liberación de los fondos del Crédito Puente a la Compañía.

Certificado el cumplimiento de las Condiciones de Repactación por el Interventor Concursal o, en su defecto, por la Comisión de Acreedores con el voto favorable de cuatro de sus miembros, los créditos se repactarán en la forma dispuesta en el número 3 siguiente.

En el evento que el Interventor Concursal determine fallidas las Condiciones de Repactación por haber vencido la Prórroga de los Bonos Internacionales sin que éstas se verificaren, o bien, por haber llegado a ser cierto antes del vencimiento del plazo de la Prórroga que no ocurrirá alguno de los hechos que las constituyen:

(i) los Tenedores de Bonos Internacionales podrán ejercer todos sus derechos bajo el Indenture para obtener el pago de sus acreencias, sin limitación alguna y sin sujeción a este Acuerdo;

(ii) el incumplimiento de las Condiciones de Repactación o el vencimiento del plazo sin que éstas se verifiquen, será un *Bankruptcy Law Event of Default* bajo el Indenture; y

(iii) los Tenedores de Bonos Internacionales podrán ejecutar y cobrar judicialmente sus créditos en forma individual conforme a las reglas del Indenture, con todas sus garantías reales

o personales y en cualquier jurisdicción, sin necesidad de obtener una declaración de incumplimiento de este Acuerdo y sin que el mismo sirva de defensa a esa ejecución.

Para ausencia de duda, en todo lo no modificado por el presente Acuerdo de Reorganización, se ratifican las obligaciones contenidas en el Indenture y en los Bonos Internacionales, y por lo tanto se mantendrán todos los derechos de los Tenedores de Bonos Internacionales bajo dicho contrato, y todas las garantías reales y personales establecidas en el Indenture, los Bonos Internacionales y sus documentos conexos. Nada en este Acuerdo podrá interpretarse en el sentido de impedir u obstaculizar que los Tenedores de Bonos Internacionales ejerzan sus derechos y acciones bajo el Indenture frente a un incumplimiento de las obligaciones de la Empresa Deudora bajo dicho contrato, entendiéndose todos esos derechos y acciones expresamente reservados.

Todo lo anterior, es sin perjuicio que la Comisión de Acreedores resuelva extender la Prórroga de los Bonos Internacionales en caso que fallen las Condiciones de Repactación según lo señalado en el **Capítulo XV** siguiente. Mientras se encuentre vigente la Prórroga de los Bonos Internacionales, los Tenedores de Bonos Internacionales se comprometen a no ejecutar individual ni colectivamente procedimiento de ejecución alguno en contra de Enjoy y sus Garantes (según este término se define más adelante).

**3.- Repactación de los Bonos Internacionales:**

Cumplidas las Condiciones de Repactación dentro del plazo de la Prórroga de los Bonos Internacionales, los Bonos Internacionales se repactarán en la forma indicada a continuación, intercambiándose los actuales títulos de deuda por los Nuevos Bonos Internacionales, entendiéndose, para todos los efectos legales, que la fecha de la repactación de los Bonos Internacionales será la fecha de la Junta Deliberativa.

Efectuado el intercambio de los Bonos Internacionales por los Nuevos Bonos Internacionales, la Compañía deberá obtener números CUSIP y ISIN para los Nuevos Bonos Internacionales (separadamente para el Nuevo Bonos Internacional Senior y para el Nuevo Bono Internacional Junior, según estos términos se definen más adelante).

El monto total de capital de los Nuevos Bonos Internacionales será el equivalente a la suma de: (i) UDS$195 millones (equivalente al monto total del capital adeudado bajo los Bonos Internacionales); y (ii) el monto total de los intereses bajo los Bonos Internacionales (incluyendo los *Defaulted Interest* y los *Post-Petition Interest* según estos términos se definen en el Indenture) devengados y no pagados a la fecha de la Junta Deliberativa.

Los Nuevos Bonos Internacionales se dividirán en dos tramos, identificados como el "***Nuevo Bono Internacional Senior***" y el "***Nuevo Bono Internacional Junior***", los que serán idénticos en todos los aspectos, excepto por lo siguiente: (i) los Nuevos Bonos Internacionales Senior tendrán prioridad para ser rescatados anticipadamente en caso de rescate anticipado obligatorio producto de la venta de los activos que garantizan los Nuevo Bonos Internacionales en los términos que se indican en el **Anexo Nº1** de este Acuerdo, el que se entiende formar parte del

6

mismo para todos los efectos legales; y (ii) en caso que la Compañía entre en liquidación, los Nuevos Bonos Internacionales Senior tendrán derecho de optar por pagarse íntegramente (tanto su capital adeudado como los intereses devengados y no pagados) antes de que se efectúe cualquier pago a los Nuevos Bonos Internacionales Junior, todo lo anterior, en los términos que se describen en el **Anexo Nº1** de este Acuerdo.

Los Nuevos Bonos Internacionales Senior serán emitidos y entregados, en intercambio por los Bonos Internacionales, a los Tenedores de Bonos Internacionales que entreguen Compromisos de Financiamiento (según este término se define más adelante) por un monto igual o mayor a la prorrata del Nuevo Financiamiento que corresponda al respectivo Tenedor de Bonos Internacionales según su participación en el capital de los Bonos Internacionales (el "***Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales***"), y efectúen el respectivo desembolso (directamente o a través de su cesionario de la opción) del Crédito Puente (según este término se define más adelante) por el monto que efectivamente se le asigne; todo lo anterior, conforme al **Capítulo VIII** de este Acuerdo.

Por su parte, los Nuevos Bonos Internacionales Junior serán entregados a los Tenedores de Bonos Internacionales que (i) no participen del Nuevo Financiamiento por, al menos, el Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales o (ii) no efectúen el respectivo desembolso del Crédito Puente por, al menos, el monto asignado en el Crédito Puente en los términos descritos en al **Capítulo VIII**.

El Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales se calculará en Pesos de acuerdo a la siguiente fórmula:

$$\begin{array}{c}\text{Monto Mínimo Financiamiento}\\\text{Tenedor Bono Internacional j} \quad = \quad \dfrac{(\text{Capital Tenedor Bono Internacional j})}{(\text{Total capital Bonos Internacionales})} \quad \text{x} \quad (10.000.000.000)\\\text{(pesos)}\end{array}$$

Para estos efectos "Capital Tenedor Bono Internacional j" significará el saldo insoluto de capital de los Bonos Internacionales del respectivo Tenedor de Bonos Internacionales (*face value*). Por su parte, "Total capital Bonos Internacionales" significará el saldo total de capital insoluto de los Bonos Internacionales (*face value*), esto es, USD$195 millones (ciento noventa y cinco millones de dólares de los Estados Unidos de América) a la fecha de la Junta Deliberativa.

El equivalente en dólares de los Estados Unidos de América del Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales se calculará utilizando el Dólar Observado publicado en el Diario Oficial en la fecha de la Junta Deliberativa. Se adjunta como **Anexo Nº3** a esta Propuesta ejemplos del cálculo del Monto Mínimo de Financiamiento Tenedores de Bonos Internacionales, con el único objeto de facilitar su compresión y operatoria.

Los Nuevos Bonos Internacionales serán emitidos por la Compañía y se regirán por el Nuevo Indenture. Los Nuevos Bonos Internacionales y el Nuevo Indenture serán idénticos en todos sus aspectos a los actuales Bonos Internacionales e Indenture (incluido el hecho de estar sujetos a las leyes del Estado de Nueva York de los Estados Unidos de América), con la única excepción de

aquellos cambios que serán incorporados al Nuevo Indenture y a los Nuevos Bonos Internacionales en los términos que se indican en el **Anexo N°1** de este Acuerdo. El *Trustee* inicial, agente pagador (*Paying Agent*) y agente de registro y transferencia (Registrar and Transfer Agent) del Nuevo Indenture será UMB BANK, N.A. Se deja constancia que los términos contenidos en el **Anexo N°1** son los que deberán reflejarse en el Nuevo Indenture.

Los Nuevos Bonos Internacionales serán emitidos como uno o más valores globales registrados a nombre de Cede & Co. como Tenedor de Registro, y como *nominee* del *The Depository Trust Company*, de la misma forma que fueron emitidos los Bonos Internacionales.

Adicionalmente, se mantendrán todas las Garantías y *Security Documents* establecidas en el Indenture y en los Bonos Internacionales, las que serán reflejadas en los Nuevos Instrumentos, en los términos que se indican en el **Capítulo XVIII** de este Acuerdo.

**4.- Nuevo plazo para el pago de los créditos:**

La Empresa Deudora deberá pagar la totalidad del capital de los créditos repactados en una sola cuota (*bullet*), el día 14 de agosto de 2027. Lo anterior, es sin perjuicio de los rescates que puedan ocurrir de conformidad al Nuevo Indenture.

**5.- Intereses:**

**a.- Intereses devengados hasta la fecha de la Junta Deliberativa:**

Todos los créditos afectos a este **Capítulo IV** quedarán fijados al día de la Junta Deliberativa, según el saldo insoluto de capital e intereses devengados y no pagados hasta esa fecha. Los intereses convencionales y aquellos que se hubiesen devengado durante el período moratorio hasta la fecha en que se celebre la Junta Deliberativa -, se calcularán de conformidad a la tasa originalmente pactada (incluyendo *Defaulted Interest* y los *Post-Petition Interest* según estos términos se definen en el Indenture), excluyendo el pago de los intereses penales, multas y gastos de cobranza, los cuales de existir, serán expresamente condonados. Los intereses devengados hasta el día de la Junta Deliberativa se capitalizarán en dicha fecha, según se indica en la tabla de desarrollo del literal d. siguiente.

Todos los gastos de cobranza, comisiones y reembolsos que se deban bajo el Indenture al Representante de los Tenedores de Bonos (*Trustee*), el Agente Pagador, al Agente de Registros y Transferencias, o el Agente de Garantías deberán pagarse en la forma establecida en el Indenture, incluyendo los gastos de asesores y abogados que procedan bajo las reglas del Indenture y aquellos necesarios para efectos de regularizar las Garantías conforme las nuevas modalidades convenidas en el Acuerdo, que también serán de cargo de la Empresa Deudora.

En caso de que por este concepto se debieran pagar impuestos de timbres y estampillas -si procediere-, estos serán de cargo exclusivo de la Empresa Deudora, y deberán ser pagados oportunamente a petición de cualquier Acreedor.

**b.- Determinación de la tasa de interés:**

8

Los intereses serán determinados y pagados sobre el total de los créditos descritos en este **Capítulo IV**, aplicando una tasa de interés anual, con la progresión que se detalla a continuación:

    i. **6,0%** anual base 30/360 días el **primer año** de aprobado el presente Acuerdo de Reorganización.

    ii. **7,0%** anual base 30/360 días el **segundo año** de aprobado el presente Acuerdo de Reorganización.

    iii. **7,5%** anual base 30/360 días el **tercer año** de aprobado el presente Acuerdo de Reorganización.

    iv. **8,0%** anual base 30/360 días el **cuarto año** de aprobado el presente Acuerdo de Reorganización.

    v. **8,5%** anual base 30/360 días el **quinto año** de aprobado el presente Acuerdo de Reorganización.

    vi. **9,0%** anual base 30/360 días el **sexto año** de aprobado el presente Acuerdo de Reorganización.

    vii. **9,5%** anual base 30/360 días el **séptimo año** de aprobado el presente Acuerdo de Reorganización.

Estos intereses se devengarán a partir de la fecha en que se celebre la Junta Deliberativa.

**c.- Calendario de pago de intereses:**

Los intereses se pagarán mediante el siguiente calendario de pago:

**i.- Primer Período:** Aquel comprendido entre la Junta Deliberativa y el cuarto trimestre contado desde dicha fecha, es decir entre los días 15 de agosto de 2020 y 14 de agosto de 2021, se devengarán intereses que serán capitalizados trimestralmente, es decir, los días 14 de noviembre de 2020, 14 de febrero de 2021, 14 de mayo de 2021 y 14 de agosto de 2021.

**ii.- Segundo Período:** Aquel comprendido entre el quinto y sexto trimestre desde la Junta Deliberativa es decir entre los días 15 de agosto de 2021 y 14 de febrero de 2022, se devengarán intereses que serán pagados en un 50% y capitalizados en el 50% restante, trimestralmente, es decir, los días 14 de noviembre de 2021 y 14 de febrero de 2022.

**iii.- Tercer Período:** Aquel comprendido entre el séptimo trimestre desde la Junta Deliberativa en adelante, es decir desde el día 15 de febrero de 2022, se pagarán intereses trimestralmente, al final de cada periodo de tres meses.

Dentro de los cinco días hábiles siguientes a cada una de las fechas de pago de intereses señaladas, la Compañía proporcionará al *Trustee* y a los Tenedores de Nuevos Bonos Internacionales, un informe que muestre el monto de los intereses capitalizados en dichas fechas.

9

Los intereses que no se deban capitalizar de conformidad con los románicos ii o iii anteriores, se harán exigibles y deberán pagarse en la respectiva fecha de pago, según se indica en la tabla de desarrollo de la sección d.- siguiente.

**d.- Tabla de desarrollo de capital e intereses:**

**Crédito garantizado (USD)**

| Cuota | Vencimiento | Capital insoluto | Interés (100%) | Interés capitalizado | Amortización capital | Valor cuota |
|---|---|---|---|---|---|---|
| | 14-08-2020 | 210.505.263 | 0 | 0 | 0 | 0 |
| 1 | 14-11-2020 | 213.662.841 | 3.157.579 | 3.157.579 | 0 | 0 |
| 2 | 14-02-2021 | 216.867.784 | 3.204.943 | 3.204.943 | 0 | 0 |
| 3 | 14-05-2021 | 220.120.801 | 3.253.017 | 3.253.017 | 0 | 0 |
| 4 | 14-08-2021 | 223.422.613 | 3.301.812 | 3.301.812 | 0 | 0 |
| 5 | 14-11-2021 | 225.377.561 | 3.909.896 | 1.954.948 | 0 | 1.954.948 |
| 6 | 14-02-2022 | 227.349.614 | 3.944.107 | 1.972.054 | 0 | 1.972.054 |
| 7 | 14-05-2022 | 227.349.614 | 3.978.618 | 0 | 0 | 3.978.618 |
| 8 | 14-08-2022 | 227.349.614 | 3.978.618 | 0 | 0 | 3.978.618 |
| 9 | 14-11-2022 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 10 | 14-02-2023 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 11 | 14-05-2023 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 12 | 14-08-2023 | 227.349.614 | 4.262.805 | 0 | 0 | 4.262.805 |
| 13 | 14-11-2023 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 14 | 14-02-2024 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 15 | 14-05-2024 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 16 | 14-08-2024 | 227.349.614 | 4.546.992 | 0 | 0 | 4.546.992 |
| 17 | 14-11-2024 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |
| 18 | 14-02-2025 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |
| 19 | 14-05-2025 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |
| 20 | 14-08-2025 | 227.349.614 | 4.831.179 | 0 | 0 | 4.831.179 |
| 21 | 14-11-2025 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 22 | 14-02-2026 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 23 | 14-05-2026 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 24 | 14-08-2026 | 227.349.614 | 5.115.366 | 0 | 0 | 5.115.366 |
| 25 | 14-11-2026 | 227.349.614 | 5.399.553 | 0 | 0 | 5.399.553 |
| 26 | 14-02-2027 | 227.349.614 | 5.399.553 | 0 | 0 | 5.399.553 |
| 27 | 14-05-2027 | 227.349.614 | 5.399.553 | 0 | 0 | 5.399.553 |
| 28 | 14-08-2027 | 0 | 5.399.553 | 0 | 227.349.614 | 232.749.168 |

**6.- Participación en el Nuevo Financiamiento:**

Los Tenedores de Bonos Internacionales, sujeto a las restricciones que pudieran eventualmente ser aplicables a cada uno de ellos en cualquier jurisdicción relevante, tendrán la opción preferente de otorgar un nuevo financiamiento a Enjoy (en adelante, el "*Nuevo Financiamiento*"), en los términos que se describen en el **Capítulo VIII** siguiente, por un monto ascendente a $10.000.000.000.- (diez mil millones de pesos), sujeto a un ajuste por tipo de cambio que se indica más adelante en este Acuerdo.

**7.- Pagarés.**

Cumplidas las Condiciones de Repactación, en la misma fecha y a condición de que se efectúe la repactación de los Bonos Internacionales y su intercambio por los Nuevos Bonos Internacionales, la Empresa Deudora hará entrega de pagarés suscritos por Enjoy con el mismo vencimiento de los Nuevos Bonos Internacionales y por el monto total adeudado bajo el Nuevo Indenture a satisfacción del

10

*Trustee* de los Tenedores de Bonos Internacionales.

## V.   PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES VALISTAS.

### 1.- Prórroga.

Los créditos de los Acreedores Valistas serán reestructurados, sujetos a las Condiciones para la Reprogramación (según este término se define más adelante), en las condiciones que se establecen en este **Capítulo V** (en adelante la "***Reprogramación Valista***"), a excepción de aquellos Acreedores Valistas que sean Acreedores Bancarios o Proveedores y que opten por la reestructuración que se indica para ellos en el **Capítulo VI** y en el **Capítulo VII** del presente Acuerdo, respectivamente (en adelante los "***Créditos Valistas***").

El vencimiento de los Créditos Valistas afectos a este **Capítulo V** se prorrogará por un plazo máximo de 90 días contado desde la fecha en que se celebre la Junta Deliberativa (en adelante, la "***Prórroga de los Créditos Valistas***"), salvo que con anterioridad a esa fecha llegue a ser cierto que las Condiciones para la Reprogramación no se verificarán, en cuyo plazo la Prórroga de los Créditos Valistas vencerá el día en que hayan fallado dichas condiciones, a menos que la Comisión de Acreedores resuelva mantener la Prórroga de los Créditos Valistas según lo dispuesto en el **Capítulo XV** de este Acuerdo. Mientras se encuentre vigente la Prórroga de Créditos Valistas, los Acreedores Valistas sujetos a este **Capítulo V** se comprometen a no ejecutar individual ni colectivamente procedimiento de ejecución alguno, en la medida que se encuentren pendientes las Condiciones para la Reprogramación.

La Reprogramación Valista estará sujeta a que se cumplan las siguientes condiciones suspensivas: (i) que el presente Acuerdo de Reorganización se entienda aprobado y entre a regir, de conformidad a lo previsto en el art. 89 de la Ley N° 20.720; (ii) que se cumplan los demás términos de la Condición de Financiamiento; y (iii) la liberación de los fondos del Crédito Puente a la Compañía, en adelante conjuntamente denominadas como las "***Condiciones para la Reprogramación***". Cumplidas las Condiciones para la Reprogramación, se entenderá, para todos los efectos, que la fecha de la Reprogramación Valista será la fecha de la Junta Deliberativa.

Mientras no se cumplan las Condiciones para la Reprogramación, los Créditos Valistas se mantendrán vigentes de acuerdo a sus términos originales (incluyendo los intereses devengados después de la solicitud de reorganización).

Una vez cumplidas las Condiciones para la Reprogramación, se certificará su cumplimiento por el Interventor Concursal o, en su defecto, por la Comisión de Acreedores con el voto favorable de cuatro de sus miembros, y los Créditos Valistas quedarán fijados como si hubieran sido reprogramados al día de la Junta Deliberativa, según el saldo de capital insoluto e intereses devengados hasta esa fecha. Los intereses convencionales y aquellos que se hubiesen devengado durante el período moratorio -es decir hasta la fecha en que se celebre la Junta Deliberativa - se calcularán de conformidad a la tasa originalmente pactada en ellos, excluyendo el pago de los intereses penales, multas y gastos de cobranza los cuales, de existir, serán expresamente condonados. Los intereses devengados hasta el día de la Junta Deliberativa se capitalizarán en dicha fecha.

11

En caso de que por este concepto se debieran pagar impuestos de timbres y estampillas -si procediere-, estos serán de cargo exclusivo de la Empresa Deudora, y deberán ser pagados oportunamente a petición de cualquier Acreedor.

A la fecha de la Junta Deliberativa, los Créditos Valistas, incluyendo a los Acreedores Bancarios y excluyendo a Proveedores, representan un monto total de $189.860.711.276.- (ciento ochenta y nueve mil ochocientos sesenta millones setecientos once mil doscientos setenta y seis pesos) a la fecha de la referida Junta.

**2.- Reprogramación de los Créditos Valistas y Prepago Obligatorio.**

Una vez cumplidas las Condiciones para la Reprogramación, regirá lo dispuesto en esta Sección 2 y siguientes de este **Capítulo V**.

La Empresa Deudora deberá pagar la totalidad del capital de los Créditos Valistas reprogramados, en una sola cuota (*bullet*), en un plazo de 7 años y un mes contado desde la fecha de la Junta Deliberativa. Lo anterior, es sin perjuicio del prepago obligatorio de estos créditos que se regula en este **Capítulo V**.

A partir del día siguiente a la fecha de la Junta Deliberativa, los Créditos Valistas reprogramados devengarán intereses en los plazos y de conformidad a la tasa originalmente pactada en ellos, los que serán capitalizados en la fecha de vencimiento de los Créditos Valistas reprogramados o en la Fecha de Prepago (según este término se define más adelante) según corresponda.

Todos los Créditos Valistas reprogramados serán prepagados de forma obligatoria (tanto para la Empresa Deudora como para el respectivo Acreedor Valista), sin costo de prepago, y considerando su valor par a la Fecha de Prepago, esto es, el saldo insoluto de capital e intereses devengados y no capitalizados hasta la Fecha de Prepago los que se capitalizarán en dicha fecha (en adelante el "***Monto de Prepago***") de la siguiente forma: (a) un 80% del Monto de Prepago (en adelante el "***Monto de Prepago Convertible***") se prepagará mediante la entrega de (i) los bonos convertibles en acciones de Enjoy a que se refieren los numerales 3.a.- y 3.b.- siguientes y (ii) el dinero recibido por la suscripción de los referidos bonos convertibles durante su Período de Oferta Preferente (según este término se define más adelante) por los accionistas de la Empresa Deudora (en adelante los "***Accionistas***"), según se detalla en el **Capítulo X** siguiente; y (b) el 20% restante del Monto de Prepago se prepagará mediante la entrega del Bono Renta Fija B a que se refiere el numeral 3.c siguiente. En la sección 4 siguiente del presente **Capítulo V** se detalla la manera en que se efectuará este prepago.

Los Créditos Valistas reprogramados que previo a su reprogramación se encontraban denominados en Unidades de Fomento, se actualizarán según la variación que experimente la Unidad de Fomento, desde el día de la Junta Deliberativa hasta la fecha de su vencimiento o hasta la Fecha de Prepago, según corresponda.

A partir de la fecha de la Junta Deliberativa a los Créditos Valistas reprogramados les serán aplicables, única y exclusivamente, las obligaciones de hacer y de no hacer contenidas en el

12

Capítulo XIII del presente Acuerdo y no tendrán vigencia las causales de incumplimiento que contemplen los títulos de deuda en que constan los Créditos Valistas reprogramados, de ser aplicable.

Para facilitar la inscripción en el Registro de Valores de las modificaciones de los Créditos Valistas reprogramados que sean valores de oferta pública que serán aplicables a los mismos en virtud del presente Acuerdo, la Empresa Deudora se encontrará expresamente facultada en conjunto con el Interventor y el Representante de los Tenedores de Bonos, de ser aplicable, para suscribir todos los actos, contratos y documentos, sean éstos instrumentos públicos o privados, que sean necesarios, convenientes o requeridos por una autoridad competente para dar constancia de los términos de este Acuerdo en estos instrumentos, incluyendo la realización de nuevas emisiones de valores que puedan ser necesarias para instrumentalizar las modificaciones de los Créditos Valistas reprogramados y la Prórroga de los Créditos Valistas, de ser aplicable. Asimismo, la Empresa Deudora estará expresamente facultada para entregar instrucciones e información al Depósito Central de Valores S.A., Depósito de Valores (en adelante el "**DCV**"), que sea necesaria para la instrumentalización de los Créditos Valistas reprogramados, su prórroga y la ejecución de su prepago, en los términos descritos en la Sección 4 de este **Capítulo V**.

**3.- Nuevas emisiones de bonos para el prepago obligatorio de los Créditos Valistas Reprogramados:**

Para efectuar el prepago obligatorio de la totalidad del Monto de Prepago, la Empresa Deudora asume de manera incondicional e irrevocable la obligación de emitir bonos convertibles en acciones de Enjoy y bonos de renta fija e inscribirlos en el Registro de Valores que lleva la Comisión para el Mercado Financiero ("en adelante la "**CMF**"), con las siguientes características:

**a.- Bono Convertible A-1**:

Según lo indicado precedentemente, se prepagará obligatoriamente a los Acreedores Valistas el Monto de Prepago Convertible, a través de: (i) la entrega de bonos convertibles en acciones de Enjoy A-1 ("***Bono Convertible A-1***") no colocados durante el Periodo de Oferta Preferente, en una cantidad equivalente a la necesaria para prepagar el Monto de Prepago Convertible considerando para estos efectos el valor nominal del Bono Convertible A-1, el cual en ningún caso podrá ser a valores inferiores o en condiciones más ventajosas que las ofrecidas a los Accionistas durante el Período de Oferta Preferente; y (ii) en caso de existir un saldo de Monto de Prepago Convertible pendiente de prepago luego de aplicar lo señalado en el número (i) anterior, con el producto de la suscripción y pago de los Bonos Convertibles A-1 que hubieren sido adquiridos durante su Período de Oferta Preferente por los Accionistas (según se describe en el **Capítulo X** siguiente), hasta completar el Monto de Prepago Convertible.

El Bono Convertible A-1 será pagadero en una sola cuota a 99 años (*bullet*) contado desde la fecha de la Junta Deliberativa, y devengará interés a una tasa nominal en pesos igual a cero. Los demás términos y condiciones del Bono Convertible A-1 se adjuntarán como **Anexo Nº2** a esta Propuesta, entendiéndose que dicho **Anexo Nº2** forma parte de la Propuesta para todos los efectos legales.

13

La relación de canje para la conversión del Bono Convertible A-1 será de **66,67** (sesenta y seis coma sesenta y siete) nuevas acciones ordinarias de Enjoy por cada $1.000.- (mil pesos) de capital adeudado del Monto de Prepago Convertible. En caso que producto de este cálculo exista una fracción de acción, ésta se redondeará al entero más próximo y, si la fracción fuere 0,5, se redondeará al entero siguiente, y de haber una diferencia, ésta se pagará en dinero por la Empresa Deudora, considerando como precio de la acción la suma de $15. De existir fracciones de Bonos Convertibles A-1 como resultado de la diferencia entre el Monto de Prepago Convertible, y el monto de corte del Bono Convertible A-1, la diferencia se pagará en dinero por la Empresa Deudora. Estos pagos se efectuarán por la Empresa en la Fecha del Prepago y en la fecha de conversión, respectivamente.

La opción de conversión de los Bonos Convertibles A-1 en acciones de la Compañía, deberá ejercerse dentro de un plazo de 60 días hábiles bancarios, contado desde la Fecha de Prepago. En cualquier momento dentro de la vigencia del plazo de conversión antes señalado, los tenedores del Bono Convertible A-1 podrán ejercer la opción de conversión del Bono Convertible A-1 por acciones de Enjoy, mediante comunicación escrita dirigida a Enjoy manifestando en ella su intención de ejercer la opción de conversión, en los términos y conforme al formato de comunicación que se detallarán en el contrato de emisión de los Bonos Convertibles A-1.

Dado que los Bonos Convertibles A-1 deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley Nº18.046 sobre Sociedades Anónimas, la mecánica para ello se regula en el **Capítulo X**.

**b.-  Bono Convertible A-2:**

Como incentivo a participar en el Nuevo Financiamiento, una vez aprobado el Acuerdo de Reorganización, aquellos Acreedores Valistas que hayan participado en el Nuevo Financiamiento y efectuado el desembolso del respectivo Crédito Puente (directamente o a través de su cesionario de la opción), tendrán derecho a recibir en pago de una "porción" de su Monto de Prepago Convertible, a ser determinada dicha porción según su Prorrata de Participación (según este término se define más adelante), a través de: (i) la entrega de bonos convertibles en acciones de Enjoy A-2 ("***Bono Convertible A-2***") no colocados durante el Periodo de Oferta Preferente, en una cantidad equivalente a la necesaria para prepagar la referida "porción" de su Monto de Prepago Convertible considerando para estos efectos el valor nominal del Bono Convertible A-2, el cual en ningún caso podrá ser a valores inferiores o en condiciones más ventajosas que las ofrecidas Accionistas durante el Período de Oferta Preferente; y (ii) en caso de existir un saldo de la referida "porción" del Monto de Prepago Convertible pendiente de prepago luego de aplicar lo señalado en el número (i) anterior, con el producto de la suscripción y pago de los Bonos Convertibles A-2 que hubieren sido adquiridos durante el Período de Oferta Preferente por los Accionistas (según se describe en el **Capítulo X** siguiente), hasta completar la referida "porción" del Monto de Prepago Convertible.

La "porción" del Monto de Prepago Convertible que cada Acreedor Valista tendrá derecho a

14

que sea pagada con Bonos Convertibles A-2 (o con el producto de su colocación durante su oferta preferente), será igual a su prorrata de participación en el Crédito Puente (en adelante, la "***Prorrata de Participación***") multiplicada por un factor igual a 0,80. De existir fracciones de Bonos Convertibles A-2, la diferencia se pagará en dinero por la Empresa Deudora.

La **Prorrata de Participación** se calculará como la división entre (i) el total efectivamente desembolsado por el respectivo Acreedor Valista ("***acreedor valista i***") en el Crédito Puente, sobre (ii) la proporción que representa su acreencia en el total de los Créditos Valistas, excluidos Proveedores, a la fecha de la Junta Deliberativa, multiplicada por $40.000.000.000., según la siguiente fórmula:

$$\text{Prorrata de Participación de acreedor valista } i = \frac{(\text{Total efectivamente desembolsado por acreedor valista } i \text{ en Crédito Puente})}{\frac{(\text{Acreencia acreedor valista } i)}{(\text{Créditos Valistas ex. Proveedores})} \quad * \quad (40.000.000.000)}$$

donde los Créditos Valistas (excluidos Proveedores) a la fecha de la Junta Deliberativa asciende aproximadamente a $189.860.711.276.- (ciento ochenta y nueve mil ochocientos sesenta millones setecientos once mil doscientos setenta y seis pesos). Se adjunta como **Anexo N°3** a esta Propuesta ejemplos del cálculo de la "porción" del Monto de Prepago Convertible que podría ser pagada en Bonos Convertibles A-2, con el único objeto de facilitar su compresión y operatoria.

Los términos y condiciones del Bono Convertible A-2 serán idénticos a los términos y condiciones del Bono Convertible A-1, los que se dan por expresamente reproducidos, con la sola excepción de la relación de canje por acciones de Enjoy , la que en el caso del Bono Convertible A-2 será de **198,02** (ciento noventa y ocho coma cero dos) nuevas acciones ordinarias de Enjoy por cada $1.000.- (mil pesos) de capital adeudado del Monto de Prepago Convertible. Los demás términos y condiciones del Bono Convertible A-2 se adjuntan como **Anexo N°2** a esta Propuesta, entendiéndose que dicho **Anexo N°2** forma parte de la Propuesta para todos los efectos legales.

En caso de que producto de este cálculo exista una fracción de acción, ésta se redondeará al entero más próximo y, si la fracción fuere 0,5, se redondeará al entero siguiente, y de haber una diferencia, ésta se pagará en dinero por la Empresa Deudora, considerando como precio de la acción la suma de $5,05. De existir fracciones de Bonos Convertibles A-2 como resultado de la diferencia entre el Monto de Prepago Convertible a ser prepagado con Bonos Convertibles A-2, y el monto de corte del Bono Convertible A-2, la diferencia se pagará en dinero por la Empresa Deudora. Estos pagos se efectuarán por la Empresa Deudora en la Fecha de Prepago y en la fecha de conversión, respectivamente.

Si en virtud de los cálculos señalados anteriormente, la "porción" del Monto de Prepago Convertible de un Acreedor Valista no arroja como resultado que reciba el 100% de su Monto de Prepago Convertible en Bonos Convertibles A-2, la diferencia será pagada mediante la entrega de Bonos Convertibles A-1. De existir fracciones de Bonos Convertibles A-1, la diferencia se pagará en dinero por la Empresa Deudora.

15

Dado que los Bonos Convertibles A-2 deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley N° 18.046 sobre Sociedades Anónimas, la mecánica para ello se regula en el **Capítulo X**.

Tratándose de Créditos Valistas que se encuentren en custodia a través de una corredora de bolsa o entidad autorizada por ley para mantener valores a nombre propio por cuenta de terceros (en adelante el "Custodio"), únicamente para efecto de realizar el cálculo de la Prorrata de Participación ésta se calculará considerando como "acreedor valista i" individualmente a cada persona por cuenta de quien el respectivo Custodio mantenga la respectiva acreencia (en adelante los "Titulares Finales") que participe en el Nuevo Financiamiento y según ello sea informado por el Custodio en los términos indicados en el Capítulo VIII de este Acuerdo.

**c.- Bono Renta Fija B (Tramo B)**:

La amortización del 20% del total de Monto de Prepago (sea que éstos hubieran o no participado en el Nuevo Financiamiento) (en adelante el "***Monto de Prepago Renta Fija B***"), se prepagarán obligatoriamente mediante la entrega de un bono de renta fija a ser emitido por un monto, al menos, equivalente al Monto de Prepago Renta Fija B (en adelante, el "***Bono Renta Fija B***"), pagadero en un plazo de 10 años contado desde la fecha de la Junta Deliberativa. De existir fracciones de Bonos Renta Fija B como resultado de la diferencia entre el Monto de Prepago Renta Fija B, y el monto de corte del Bono Renta Fija B, la diferencia se pagará en dinero por la Empresa Deudora al respectivo Acreedor Valista en la Fecha de Prepago.

El Bono Renta Fija B tendrá las siguientes características:

i.- Moneda:

El Bono Renta Fija B será emitido en pesos chilenos.

ii.- Amortización de capital:

Las fechas de pago de intereses y amortizaciones de capital de los Bonos Renta Fija B, lo mismo que los montos a pagar en cada caso, son los que aparecen en la Tabla de Desarrollo que se indica en el literal c.iv.- siguiente.

iii.- Interés:

Los intereses serán determinados y pagados aplicando una tasa de interés nominal efectiva anual, que aumentará progresivamente como se detalla a continuación:

- **1,5%** nominal efectivo anual base 360 días y semestres iguales de 180 días, los **primeros dos años y seis meses** contados desde la fecha en que se celebre la Junta

16

Deliberativa. Estos intereses se devengarán y se capitalizarán semestralmente, conforme a la tabla de desarrollo que se indica en el literal c.iv.- siguiente.

- **6,5%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el término del **sexto semestre** contado desde la fecha en que se celebre la Junta Deliberativa en adelante. Estos intereses se devengarán y pagarán semestralmente, conforme a la tabla de desarrollo que se indica en el literal c.iv.- siguiente.

iv.- <u>Tabla de desarrollo Bono Renta Fija B[4]</u>:

**Bono Renta Fija B (CLP millones)**

| Cuota | Vencimiento | Capital insoluto | Interés | | | |
|---|---|---|---|---|---|---|
| (100%) | Interés capitalizado | Amortización capital | Valor | | | |
| cuota | 14-08-2020 | 100 | | | | |
| 1 | 14-02-2021 | 101 | 1 | 1 | 0 | 0 |
| 2 | 14-08-2021 | 102 | 1 | 1 | 0 | 0 |
| 3 | 14-02-2022 | 102 | 1 | 1 | 0 | 0 |
| 4 | 14-08-2022 | 103 | 1 | 1 | 0 | 0 |
| 5 | 14-02-2023 | 104 | 1 | 1 | 0 | 0 |
| 6 | 14-08-2023 | 104 | 3 | 0 | 0 | 3 |
| 7 | 14-02-2024 | 104 | 3 | 0 | 0 | 3 |
| 8 | 14-08-2024 | 104 | 3 | 0 | 0 | 3 |
| 9 | 14-02-2025 | 104 | 3 | 0 | 0 | 3 |
| 10 | 14-08-2025 | 104 | 3 | 0 | 0 | 3 |
| 11 | 14-02-2026 | 101 | 3 | 0 | 3 | 6 |
| 12 | 14-08-2026 | 99 | 3 | 0 | 3 | 6 |
| 13 | 14-02-2027 | 93 | 3 | 0 | 5 | 8 |
| 14 | 14-08-2027 | 88 | 3 | 0 | 5 | 8 |
| 15 | 14-02-2028 | 80 | 3 | 0 | 8 | 11 |
| 16 | 14-08-2028 | 73 | 3 | 0 | 8 | 10 |
| 17 | 14-02-2029 | 60 | 2 | 0 | 13 | 15 |
| 18 | 14-08-2029 | 47 | 2 | 0 | 13 | 15 |

v.- <u>Rescate Anticipado</u>:

A partir de la fecha en que se paguen íntegramente los Nuevos Bonos Internacionales la Empresa Deudora podrá rescatar anticipadamente, en forma total o parcial, los Bonos Renta Fija B al equivalente al monto del capital insoluto a ser prepagado a la fecha fijada para el rescate, más los intereses devengados y no pagados en el período que media entre el día siguiente al de la fecha de vencimiento de la última cuota de intereses pagada y la fecha fijada para el rescate (a la par).

vi.- <u>Covenant Financiero</u>:

En adición a las obligaciones de hacer y no hacer señaladas en el Capítulo XIII del presente Acuerdo de Reorganización Judicial, en el Bono Renta Fija B la Empresa Deudora se obligará a mantener una razón Deuda Financiera Neta / EBITDA no superior a: **(a)** 6,5 veces medido y calculado sobre los estados financieros consolidados de Enjoy reportados

---

[4] Esta tabla de desarrollo es ilustrativa en base 100, mientras que los valores finales que se deben considerar dependerán de la cantidad de Acreedores Bancarios que ejerza la opción de los Créditos Valistas.

trimestralmente a la CMF (los "*Estados Financieros*") al 31 de marzo de 2024 y hasta los Estados Financieros al 31 de diciembre de 2025; **(b) 6,0 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2026 y hasta los Estados Financieros al 31 de diciembre de 2026; **(c) 5,5 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2027 y hasta los Estados Financieros al 31 de diciembre de 2027; **(d) 5,0 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2028 y hasta los Estados Financieros al 31 de diciembre de 2028; y **(e) 4,5 veces** medido y calculado sobre los Estados Financieros al 31 de marzo de 2029 en adelante.

La razón Deuda Financiera Neta / EBITDA no será medida sobre los Estados Financieros anteriores al 31 de marzo de 2024.

Para estos efectos:

a. <u>Deuda Financiera Neta:</u> corresponderá a: /i/ La suma de las partidas registradas en los rubros "Otros pasivos financieros Corrientes", "Otros pasivos financieros no corrientes", "Pasivos por Arrendamientos corrientes", "Pasivos por Arrendamientos no corrientes"; menos /ii/ la partida registrada en el rubro como "Efectivo y equivalentes al efectivo"; todo lo anterior, del Estado de Situación Financiera Consolidado de Enjoy, que forma parte integral de los Estados Financieros.

b. <u>EBITDA:</u> corresponderá al resultado de las siguientes partidas del Estado de Resultado por Función de los Estados Financieros: /i/ Ingresos de actividades ordinarias; menos /ii/ Costo de ventas; menos /iii/ Gastos de administración; más /iv/ depreciación del ejercicio; más /v/ Amortización del ejercicio.

vii.- <u>Otros términos y condiciones:</u>

Otros términos y condiciones aplicables a los Bonos Renta Fija B se adjuntan como **Anexo Nº4** a esta Propuesta entendiéndose que dicho Anexo formará parte de la Propuesta para todos los efectos legales.

**4.- Prepago Obligatorio de los Créditos Valistas Reprogramados**:

El procedimiento que será aplicable para efectos de efectuar el prepago obligatorio del Monto de Prepago de los Créditos Valistas reprogramados será el siguiente:

**a.- Fecha de Prepago:**

Dentro de un plazo de 15 días hábiles bancarios contado desde el término del Período de Oferta Preferente, la Empresa Deudora deberá proceder a efectuar el prepago obligatorio de los Créditos Valistas reprogramados (en adelante la "*Fecha de Prepago*"). Para estos efectos, Enjoy deberá otorgar un aviso de prepago a los Acreedores Valistas, mediante el envío de un Hecho Esencial con a lo menos 5 Días Hábiles Bancarios de anticipación a la Fecha de Prepago.

**b.- Acreencias que sean títulos de deuda de oferta pública desmaterializados** :

18

Tratándose de Créditos Valistas reprogramados que correspondan a títulos de deuda de oferta pública, su prepago se efectuará en la Fecha de Prepago mediante transferencias electrónica de fondos, tratándose pagos en dinero, y mediante la entrega de los respectivos Bonos Convertibles A-1 y/o A-2, según corresponda, y del Bono Renta Fija B, a través del DCV mediante su transferencia y/o depósito en las cuentas que los respectivos Acreedores Valistas tengan registradas en el DCV, previa instrucción de la Empresa Deudora e información al Interventor.

Asimismo, en la Fecha de Prepago, la Empresa Deudora, enviará una instrucción al DCV a efectos de que éste deje sin efecto las posiciones correspondientes a los títulos de deuda desmaterializados que hubieren sido objeto del prepago.

**c.- Otras Acreencias**:

Tratándose de otras acreencias distintas de las señaladas en el literal 4.b anterior y de aquellos títulos de deuda de oferta pública que se encuentren materializados, sus Acreedores Valistas deberán dirigirse en la Fecha de Prepago a las oficinas de Enjoy, ubicadas en calle Rosario Norte Nº555, piso 10, comuna de Las Condes, Santiago en horario hábil debiendo acompañar los antecedentes y títulos que acrediten su calidad de Acreedor Valista. En dicha oportunidad, Enjoy efectuará el prepago de aquellos montos que correspondan en dinero mediante fondos de inmediata disponibilidad, a las cuentas bancarias informadas por los respectivos Acreedores Valistas a Enjoy con, a los menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago, junto con instruir al DCV para que realice la transferencia y/o depósito de los Bonos Convertibles A-1 y/o A-2, según corresponda, y del Bono Renta Fija B que también corresponda a dichos acreedores en las cuentas que los respectivos Acreedores Valistas tengan registradas en el DCV y hayan informado a Enjoy con, a lo menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago, debiendo los respectivos Acreedores Valistas suscribir un documento que dé cuenta del prepago total de su Crédito Valista reprogramado.

## VI. PROPUESTA DE PAGO DE CAPITAL E INTERESES A ACREEDORES BANCARIOS (TRAMO C).

De conformidad a lo previsto en el artículo 64 de la Ley Nº 20.720, se proponen condiciones más favorables para aquellos Acreedores Bancarios que se comprometan a otorgar a la Empresa Deudora, o a una o más de sus filiales, a ser acordado con la Empresa Deudora, una o más líneas de crédito rotativas dentro de un plazo máximo de 15 días hábiles bancarios contado desde la fecha de entrada en vigencia del Acuerdo, con las siguientes características:

1.- Plazo:  3 años contado desde la fecha en que se celebre la Junta Deliberativa.

2.- Tasa de interés: acorde al mercado.

3.- Monto: el equivalente a, al menos, 40% de su correspondiente crédito en contra de la Empresa Deudora, afecto al presente Acuerdo de Reorganización.

4.- Otras condiciones: las habituales de mercado para este tipo de operaciones.

19

Los Acreedores Bancarios que opten por el presente Capítulo VI del Acuerdo, deberán otorgar su compromiso vinculante de abrir las mencionadas línea al Interventor dentro de un plazo de 5 días hábiles bancarios siguientes a la fecha de la Junta Deliberativa.

La condición más favorable que se propone consiste en el prepago, sin costos de prepago, del 100% del capital insoluto e intereses devengados de los créditos del respectivo Acreedor Bancario mediante la entrega de un bono de renta fija, por el total de dicho monto para cuyos efectos la Empresa Deudora propone asumir la obligación de emitir un bono de renta fija con las características que se describen en este **Capítulo VI** e inscribirlo en el Registro de Valores que lleva la CMF (en adelante, el "***Bono Renta Fija C***"), pagadero en un plazo de 12 años contado desde la aprobación del presente Acuerdo de Reorganización. De existir fracciones de Bonos Renta Fija C como resultado de la diferencia entre el monto del crédito de un Acreedor Bancario, y el monto de corte del Bono Renta Fija C, la diferencia se pagará en dinero por la Empresa Deudora. Estos créditos, previo a la entrega de Bonos Renta Fija C, serán prorrogados y capitalizarán intereses en la forma estipulada en los numerales 1.- y 2.- del **Capítulo V**, en lo que resulten aplicables.

El prepago de los créditos de los Acreedores Bancarios se efectuará dentro de los 15 días hábiles bancarios siguientes a la fecha en que se obtenga la inscripción en el Registro de Valores de la CMF de los Bonos Renta Fija C. Para estos efectos, Enjoy deberá otorgar un aviso de prepago a los Acreedores Bancarios, mediante el envío de un Hecho Esencial con una anticipación de a lo menos 5 Días Hábiles Bancarios de anticipación a su fecha de prepago. El prepago se efectuará a través del DCV mediante su transferencia y/o depósito en las cuentas que los respectivo Acreedores Bancarios tengan registradas en el DCV, previa instrucción de la Empresa Deudora e información al Interventor.

Los Acreedores Bancarios que no se acojan a lo dispuesto por este **Capítulo VI**, se regirán por lo dispuesto en el **Capítulo V** precedente.

Estos Acreedores Bancarios representan **6** acreedores, por un monto total de **$19.629.732.671.-** (diecinueve mil seiscientos veintinueve millones setecientos treinta y dos mil seiscientos setenta y un pesos) y se detallan en el Anexo N° 6 del presente Acuerdo.

El Bono Renta Fija C tendrá las siguientes características:
i.- Moneda:

El Bono Renta Fija C será emitido en pesos chilenos.

ii.- Amortización de capital:

El pago del Bono Renta Fija C se efectuará en una sola cuota al final de 12 años contados desde la fecha de la Junta Deliberativa, conforme a la Tabla de Desarrollo que se indica en el literal iv.- siguiente.

iii.- Interés:

20

Los intereses serán determinados y pagados aplicando una tasa de interés nominal efectiva anual, que aumentará progresivamente como se detalla a continuación:

- **1,5%** nominal efectivo anual base 360 días y semestres iguales de 180 días, los **primeros cinco semestres** contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y pagarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica.

- **2,0%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el **sexto semestre** y hasta el **doceavo semestre**, ambos inclusive, contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y capitalizarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica.

- **3,0%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el **treceavo semestre** y hasta el **dieciochoavo semestre**, ambos inclusive, contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y capitalizarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica.

- **4,0%** nominal efectivo anual base 360 días y semestres iguales de 180 días, desde el **diecinueveavo semestre** y hasta el **vigésimo cuarto semestre**, ambos inclusive, contados desde la fecha de la Junta Deliberativa. Estos intereses se devengarán y capitalizarán semestralmente, conforme a la tabla de desarrollo que más adelante se indica

iv.- <u>Tabla de desarrollo de capital e intereses Bono Renta Fija C[5]</u>:

| Cuota | Vencimiento | Capital insoluto | Interés (100%) | Interés capitalizado | Amortización capital (%) | Valor cuota |
|---|---|---|---|---|---|---|
| | 14-08-2020 | 100,0 | | | | |
| 1 | 14-02-2021 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 2 | 14-08-2021 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 3 | 14-02-2022 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 4 | 14-08-2022 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 5 | 14-02-2023 | 100,0 | 0,8 | 0,0 | 0,0 | 0,8 |
| 6 | 14-08-2023 | 101,0 | 1,0 | 1,0 | 0,0 | 0,0 |
| 7 | 14-02-2024 | 102,0 | 1,0 | 1,0 | 0,0 | 0,0 |
| 8 | 14-08-2024 | 103,0 | 1,0 | 1,0 | 0,0 | 0,0 |
| 9 | 14-02-2025 | 104,1 | 1,0 | 1,0 | 0,0 | 0,0 |
| 10 | 14-08-2025 | 105,1 | 1,0 | 1,0 | 0,0 | 0,0 |
| 11 | 14-02-2026 | 106,2 | 1,1 | 1,1 | 0,0 | 0,0 |
| 12 | 14-08-2026 | 107,2 | 1,1 | 1,1 | 0,0 | 0,0 |
| 13 | 14-02-2027 | 108,8 | 1,6 | 1,6 | 0,0 | 0,0 |
| 14 | 14-08-2027 | 110,5 | 1,6 | 1,6 | 0,0 | 0,0 |
| 15 | 14-02-2028 | 112,1 | 1,7 | 1,7 | 0,0 | 0,0 |
| 16 | 14-08-2028 | 113,8 | 1,7 | 1,7 | 0,0 | 0,0 |
| 17 | 14-02-2029 | 115,5 | 1,7 | 1,7 | 0,0 | 0,0 |
| 18 | 14-08-2029 | 117,2 | 1,7 | 1,7 | 0,0 | 0,0 |
| 19 | 14-02-2030 | 119,6 | 2,3 | 2,3 | 0,0 | 0,0 |
| 20 | 14-08-2030 | 122,0 | 2,4 | 2,4 | 0,0 | 0,0 |

---

[5] Esta tabla de desarrollo es ilustrativa en base 100, mientras que los valores finales que se deben considerar dependerán de la cantidad de Acreedores Bancarios que ejerza esta opción.

21

| 21 | 14-02-2031 | 124,4 | 2,4 | 2,4 | 0,0 | 0,0 |
| 22 | 14-08-2031 | 126,9 | 2,5 | 2,5 | 0,0 | 0,0 |
| 23 | 14-02-2032 | 129,4 | 2,5 | 2,5 | 0,0 | 0,0 |
| 24 | 14-08-2032 | 0,0 | 2,6 | 0,0 | 129,4 | 132,0 |

v.- <u>Rescate Anticipado</u>:

A partir de la fecha en que se paguen íntegramente los Nuevos Bonos Internacionales la Empresa Deudora podrá rescatar anticipadamente, en forma total o parcial, los Bonos Renta Fija C al equivalente al monto del capital insoluto a ser prepagado a la fecha fijada para el rescate, más los intereses devengados y no pagados en el período que media entre el día siguiente al de la fecha de vencimiento de la última cuota de intereses pagada y la fecha fijada para el rescate (a la par).

v.- <u>Otros términos y condiciones</u>: Otros términos y condiciones aplicables a los Bonos Renta Fija C se adjuntarán como **Anexo Nº4** a esta Propuesta con anticipación a la fecha de la Junta Deliberativa entendiéndose que dicho Anexo formará parte de la Propuesta para todos los efectos.

## VII. PROPUESTA DE PAGO DE CAPITAL A ACREEDORES PROVEEDORES.

De conformidad a lo previsto en el artículo 64 de la Ley Nº 20.720, se proponen condiciones más favorables para algunos de los acreedores valistas Proveedores. La condición más favorable que se propone consiste en el pago del 100% del capital de los créditos provenientes de facturas o boletas emitidas por Proveedores, en los mismos términos en que deben ser pagadas, en un plazo de hasta 12 meses contado desde la aprobación del presente Acuerdo de Reorganización Judicial.

Estos Proveedores representan **18** acreedores, por un monto total de **$381.718.815.-** (trescientos ochenta y un millones setecientos dieciocho mil ochocientos quince pesos) y se detallan en el Anexo N° 6 del presente Acuerdo.

## VIII. NUEVO FINANCIAMIENTO (TRAMO D).

Los Tenedores de Bonos Internacionales y los Acreedores Valistas tendrán la opción preferente de otorgar un Nuevo Financiamiento a Enjoy ascendente a, aproximadamente, $50.000.000.000.- (cincuenta mil millones de pesos) (en adelante, los Tenedores de Bonos Internacionales y los Acreedores Valistas que participen en el Nuevo Financiamiento serán referidos conjuntamente como los "*Nuevos Financistas*").

El Nuevo Financiamiento se documentará en un único contrato de apertura de crédito no rotativo a ser celebrado entre Enjoy y los Nuevos Financistas en términos sustancialmente similares a los que se adjuntan como **Anexo Nº5** a este Acuerdo, el que se entiende formar parte del mismo para todos los efectos legales (el "*Crédito Puente*"), que se prepagará en forma obligatoria (tanto para la Empresa Deudora como para el respectivo Nuevo Financista) sin costo de prepago, y considerando como monto a prepagar el saldo insoluto de capital sumado a los intereses devengados y que se capitalizan a la Fecha de Prepago (en adelante el "*Monto de Prepago del Nuevo Financiamiento*"),

22

mediante la entrega de (i) de bonos convertibles en acciones de Enjoy ("**Bono Convertible D**") no colocados durante el Periodo de Oferta Preferente, en una cantidad equivalente a la necesaria para prepagar el Monto de Prepago del Nuevo Financiamiento considerando para estos efectos el valor nominal del Bono Convertible D, el cual en ningún caso podrá ser a valores inferiores o en condiciones más ventajosas que las ofrecidas Accionistas durante el Período de Oferta Preferente; y (ii) en caso de existir un saldo de Monto de Prepago del Nuevo Financiamiento pendiente de prepago luego de aplicar lo señalado en el número (i) anterior, con el producto de la suscripción y pago de los Bonos Convertibles D que hubieren sido adquiridos durante su Período de Oferta Preferente por los Accionistas (según se describe en el **Capítulo X** siguiente), hasta completar el Monto de Prepago del Nuevo Financiamiento; todo lo anterior, a prorrata de la participación de los Nuevos Financistas en el Nuevo Financiamiento.

**1.- Crédito Puente**.

a.- Con el objeto de participar en el Nuevo Financiamiento, los Nuevos Financistas suscribirán un contrato de apertura de crédito no rotativo, en idénticos términos y condiciones, con vencimiento a 18 meses, cuyos desembolsos se documentarán mediante la suscripción de pagarés a la orden de cada uno de los respectivos Nuevos Financistas. El desembolso tendrá lugar el día hábil bancario siguiente a la fecha de suscripción del Crédito Puente, o al día hábil bancario siguiente a que se haya cumplido la Condición de Financiamiento (según este término se define más adelante), si ésta se hubiere cumplido con posterioridad a la celebración del Crédito Puente, oportunidad en la cual se hará entrega del respectivo pagaré autorizado ante Notario.

Los créditos que se otorguen bajo el Crédito Puente devengarán una tasa de interés de un 5,7% anual (base 360 días y semestres iguales de 180 días), salvo que dicha tasa exceda la tasa máxima convencional vigente aplicable a los créditos de estas características vigente a la fecha de suscripción del Crédito Puente, en cuyo caso regirá la tasa máxima convencional.

El Crédito Puente será prepagado obligatoriamente para el deudor y el acreedor en la Fecha de Prepago, sin costos de prepago, mediante la entrega de Bonos Convertibles D no colocados durante el Período de Oferta Preferente cuyas características se indican en el numeral 3.- de este **Capítulo VIII** y, en la diferencia, con el producto de la suscripción y pago de los Bonos Convertibles D que hubieren sido adquiridos durante su Período de Oferta Preferente por los Accionistas, según se indica más adelante.

b.- La posibilidad de participar en el Crédito Puente será ofrecida preferentemente a los grupos y en las proporciones que se señalan a continuación (en adelante, los "**Grupos**"):

i.- A los Tenedores de Bonos Internacionales: hasta $10.000.000.000.- (diez mil millones de pesos) (en adelante, el "**Grupo A**") o su equivalente en Dólares, según el tipo de cambio Dólar Observado publicado por el Banco Central de Chile correspondiente al día en que se celebre la Junta Deliberativa.

ii.- A los Acreedores Valistas: hasta $40.000.000.000.- (cuarenta mil millones de pesos) (en adelante, el "**Grupo B**").

23

c.- Los interesados en participar en el Nuevo Financiamiento deberán manifestarlo por escrito al Interventor Concursal, mediante un compromiso de financiamiento (en adelante, el "**Compromiso de Financiamiento**"), cuyos resultados y los montos totales serán informados posteriormente por el Interventor Concursal. Tratándose de los Tenedores de Bonos Internacionales, estos deberán manifestar su interés enviando una comunicación escrita al Representante de los Tenedores de Bonos Internacionales. Adicionalmente, los Tenedores de Bonos Internacionales podrán manifestar su compromiso directamente al Interventor Concursal, mediante un Compromiso de Financiamiento. El Representante de los Tenedores de Bonos Internacionales remitirá al Interventor Concursal los Compromisos de Financiamiento que reciba de los Tenedores de Bonos Internacionales. Tratándose de acreencias que se encuentren en custodia a través de un Custodio, los Titulares Finales de las mismas que estén interesados en participar en el Nuevo Financiamiento deberán manifestarlo a su respectivo Custodio, quien remitirá al Interventor Concursal una comunicación por escrito identificando a los Titulares Finales interesados participar en el Nuevo Financiamiento junto con acompañar certificados de custodia que permitan identificar las acreencias de los referidos Titulares Finales. Adicionalmente, los Titulares Finales interesados en participar en el Nuevo Financiamiento deberán manifestarlo por escrito al Interventor Concursal mediante un Compromiso de Financiamiento, el que podrán entregar directamente al Interventor Concursal o a través de su respectivo Custodio.

i.- Los Compromisos de Financiamiento recibidos al interior de un determinado Grupo se asignarán al monto de participación en el Nuevo Financiamiento ofrecido al correspondiente Grupo, a prorrata de acuerdo a la participación en el pasivo del respectivo Grupo que tuvieren todos los acreedores del Grupo que hayan manifestado interés, hasta llegar a asignar a cada acreedor participante dentro del Grupo el monto menor entre el 100% de lo que le correspondería a dicho acreedor de acuerdo a su prorrata y su oferta de compromiso. Si quedare un remanente de participación en el Nuevo Financiamiento luego de la asignación anterior, este se distribuirá entre los acreedores del respectivo Grupo que hubiesen entregado Compromisos de Financiamiento por sobre su prorrata en el pasivo del respectivo Grupo, a prorrata de estas ofertas de compromiso en excesos. Si los Compromisos de Financiamiento recibidos al interior de un determinado Grupo superan el monto de participación en el Nuevo Financiamiento ofrecido al correspondiente Grupo, dicho exceso se destinará a cubrir déficits en el otro Grupo, en caso de haberlos, a prorrata (entre todos ellos considerando sólo el exceso), hasta completar el monto total de $50.000.000.000.- (cincuenta mil millones de pesos).

ii.- En caso que no se logre obtener Compromisos de Financiamiento por un monto equivalente al 100% del Nuevo Financiamiento en una primera ronda, se podrán realizar rondas sucesivas entre aquellos interesados que hayan presentado Compromisos de Financiamiento en una ronda anterior, las que se asignarán a prorrata de la nueva demanda hasta agotar el monto de déficit.

iii.- Si, a pesar de haber sido ofrecido en la forma indicada en los literales i.- y ii.- anteriores, quedare parte del Nuevo Financiamiento sin recibir Compromisos de

24

Financiamiento, la Compañía podrá ofrecer dicho remanente del Nuevo Financiamiento a terceros en términos no más favorables a los ofrecidos a los Grupos.

iv.- Las rondas y ofertas del Nuevo Financiamiento que sucedan a la primera, deberán concluirse en un plazo máximo de 10 días hábiles bancarios.

d.- No obstante lo anterior, y previo a la Junta Deliberativa, los llamados a participar en el Nuevo Financiamiento podrán manifestar anticipadamente su voluntad de concurrir a éste, mediante una nota vinculante que se enviará al Veedor Concursal, para que éste dé cuenta sobre ésta en la respectiva Junta. En la respectiva Junta Deliberativa se podrá dejar constancia de los compromisos recibidos con anterioridad, pudiendo comparecer los acreedores que los hayan manifestado, para reiterar dicho compromiso, lo cual en ningún caso afectará la vigencia o ejecutabilidad del compromiso por escrito entregado al Veedor Concursal.

e.- **Monto Mínimo de Compromisos de Financiamiento:**

i.- En caso de que, concluidas las rondas y ofertas de Nuevo Financiamiento descritas en el literal c. anterior, los Compromisos de Financiamiento no superen los $25.000.000.000.- (veinticinco mil millones de pesos) ("***Monto Mínimo de Financiamiento***"), la Condición de Financiamiento (según este término se define más adelante) se entenderá incumplida y, consecuente a ello, se producirá una causal de incumplimiento del Acuerdo de Reorganización y Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

ii.- En caso de que, concluidas las rondas y ofertas de Nuevo Financiamiento descritas en el literal c. anterior, los Compromisos de Financiamiento sean iguales o superiores a $25.000.000.000.- (veinticinco mil millones de pesos), pero inferiores a $45.000.000.000.- (cuarenta y cinco mil millones de pesos), los Nuevos Financistas que hayan entregado a la Compañía Compromisos de Financiamiento no estarán obligados a mantener tales compromisos, pudiendo informar a la Compañía y al Interventor el retiro, mantención u aumento de los mismos en un plazo de dos días hábiles con posterioridad al comunicado entregado por el Interventor a los Nuevos Financistas con los resultados finales de las rondas y ofertas de Nuevo Financiamiento. Aquellos Nuevos Financistas que nada indiquen dentro de dicho plazo se entenderá que mantienen su respectivo Compromiso de Financiamiento. Cumplido el plazo de retiro de los Compromisos de Financiamiento, la Compañía y el Interventor calcularán el monto total de Compromisos de Financiamiento neto de aquellos retirados (los "***Compromisos de Financiamiento Netos***"). Si los Compromisos de Financiamiento Netos no superan el Monto Mínimo de Financiamiento, la Condición de Financiamiento se entenderá incumplida y, consecuente a ello, se producirá una causal de incumplimiento del del Acuerdo de Reorganización y Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria. Si los Compromisos de Financiamiento Netos son iguales o superiores a $25.000.000.000.- (veinticinco mil millones de pesos), pero inferiores a $45.000.000.000. (cuarenta y cinco mil millones de pesos) se entenderá cumplida la Condición de Financiamiento en este aspecto, a menos que la Comisión de Acreedores resuelva lo contrario mediante el voto de cuatro de sus

miembros, en cuyo caso se entenderá incumplido el Acuerdo de Reorganización y Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

iii.- En caso de que los Compromisos de Financiamiento sean iguales o superiores a $45.000.000.000.- (cuarenta y cinco mil millones de pesos) se tendrá por cumplida la Condición de Financiamiento en este respecto.

iv.- Para los efectos del cálculo de los montos que se establecen en esta letra **e.-**, los montos comprometidos por los Nuevos Financistas que sean Tenedores de Bonos Internacionales se considerara en su monto equivalente en pesos, utilizando el tipo de cambio Dólar Observado publicado por el Banco Central de Chile que rija para el día en que se celebre la Junta Deliberativa, sin perjuicio del valor a que efectivamente se liquiden las divisas que se reciban de ellos a la fecha de desembolso respectivo.

f.- Una vez vencidos los plazos de recepción de los Compromisos de Financiamiento según lo señalado en la letra **c.-** anterior, los Nuevos Financistas deberán suscribir el contrato de apertura de crédito no rotativo y los demás documentos del Nuevo Financiamiento dentro del segundo día hábil bancario contado desde la fecha en que se informe por el Interventor la participación de cada Nuevo Financista en el Crédito Puente. Para efectos de celebrar el contrato de apertura de crédito no rotativo, los Nuevos Financistas otorgarán mandato al Interventor, a fin que suscriba a su nombre y representación el referido contrato, al momento de ejercer su opción de otorgar el Nuevo Financiamiento. Los plazos definitivos del proceso de asignación de la participación de cada Nuevo Financista en el Crédito Puente y la celebración y desembolso del mismo serán informado por el Veedor y/o el Interventor, según corresponda.

g.- Los fondos desembolsados por cada Nuevo Financista se mantendrán depositados en los agentes de retención que se designarán en el Crédito Puente (en adelante los "*Agentes de Retención*"), hasta que corresponda su liberación y entrega a Enjoy de conformidad con lo dispuesto en el Crédito Puente.

h.- Si dentro del segundo día hábil bancario siguiente a la fecha de desembolso del Crédito Puente, uno o más de los Nuevos Financistas no dieren cumplimiento a su Compromiso de Financiamiento y en consecuencia no se hubieran entregado a los Agentes de Retención un monto equivalente a aquellos que permitieron dar por cumplida la condición establecida en la letra h de la Condición de Financiamiento, la Empresa Deudora deberá así informarlo al Interventor y a la Comisión de Acreedores con el objeto que esta última decida si el monto efectivamente desembolsado es suficiente para efectuar la liberación de los fondos a la Compañía por parte de los Agentes Retenedores. Si la Comisión de Acreedores mediante el voto de cuatro de sus miembros no acepta el monto efectivamente desembolsado, la Compañía deberá proponer, dentro de un plazo de 10 días hábiles bancarios contados desde la fecha de la resolución de la Comisión de Acreedores, una nueva alternativa de financiamiento para completar el monto faltante, en los mismos términos que el Crédito Puente. Si la Comisión de Acreedores acepta la propuesta de la Compañía, se procederá a la liberación de los fondos a la Compañía por parte de los Agentes Retenedores. En caso contrario, se entenderán como suficientes los montos desembolsados, a menos que la Comisión de Acreedores resuelva lo

contrario mediante el voto de cuatro de sus miembros y los montos desembolsados serán devueltos por los Agentes de Retención al respectivo Nuevo Financista.

i.- La Empresa Deudora pagará a cada Nuevo Financista (en la medida que efectivamente realice el desembolso respectivo bajo el Crédito Puente), una comisión (*commitment fee*) ascendente al 2% del monto total efectivamente desembolsado por el respectivo Nuevo Financista bajo el Crédito Puente, la que será reducida del monto de su desembolso cuando éste sea exigible.

j.- Los fondos desembolsados bajo el Crédito Puente se destinarán al pago de las obligaciones propias del giro operacional de la Empresa Deudora y sus filiales, conforme las condiciones y restricciones que se convienen en el presente Acuerdo. Al respecto, la Empresa Deudora deberá presentar a la Comisión de Acreedores un Plan de Uso de Fondos para su aprobación en general, quedando la atribución y responsabilidad específica de su implementación en la Empresa  Deudora, cuyo cumplimiento será supervisado por el Interventor.

k.- Las acreencias de los Acreedores Valistas y a los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa (con excepción de los Bonos Internacionales y los Nuevos Bonos Internacionales, que son preferentes, del"Contrato de arrendamiento con Opción de Compra" celebrado entre Enjoy y Banco Security, mediante escritura pública de fecha 5 de octubre de 2016, Repertorio N° 21.180-2016, otorgada en la Notaría de Santiago de don Eduardo Diez Morello y de las boletas de garantía de que da cuenta el **Capítulo XII** siguiente), se entenderán subordinados respecto al Crédito Puente y los Bonos Convertibles D, hasta el término del Período de Conversión, es decir al día 540 después de la fecha de desembolso del Crédito Puente. Los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa, exceptuando los ya señalados, así como los créditos respecto de proveedores no financieros que se generen en el curso ordinario de los negocios de Enjoy, deberán contener expresamente esta subordinación en sus títulos. Sin perjuicio de la subordinación antes indicada respecto a todos los Acreedores Valistas, aquellos Acreedores Valistas que participen en el Crédito Puente facultan al Interventor para que confirme y ratifique, en su representación, por escritura pública, los convenios de subordinación antes referidos.

l.- La opción de otorgar el Nuevo Financiamiento podrá ser cedida por el respectivo acreedor, total o parcialmente, para lo cual así lo informará en la comunicación en que manifieste su Compromiso de Financiamiento, la cual también deberá ser firmada por el respectivo cesionario.

m.- La cesión de un crédito bajo el Crédito Puente por parte de un acreedor sujeto al presente Acuerdo no alterará ni afectará en nada los derechos y preferencias que a dicho acreedor cedente le corresponda en tal carácter, en virtud del presente Acuerdo por su participación en el otorgamiento del Nuevo Financiamiento.

**2.- Condición de Financiamiento**.

La obligación de efectuar los desembolsos bajo el Crédito Puente estará sujeta al cumplimiento, dentro de un plazo máximo de 90 días corridos de la fecha de la Junta Deliberativa, de las siguientes condiciones suspensivas y copulativas (la "**Condición de Financiamiento**"):

a.- Que Enjoy cuente con las autorizaciones societarias que sean pertinentes para suscribir, desembolsar y cumplir el Crédito Puente;

b.- La aprobación por parte de los Accionistas en una junta extraordinaria de accionistas de Enjoy de un aumento de capital, mediante la emisión de acciones y la emisión de bonos convertibles en acciones de Enjoy, en una cantidad suficiente para respaldar la emisión de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D, las acciones que serán destinadas a la Opción y las Acciones de Respaldo (según estos términos se definen en el **Capítulo X**), así como las modificaciones del estatuto social que fueren necesarias para estos efectos;

c.- La obtención del compromiso de, al menos, el 60% de los actuales Accionistas, de renunciar a sus derechos de opción preferente para suscribir el Bono Convertible A-1 y el Bono Convertible A-2, en los términos que se estipulen en el Acuerdo de Soporte.

d.- La obtención del compromiso de, al menos, el 60% de los actuales Accionistas de renunciar a un 90.88% de sus derechos de opción preferente para suscribir el Bono Convertible D, en los términos que se estipulen en el Acuerdo de Soporte;

e.- La obtención de un compromiso de, al menos, el 60% de los actuales Accionistas, de no vender sus acciones en la Sociedad en los términos que se estipulen en el Acuerdo de Soporte.

f.- Que el presente Acuerdo de Reorganización se entienda aprobado y entre a regir, de conformidad a lo previsto en el art. 89 de la Ley N° 20.720;

g.- Que el Interventor certifique que, salvo por la condición consistente en el desembolso del Crédito Puente, se han cumplido las condiciones para la liberación en favor de la Empresa Deudora de los depósitos a plazo por $9.300.000.000 que actualmente mantienen en garantía los bancos emisores de las boletas de garantía a que hace referencia el **Capítulo XII** de este Acuerdo, distinta de la condición del desembolso efectivo de, al menos, $25.000.000.000 del Nuevo Financiamiento;

h.- (i) Que la Empresa Deudora reciba Compromisos de Financiamiento por, al menos, el Monto Mínimo de Financiamiento y (ii) que la Comisión de Acreedores no resuelva el incumplimiento de la Condición de Financiamiento en caso que los Compromisos de Financiamiento sean inferiores a $45.000.000.000.- (cuarenta y cinco mil millones de pesos), según lo indicado en la letra e, literal ii, del numeral 1 anterior; y

i.- . Que el Tribunal de Quiebras del Distrito Sur de Nueva York (del estado Nueva York de los Estados Unidos de América) reconozca el Acuerdo en el procedimiento denominado *Chapter 15* que la Compañía está tramitando en dicho tribunal con motivo de su Procedimiento de Reorganización, Caso N° 20-11411 (MG), en la forma descrita en el Anexo1.

**3.- Bono Convertible D**.

a.- Enjoy se obliga de manera incondicional e irrevocable a emitir el Bono Convertible D, el que tendrá un monto de emisión, igual a $65.000.000.000.- (sesenta y cinco mil millones de pesos). De existir fracciones de Bonos Convertibles D como resultado de la diferencia entre el Monto de Prepago del Nuevo Financiamiento de un Nuevo Financista y el monto de corte de un Bono Convertible D, la diferencia se pagará en dinero por la Empresa Deudora a los respectivos Nuevo Financistas, a prorrata de su participación en el Nuevo Financiamiento, en la Fecha de Prepago.

b.- Dado que los Bonos Convertibles D deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley N° 18.046 sobre Sociedades Anónimas, la mecánica para ello se regula en el Capítulo X.

c.- El Bono Convertible D tendrá las siguientes características:

**i.- Moneda**:

El Bono Convertible D será emitido en pesos chilenos.

**ii.- Amortización de capital**:

El Bono Convertible D será pagado mediante una única cuota en un plazo de 99 años a partir de la fecha de la Junta Deliberativa que apruebe la Propuesta (*bullet*).

**iii.- Interés:**

Los intereses serán determinados y capitalizados aplicando una tasa de interés nominal efectiva anual (base 360 días y semestres iguales de 180 días) hasta la fecha de su conversión en acciones, que disminuirá según se detalla a continuación:

- **5,7%** anual, para el período que se inicia en la Fecha de Prepago del Crédito Puente y que termina el día 540 después desde la fecha del desembolso del Crédito Puente.

- **0,0%** nominal efectivo anual desde el día 541 después de la fecha del desembolso del Crédito Puente.

**iv.- Período de Conversión**:

El Bono Convertible D podrá ser convertido en acciones de Enjoy durante un plazo que se iniciará en la Fecha de Prepago, y terminará al día 540 después de la fecha de desembolso del

29

Crédito Puente. En cualquier momento dentro de la vigencia del plazo de conversión antes señalado, los tenedores del Bono Convertible D podrán ejercer la opción de conversión del Bono Convertible D por acciones de Enjoy, mediante comunicación escrita dirigida a Enjoy manifestando en ella su intención de ejercer la opción de conversión, en los términos y conforme al formato de comunicación que se detallarán en el contrato de emisión de los Bonos Convertibles D.

**v.- Relación de Conversión**:

El Bono Convertible D tendrá una relación de conversión de 266,67 (doscientas sesenta y seis coma sesenta y siete) nuevas acciones de Enjoy por cada $1.000.- (mil pesos) de capital vigente e intereses devengados hasta la última fecha de capitalización de intereses anterior a la fecha de conversión.

En caso que producto de este cálculo exista una fracción de acción, ésta se redondeará al entero más próximo y, si la fracción fuere 0,5, se redondeará al entero siguiente, y de haber una diferencia, ésta la diferencia se pagará en dinero por la Empresa Deudora considerando como precio de la acción la suma de $3,75, cuyo pago se efectuará por la Empresa Deudora en la fecha de conversión.

**vi.- Preferencia**:

El Bono Convertible D será considerado como preferente para el pago de capital e intereses, y en caso de liquidación concursal, respecto de los Acreedores Valistas (con excepción de los Bonos Internacionales y los Nuevos Bonos Internacionales, que son preferentes, del "Contrato de arrendamiento con Opción de Compra" celebrado entre Enjoy y Banco Security, mediante escritura pública de fecha 5 de octubre de 2016, Repertorio N° 21.180-2016, otorgada en la Notaría de Santiago de don Eduardo Diez Morello y de las boletas de garantía de que da cuenta el **Capítulo XII** siguiente) y a los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa (con excepción de aquellos créditos expresamente convenidos por medio del presente Acuerdo de Reorganización Judicial), cuyos créditos por tanto, se entenderán subordinados respecto a al Bono Convertible D, hasta el término del Período de Conversión, es decir al día 540 después de la fecha de desembolso del Crédito Puente. Los créditos contra Enjoy que nazcan con posterioridad al día de la Junta Deliberativa, exceptuando los ya señalados, deberán contener expresamente esta subordinación en sus títulos. Sin perjuicio de la subordinación establecida en el presente Acuerdo respecto a todos los Acreedores Valistas, aquellos Acreedores Valistas que participen en el Crédito Puente facultan al Interventor para que confirme y ratifique, en su representación, por escritura pública, los convenios de subordinación antes referidos.

**vii.- Uso de fondos**:

El uso de fondos del Bono Convertible D será exclusivamente el prepago del Crédito Puente, y en caso de existir un remanente, luego de efectuado lo anterior, dichos recursos se destinarán al pago de las obligaciones propias del giro operacional de la Empresa Deudora y sus filiales.

**viii.- Otros términos y condiciones**:

Otros términos y condiciones del Bono Convertible D se adjuntan como **Anexo Nº2** a esta Propuesta entendiéndose que dicho Anexo formará parte de la Propuesta para todos los efectos legales.

**4.- Prepago del Crédito Puente**

El prepago del Crédito Puente a los Nuevos Financistas se efectuará en la Fecha de Prepago, para cuyos efectos Enjoy deberá otorgar un aviso de prepago a los Nuevos Financistas, mediante el envío de un Hecho Esencial con una anticipación de a lo menos 5 días hábiles bancarios de anticipación a la Fecha de Prepago, y en tal fecha Enjoy efectuará el prepago de aquellos montos que correspondan en dinero mediante fondos de inmediata disponibilidad, a las cuentas bancarias informadas por los respectivos Nuevos Financistas a Enjoy con, a los menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago, y tratándose de la entrega de los Bonos Convertibles D, mediante la entrega de los mismos, a través del DCV, mediante su transferencia y/o depósito en las cuentas que los respectivos Nuevos Financistas tengan registradas en el DCV o bien la cuenta que su respectivo Custodio tenga registrada en el DCV y hayan informado a Enjoy con, a lo menos, 2 días hábiles bancarios de anticipación a la Fecha de Prepago. Para estos efectos, los Nuevos Financistas deberán hacer entrega en esa misma fecha a Enjoy de los pagarés que les fueran entregados bajo el Crédito Puente, con constancia de pago de los mismos.

## IX. OPCIÓN DE SUSCRIPCIÓN DE ACCIONES A ACTUALES ACCIONISTAS.

En virtud del presente Acuerdo de Reorganización, y sujeto a las aprobaciones estatutarias correspondientes, se otorgará a los Accionistas de manera simultánea con la apertura del Período de Ofertas Preferente, una opción preferente para suscribir 9.389.919.856 nuevas acciones de pago de la Compañía (en adelante, la "*Opción*"), las que podrán pagarse dentro de un plazo de 24 meses contado desde la fecha de la Junta Deliberativa que apruebe la Propuesta, a un precio de suscripción de $5,42 por acción (lo que da una razón de 2,00 nuevas acciones por cada acción vigente actualmente).

Para materializar la Opción, Enjoy acordará, en el mismo aumento de capital que respalde la emisión de los Bonos Convertibles A-1, los Bonos Convertibles A-2 y los Bonos Convertibles D, la emisión de las acciones de pago de la Opción. La Opción sobre estas nuevas acciones de pago se ofrecerá preferentemente a los Accionistas con derecho a suscribirlas (aquellos inscritos en el Registro de Accionistas de Enjoy a la medianoche del quinto día hábil anterior a la fecha de inicio del Período de Oferta Preferente), a un precio de suscripción de $5,42 (cinco coma cuarenta y dos pesos) por acción, quienes podrán ejercer la Opción suscribiendo las acciones durante el Período de Oferta Preferente, pudiendo pagar el precio de suscripción dentro de un plazo de 24 meses contado desde la fecha de la Junta Deliberativa. Los saldos insolutos de las acciones suscritas y no pagadas serán reajustados en la misma proporción en que varíe el valor de la Unidad de Fomento conforme a lo dispuesto en la ley. En la junta extraordinaria de accionistas que deba pronunciarse respecto del aumento de capital antes señalado se propondrá a los accionistas autorizar

31

al Directorio para no perseverar en el cobro de las acciones suscritas que no hayan sido pagadas dentro del referido plazo, y modificar los estatutos para establecer en ellos que las acciones suscritas cuyo valor no se encuentre totalmente pagado (individualmente consideradas) no tendrán derecho a voto mientras no sean pagadas.

La oferta preferente de suscripción de las acciones objeto de la Opción se efectuará en los términos indicados en el **Capítulo X** siguiente.

## X. MODALIDAD JURIDICA PARA LOS PROCESOS DE FINANCIAMIENTO Y CONVERSIÓN.

1.- Antes de la Junta Deliberativa, la Empresa Deudora podrá complementar la estructura legal para la implementación de la repactación de créditos convenida en el presente Acuerdo y, en particular, para la implementación del Nuevo Financiamiento, el prepago obligatorio de los créditos valistas con los Bonos Convertibles A-1 y Bonos Convertibles A-2 y Bono Renta Fija B, el pago del Crédito Puente con los Bonos Convertibles D, entre otros.

2.- Sin perjuicio de la entrada en vigencia del presente Acuerdo, el Interventor Concursal citará a la Comisión de Acreedores para que, conjuntamente con la Empresa Deudora y los asesores técnicos que los asistan, adopten los acuerdos necesarios para la adecuada implementación de los distintos pasos contemplados en el Acuerdo de Reorganización en caso de ser ello necesario, con plenas facultades. Dicha reunión de la Comisión de Acreedores deberá celebrarse a más tardar el quinto día hábil siguiente a la fecha de la celebración de la Junta Deliberativa.

3.- No obstante lo señalado anteriormente, a continuación se fijan los lineamientos generales propuestos para alguno de los pasos contemplados en esta Propuesta:

a.- Todos los bonos convertibles en acciones que emita la Compañía deberán ser ofrecidos preferentemente a los Accionistas en conformidad a la Ley Nº 18.046 sobre Sociedades Anónimas (en adelante el "*Período de Oferta Preferente*"). Si ningún Accionista ejerce su opción preferente durante el Período de Oferta Preferente, la Compañía destinará Bonos Convertibles A-1, Bonos Convertibles A-2 y Bonos Convertibles D que sean necesarios para ser entregados en prepago del Monto de Prepago Convertible y del Monto de Prepago del Nuevo Financiamiento, conforme a lo establecido en el presente Acuerdo de Reorganización. Si Accionistas ejercen su opción preferente de suscripción antes señalada, se procederá de la siguiente manera:

i.- Los Bonos Convertibles A-1, que no sean colocados durante el Periodo de Oferta Preferente, serán destinados en una cantidad de bonos equivalente a la necesaria para prepagar el Monto de Prepago Convertible de los Créditos Valistas reprogramados con derecho a recibir en pago Bonos Convertibles A-1, a prorrata;

ii.- En caso de existir un saldo de Monto de Prepago Convertible luego de aplicar lo señalado en el número i.- anterior, el producto neto que obtenga la Compañía por la suscripción y pago de los Bonos Convertibles A-1 durante el Período de Oferta Preferente se destinará a pagar el saldo del Monto de Prepago Convertible de los

32

Créditos Valistas reprogramados con derecho a recibir en pago Bonos Convertibles A-1, a prorrata.

iii.- Los Bonos Convertibles A-2, que no sean colocados durante el Periodo de Oferta Preferente, serán destinados en una cantidad de bonos equivalente a la necesaria para prepagar el Monto de Prepago Convertible de los Créditos Valistas reprogramados con derecho a recibir en pago Bonos Convertibles A-2, a prorrata.

iv.- En caso de existir un saldo de Monto de Prepago Convertible con derecho a recibir en pago Bonos Convertibles A-2 luego de aplicar lo señalado en el número iii.- anterior, el producto neto que obtenga la Compañía por la suscripción y pago de los Bonos Convertibles A-2 durante el Período de Oferta Preferente, se destinará a pagar el saldo del Monto de Prepago Convertible con derecho a recibir en pago Bonos Convertibles A-2, a prorrata.

v.- Los Bonos Convertibles D, que no sean colocados durante el Periodo de Oferta Preferente, serán destinados en una cantidad de bonos equivalente a la necesaria para prepagar el Monto de Prepago del Nuevo Financiamiento, a prorrata.

vi.- En caso de existir un saldo de Monto de Prepago del Nuevo Financiamiento con derecho a recibir en pago Bonos Convertibles D luego de aplicar lo señalado en el número v.- anterior, el producto neto que obtenga la Compañía por la suscripción y pago de los Bonos Convertibles D durante el Período de Oferta Preferente, se destinará a pagar el saldo del Monto de Prepago del Nuevo Financiamiento, a prorrata.

vii.- En los tres casos previstos anteriormente, la Compañía podrá emitir Bonos Convertibles A-1, Bonos Convertibles A-2 y Bonos Convertibles D, según corresponda, por un monto superior al requerido para cubrir el pago previsto en el presente Acuerdo de Reorganización.

b.- El Período de Oferta Preferente de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D y de las acciones para el ejercicio de la Opción se realizará de manera simultánea (al mismo tiempo). Los Períodos de Oferta Preferente de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D y de las acciones para el ejercicio de la Opción deberá iniciarse dentro de los 15 días hábiles siguientes a la última fecha en que se efectúe la inscripción en el Registro de Valores de la CMF de estas emisiones.

c.- Con el objeto de facilitar la viabilidad de los acuerdos contenidos en la presente Propuesta de Reorganización:

i.- Las sociedades Entretenciones Consolidadas SpA, Inversiones e Inmobiliaria Almonacid Limitada e Inversiones Cumbres Limitada, que representan el 60.52% del capital accionario de Enjoy suscribirán un acuerdo de soporte con Enjoy (en

adelante el "***Acuerdo de Soporte***") por el que: (i) se obliga a asistir y participar con la totalidad de sus acciones en la junta extraordinaria de accionistas de que da cuenta el literal e siguiente, aprobando en ella la emisión de los Bonos Convertibles A-1, Bonos Convertibles A-2 y Bonos Convertibles D, el aumento de capital indicado en la referida letra e, las modificaciones de estatutos que sean necesarias para estos efectos, y las demás materias que sean necesarias para la implementación de la Propuesta en el contexto del Acuerdo de Reorganización Judicial de Enjoy; (ii) prometen renunciar a sus derechos de suscripción preferente para suscribir los Bonos Convertibles A-1 y los Bonos Convertibles A-2 y renunciar a un 90.88% de sus derechos para suscribir preferentemente de los Bonos Convertibles D, cuando tales derechos nazcan, en los términos estipulados en el Acuerdo de Soporte; y (iii) se obligan a no enajenar sus acciones, en los términos indicados en el Acuerdo de Soporte. El Acuerdo de Soporte deberá ser celebrado y entregado al Veedor con anticipación a la fecha de la Junta Deliberativa, para que éste dé cuenta sobre el Acuerdo de Soporte en la referida Junta; y

ii.- Acreedores de la Compañía, deberán manifestar y hacer llegar al Veedor con anticipación a la fecha de la Junta Deliberativa su compromiso de participar en el Nuevo Financiamiento sujeto a los términos y condiciones de este Acuerdo de Reorganización, con un monto de $25.000.000.000.- (veinticinco mil millones de pesos).

d.- Los Compromisos de Financiamiento deberán formalizarse mediante un documento vinculante estandarizado, cuyo formato será remitido a cada acreedor por el Veedor, con anterioridad a la Junta Deliberativa, y que deberá ser entregado por el respectivo acreedor al Interventor Concursal hasta el día 20 de agosto del 2020 a las 17 horas. El procedimiento para formalizar este compromiso será informado por el Veedor con anterioridad a la Junta Deliberativa, el que en todo caso deberá ser consistente con el procedimiento descrito en la letra c), del número 1, del **Capítulo VIII** del presente Acuerdo.

e.- Dentro de los 60 días corridos siguientes a la fecha de entrada en vigencia del Acuerdo de Reorganización, se deberá realizar una Junta Extraordinaria de Accionistas, en la que se someterá a consideración de los Accionistas lo siguiente:

i.- Un único aumento de capital, mediante la emisión de nuevas acciones, que permitan dar cumplimiento a lo siguiente:

- Emisión de acciones necesarias para el respaldo de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D;

- Emisión de acciones necesarias para poder otorgar la Opción a los Accionistas; y

- La emisión de acciones de pago por hasta $10.000.000.000.- (diez mil millones de pesos) adicionales, como mecanismo de protección frente a

necesidades de caja, cuyas condiciones (incluyendo su precio de colocación) podrán ser determinadas por el Directorio dentro de los plazos legales (en adelante las "***Acciones de Reserva***"), pudiendo ser destinada una parte de ellas a planes de compensación de trabajadores de la Compañía y sus filiales, en los términos que determine el Directorio (en adelante el "***Stock Option***").

ii.- La emisión de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bonos Convertibles D señalados precedentemente en el presente Acuerdo de Reorganización.

iii.- Todas las demás materias que sea necesario someter a consideración de los Accionistas en la referida Junta, para la correcta implementación del presente Acuerdo.

4.- En todo caso, el número de acciones en que se puedan convertir los Bonos Convertibles A-1, los Bonos Convertibles A-2 y los Bonos Convertibles D incluidos en el presente Acuerdo, serán determinadas para cumplir la condición de que los Accionistas actuales no disminuyan su participación accionaria en Enjoy a un porcentaje menor a un 10% una vez convertidos todos los referidos bonos. Sin embargo, este mínimo de 10% se enmarca exclusivamente en el contexto de la Reorganización Judicial de Enjoy y, por lo tanto, no es aplicable en caso de que Enjoy, concluida la Reorganización, requiera nuevo capital, en cuyo caso, los referidos Accionistas y sus diluciones (si aplican) quedarán sujetas a las condiciones particulares de dicho nuevo aumento de capital o financiamiento.

## XI.  ADMINISTRACIÓN.

La administración de Enjoy, será ejercida por los actuales órganos que establecen sus estatutos, durante la vigencia del presente Acuerdo.

Sin perjuicio de lo señalado y, de conformidad a lo establecido en el artículo 69 de la Ley N° 20.720, se propone que los acreedores en la Junta Deliberativa designen a un Interventor Concursal con las atribuciones que se señalan más adelante y por el plazo previsto en la disposición antes citada. Sus honorarios los fijará la Comisión de Acreedores, que más adelante se regula, en conjunto con la Empresa Deudora.

## XII. RENOVACIÓN DE BOLETAS DE GARANTIAS.

1.- Con el objeto de garantizar ante la Superintendencia de Casinos de Juego el cumplimiento de la oferta técnica; la construcción y desarrollo los proyectos en tiempo y forma en los casinos de Coquimbo, Viña del Mar, Puerto Varas y Pucón y, finalmente, para cumplir íntegramente la oferta económica contenidas en los procesos de licitación que realizó la autoridad reguladora, los bancos Banco BTG Pactual Chile, Banco Internacional y Banco Security emitieron en 2018 Boletas de Garantía por aproximadamente UF4.800.000.- (cuatro millones ochocientas mil Unidades de Fomento), en favor de Casino de la Bahía S.A., Casino del Mar S.A., Casino de Lago

35

S.A., y Casino de Puerto Varas S.A. Parte de dichas Boletas de Garantía se encuentran garantizadas por pólizas de seguro, emitidas por CESCE Chile Aseguradora S.A.

2.- El total de aquellas boletas de garantía -que no se encontraban aseguradas por las pólizas de garantía antes indicadas- y las obligaciones bajo tales pólizas se encontraban, a su turno, garantizadas: (i) Con el aval, fianza solidaria y codeuda solidaria de Enjoy; (ii) Con una hipoteca sobre un inmueble de propiedad de una filial de Enjoy ubicado en la ciudad de Castro; (iii) Con Depósitos a Plazo endosados en garantía por aproximadamente $32.000.000.000.- (treinta y dos mil millones de pesos) tomados por Enjoy en favor de los Bancos, títulos que se encontraban en poder de Banco BTG Pactual Chile, como banco agente del sindicato de bancos y agente de garantías.

3.- Con fecha 14 de julio de 2020, la Administración y los otorgantes de las boletas de garantías antes señaladas, suscribieron nuevos contratos para la renovación de las referidas boletas y pólizas, y acordaron las condiciones para la liberación de los mencionados depósitos en garantía, sujeto al cumplimiento de ciertos hitos, que incluyeron el otorgamiento y posterior inscripción de una hipoteca sobre ciertos inmuebles de propiedad de una filial de Enjoy, ubicados en la comuna de Rinconada de Los Andes, correspondiente a catorce lotes (en conjunto el "**Inmueble Rinconada**").

4.- La liberación de los depósitos en garantía, está sujeta al cumplimiento de las siguientes condiciones:

**a.- Para la liberación de $5.200.000.000.- (cinco mil doscientos millones de pesos)**: Cuando copulativamente se encuentren cumplidas las siguientes condiciones: (i) Se hayan obtenido las autorizaciones de los acreedores de Enjoy en los términos requeridos por el artículo 74 inciso segundo de la Ley N° 20.720, y tratándose de los tenedores de bonos locales, que además, éstos hayan aprobado todas las materias previstas en las letras c) y d) de la citación a junta de tenedores de bonos cuyo primer aviso fue publicado el 27 de junio de 2020, y que debe celebrarse el día 13 de julio a las 12.00 PM; (ii) Se haya suscrito por todas las partes el contrato de hipoteca y prohibiciones sobre el Inmueble Rinconada en favor de Banco BTG Pactual Chile, como agente de garantías junto a toda la Documentación del Préstamo, según este término se define más adelante a satisfacción de los financistas; y (iii) Pago total de la o las primas correspondientes a las pólizas de seguro de garantía. Estas condiciones ya se han cumplido, y por tanto estos depósitos fueron liberados con fecha 14 de julio;

**b.- Para la liberación por $18.600.000.000.- (dieciocho mil seiscientos millones de pesos)**:

i.-     Se liberarán $9.300.000.000.- (nueve mil trescientos millones de pesos) cuando copulativamente se encuentren cumplidas las siguientes condiciones:

• Cuando el Tribunal certifique que el Acuerdo de Reorganización Judicial de la Empresa Deudora se encuentre aprobado según los términos del artículo 89 de la Ley N° 20.720 y que puede ser cumplido y comenzar a regir, en conformidad con el inciso cuarto de dicho artículo.

36

- Que dicho Acuerdo de Reorganización Judicial incorpore y acuerde las siguientes materias: (a) Restructuración total del bono internacional de Enjoy; y (b) Capitalización de al menos un 70% de los créditos valistas verificados en el procedimiento de reorganización, con un mínimo de $115.000.000.000.- (ciento quince mil millones de pesos); y c) Que se hayan incorporado al texto del Acuerdo de Reorganización que se acuerde, declaraciones en orden a confirmar y ratificar expresamente (c.i) todos los otorgamientos de créditos; (c.ii) restructuración de pasivos; y (c.iii) operaciones entre los bancos, Banco BTG Pactual Chile, Banco Internacional y Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos, y sus fondos administrados, incluyendo, sin limitación, a BTG Pactual Deuda Privada Fondo de Inversión, y sus respectivas filiales y demás personas relacionadas, con Enjoy y sus sociedades filiales, en los 2 años anteriores al inicio del Procedimiento de Reorganización Judicial, dejándose constancia en el texto del acuerdo del retiro y renuncia definitiva por los acreedores de toda acción judicial o de otra naturaleza que pretenda impugnar o cuestionar la eficacia y/u oponibilidad de los actos y contratos ejecutados o celebrados a que se refieren los puntos (c.i), (c.ii) y (c.iii) anteriores y que las condiciones indicadas en la letra c) anterior, no hayan sido objeto de impugnación.

En cumplimiento de los términos y condiciones antes señalados, mediante este Acuerdo se confirman y ratifican expresamente las materias a que se refieren los puntos (c.i), (c.ii) y (c.iii) anteriores. Asimismo, mediante este Acuerdo, los Acreedores dejan constancia del retiro y renuncia definitiva de toda acción judicial o de otra naturaleza que pretenda impugnar o cuestionar la eficacia y/u oponibilidad de los actos y contratos ejecutados o celebrados a que se refieren los puntos (c.i), (c.ii) y (c.iii) anteriores.

- Para los efectos de lo anterior y, sin perjuicio que la Junta de Tenedores de Bonos celebrada con fecha 13 de Julio del año en curso, aprobó y ratificó entre otras materias la validación de las operaciones antes señaladas, los acreedores presentes en esta Junta Deliberativa, confirman y ratifican expresamente (i) todos los otorgamientos de créditos; (ii) las reestructuraciones de pasivos; y (iii) las operaciones celebradas o ejecutadas entre los bancos, Banco BTG Pactual Chile, Banco Internacional y Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos, y sus fondos administrados, incluyendo, sin limitación, a BTG Pactual Deuda Privada Fondo de Inversión, y sus respectivas filiales y demás personas relacionadas, con Enjoy y sus sociedades filiales, en los 2 años anteriores al inicio del Procedimiento de Reorganización Judicial, y declararan que renuncian expresamente a ejercer cualquier acción judicial o de otra naturaleza que pretenda impugnar o cuestionar la eficacia y/u oponibilidad de los actos y contratos ejecutados o celebrados a que se refieren los puntos (i), (ii) y (iii) antes referidos o requerir la revocación de los mismos.

37

- Se produzca el desembolso efectivo de al menos $25.000.000.000.- (veinticinco mil millones de pesos) en virtud del Nuevo Financiamiento otorgado a Enjoy, por uno o más acreedores, ingresando efectivamente dicho monto a la caja de la compañía.

ii.- Se liberan $9.300.000.000.- (nueve mil trescientos millones de pesos) cuando copulativamente se encuentren cumplidas las condiciones anteriores y se haya inscrito legalmente en favor del Banco Agente, como acreedor y agente de garantías, la hipoteca específica y prohibiciones constituidas sobre el Inmueble Rinconada, en el Conservador de Bienes Raíces respectivo.

**c.- Para la liberación de $8.300.000.000.- (ocho mil trescientos millones):** Habiéndose cumplido todas y cada una de las condiciones copulativas mencionadas precedentemente en los literales a.- y b.- precedentes, se procederá a: (a) La liberación de $4.150.000.000.- (cuatro mil ciento cincuenta millones de pesos), contra el ingreso efectivo a la caja de Enjoy de al menos otros $10.000.000.000.- (diez mil millones de pesos) adicionales a los $25.000.000.000.- (veinticinco mil millones de pesos) referidos precedentemente; (b) La liberación de $4.150.000.000.- (cuatro mil ciento cincuenta millones de pesos), contra el ingreso efectivo a la caja de Enjoy de al menos otros $5.000.000.000.- (cinco mil millones de pesos), adicionales a los $25.000.000.000.- (veinticinco mil millones de pesos) y $10.000.000.000.- (diez mil millones de pesos) mencionados anteriormente.

**d.- Para la liberación de la hipoteca y prohibiciones sobre Inmueble Rinconada:** Se podrá liberar sólo a partir del mes 18 contado desde la fecha de emisión de las respectivas boletas de garantía y/o pólizas, sujeto a ciertas condiciones que se indican en los respectivos documentos del financiamiento suscritos con ocasión de la emisión de las nuevas boletas de garantía, incluyendo que la sentencia que apruebe el Acuerdo de Reorganización Judicial se encuentre firme y ejecutoriada.

## XIII. OBLIGACIONES DE HACER Y NO HACER.

Según lo señalado en el **Capítulo IV**, se mantendrán las obligaciones de hacer y de no hacer para con los Tenedores de Bonos Internacionales contenidas en el **Indenture** -con los cambios descritos en el **Anexo N° 1** respecto de los Nuevos Bonos Internacionales. Por su parte, se establecen exclusivamente las siguientes obligaciones de hacer y no hacer para con el resto de los Acreedores afectos al presente Acuerdo:

1.- **Obligaciones de Hacer.**

a.- Realizar o hacer que se realice todo lo necesario para preservar y mantener en pleno vigor y efecto su existencia societaria y validez, sin alterar su forma societaria, lo que incluye su carácter de sociedad anónima abierta, inscrita en el Registro de Valores que lleva para estos efectos la CMF y, además, incluyendo, sin carácter limitativo, su disolución o transformación, y sin incurrir en causas legales de disolución; como asimismo, preservar y mantener todos aquellos derechos, propiedades, licencias, marcas, permisos, franquicias, servidumbres, concesiones o patentes que sean necesarios para el normal funcionamiento de

38

la Empresa Deudora y el desarrollo de su giro; y mantener todos sus activos relevantes en buen estado de conservación conforme a su natural uso y desgaste.

b.- Pagar todos los impuestos y otras obligaciones tributarias aplicables, como asimismo aquellas de origen laboral u otras preferentes de acuerdo a la legislación vigente, salvo aquéllas que sean impugnadas de buena fe y conforme a los procedimientos legales apropiados.

c.- Cumplir en todos los aspectos con las leyes, reglamentos y disposiciones y órdenes aplicables, incluyéndose especialmente en dicho cumplimiento, sin limitaciones, el pago oportuno de todos los impuestos, contribuciones, gravámenes y cargas fiscales o de otro tipo que afecten a la Empresa Deudora o a sus bienes, y dar oportuno cumplimiento a las obligaciones tributarias, laborales, previsionales y medioambientales a que pudiere estar afecta, si corresponde, salvo aquellas respecto de las cuales se hayan presentado de buena fe los recursos legales apropiados.

d.- Proporcionar al Interventor Concursal toda la información financiera y/o contable adicional, que sea solicitada por el mismo.

e.- Asegurar que, en cualquier tiempo, sus obligaciones bajo el presente Acuerdo de Reorganización tengan, al menos, la misma prelación y prioridad de pago bajo la ley que sus restantes obligaciones de pago, actuales o futuras, con otros acreedores de la misma clase, de acuerdo con la ley. Lo anterior es sin perjuicio de las preferencias establecidas en el presente Acuerdo de Reorganización.

f.- Realizar, suscribir, ejecutar y celebrar todos los actos y contratos para dar íntegro cumplimiento al Acuerdo de Reorganización, que le requiera el Interventor Concursal, mientras éste se encuentre vigente.

2.- **Obligaciones de No Hacer**.

a.- Otorgar préstamos o créditos o cualquier clase de financiamiento a terceros, excluyendo filiales, salvo que se trate de financiamiento dentro del giro ordinario del negocio del Emisor el que en todo caso deberá siempre realizarse en condiciones de mercado.

b.- Efectuar operaciones con partes relacionadas sin dar cumplimiento a lo dispuesto en el Título XVI de la Ley de Sociedades Anónimas. Para todos los efectos, se entenderá por "operaciones con partes relacionadas" a las definidas como tales en el artículo ciento cuarenta y seis de la Ley de Sociedades Anónimas, o aquél que lo modifique o reemplace en el futuro.

c.- A partir de la fecha de la Junta Deliberativa que apruebe la Propuesta constituirse en aval, fiador, codeudor solidario, o comprometer su patrimonio por obligaciones de terceros, salvo que dichos terceros fueren filiales del Emisor.

39

## XIV. APROBACIÓN Y VIGENCIA DEL ACUERDO.

1.- De conformidad a lo previsto en el art. 89 de la Ley N° 20.720, el presente Acuerdo se entenderá aprobado y entrará a regir desde que:

a.- Una vez vencido el plazo para impugnarlo, sin que se hubiere impugnado, el tribunal competente lo declare así de oficio o a petición de cualquier interesado o del Veedor.

b.- Si se hubiere impugnado y las impugnaciones fueren desechadas, desde que cause ejecutoria la resolución que deseche la o las impugnaciones y declare aprobado el Acuerdo.

c.- Si se hubiere impugnado y las impugnaciones fueren interpuestas por acreedores de una determinada clase o categoría, que representen menos del 30% del pasivo con derecho a voto de su respectiva clase o categoría y el tribunal así lo declare.

2.- El Acuerdo de Reorganización tendrá vigencia hasta la última de las siguientes fechas: (i) lo primero que ocurra entre: (a) la fecha de término del período de conversión de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y de los Bono Convertible D o (b) la fecha en que se hayan convertido la totalidad de los Bonos Convertibles A-1, de los Bonos Convertibles A-2 y los Bonos Convertibles D, para el caso de que este último evento ocurra con anterioridad al término del referido período de conversión y (ii) la fecha en que ocurra el intercambio de los Bonos Internacionales por los Nuevos Bonos Internacionales.

## XV. COMISIÓN DE ACREEDORES.

1.- Para supervigilar el cumplimiento de las estipulaciones del Acuerdo de Reorganización Judicial y la actuación de los Órganos de Administración de la Compañía, se designa a una Comisión de Acreedores -no remunerada, salvo la excepción que se indica más adelante- integrada por cinco miembros titulares y sus respectivos suplentes (uno por cada miembro titular de la Comisión de Acreedores), que ejercerá sus funciones mientras se encuentre vigente el presente Acuerdo. La Comisión de Acreedores estará compuesta por dos representantes de los Tenedores de Bonos Internacionales, dos representantes de los tenedores de bonos nacionales y un quinto miembro no acreedor ni representante de un acreedor y su respectivo suplente, que será elegido por los restantes miembros de la Comisión de Acreedores en su primera sesión, en la que además podrán determinarle una remuneración. Cada acreedor de los recién mencionados tendrá el derecho de remover a su representante en la Comisión de Acreedores y designar su reemplazo. Los cuatro miembros titulares y suplentes de la Comisión de Acreedores que serán representantes de los acreedores serán elegidos en la Junta de Acreedores, respectivamente, por los Tenedores de Bonos Internacionales (dos miembros titulares y dos suplentes) y los tenedores de bonos nacionales (dos miembros titulares y dos miembros suplentes). Se deja constancia que ni la repactación de los Tenedores de Bonos Internacionales ni la reprogramación de los Acreedores Valistas implicarán un cambio o actualización de los integrantes de la Comisión de Acreedores.

2.- Los miembros de la Comisión de Acreedores tendrán la obligación de mantener en absoluta reserva toda información que, por la naturaleza de su contenido, tenga el carácter de

40

confidencial, debiendo abstenerse de divulgarla a terceros. Para estos efectos, deberán suscribir un Acuerdo de Confidencialidad que contenga la obligación antes señalada.

3.- El Directorio de Enjoy S.A. se ha comprometido a adoptar las medidas que, dentro del marco de las disposiciones de la Ley sobre Sociedades Anónimas, le permitan a tres (3) representantes de la Comisión de Acreedores conformada por representantes de los tenedores de bonos internacionales y los tenedores de bonos locales de Enjoy, para que sean invitados a las sesiones del Directorio en que se traten las materias atingentes a la implementación y cumplimiento del Acuerdo de Reorganización, con el fin de que exista una adecuada coordinación entre las materias que son sometidas a conocimiento y aprobación del Directorio, por una parte, y, por la otra, el cumplimiento del Acuerdo de Reorganización y las facultades de la Comisión de Acreedores. Para lo anterior, los miembros de la Comisión de Acreedores deberán otorgar en forma previa un acuerdo de confidencialidad que asegure la debida reserva de la información de la Compañía a la que pudieran acceder.

4.- La Comisión de Acreedores fijará su forma funcionamiento y determinará la periodicidad de sus reuniones. Habrá miembros titulares y suplentes. Con todo, la administración de la Empresa Deudora o el Interventor Concursal, en su caso, podrán requerir que la Comisión de Acreedores se reúna para conocer y resolver materias específicas. Para estos efectos, se despachará carta certificada al domicilio del representante legal de los respectivos miembros de la Comisión de Acreedores o a sus correos electrónicos (registrado en la primera sesión constitutiva de esta Comisión), con a lo menos dos días hábiles bancarios de antelación, requiriendo la reunión, con indicación de la materia a consultar o discutir. Las citaciones consecutivas deberán tener, a lo menos, dos días hábiles bancarios de diferencia entre la primera y segunda citación. Si a requerimiento de éstos, la Comisión de Acreedores no se reúne habiendo mediado dos citaciones consecutivas, se solicitará las autorizaciones que corresponda al Tribunal competente.

5.- Respecto a los quórums para sesionar y mayorías para adoptar acuerdos, la Comisión de Acreedores sesionará con la participación de la mayoría simple de sus miembros (a lo menos 3), y los acuerdos se adoptarán por mayoría simple de sus miembros asistentes a la respectiva sesión (a lo menos 2), salvo en lo que respecta a las Condiciones de Repactación, las Condiciones para la Reprogramación y/o la Condición de Financiamiento o a las materias indicadas en el numeral 7.g y 7.j siguiente, para lo cual se requerirá de un quórum de asistencia de a lo menos 4 (cuatro) de sus miembros y una mayoría de a lo menos 4 de los asistentes para adoptar acuerdos.

6.- La Comisión de Acreedores designará a un Presidente de la misma, que tendrá las siguientes facultades:

a.- Citar a reunión a los miembros de la Comisión de Acreedores, a requerimiento de cualquier miembro de la Comisión; del Interventor Concursal o de la Empresa Deudora.

b.- Citar a Junta de Acreedores en todos los casos que la Comisión de Acreedores lo estime necesario o conveniente.

c.- Comunicar a la Empresa Deudora las decisiones adoptadas por la Comisión de Acreedores.

7.- La Comisión de Acreedores tendrá las siguientes facultades:

a.- Remover y reemplazar al Interventor y requerir de él la información y gestiones que estime pertinentes.

b.- Fijar los honorarios del Interventor en cuanto a sus actividades de intervención propiamente tal. Dichos honorarios deberán ajustarse a la remuneración corriente del mercado, de acuerdo con la complejidad y responsabilidad del cargo y capacidad de pago de la Compañía.

c.- Tomar conocimiento de los antecedentes que le proporcione el Interventor, en especial, de la cuenta de su gestión, cuya periodicidad será determinada por la Comisión de Acreedores.

d.- Proveer las autorizaciones establecidas en el presente Acuerdo de Reorganización.

e.- Reemplazar al Presidente y/o Vicepresidente de la Comisión de Acreedores.

f.- Solicitar a la Empresa Deudora por intermedio del Interventor, la información del giro y sus planes y programas de operación.

g.- De conformidad al inciso segundo del art. 83 de la Ley N° 20.720, la Comisión de Acreedores podrá modificar todo o parte del contenido del Acuerdo de Reorganización, salvo lo referente a la calidad de acreedor, su clase o categoría, diferencias entre acreedores de igual clase o categoría, monto de sus créditos y su preferencia. Se deja constancia que, cualquier modificación a los derechos de los Tenedores de Bonos Internacionales bajo el Indenture o el Nuevo Indenture requerirá de la modificación de dicho contrato, según corresponda, con el acuerdo previo de la Compañía y de los Tenedores de Bonos Internacionales bajo las reglas del Indenture o Nuevo Indenture.

h.- Autorizar excepcionalmente a Enjoy a no cumplir una determinada, obligación de hacer y/o de no hacer del presente Acuerdo de Reorganización.

i.- En representación de los acreedores, renunciar fundadamente al cumplimiento de cualquiera de las condiciones establecidas en su beneficio en el Acuerdo (sujeto al respectivo quórum fijado en este Acuerdo), o acordar su cumplimiento en una forma distinta a la originalmente contemplada o suspender su aplicación en forma temporal.

j.- En el evento que no se cumplan las *Condiciones de Repactación* previstas en el **Capítulo IV**, o bien las Condiciones de Financiamiento contenidas en el **Capítulo VIII** del presente Acuerdo de Reorganización, la Comisión de Acreedores analizará y determinará un mecanismo que permita implementar la repactación de los Bonos Internacionales en los

42

términos previstos en el referido **Capítulo IV** o bien, en su caso, acordará la fórmula adecuada para la obtención de un financiamiento transitorio, pudiendo acordar con la Empresa deudora los plazos y demás condiciones de este financiamiento. Estas materias deberán ser acordadas por a lo menos 4 miembros de la Comisión quienes, además, determinarán los plazos para dar cumplimiento a la ejecución de los actos y contratos que sean necesarios para implementar y desarrollar las referidas operacionesde Acreedores.

k.- Aprobar Plan de Uso de Fondos del Nuevo Financiamiento en general, quedando la atribución y responsabilidad específica de su implementación en la Empresa Deudora, cuyo cumplimiento será supervisado por el Interventor

l.- Las demás facultades que el presente Acuerdo le otorgue.

m.- Asistir a las sesiones de directorio de Enjoy en los términos del N° 3 de este Capítulo XV.

## XVI. INTERVENTOR CONCURSAL.

1.- Sin perjuicio de la conformación de una Comisión de Acreedores, y de conformidad a lo establecido en el artículo 69 de la Ley N° 20.720, se propone que en la Junta Deliberativa de Acreedores se designe un Interventor (en adelante, el "*Interventor Concursal*" o el "*Interventor*"), que ejercerá sus funciones mientras se encuentre vigente el presente Acuerdo, quien tendrá las facultades establecidas en el citado artículo y las que más adelante se señalan.

2.- Esta designación deberá recaer en un veedor vigente de la Nómina de Veedores registrada en la Superintendencia de Insolvencia y Reemprendimiento.

3.- Sin perjuicio de las facultades que le corresponden de acuerdo al artículo 294 del Código de Procedimiento Civil, se propone que el Interventor Concursal designado tenga las siguientes facultades:

a.- Tener acceso a las oficinas e instalaciones de la Empresa Deudora para solicitar toda la información contable, financiera y comercial de esta, a fin de verificar o controlar el debido cumplimiento de las obligaciones contraídas en el presente Acuerdo de Reorganización.

b.- Informar a la Comisión de Acreedores de cualquier antecedente u operación que realice la Empresa Deudora y que pueda afectar el normal servicio de la deuda afecta al presente Acuerdo.

c.- Informar regularmente (a lo menos mensualmente) a la Comisión de Acreedores sobre los ingresos y gastos de la Empresa Deudora y en especial, sobre la eficiencia y gastos operacionales y pago de proveedores.

d.- Confeccionar actas de las reuniones de la Comisión.

e.- Aprobar todos los pagos que se realicen para el servicio de la deuda.

43

f.- Realizar una comprobación acerca del saldo de los créditos afectos al presente Acuerdo de Reorganización y determinar la procedencia de los pagos.

g.- Autorizar a la Empresa Deudora a otorgar garantías personales o reales para caucionar obligaciones propias y/o de terceros, en casos distintos a los ya permitidos mediante el presente Acuerdo, cuando éstas se encuentren ligadas al giro de la Compañía.

h.- Cumplir y ejecutar todas las facultades y obligaciones establecidas en el presente Acuerdo de Reorganización y aquellas que encomiende la Comisión de Acreedores.

i.- Informar regularmente (a lo menos mensualmente) a la Comisión de Acreedores sobre el uso de los fondos provenientes del Crédito Puente.

j.- Las demás facultades que se le otorgan en el presente Acuerdo de Reorganización.

# XVII. INCUMPLIMIENTO.

1.- De conformidad con lo dispuesto en los artículos 98 y siguientes de la Ley N° 20.720, cualquier acreedor al que le afecte este Acuerdo podrá solicitar la declaración de incumplimiento, en caso de inobservancia de las estipulaciones del presente Acuerdo, y/o en caso de que se hubiere agravado el mal estado de los negocios de la Empresa Deudora en forma que haga temer un perjuicio para dichos acreedores.

2.- Será una causal expresa de incumplimiento del Acuerdo de Reorganización, en caso de que los Compromisos de Financiamiento no superen los $25.000.000.000.- (veinticinco mil millones de pesos). De ocurrir dicho incumplimiento, Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

3.- Será una causal expresa de incumplimiento (y un "*Bankruptcy Law Evento of Default*" bajo el Nuevo Indenture) uno cualquiera de los siguientes eventos: (i) que no se realice la junta extraordinaria de accionistas de aumento de capital señala en el **Capítulo X** anterior dentro de los 60 días siguientes a la fecha de la Junta Deliberativa; (ii) que en la junta extraordinaria de accionistas antes señalada no se aprueben todas las materias propuestas; (iii) que Enjoy no suscriba cada uno de los contratos de emisión de bonos dentro de los 90 días siguientes a la fecha de la de la Junta Deliberativa; (iv) que Enjoy no solicite a la CMF la inscripción en el Registro de Valores de los respectivos bonos dentro de los 120 días siguientes a la fecha de la Junta Deliberativa; (v) que Enjoy no obtenga de la CMF la inscripción de los respectivos bonos en el Registro de Valores dentro del plazo de un año contado desde la fecha de la Junta Deliberativa; (vi) que Enjoy no dé inicio al Período de Oferta Preferente dentro de los 30 días hábiles siguientes a la a la última fecha en que se efectúe la inscripción en el Registro de Valores de la CMF de las emisiones de bonos convertibles y de las acciones; y (vii) que Enjoy no efectúe los prepagos con los respectivos bonos en las fechas establecidas en este Acuerdo. De ocurrir cualquiera de los eventos anteriormente descritos, Enjoy deberá solicitar inmediatamente su propia liquidación voluntaria.

44

4.- Por otra parte, los Acreedores también podrán individualmente ejercer todas las acciones que les confiere la ley para obtener el pago íntegro de sus créditos, todo ello dentro del marco del presente Acuerdo de Reorganización, salvo en el caso de las acciones de los Tenedores de Bonos Internacionales bajo el Indenture, que se ejercerán libremente sin sujeción a este Acuerdo conforme se explica en los Capítulos IV y XVIII.

## XVIII. GARANTÍAS.

Se ratifican las obligaciones de Enjoy contenidas en el **Indenture** y en los **Bonos Internacionales**, y por tanto se mantienen, ratifican y reservan, expresamente y en todas sus partes, las Garantías reales y personales establecidas en estos documentos para garantizar el pago de las obligaciones del Indenture, incluyendo, sin limitación, durante la Prórroga de los Bonos Internacionales. Asimismo, dichas Garantías reales y personales garantizarán todas las obligaciones de Enjoy bajo los Nuevos Instrumentos, debiendo otorgarse los documentos que pudieran ser requeridos bajo ley chilena y uruguaya para la debida reserva, ratificación y mantención de las mismas, o bien, para la creación de nuevas garantías en términos sustancialmente idénticos a las actuales.

Por el presente acto, o bien, mediante Escritura Pública de Declaración (en adelante la "*Escritura de Declaración*") acompañada al 8° Juzgado Civil de Santiago, en la causa rol C-6.689-2020, con anterioridad a la celebración de la Junta Deliberativa, Enjoy Gestión Limitada., Inversiones Enjoy SpA, Inversiones Inmobiliarias Enjoy SpA., Enjoy Consultora S.A., Inversiones Andes Entretención Limitada., Inmobiliaria Proyecto Integral Coquimbo SpA, Operaciones Integrales Coquimbo Limitada, Inmobiliaria Kuden SpA, Campos del Norte S.A., Enjoy Caribe SpA, Inmobiliaria Proyecto Integral Castro SpA, Slots S.A., Masterline S.A., Kuden S.A., Operaciones Turísticas S.A., Operaciones Integrales Isla Grande S.A., Rantrur S.A., Casino de Iquique S.A., Casino de la Bahía S.A., Casino del Mar S.A., Casino del Lago S.A., Casino de Puerto Varas S.A., Yojne S.A. y Baluma S.A. (en adelante conjuntamente los "*Garantes*"), representadas por sus apoderados señores Esteban Rigo-Righi Baillie RUT Nº13.454.480-5 y Rodrigo Larraín Kaplan RUT Nº 10.973.139-0, comparecen y declaran expresamente que acceden a las obligaciones de Enjoy bajo el Indenture, este Acuerdo y los Nuevos Instrumentos, y declaran expresamente que las prendas, hipotecas, fideicomisos y codeudas solidarias constituidas por ellos en los términos señalados en el Indenture, según corresponda, se extenderán también a las obligaciones de la Empresa Deudora bajo el Indenture, este Acuerdo y los Nuevos Instrumentos, en los términos señalados en el presente Acuerdo.

Adicionalmente, por el presente acto o mediante la Escritura de Declaración, Inmobiliaria Proyecto Integral Coquimbo SpA e Inmobiliaria Kuden SpA, representadas por sus apoderados señores Esteban Rigo-Righi Baillie y Rodrigo Larraín comparecen y declaran que accederán expresamente a las nuevas obligaciones de Enjoy bajo el Indenture, este Acuerdo y los Nuevos Instrumentos aquí acordadas. Asimismo, para los efectos del artículo 1.642 del Código Civil, Inmobiliaria Proyecto Integral Coquimbo SpA, Inmobiliaria Kuden SpA, la Empresa Deudora, todos ellos representados por sus apoderados señores Esteban Rigo-Righi Baillie y Rodrigo Larraín Kaplan y los Tenedores de Bonos Internacionales convienen expresamente en la reserva de las hipotecas constituidas por Inmobiliaria Coquimbo SpA e Inmobiliaria Kuden SpA, en beneficio de los Tenedores de Bonos Internacionales.

45

Para ausencia de dudas, las Garantías reales y personales que garantizan las obligaciones de Enjoy bajo el Indenture y los Bonos Internacionales, reservadas y ratificadas en este acto o mediante la Escritura de Declaración, se extienden y acceden al pago total de la deuda de Enjoy con los Tenedores de Bonos Internacionales, sea en virtud de este Acuerdo, los actuales Bonos Internacionales, del Indenture y sus *Security Documents*, o bien del Nuevo Indenture y los Nuevos Bonos Internacionales en el evento que el intercambio previsto en el **Capítulo IV** se lleve a efecto, extendiéndose en todos los casos a las sucesivas prórrogas, repactaciones o novaciones de dichos créditos, lo que es expresamente aceptado por los Garantes comparecientes.

Los Garantes, representados en la forma antes señalada, se obligan a suscribir todos los actos, contratos y documentos que sean necesarios o convenientes para la implementación del presente Acuerdo de Reorganización, incluyendo, en o antes del intercambio de los Bonos Internacionales por los Nuevos Instrumentos y como condición de dicho intercambio, el otorgamiento de escrituras públicas de reserva y ratificación de las Garantías, y el otorgamiento de las correspondientes autorizaciones corporativas, a satisfacción del Trustee de los Bonos Internacionales.

En el evento que el Trustee de los Bonos Internacionales considere que, para cualquiera de las Garantías, es más beneficioso para los Tenedores de Bonos Internacionales el otorgamiento de nuevos contratos de garantías que recaigan sobre los mismos bienes, muebles o inmuebles, en lugar de la ratificación y reserva de las existentes, los Garantes suscribirán todos los actos, contratos y documentos que sean necesarios o convenientes para la implementación de esas nuevas garantías, en términos sustancialmente iguales a las Garantías actuales, y la condición de intercambio se entenderá cumplida al otorgarse las nuevas garantías a satisfacción del Trustee de los Bonos Internacionales.

## XIX. FORMALIDAD Y OTRAS ESTIPULACIONES.

1.- Según lo establece el artículo 90 de la Ley N° 20.720, una copia del acta de la Junta de Acreedores en la que conste el voto favorable del Acuerdo y su texto íntegro, junto con la copia de la resolución judicial que lo aprueba y su certificado de ejecutoria, podrá ser autorizado por un ministro de fe o protocolizarse ante un notario público. Sin perjuicio de lo anterior, la Empresa Deudora estará obligada a suscribir los nuevos títulos que documenten los términos del presente Acuerdo.

2.- El presente Acuerdo de Reorganización debidamente aprobado tendrá el efecto de poner término inmediato a todos los juicios pendientes o de precaver la interposición de acciones de diversa índole, ya sea civiles, comerciales y otros, incluidos pero no limitados a juicios de notificación de cobro de facturas, juicios de notificación de protesto de cheque, querellas por giro doloso de cheque y/o juicios ejecutivos por cualquier título, que se sigan en contra de la Empresa Deudora o sus codeudores solidarios, avalistas o fiadores, iniciados por acreedores a quienes el presente Acuerdo de Reorganización afecte en los términos del artículo 66 de la Ley N° 20.720.

3.- Para estos efectos una copia autorizada de la resolución que tenga por aprobado el Acuerdo de Reorganización servirá como atento y suficiente oficio remisor para requerir al Tribunal

46

correspondiente que disponga el término del juicio y el alzamiento de embargos, medidas precautorias y cualquier gravamen de diversa índole. Todo lo anterior es sin perjuicio de la instrucción directa que al efecto envíe el Tribunal llamado a conocer de la presente Propuesta mediante medios electrónicos de interconexión, donde se requiera el término de los procedimientos y los respectivos alzamientos.

El mismo efecto señalado en los párrafos anteriores, tendrá el Acuerdo que comience a regir, no obstante ser impugnado por acreedores que representen menos del 30% del pasivo con derecho a voto de su respectiva clase o categoría, según lo dispuesto en el inciso cuarto del artículo 89 de la Ley N° 20.720. Para efectos de determinar el porcentaje señalado anteriormente, será necesaria una certificación que realice la Secretaría de este Tribunal.

4.- Los acreedores de la Empresa Deudora que hayan publicado sus acreencias morosas en los respectivos registros que mantengan diversas instituciones, ya sea públicos o privados, tales como DICOM EQUIFAX, Boletín Comercial dependiente de la Cámara de Comercio de Chile, registro de morosidad de la Comisión para el Mercado Financiero, y en general cualquier registro de morosidades existente en nuestro País, autorizan por este acto a la Empresa Deudora a solicitar la eliminación de todas las anotaciones de morosidades y en general cualquier publicación relacionada al efecto, que tengan relación con acreencias anteriores a la Resolución de Reorganización y aquellas posteriores sobre créditos previamente devengados.

Asimismo, los acreedores por este acto se comprometen a no requerir nuevas publicaciones respectos a los créditos que forman parte del presente Acuerdo de Reorganización, mientras la Empresa Deudora se encuentre al día en el cumplimiento de sus obligaciones bajo este Acuerdo.

Los antecedentes señalados en el numeral primero del presente Capítulo servirán como atento y suficiente oficio remisor para efectos de requerir la eliminación de las publicaciones y publicaciones referidas precedentemente.

5.- Los acreedores y la Empresa Deudora dejan constancia que con posterioridad al cumplimiento de la Condición de Financiamiento no será aplicable la prohibición establecida en el artículo 67 de la Ley N° 20.720, sin perjuicio de la restricción contractual para efectuar disminuciones de capital conforme a los términos del Nuevo Indenture.

## XX. DECLARACIONES Y SEGURIDADES A LA FECHA DE ESTE ACUERDO DE REORGANIZACIÓN JUDICIAL.

La Empresa Deudora debidamente representada en la forma indicada en la comparecencia de este instrumento, a esta fecha, declara y asegura lo siguiente a cada Acreedor de este Acuerdo de Reorganización Judicial:

1.- Que es una sociedad válidamente constituida y vigente bajo las leyes de Chile y que, tanto la celebración de este Acuerdo de Reorganización Judicial, como el cumplimiento y ejecución de todas las obligaciones en él contenidas, se encuentran dentro de sus facultades legales y societarias y que han sido aprobadas por sus órganos de administración competentes; y que quienes comparecen en este Acuerdo de Reorganización Judicial en su representación tienen los poderes y

autoridades suficientes para celebrar este Acuerdo de Reorganización y cumplir las obligaciones contraídas en el mismo.

2.- Que la celebración de este Acuerdo de Reorganización Judicial no requiere de la aprobación o autorización de autoridad gubernamental o judicial adicional ninguna, ni de terceros, salvo aquéllas ya obtenidas y que permanecen en vigencia, y que no tiene información ni conocimiento que la celebración y el cumplimiento de este Acuerdo de Reorganización Judicial viola ni contraviene la legislación, normativa o resoluciones actualmente vigentes, ni sus respectivos estatutos. Lo anterior es sin perjuicio de las aprobaciones y/o autorizaciones y/o procedimientos que puedan ser requeridos con motivo de la implementación del presente Acuerdo, conforme a /i/ los estatutos de Enjoy; /ii/ la Ley N° 18.046 sobre Sociedades Anónimas y su Reglamento; /iii/ la Ley N° 18.045 sobre Mercado de Valores, y normativa relacionada dictada por la Comisión para el Mercado Financiero, /iv/ el DL 211 que fija las normas para la defensa de la Libre Competencia; /v/ la Ley N° 19.995 que establece las bases generales para la autorización, funcionamiento y fiscalización de Casinos de Juego; /vi/ las regulaciones emitidas por la Superintendencia de Casinos de Juego; y /vii/ la normativa y legislación que sea aplicable de Uruguay y Argentina.

3.- Que el presente instrumento constituye documentación legal, válida, exigible, con mérito ejecutivo, obligatoria y suficiente para su cobro, y que en cualquier gestión de cobro de las obligaciones de que da cuenta este Acuerdo de Reorganización Judicial, reconocerá este instrumento como título suficiente para el cobro de las mismas.

4.- Ninguna renuncia a cualquier disposición de este Acuerdo de Reorganización Judicial, ni el consentimiento para que la Empresa Deudora actúe en forma diferente a ellos, tendrá efecto alguno a menos que haya sido otorgada por escrito y suscrita por la Comisión de Acreedores en este Acuerdo de Reorganización Judicial, y en tal caso esa renuncia o consentimiento tendrá efecto solamente en el caso específico y para el objeto específico para el cual se haya otorgado. En todo caso, toda modificación de este Acuerdo de Reorganización Judicial deberá ceñirse y respetar, en todo lo que fuere aplicable, las estipulaciones contenidas en este instrumento.

5.- Lo dispuesto en este Acuerdo de Reorganización Judicial será obligatorio para la Empresa Deudora y los acreedores afectos a este Acuerdo, y sus respectivos sucesores legales y cesionarios.

6.- Las denominaciones asignadas a las distintas estipulaciones de este Acuerdo de Reorganización Judicial han sido establecidas sólo para referencia y facilidad de su lectura, sin afectar el significado o alcance que la cláusula en su integridad pueda tener y que puedan ser distintos que dicha denominación.

## XXI. DOMICILIO Y JURISDICCIÓN COMPETENTE.

El domicilio especial del Acuerdo será la ciudad de Santiago, por lo que se someterá a la competencia de sus tribunales ordinarios para conocer sobre cualquier dificultad que se suscite en cualquiera de las clases o categorías del presente Acuerdo, sin excluir la posibilidad de que los

Tenedores de Bonos Internacionales recurran para el cumplimiento del Indenture a las jurisdicciones que correspondan bajo ese contrato.

**<u>Exhibit B</u>**

**Redline**

Presentation version 8/8

<u>JUDICIAL REORGANIZATION AGREEMENT</u>

<u>ENJOY S.A.</u>

## I.    BACKGROUND INFORMATION ON THE PETITIONING DEBTOR COMPANY

**1.- Corporate name:**         ENJOY S.A.

**2.- R.U.T.:**                 96.970.380-7.

**3.- Domicile:**               Avenida Presidente Riesco N° 5.711, piso 15, comuna de Las Condes, Metropolitan Region.

**4.- Organization:**           Organized pursuant to a public instrument dated October 23, 2001. On June 9, 2009, the Company was registered with the Securities Registry of the Chilean Financial Market Commission (*Comisión para el Mercado Financiero*) (CMF) under No. 1033.

## II.    CREDITORS ENROLLED IN THE REORGANIZATION AGREEMENT.

For purposes of this Judicial Reorganization Agreement, creditors (hereinafter, indiscriminately, the "*Creditors*") shall be considered all holders of direct loans against **ENJOY S.A.** (hereinafter, indiscriminately, "*Enjoy*," the "*Debtor Company*" or the "*Company*"), which originated prior to the Reorganization Resolution, pursuant to Article 66 of Law 20,720. Loans originating after the Reorganization Resolution shall be repaid in accordance with the agreed-upon terms and tenors.

Pursuant to Article 61 of the aforementioned bankruptcy law, this Judicial Reorganization Agreement (hereinafter, indiscriminately, "*Reorganization Agreement*," "*Agreement*" or the "*Proposal*") contains a restructuring and repayment proposal for secured creditors, which corresponds to International Bondholders (as said term is defined further below), a restructuring and payment proposal for unsecured creditors, excluding creditors that are related companies belonging to the Enjoy S.A. group of companies (hereinafter the "*Unsecured Creditors*"), a special repayment proposal for bank creditors (hereinafter the "*Bank Creditors*") and a special repayment proposal for unsecured creditors participating as suppliers to Enjoy of goods and services (hereinafter the "*Suppliers*") as these terms are defined in the following chapters.

Pursuant to Article 63 of Law No. 20,720, loans held by related companies belonging to the group of Enjoy S.A. subsidiary companies will be subject to postponed repayment, until expiration of this Reorganization Agreement. Nevertheless, all payments may be made to related companies that correspond to Enjoy's normal operational activities with its subsidiaries.

4

Presentation version 8/8

## III.  DEVELOPMENT OF THE PURPOSE OF THE AGREEMENT.

The Reorganization Agreement shall have the following purpose and content:

1.- The effective and total continuation of the ongoing commercial activities of **ENJOY S.A.,** as from the date of presentation of this Proposal, with a view to fulfilling payment conditions consistent with projected cash flows, recovering the Company's operating levels and providing for the payment of its obligations.

2.- The granting of new conditions for the repayment of all loans enrolled in the Reorganization Agreement under the conditions set forth in this instrument;

3.- A reduction in the Company's debt level, through conversion of at least 70% of the unsecured debt consisting of bonds convertible to Enjoy shares, with a strong incentive for conversion.

4.- Obtaining fresh funds for the Company totaling approximately $50,000,000,000 (fifty billion Chilean pesos),[1] through the granting of loans to be prepaid through the issuance of a bond convertible to shares of Enjoy, with a strong incentive for conversion.

## IV.  PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO SECURED CREDITORS.

---

[1] Hereinafter, all references to figures in pesos refer to Chilean pesos.

5

Presentation version 8/8

Guaranteed creditors are holders of debt issued under the instrument referred to as the "Indenture," dated May 16, 2017, supplemented by the instrument known as "Supplemental Indenture No. 1" dated May 30, 2017, entered into between the Company, as issuer, its guarantor subsidiaries ("**Guarantors**") and Citibank N.A. as International Bondholders Representative or Trustee[2] (hereinafter the "**Indenture**"), concerning the guaranteed bonds maturing in 2022 (10.50% Senior Secured Notes due to 2022) placed by the Company in the international markets under US Securities and Exchange Commission Rule 144A and Regulation S and the US Securities Act of 1933 (hereinafter the "**International Bonds**," with their holders or final beneficiaries being the "**International Bondholders**"[3])

As explained further below, under the Agreement the International Bonds will be extended and, subject to the Renegotiation Conditions (as this term is defined further below), renegotiated without intent to substitute, with said renegotiation reflected in a new Indenture, new bonds, and the guarantee documents needed in order to extend, ratify and reserve the International Bonds' current guarantees to the extended and restructured debt (hereinafter, the "**New Indenture**" and the "**New International Bonds**" and, together, the "**New Instruments**").

## 1.- Extension.

The due dates of the loans under this **Chapter IV** will be extended for a maximum of 90 days after the date of the Deliberative Meeting [*Junta Deliberativa*] of Creditors, convened to hear and decide on the Proposal (hereinafter the "**Deliberative Meeting**"), unless it becomes certain prior to said deadline that the Renegotiation Conditions (as this term is defined further below) will not be fulfilled, in which case the extension period will expire on the day that said conditions failed (the "**Extension of the International Bonds**"), unless the Creditors Commission resolves to maintain the Extension of the International Bonds as provided for in **Chapter XV** of this Agreement.

Until such time as the Renegotiation Conditions are met, the International Bonds shall remain current in accordance with their original terms (including interest accrued after the request for reorganization); non-compliance events and rights and actions existing under the Indenture due to existing non-compliance events shall not be waived; and current real and personal guarantees of the International Bonds (hereinafter the "**Guarantees**" shall remain in full force and effect. So long as the International Bonds Extension is current, the above is without prejudice to International Bondholders' committing not to individually or collectively file any enforcement proceeding whatsoever, as long as the Renegotiation Conditions are pending.

## 2.- Renegotiation Conditions.

---

[2] Pursuant to the document titled "Agreement of Resignation, Appointment and Acceptance" dated July 9, 2020 entered into between the Company, UMB BANK, N.A. and CITIBANK, N.A., UMB BANK, N.A. was appointed as "Trustee" for purposes of the Indenture.

[3] After the exchange of the International Bonds for the New International Bonds, "International Bondholders" will mean the holders of the New International Bonds.

The International Bonds shall be renegotiated by means of their exchange for the New International Bonds, in the event of fulfillment of the following contingent and supplementary conditions, as established to the benefit of the International Bondholders (the "***Renegotiation Conditions***"):

(i) That this Reorganization Agreement is understood as approved and begins to apply pursuant to Art. 89 of Law No. 20,720;

(ii) That the New York Southern District Bankruptcy Court (New York State, United States of America) recognizes the Agreement in the Chapter 15 proceeding the Company is filing with said court by reason of its Reorganization Proceeding, Case No. 20-11411 (MG);

(iii) That the promissory notes to which Section 7 below refers, and the documents for the reserve and ratification of guarantees to which **Chapter XVIII** below refers, are granted simultaneously, in both cases to the satisfaction of the International Bonds' Trustee;

(iv) That collection expenses, fees and reimbursements owed to the Trustee under the Indenture have been paid to its satisfaction, including the Trustee's advisors fees, applicable under the rules of the Indenture;

(v) That the other terms of the Financing Condition (as this term is defined further below in **Chapter VIII** of this Agreement) and the release of the funds from the Bridge Loan to the Company have been met.

Having certified the fulfillment of the Renegotiation Conditions by the Bankruptcy Administrator [*Interventor Concursal*] or, absent the latter, by the Creditors Commission with the favorable vote of four of its members, the loans shall be renegotiated in the form set forth in Number 3 below.

In the event that the Bankruptcy Administrator determines that the Renegotiation Conditions have failed due to expiration of the International Bonds Extension without the latter's having been verified, or because it has become certain before expiration of the term of the Extension that none of the events comprising them will occur:

(i) International Bondholders may exercise all their rights under the Indenture to obtain payment of their receivables, with no restrictions whatsoever and without being subject to this Agreement;

(ii) non-fulfillment of the Renegotiation Conditions or expiration of the term without their verification shall be a *Bankruptcy Law Event of Default* under the Indenture; and

(iii) International Bondholders may judicially enforce and collect their loans individually under the rules of

7

Presentation version 8/8

the Indenture, with all their real or personal guarantees and in any jurisdiction, without need to obtain a declaration of breach of this Agreement and without its serving as defense for that enforcement.

To remove all doubt, in all aspects not modified by this Reorganization Agreement, the obligations contained in the Indenture and in the International Bonds are ratified, and therefore all International Bondholder rights under said agreement shall be maintained, as well as all real and personal guarantees established in the Indenture, the International Bonds and their related documents. Nothing in this Agreement may be interpreted as restricting or impeding the International Bondholders from exercising their rights and actions under the Indenture in the face of a breach of the Debtor Company's obligations under said agreement, as it is understood that all those rights and actions are expressly reserved.

All the above is without prejudice to the Creditors Commission's resolving to extend the Extension of the International Bonds in the event that the Renegotiation Conditions fail as set forth in **Chapter XV** below. As long as the International Bond Extension is current, International Bondholders undertake to not individually or jointly take any enforcement action whatsoever against Enjoy and its Guarantors (as this term is defined further below).

**3.- Renegotiation of the International Bonds:**

Having satisfied Renegotiation Conditions within the deadline for the International Bonds Extension, the International Bonds shall be renegotiated in the form indicated below, exchanging the current debt instruments for the New International Bonds, on the understanding that, for all legal purposes, the International Bonds' renegotiation date shall be the date of the Deliberative Meeting.

Having completed the exchange of the International Bonds for the New International Bonds, the Company will have to obtain CUSIP and ISIN numbers for the New international Bonds (separately for the Senior New International Bonds and the Junior New International Bond, as these terms are defined below).

The total principal value of the New International Bonds shall be equivalent to the sum of: (i) USD 195 million (equivalent to the total principal owed under the International Bonds); and (ii) total interest under the International Bonds (including Defaulted Interest and Post-Petition Interest, as these terms are defined in the Indenture), accrued and not paid as of the date of the Deliberative Meeting.

The New International Bonds shall be divided into two tranches, the "***Senior New International Bond***" and the "***Junior New International Bond***," which shall be identical in all aspects, except the following: (i) the Senior New International Bonds shall have priority to be redeemed early in the event of mandatory early redemption as a result of sale of the assets backing the New International Bonds, pursuant to **Appendix No. 1** of this Agreement,

Presentation version 8/8

which is understood as forming part of the same for all legal purposes; and (ii) in the event the Company enters into liquidation, the Senior New International Bonds shall have the right to comprehensive payment (both outstanding principal and interest accrued and not paid) before any payment is made to the Junior New International Bonds, all as described in **Appendix No. 1** of this Agreement.

Senior New International Bonds shall be issued and delivered, in exchange for the International Bonds, to International Bondholders who issue Financing Commitments (as this term is defined further below) for an amount greater than or equal to the prorated New Financing corresponding to the respective International Bondholder in accordance with that bondholder's proportion of principal of the International Bonds (the "***International Bondholder Financing Minimum Amount***"), and undertake the respective disbursement (directly or through the option assignee) from the Bridge Loan (as this term is defined further below) in an amount effectively assigned thereto; all the above is in accordance with **Chapter VIII** of this Agreement.

For their part, Junior New International Bonds will be issued to International Bondholders that (i) do not participate in the New Financing up to at least the International Bondholder Financing Minimum Amount, or who (ii) do not undertake the respective disbursement of the Bridge Loan up to at least the amount assigned in the Bridge Loan under the terms described in **Chapter VIII**.

The International Bondholder Financing Minimum Amount shall be calculated in pesos in accordance with the following formula:

$$\text{International Bondholder j Financing Minimum Amount (pesos)} = \frac{\text{International Bondholder j Principal}}{\text{(Total International Bond Principal)}} \times (10,000,000,000)$$

To this end, "International Bondholder j Principal" shall mean the unpaid balance of principal of the International Bonds of the respective International Bondholder (face value). For its part, "Total International Bond Principal" shall mean the total balance of unpaid principal of the International Bonds (face value), i.e., USD 195 million (one hundred ninety-five million US dollars) as of the date of the Deliberative Meeting.

The equivalent in US dollars of the International Bondholder Financing Minimum Amount shall be calculated by using the Observed Dollar published in the *Diario Oficial* [Official Daily Gazette] on the date of the Deliberative Meeting. Attached as **Appendix No. 3** to this Proposal are examples of calculations of the International Bondholder Financing Minimum Amount, solely for purposes of facilitating its understanding and application.

The New International Bonds shall be issued by the Company and be governed by the New Indenture. The New International Bonds and New Indenture shall be identical in all aspects to the current International Bonds and Indenture (including the fact of being subject to the laws of the State of New York of the United States of America), with the sole exception of those changes that will be incorporated into the New Indenture and the New International

Presentation version 8/8

Bonds as noted in **Appendix No. 1** of this Agreement. The initial Trustee, paying agent and Registrar and Transfer Agent for the New Indenture shall be UMB BANK, N.A. It is confirmed that the terms contained in the **Appendix No. 1** are those that must be reflected in the New Indenture.

The New International Bonds will be issued as one or more global amounts registered in the name of Cede & Co. as Holder of Record, and as nominee of The Depository Trust Company, in the same way as the International Bonds were issued.

Additionally, all Guarantees and Security Documents established in the Indenture and in the International Bonds will be maintained, to be reflected in the New Instruments, in accordance with the terms set forth in **Chapter XVIII** of this Agreement.

**4.- New term for repayment of the loans:**

The Debtor Company must pay the entire principal balance of the renegotiated loans in a single installment (bullet), on August 14, 2027**.** The above is without prejudice to any redemptions that may occur in accordance with the New Indenture.

Presentation version 8/8

**5.- Interest:**

**a.- Interest accrued up to the date of the Deliberative Meeting:**

All loans applied to this **Chapter IV** shall be set as of the date of the Deliberative Meeting, in accordance with the outstanding balance of principal and interest accrued and not paid to date. Contractual interest and any that might have accrued during the delinquency period, up to the date of holding of the Deliberative Meeting, shall be calculated in accordance with the rate originally agreed upon (including Defaulted Interest and Post-Petition Interest, as these terms are defined in the Indenture), excluding the payment of any penalty interest, fines and collection expenses, which shall be expressly forgiven, if they exist. Interest accrued up to the date of the Deliberative Meeting shall be capitalized on said date, as shown in the amortization table of Part d. below.

Any collection expenses, fees and reimbursements that may be owed under the Indenture to the Bondholders' Representative (Trustee), Paying Agent, Registrar and Transfer Agent or Guarantee Agent must be paid as set forth in the Indenture, including any advisory and attorney expenses applicable under the rules of the Indenture and those necessary for purposes of recording the guarantees in accordance with the new conditions set forth in the Agreement, which shall also be assumed by the Debtor Company.

In the event that stamp and recording taxes – if applicable – are to be owed for this reason, they shall be assumed solely by the Debtor Company, and must be paid in timely fashion at the request of any Creditor.

**b.- Calculation of the interest rate:**

11

Presentation version 8/8

Interest shall be calculated and paid on all loans described in this **Chapter IV**, applying an annual interest rate, subject to the increments detailed below:

    i.   **6.0%** annual basis 30/360 days the **first year** of approval of this Reorganization Agreement.

    ii.   **7.0%** annual basis 30/360 days the **second year** of approval of this Reorganization Agreement.

    iii.   **7.5%** annual basis 30/360 days the **third year** of approval of this Reorganization Agreement.

    iv.   **8.0%** annual basis 30/360 days the **fourth year** of approval of this Reorganization Agreement.

    v.   **8.5%** annual basis 30/360 days the **fifth year** of approval of this Reorganization Agreement.

    vi.   **9.0%** annual basis 30/360 days the **sixth year** of approval of this Reorganization Agreement.

    vii.   **9.5%** annual basis 30/360 days the **seventh year** of approval of this Reorganization Agreement.

Presentation version 8/8

This interest shall accrue as from the date the Deliberative Meeting is held.

**c.- Interest payment schedule:**

Interest shall be paid in accordance with the following payment schedule:

> **i.- First Period:** For the period running from the Deliberative Meeting to the fourth quarter after said date, i.e., between August 15, 2020 and August 14, 2021, interest shall accrue to be capitalized quarterly, i.e., on November 14, 2020, February 14, 2021, May 14, 2021 and August 14, 2021.

> **ii.- Second Period:** For the period running between the fifth and sixth quarters after the Deliberative Meeting, i.e., between August 15, 2021 and February 14, 2022, interest shall accrue, 50% of which shall be paid and the remaining 50% capitalized quarterly, i.e., on November 14, 2021 and February 14, 2022.

> **iii.- Third Period:** For the period running from the seventh quarter after the Deliberative Meeting and henceforth, i.e., from February 15, 2022, interest shall be paid quarterly, at the end of each three-month period.

Within five business days after each of the indicated interest payment dates, the Company shall provide to the Trustee and the New International Bondholders a report showing the amount of interest capitalized on said dates.

13

Presentation version 8/8

Interest not to be capitalized in accordance with Roman numerals ii or iii above shall be due and must be paid on the respective payment date, as indicated in the amortization schedule in Section d.- below.

**d.- Principal and interest amortization schedule:**

**Secured Loan (USD)**

| Installment | Maturity | Unpaid balance | Interest (100%) | Capitalized interest | Amortization of principal | Installment amount |
|---|---|---|---|---|---|---|
| | 8/14/2020 | 210,505,263 | 0 | 0 | 0 | 0 |
| 1 | 11/14/2020 | 213,662,841 | 3,157,579 | 3,157,579 | 0 | 0 |
| 2 | 2/14/2021 | 216,867,784 | 3,204,943 | 3,204,943 | 0 | 0 |
| 3 | 5/14/2021 | 220,120,801 | 3,253,017 | 3,253,017 | 0 | 0 |
| 4 | 8/14/2021 | 223,422,613 | 3,301,812 | 3,301,812 | 0 | 0 |
| 5 | 11/14/2021 | 225,377,561 | 3,909,896 | 1,954,948 | 0 | 1,954,948 |
| 6 | 2/14/2022 | 227,349,614 | 3,944,107 | 1,972,054 | 0 | 1,972,054 |
| 7 | 5/14/2022 | 227,349,614 | 3,978,618 | 0 | 0 | 3,978,618 |
| 8 | 8/14/2022 | 227,349,614 | 3,978,618 | 0 | 0 | 3,978,618 |
| 9 | 11/14/2022 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 10 | 2/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 11 | 5/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 12 | 8/14/2023 | 227,349,614 | 4,262,805 | 0 | 0 | 4,262,805 |
| 13 | 11/14/2023 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 14 | 2/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 15 | 5/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 16 | 8/14/2024 | 227,349,614 | 4,546,992 | 0 | 0 | 4,546,992 |
| 17 | 11/14/2024 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 18 | 2/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 19 | 5/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 20 | 8/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 21 | 11/14/2025 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 22 | 2/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 23 | 5/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 24 | 8/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 25 | 11/14/2026 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 26 | 2/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 27 | 5/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 28 | 8/14/2027 | 0 | 5,399,553 | 0 | 227,349,614 | 232,749,168 |

14

Presentation version 8/8

| 19 | 5/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 20 | 8/14/2025 | 227,349,614 | 4,831,179 | 0 | 0 | 4,831,179 |
| 21 | 11/14/2025 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 22 | 2/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 23 | 5/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 24 | 8/14/2026 | 227,349,614 | 5,115,366 | 0 | 0 | 5,115,366 |
| 25 | 11/14/2026 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 26 | 2/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 27 | 5/14/2027 | 227,349,614 | 5,399,553 | 0 | 0 | 5,399,553 |
| 28 | 8/14/2027 | 0 | 5,399,553 | 0 | 227,349,614 | 232,749,168 |

**6.- Participation in the New Financing:**

International Bondholders, subject to any restrictions that might apply to each of them in any relevant jurisdiction, shall have the preferential option to grant new financing to Enjoy (hereinafter the "***New Financing***"), pursuant to the terms described in **Chapter VIII** below, for a minimum amount totaling $10,000,000,000.- (ten billion pesos), subject to an exchange rate adjustment indicated further below in this Agreement.

**7.- Promissory Notes.**

Having fulfilled the Renegotiation Conditions, on the same date and provided that the renegotiation of the International Bonds and their exchange for the New International Bonds is realized, the Debtor Company will deliver promissory notes signed by Enjoy with the same maturity as the New International Bonds and for the total

Presentation version 8/8

amount owed under the New Indenture, to the satisfaction of the International Bondholders' Trustee.

## V.    PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO UNSECURED CREDITORS

**1.- Extension.**

The loans of Unsecured Creditors shall be restructured, subject to the Rescheduling Conditions (as this term is defined below), under the conditions set forth in this **Chapter V** (hereinafter the "***Unsecured Rescheduling***"), with the exception of those Unsecured Creditors who are Bank Creditors or Suppliers and who opt for the restructuring stipulated for them in **Chapter VI** and **Chapter VII** of this Agreement, respectively (hereinafter the "***Unsecured Loans***").

The maturity of Unsecured Loans under this **Chapter V** shall be extended for a maximum of 90 days as from the date the Deliberative Meeting is held (hereinafter, the "***Extension of the Unsecured Loans***"), unless it becomes certain before that date that the Rescheduling Conditions will not be verified, during the term of which the Extension of the Unsecured Loans will expire on the date that said conditions failed, unless the Creditors Commission resolves to maintain the Extension of the Unsecured Loans as provided for in **Chapter XV** of this Agreement. So long as the Extension of the Unsecured Loans remains current, the Unsecured Creditors subject to this **Chapter V** undertake to not individually or collectively file any enforcement proceeding whatsoever, to the extent that the Renegotiation Conditions remain pending.

The Unsecured Rescheduling shall be subject to fulfillment of the following contingent conditions: (i) that this Reorganization Agreement is understood as approved and enters into force, in accordance with the provisions of Art. 89 of Law No. 20,720; (ii) that the other terms of the Financing Conditions are fulfilled; and (iii) that the Bridge Loan funds are released to the Company, hereinafter referred to together as the "***Rescheduling Conditions***," are fulfilled. Having satisfied the Rescheduling Conditions, it shall be assumed, for all due purposes, that the date of the Unsecured Rescheduling shall be the date of the Deliberative Meeting.

Until such time as the Rescheduling Conditions are fulfilled, the Unsecured Loans shall remain current in accordance with their original terms (including interest accrued after the reorganization request).

Once the Rescheduling Conditions have been met, their fulfillment shall be certified by the Bankruptcy Administrator or, in the latter's absence, by the Creditors Commission with the favorable vote of four of its members, and the Unsecured Loans shall be set as if they had been rescheduled on the date of the Deliberative Meeting, consistent with the outstanding balance of principal and interest accrued up to that date. Contractual interest and that which had accrued during the delinquency period – i.e., up to the date of holding of the Deliberative Meeting – will be calculated in accordance with the rate originally agreed to therein, excluding the payment of any penalty interest, fines and collection expenses, which shall be expressly forgiven. Interest accrued up to the date of the Deliberative Meeting shall be capitalized on said date.

16

Presentation version 8/8

In the event that stamp and recording taxes – if any – are to be paid for this item, they shall be assumed solely by the Debtor Company, and must be paid in a timely fashion at the petition of any Creditor.

As of the date the Deliberative Meeting is held, Unsecured Loans, including those to Bank Creditors and excluding Suppliers, represent a total of $~~189,909,378,544~~189,860,711,276 (one hundred eighty-nine billion, ~~nine~~eight hundred ~~nine~~sixty million, ~~three~~seven hundred eleven thousand, two hundred seventy-~~eight thousand, five hundred forty four~~six pesos) on the date of the aforementioned Meeting.

**2.- Rescheduling of Unsecured Loans and Mandatory Prepayment.**

Once the Rescheduling conditions are fulfilled, the provisions of this Section 2 and thereafter of this **Chapter V** shall apply.

The Debtor Company must pay the entire principal of the rescheduled Unsecured Loans, in a single installment (bullet) within 7 years and one month from the date of the Deliberative Meeting. The above is without prejudice to the mandatory prepayment of these loans as regulated in this **Chapter V**.

As from the day after the date of the Deliberative Meeting, the rescheduled Unsecured Loans shall accrue interest during the periods and in accordance with the rate originally agreed to for them, to be capitalized on the maturity date of the rescheduled Unsecured Loans or on the Prepayment Date (as this term is defined below), as the case may be.

All rescheduled Unsecured Loans shall be required to be prepared (for both the Debtor Company and the respective Unsecured Creditor) at no prepayment cost, and assuming their par value on the Prepayment Date, i.e., the unpaid balance of principal and interest accrued and not capitalized up to the Prepayment Date, which shall be capitalized on said date (hereinafter the "***Prepayment Amount***") as follows: (a) 80% of the Prepayment Amount (hereinafter the "***Convertible Prepayment Amount***") shall be prepaid through delivery of (i) the bonds convertible to shares of Enjoy to which numerals 3.a.- and 3.b.- below refer, and (ii) the money received for the subscription of the aforementioned convertible bonds during their Preferential Offer Period (as this term is defined below) by shareholders of the Debtor Company (hereinafter the "***Shareholders***"), as detailed in **Chapter X** below; and (b) the remaining 20% of the Prepayment Amount shall be prepaid through the delivery of Fixed Income Bond B to which numeral 3.c below refers. Section 4 below of this **Chapter V** details how this prepayment shall be made.

The rescheduled Unsecured Loans that, before rescheduling, were denominated in *Unidades de Fomento* [Chilean Incentive Units], will be updated according to the change in the Unidad de Fomento from the date of the Deliberative Meeting to their due dates or up to the Prepayment Date, as applicable.

As from the date of the Deliberative Meeting, the obligations to do and not do as contained in Chapter XIII of this Agreement shall apply solely and exclusively to the rescheduled Unsecured Loans, and the default events

17

considered in the debt instruments containing the rescheduled Unsecured Loans, if applicable, shall not be valid.

To facilitate the recording in the Securities Registry of the changes in rescheduled Unsecured Loans that are publicly offered securities, which will be applicable thereto under this Agreement, the Debtor Company, together with the Administrator and the Bondholders Representative, if applicable, will be expressly entitled to sign all instruments, agreements and documents, whether public or private, that are necessary, appropriate or requested by a competent authority to afford confirmation of the terms of this Agreement in these instruments, including the execution of new issuances of securities that may be necessary in order to facilitate modification of the rescheduled Unsecured Loans, and the Extension of the Unsecured Loans, if applicable. The Debtor Company will also be expressly authorized to deliver instructions and information to Depósito Central de Valores S.A., Depósito de Valores (hereinafter "**DCV**"), that may be necessary for facilitating the rescheduled Unsecured Loans, their extension and execution of their prepayment, as described in Section 4 of this **Chapter V**.

### 3.- New issuance of bonds for mandatory prepayment of the Rescheduled Unsecured Loans:

To undertake the mandatory prepayment of the entire Prepayment Amount, the Debtor Company unconditionally and irrevocably assumes the obligation to issue bonds convertible to shares of Enjoy and fixed-income bonds and to record them with the Securities Registry maintained by the Financial Market Commission ("hereinafter the "**CMF**"), with the following characteristics:

#### a.- Convertible A-1 Bond:

As noted above, Unsecured Creditors are required to be prepaid the Convertible Prepayment Amount, through: (i) the delivery of bonds convertible to Enjoy A-1 shares ("**Convertible A-1 Bond**") not placed during the Preferential Offer Period, in an amount equivalent to that needed to prepay the Convertible Prepayment Amount, assuming for these purposes the par value of the Convertible A-1 Bond, which in no case may be for amounts less than or under conditions more advantageous than those offered to Shareholders during the Preferential Offer Period; and (ii) in the event of the existence of a balance in the Convertible Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible A-1 Bonds that would have been acquired during their Preferential Offer Period by the Shareholders (as described in **Chapter X** below), until the Convertible Prepayment Amount is realized.

The Convertible A-1 Bond will be payable in a single installment 99 years (bullet) after the date of the Deliberative Meeting, and will accrue interest at a nominal peso rate equal to zero. The other terms and conditions of the Convertible A-1 Bond will be attached as **Appendix No. 2** to this Proposal, on the understanding that said **Appendix No. 2** forms part of the Proposal for all legal purposes.

18

Presentation version 8/8

The exchange rate for converting the Convertible A-1 Bond shall be **66.67** (sixty-six point six seven) new common shares of Enjoy for every $1,000 (one thousand pesos) of principal owed on the Convertible Prepayment Amount. In the event that this calculation results in a fraction of a share, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next highest whole number, and should there be a difference, it shall be paid in cash by the Debtor Company, assuming the sum of $15 as the price per share. Should there exist fractions of Convertible A-1 Bonds as a result of the difference between the Convertible Prepayment Amount and the cutoff amount for the Convertible A-1 Bond, the difference shall be paid in cash by the Debtor Company. These payments shall be made by the Company on the Prepayment Date and the conversion date, respectively.

The option for conversion of the Convertible A-1 Bonds into Company shares must be exercised within 60 banking days from the Prepayment Date. Convertible A-1 Bondholders may exercise the option to convert the Convertible A-1 Bond to shares of Enjoy at any time during the validity of the aforementioned conversion period, by written communication sent to Enjoy expressing therein their intent to exercise the conversion option, under the terms and in accordance with the communication form to be described in the Convertible A-1 Bonds issuance agreement.

Since the Convertible A-1 Bonds must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanisms for doing so shall be regulated in **Chapter X**.

**b.- Convertible A-2 Bond:**

As an incentive for participating in the New Financing, once the Reorganization Agreement is approved, those Unsecured Creditors who participated in the New Financing and effected the disbursement of the respective Bridge Loan (directly or through their option assignee) shall be entitled to receive in payment of a "portion" of their Convertible Prepayment Amount, with said portion to be determined according to their Prorated Share (as this term is defined further below), through: (i) the delivery of bonds convertible to A-2 Enjoy shares ("***Convertible A-2 Bond***") not placed during the Preferential Option Period, in an amount equivalent to that which is necessary to prepay the aforementioned "portion" of their Convertible Prepayment Amount, assuming for these purposes the par value of the Convertible A-2 Bond, which under no circumstances may be less than or under conditions more advantageous than those offered [to?] Shareholders during the Preferential Offer Period; and (ii) should there exist a balance in the aforementioned "portion" of the Convertible Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible A-2 Bonds that had been acquired during the Preferential Offer Period by Shareholders (as described in **Chapter X** below), until completing the aforementioned "portion" of the Convertible Prepayment Amount.

The "portion" of the Convertible Prepayment Amount that each Unsecured Creditor shall be entitled to be

Presentation version 8/8

paid with Convertible A-2 Bonds (or with the proceeds of their placement during their preferential offer) shall be equal to their prorated share in the Bridge Loan (hereinafter, the "***Prorated Share***"), multiplied by a factor equal to 0.80. Should there exist fractions of Convertible A-2 Bonds, the difference will be paid in cash by the Debtor Company.

The ***Prorated Share*** shall be calculated as the quotient between (i) the amount effectively disbursed by the respective Unsecured Creditor ("***unsecured creditor i***") in the Bridge Loan, over (ii) the proportion represented by its receivable among total Unsecured Loans, excluding Suppliers, on the date of the Deliberative Meeting, multiplied by $40,000,000,000, in accordance with the following formula:

$$\text{Prorated Share of unsecured creditor i} = \frac{\text{(Total effectively disbursed by unsecured creditor i in the Bridge Loan)}}{\text{(Receivable of unsecured creditor i)}} * (40,000,000,000)$$
$$\text{(Unsecured Loans excluding Suppliers)}$$

where Unsecured Loans (excluding Suppliers) as of the date of the Deliberative Meeting total approximately $~~189,909,378,544~~189,860,711,276 (one hundred eighty-nine billion, ~~nine~~eight hundred ~~nine~~sixty million, ~~three~~seven hundred eleven thousand, two hundred seventy-~~eight thousand, five hundred forty-four~~six pesos). Attached as **Appendix No. 3** to this Proposal are examples of the calculation of the "portion" of the Convertible Prepayment Amount that could be paid in Convertible A-2 Bonds, for the sole purpose of facilitating understanding and implementation.

The terms and conditions of the Convertible A-2 Bond shall be identical to the terms and conditions of the Convertible A-1 Bond, which are considered expressly reproduced herein, with the sole exception of the exchange rate for shares of Enjoy, which in the case of the Convertible A-2 Bond shall be **198.02** (one hundred ninety-eight point zero two) new common shares of Enjoy for each $1,000.- (one thousand pesos) of principal owed from Convertible Prepayment Amount. The other terms and conditions of the Convertible A-2 Bond are attached as **Appendix No. 2** to this Proposal, on the understanding that said **Appendix No. 2** forms part of the Proposal for all legal purposes.

In the event that the results of this calculation yield a fraction of shares, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next highest whole number, and should there be a difference, it will be paid in cash by the Debtor Company, considering the sum of $5.05 as the price per share. Should there be fractions of Convertible A-2 Bonds as a result of the difference between the Convertible Prepayment Amount to be prepaid with Convertible A-2 Bonds, and the cutoff amount of the Convertible A-2 Bond, the difference shall be paid in cash by the Debtor Company. These payments shall be made by the Debtor Company on the Prepayment Date and conversion date, respectively.

If, pursuant to the calculations noted above, the "portion" of an Unsecured Creditor's Convertible Prepayment Amount does not yield as a result the receipt of 100% of its Convertible Prepayment Amount in A-2 Convertible B, the difference shall be paid through the delivery of Convertible A-1 Bonds. Should fractions of Convertible A-1 Bonds exist, the difference shall be paid in cash by the Debtor Company.

Since Convertible A-2 Bonds must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanism for this is regulated in **Chapter X**.

With regard to Unsecured Loans in custody through an exchange broker or an entity legally authorized to hold securities in its own name on behalf of third parties (hereinafter the "Custodian"), solely for purposes of undertaking calculation of the Prorated Share, this shall be calculated by assuming as "unsecured creditor i" each person individually on behalf of whom the respective Custodian is holding the respective receivable (hereinafter the "Final Instruments") participating in the New Financing, depending on how that is reported by the Custodian in accordance with the terms noted in Chapter VIII of this Agreement.

**c.- Fixed Income Bond B (Tranche B)**:

The amortization of 20.0% of the total Prepayment Amount (whether or not they had participated in the New Financing) (hereinafter the "*Fixed Income Prepayment Amount B*") shall be required to be prepaid through delivery of a fixed income bond to be issued for an amount equivalent to at least the Fixed Income Prepayment Amount B (hereinafter the "*Fixed Income B Bond*"), payable within 10 years as from the date of the Deliberative Meeting. If fractions of Fixed Income B Bonds exist as a result of the difference between the Fixed Income Prepayment Amount B and the cutoff amount of the Fixed Income B Bond , the difference shall be paid in cash by the Debtor Company to the respective Unsecured Creditor on the Prepayment Date.

Fixed Income B Bond shall have the following features.

i.- Currency:

Fixed Income B Bond shall be issued in Chilean pesos.

 ii.- Amortization of principal:

 The dates of payment of interest and amortizations of principal of the Fixed Income B Bond, as well as the amounts to be paid in each case, are as shown in the Amortization Table indicated in Part c.iv.- below.

 iii.- Interest:

 Interest shall be calculated and paid by applying an annual effective nominal interest rate, which will gradually increase as described below:

- **1.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, the **first two years and six months** after the date the Deliberative Meeting is held. This interest shall accrue

Presentation version 8/8

and be capitalized semi-annually, all in accordance with the amortization table indicated in Part c.iv.- below.

- **6.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the end of the **sixth semi-annual period** after the date the Deliberative Meeting is held, and henceforth. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below in Part c.iv.-.

iv.- Amortization table for Fixed Income Bond B[4]:

**Fixed Income Bond B (CLP millions)**

| Installment | Maturity | Unpaid Principal | Interest (100%) | ~~Capitalized interest~~ | ~~Amortization of principal~~ | ~~Value of installment~~ |
|---|---|---|---|---|---|---|
| (100%) installment | Capitalized interest | Amortization of principal | Value | | | |
| | 8/14/2020 | ~~38,031~~100 | ~~0~~ | ~~0~~ | ~~0~~ | ~~0~~ |
| 1 | 2/14/2021 | ~~38,315~~101 | ~~284~~1 | ~~284~~1 | 0 | 0 |
| 2 | 8/14/2021 | ~~38,601~~102 | ~~286~~1 | ~~286~~1 | 0 | 0 |
| 3 | 2/14/2022 | ~~38,890~~103 | ~~288~~1 | ~~288~~1 | 0 | 0 |
| 4 | 8/14/2022 | ~~39,180~~103 | ~~291~~1 | ~~291~~1 | 0 | 0 |
| 5 | 2/14/2023 | ~~39,473~~104 | ~~293~~1 | ~~293~~1 | 0 | 0 |
| 6 | 8/14/2023 | ~~39,473~~104 | ~~1,263~~3 | 0 | 0 | ~~1,263~~3 |
| 7 | 2/14/2024 | ~~39,473~~104 | ~~1,263~~3 | 0 | 0 | ~~1,263~~3 |
| 8 | 8/14/2024 | ~~39,473~~104 | ~~1,263~~3 | 0 | 0 | ~~1,263~~3 |
| 9 | 2/14/2025 | ~~39,473~~104 | ~~1,263~~3 | 0 | 0 | ~~1,263~~3 |
| 10 | 8/14/2025 | ~~39,473~~104 | ~~1,263~~3 | 0 | 0 | ~~1,263~~3 |
| 11 | 2/14/2026 | ~~38,486~~101 | ~~1,263~~3 | 0 | ~~987~~3 | ~~2,250~~6 |
| 12 | 8/14/2026 | ~~37,499~~99 | ~~1,231~~3 | 0 | ~~987~~3 | ~~2,218~~6 |
| 13 | 2/14/2027 | ~~35,526~~93 | ~~1,200~~3 | 0 | ~~1,974~~5 | ~~3,173~~8 |
| 14 | 8/14/2027 | ~~33,552~~88 | ~~1,136~~3 | 0 | ~~1,974~~5 | ~~3,110~~8 |
| 15 | 2/14/2028 | ~~30,592~~80 | ~~1,073~~3 | 0 | ~~2,960~~8 | ~~4,034~~11 |
| 16 | 8/14/2028 | ~~27,631~~73 | ~~979~~3 | 0 | ~~2,960~~8 | ~~3,939~~10 |
| 17 | 2/14/2029 | ~~22,697~~60 | ~~884~~2 | 0 | ~~4,934~~13 | ~~5,818~~15 |
| 18 | 8/14/2029 | ~~17,763~~47 | ~~726~~2 | 0 | ~~4,934~~13 | ~~5,660~~15 |
| ~~19~~ | ~~2/14/2030~~ | ~~8,881~~ | ~~568~~ | ~~0~~ | ~~8,881~~ | ~~9,450~~ |
| ~~20~~ | ~~8/14/2030~~ | ~~0~~ | ~~284~~ | ~~0~~ | ~~8,881~~ | ~~9,166~~ |

v.- Early Redemption:

As from the date the New International Bonds are repaid in their entirety, the Debtor Company may redeem the Fixed Income B Bonds in advance, in whole or in part, at the equivalent of the amount of outstanding principal to be prepaid on the date set for the redemption, plus interest accrued and not paid during the period between the day after the due date of the final installment of paid interest and the date set for the redemption (at par).

vi.- Financial Covenant:

---

[4] This amortization table is ~~for reference purposes, with the UF value of July 2, 2020. Said amount must be updated in accordance with the value of the UF on the date of the Deliberative Meeting, i~~illustrated on a base 100, while the final amounts to be considered will depend on the number of Bank Creditors who exercise the Unsecured Loans option.~~e., August 14, 2020.~~

Presentation version 8/8

In addition to the obligations to do and not do as indicated in Chapter XIII of this Judicial Reorganization Agreement, in the Fixed Income B Bond the Debtor Company shall undertake to maintain a Net Financial Debt / EBITDA ratio not to exceed: **(a)** 6.5x measured and calculated on the consolidated financial statements of Enjoy

Presentation version 8/8

reported quarterly to the CMF (the "***Financial Statements***") as of March 31, 2024, and up to the Financial Statements of December 31, 2025; **(b) 6.0 times** measured and calculated on the Financial Statements as of March 31, 2026 and up to the Financial Statements of December 2026; **(c) 5.5x** measured and calculated on the Financial Statements as of March 31, 2027 and up to the Financial Statements of December 31, 2027; **(d) 5.0x** measured and calculated on the Financial Statements as of March 31, 2028 and up to the Financial Statements of December 31, 2028; and **(e) 4.5 times** measured and calculated on the Financial Statements as of March 31, 2029 and henceforth.

The Net Financial Debt / EBITDA ratio shall not be measured on the Financial Statements prior to March 31, 2024.

For these purposes:

a. <u>Net Financial Debt:</u> shall correspond to: /i/ The sum of the items posted under "Other current financial liabilities," "Other non-current financial liabilities," "Current leasing liabilities" and "Non-current leasing liabilities," less /ii/ the item posted as "Cash and cash equivalents;" all the above are from the Enjoy Consolidated Statement of Financial Position, which forms an integral part of the Financial Statements.

b. <u>EBITDA</u>: corresponds to the results of the following items from the Income Statement by Function of the Financial Statements: /i/ Revenue from ordinary activities; less /ii/ Cost of sales; less /iii/ Administrative expenses; plus /iv/ Annual depreciation; plus /v/ Annual amortization.

vii.- <u>Other terms and conditions</u>:

Other terms and conditions applicable to the Fixed Income B Bonds are added as **<u>Appendix No. 4</u>** to this Proposal, on the understanding that said Appendix shall form part of the Proposal for all legal purposes.

**4.- Mandatory Prepayment of the Rescheduled Unsecured Loans:**

The procedure that shall apply for purposes of undertaking mandatory prepayment of the Prepayment Amount of the rescheduled Unsecured Loans shall be the following:

**a.- Prepayment Date:**

Within 15 banking days after expiration of the Preferential Offer Period, the Debtor Company must undertake to make mandatory prepayment of the rescheduled Unsecured Loans (hereinafter the "***Prepayment Date***"). To this end, Enjoy must grant a prepayment notice to the Unsecured Creditors, by reporting an essential Event as least five Banking Days prior to the Prepayment Date.

**b.- Receivables that are unrealized public debt offering instruments:**

24

Presentation version 8/8

Rescheduled Unsecured Loans that correspond to public debt offering instruments shall be prepaid on the Prepayment Date by means of electronic funds transfers, in the case of cash payments, and through delivery of the respective Convertible A-1 and/or A-2 Bonds, as applicable, and the Fixed Income B Bond, through DCV by means of their transfer and/or deposit to the accounts that the respective Unsecured Creditors have registered with DCV, subject to instruction from the Debtor Company and information to the Administrator.

Further, on the Prepayment Date, the Debtor Company shall send an instruction to DCV in order for the latter to leave as invalid the positions corresponding to the unrealized debt instruments that had been the object of the prepayment.

**c.- Other Receivables:**

In the case of receivables other than those indicated in Part 5.b above and those public debt offering instruments that are released, Unsecured Creditors must direct themselves on the Prepayment Date to the offices of Enjoy, located at calle Rosario Norte No. 555, piso 10, commune of las Condes, Santiago, during business hours, to monitor the information and instruments that attest to their capacity as Unsecured Creditors. On that occasion, Enjoy shall prepay those corresponding cash amounts through immediately available funds, to the bank accounts reported by the respective Unsecured Creditors to Enjoy, at least two banking days before the Prepayment Date, while instructing the DCV to make the transfer and/or deposit of the Convertible A-1 and/or A-2 Bonds, as applicable, and the Fixed Income B Bond that also corresponds to said creditors, into the accounts that the respective Unsecured Creditors have registered with DCV and reported to Enjoy at least two banking days before the Prepayment Date, and the respective Unsecured Creditors must sign a document acknowledging complete prepayment of their rescheduled Unsecured Loan.

## VI. PROPOSED PAYMENT OF PRINCIPAL AND INTEREST TO BANK CREDITORS (TRANCHE C).

Pursuant to Article 64 of Law No. 20,720, more favorable conditions are proposed for Bank Creditors who commit to granting to the Debtor Company, or to one or more of its subsidiaries, to be agreed to with the Debtor Company, one or more revolving lines of credit within a maximum of 15 banking days after the date of entry into force of the Agreement, with the following features:

1.- Term: 3 years after the date of holding of the Deliberative Meeting.

2.- Interest rate: consistent with the market.

3.- Amount: the equivalent of at least 40% of its corresponding loan against the Debtor Company, allocated to this Reorganization Agreement.

4.- Other conditions: those typical in the market for these types of transactions.

25

Presentation version 8/8

Bank Creditors that opt for this Chapter VI of the Agreement must grant their binding commitment to open the aforementioned lines to the Administrator within five banking days after the date of the Deliberative Meeting.

The most favorable condition offered consists of the prepayment, at no prepayment costs, of 100% of outstanding principal and accrued interest from the respective Bank Creditor's loans through issuance of a fixed income bond totaling said amount, for the purposes of which the Debtor Company proposes assuming the obligation to issue a fixed income bond with the characteristics described in this **Chapter VI** and to record it with the Securities Registry maintained by the CMF (hereinafter "***Fixed Income Bond C***"), payable within 12 years after approval of this Reorganization Agreement. Should there exist fractions of Fixed Income C Bonds as a result of the difference between the amount of the loan of a Bank Creditor, and the cutoff amount of the Fixed Income C Bond, the difference shall be paid in cash by the Debtor Company. These loans, prior to delivery of the Fixed Income C Bonds, shall be extended and shall capitalize interest in the form stipulated in numerals 1.- and 2.- of **Chapter V**, where applicable.

The Bank Creditors' loans shall be prepaid within 15 banking days after the date of acquisition of registration of the Fixed Income C Bonds with the CMF's Securities Registry. To this end, Enjoy must issue a prepayment notice to the Bank Creditors, by declaring an Essential Event at least five banking days before its prepayment date. Prepayment shall be made through the DCV by means of transfer and/or deposit to the accounts the respective Bank Creditors have registered with the DCV, subject to instructions of the Debtor Company and information to the Administrator.

Bank Creditors who do not conform to the provisions of this **Chapter VI** shall be governed by the provisions of **Chapter V** above.

These Bank Creditors represent ~~five~~six creditors, totaling $~~19,629,681,603.94~~19,629,732,671 (nineteen billion, six hundred twenty-nine million, ~~six~~seven hundred ~~eighty one~~thirty-two thousand, six hundred ~~three~~seventy-one pesos), and are detailed in Annex No. 6 of this Agreement.

The Fixed Income C Bond shall have the following features.

i.- <u>Currency</u>:

The Fixed Income C Bond shall be issued in Chilean pesos.

ii.- <u>Amortization of principal</u>:

Payment of the Fixed Income C Bond shall be made in a single installment after 12 years after the date of the Deliberative Meeting, in accordance with the Amortization Table provided in Part iv.- below.

iii.- <u>Interest</u>:

Presentation version 8/8

Interest shall be calculated and paid by applying an annual effective nominal interest rate, which will gradually increase as described below:

- **1.5%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, the **first five semi-annual periods** after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **2.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **sixth semi-annual period** to the **twelfth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **3.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **thirteenth semi-annual period** to the **eighteenth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

- **4.0%** annual effective rate, base 360 days and semi-annual periods equal to 180 days, from the **nineteenth semi-annual period** to the **twenty-fourth semi-annual period**, both inclusive, after the date of the Deliberative Meeting. This interest shall accrue and be paid semi-annually, all in accordance with the amortization table provided below.

iv.- Amortization table for Fixed Income Bond C[5]:

| Installment | Maturity | Unpaid principal | Interest (100%) | Capitalized interest | Amortization of principal | Value of installment |
|---|---|---|---|---|---|---|
| | 8/14/2020 | 100.0 | | | | |
| 1 | 2/14/2021 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 2 | 8/14/2021 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 3 | 2/14/2022 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 4 | 8/14/2022 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 5 | 2/14/2023 | 100.0 | 0.8 | 0.0 | 0.0 | 0.8 |
| 6 | 8/14/2023 | 101.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 7 | 2/14/2024 | 102.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 8 | 8/14/2024 | 103.0 | 1.0 | 1.0 | 0.0 | 0.0 |
| 9 | 2/14/2025 | 104.1 | 1.0 | 1.0 | 0.0 | 0.0 |
| 10 | 8/14/2025 | 105.1 | 1.0 | 1.0 | 0.0 | 0.0 |
| 11 | 2/14/2026 | 106.2 | 1.1 | 1.1 | 0.0 | 0.0 |
| 12 | 8/14/2026 | 107.2 | 1.1 | 1.1 | 0.0 | 0.0 |
| 13 | 2/14/2027 | 108.8 | 1.6 | 1.6 | 0.0 | 0.0 |
| 14 | 8/14/2027 | 110.5 | 1.6 | 1.6 | 0.0 | 0.0 |
| 15 | 2/14/2028 | 112.1 | 1.7 | 1.7 | 0.0 | 0.0 |
| 16 | 8/14/2028 | 113.8 | 1.7 | 1.7 | 0.0 | 0.0 |
| 17 | 2/14/2029 | 115.5 | 1.7 | 1.7 | 0.0 | 0.0 |
| 18 | 8/14/2029 | 117.2 | 1.7 | 1.7 | 0.0 | 0.0 |
| 19 | 2/14/2030 | 119.6 | 2.3 | 2.3 | 0.0 | 0.0 |
| 20 | 8/14/2030 | 122.0 | 2.4 | 2.4 | 0.0 | 0.0 |
| 21 | 2/14/2031 | 124.4 | 2.4 | 2.4 | 0.0 | 0.0 |
| 22 | 8/14/2031 | 126.9 | 2.5 | 2.5 | 0.0 | 0.0 |
| 23 | 2/14/2032 | 129.4 | 2.5 | 2.5 | 0.0 | 0.0 |
| 24 | 8/14/2032 | 0.0 | 2.6 | 0.0 | 129.4 | 132.0 |

[5] This amortization table is illustrated on a base 100, while the final amounts to be considered will depend on the number of Bank Creditors who exercise the Unsecured Loans option.

Presentation version 8/8

| | | | | | | |
|---|---|---|---|---|---|---|
| 21 | 2/14/2031 | 124.4 | 2.4 | 2.4 | 0.0 | 0.0 |
| 22 | 8/14/2031 | 126.9 | 2.5 | 2.5 | 0.0 | 0.0 |
| 23 | 2/14/2032 | 129.4 | 2.5 | 2.5 | 0.0 | 0.0 |
| 24 | 8/14/2032 | 0.0 | 2.6 | 0.0 | 129.4 | 132.0 |

v.- <u>Early Redemption</u>:

As from the date the New International Bonds are repaid in their entirety, the Debtor Company may redeem the Fixed Income C Bonds early, in whole or in part, at the equivalent of the total outstanding principal to be prepaid on the date set for the redemption, plus interest accrued and not paid during the period between the day after the due date of the final installment of paid interest and the date set for the redemption (at par).

v.- <u>Other terms and conditions</u>: Other terms and conditions applicable to the Fixed Income C Bonds shall be attached as **Appendix No. 4** to this Proposal before the date of the Deliberative Meeting, on the understanding that said Appendix shall form part of the Proposal for all due purposes.

## VII. PROPOSED PAYMENT OF PRINCIPAL TO SUPPLIER CREDITORS

Pursuant to Article 64 of Law 20,720, more favorable conditions are proposed for some of the unsecured creditors. The more favorable condition proposed consists in paying 100% of the principal of the loans originating from invoices or receipts issued by Suppliers under the same terms, which must be paid within 12 months as from approval of this Judicial Reorganization Agreement.

These Suppliers represent **18** creditors, totaling **$382,029,349.381,718,815.-** (three hundred eighty-twoone million, twenty-nineseven hundred eighteen thousand, three hundred forty nine pesos)eight hundred fifteen pesos) and are detailed in Appendix No. 6 of this Agreement.

## VIII. NEW FINANCING (TRANCHE D).

The International Bondholders and Unsecured Creditors shall have the preferential option of granting New Financing to Enjoy totaling approximately $50,000,000,000 (fifty billion pesos) (hereinafter, the International Bondholders and Unsecured Creditors participating in the New Financing shall be referred to jointly as the "**New Financers**").

The New Financing shall be documented in a single, non-revolving loan opening agreement to be entered into between Enjoy and the New Financers under terms substantially similar to those attached as **Appendix No. 5** of this Agreement, which is understood as forming a part thereof for all legal purposes (the "**Bridge Loan**"), which shall be required to be prepaid (for both the Debtor Company and the respective New Financer) at no prepayment cost, and assuming as the amount to be prepaid the outstanding balance of principal plus interest accrued and to be capitalized on the Prepayment Date (hereinafter the "**New Financing Prepayment Amount**"), through the delivery

28

Presentation version 8/8

of (i) bonds convertible to Enjoy shares ("***Convertible D Bond***") not placed during the Preferential Offer Period, in an amount equivalent to that which is necessary to prepay the New Financing Prepayment Amount, assuming for these purposes the par value of the Convertible D Bond, which under no circumstances may be for amounts less than or under conditions more advantageous than those offered to Shareholders during the Preferential Offer Period; and (ii) in the event there exists a balance of the New Financing Prepayment Amount pending prepayment after applying the amount indicated in number (i) above, with the proceeds from the subscription and payment of the Convertible D Bonds that had been acquired during their Preferential Offer Period by the Shareholders (as described in **Chapter X** below), until completing the New Financing Prepayment Amount; all the above shall be prorated for the New Financers' Share in the New Financing.

**1.- Bridge Loan**.

a.- With a view to participating in the New Financing, the New Financers will sign a non-revolving loan opening agreement, under identical terms and conditions maturing at 18 months, the disbursements of which shall be documented by signing promissory notes to the order of each respective New Financer. The disbursement shall take place on the third banking day after the signing date of the Bridge Loan, or on the banking day after which the Financing Condition (as this term is defined below) has been fulfilled, if fulfilled after entering into the Bridge Loan, at which time the respective promissory note authorized by a Notary shall be issued.

Loans granted under the Bridge Loan shall accrue annual interest of 5.7% (base 360 days and semi-annual periods equal to 180 days), unless said rate exceeds the current maximum contractual rate applicable to loans with these characteristics current on the signing date of the Bridge Loan, in which case said contractual maximum rate shall apply.

It shall be required for the Bridge Loan to be prepaid for the debtor and creditor on the Prepayment Date, with no prepayment costs, through the issuance of Convertible D Bonds not placed during the Preferential Option Period, the characteristics of which are noted in Numeral 3 of this **Chapter VIII**, and in the event of a difference, with the proceeds from the subscription and paying of the Convertible D Bonds that had been acquired during its Preferential Offer Period by the Shareholders, as indicated below.

b.- The opportunity to participate in the Bridge Loan shall be offered preferentially to the groups and in the proportions specified below (hereinafter the "***Groups***"):

i.- To International Bondholders: up to $10,000,000,000.- (ten billion pesos) (hereinafter, "***Group A***") or its equivalent in US dollars, according to the Observed Dollar Exchange rate published by the Central Bank of Chile on the date the Deliberative Meeting is held.

ii.- To Unsecured Creditors: up to $40,000,000,000.- (forty billion pesos) (hereinafter, "***Group B***").

29

c.- Those interested in participating in the New Financing must express this in writing to the Bankruptcy Administrator, through a financing commitment (hereinafter the "***Financing Commitment***"), the results and total amounts of which must be subsequently reported by the Bankruptcy Administrator. With regard to International Bondholders, they must express their interest by sending a written communication to the International Bondholders Representative. Additionally, International Bondholders may express their commitment directly to the Bankruptcy Administrator, through a Financing Commitment. The International Bondholders Representative shall send to the Bankruptcy Administrator any Financing ~~Commitment forms~~Commitments it might receive from International Bondholders. With regard to receivables held in custody through a Custodian, their Final Holders interested in participating in the New Financing must express this to their respective Custodian, who shall send to the Bankruptcy Administrator a written communication identifying Final Holders interested in participating in the New Financing while attaching custody certificates to identify the receivables of the aforementioned Final Holders. Additionally, Final Holders interested in participating in the New Financing must so state in writing to the Bankruptcy Administrator through a Financing Commitment, which they may deliver to the Bankruptcy Administrator either directly or through their respective Custodian.

i.- Financing Commitments received within a specified Group shall be allocated to the value of the share in the New Financing offered to the corresponding Group, prorated in accordance with the share in the liabilities of the respective Group held by all group creditors who have expressed interest, until the allocation to each participating creditor within the Group of 100% of what would correspond to each creditor in accordance with their prorating, or their commitment offer, whichever is less. If a share of the New Financing remains after the above allocation, it shall be distributed among the creditors of the respective Group that delivered Financing Commitments above their prorating for the respective Group's liabilities, prorated for these excess commitment offers. If the Financing Commitments received within a specific Group exceed the share in the New Financing offered to the Corresponding Group, said excess shall be allocated to cover shortfalls in the other Group, if any, prorated (among all those considering only the excess) until depletion of the total of $50,000,000,000 (fifty billion pesos).

ii.- In the event it is not possible to obtain Financing Commitments in an initial round for an amount equivalent to 100% of the New Financing, successive rounds may be held among interested parties who submitted Financing Commitments in previous rounds, which shall be allocated, prorated for the new request until the amount of the shortfall is depleted.

iii.- If, despite having been offered in the form indicated in Parts i.- and ii.- above, a portion of the New Financing remains without having received Financing Commitments, the Company may offer said

remainder of the New Financing to third parties under terms no more favorable than those offered to these three Groups.

iv.- Rounds and offerings of New Financing that follow the first must be concluded within a maximum of 10 banking days.

d.- Notwithstanding the above, and prior to the Deliberative Meeting, those convened to participate in the New Financing may state in advance their intent to participate therein, through a binding note to be sent to the Bankruptcy Auditor (*Veedor Concursal*), in order for the latter to acknowledge this at the respective meeting. At the respective Deliberative Meeting, a record may be left of the commitments received in advance, and the creditors may appear who expressed them, to repeat said commitment, which under no circumstances shall affect the validity or enforceability of the written commitment delivered to the Bankruptcy Auditor.

e.- **Minimum Amount of Financing Commitments:**

i.- In the event that, after completing the rounds and offerings of New Financing described in Part c. above, the Financing Commitments do not exceed $25,000,000,000 (twenty-five billion pesos) ("***Minimum Financing Amount***"), the Financing Condition (as this term is defined below) shall be understood as unfulfilled and, as a consequence, a cause for breach of the Reorganization Agreement shall occur and Enjoy must immediately request its own voluntary liquidation.

ii.- In the event that, after completing the New Financing rounds and offers as described in Part c. above, Financing Commitments are greater than or equal to $25,000,000,000 (twenty-five billion pesos) but less than $45,000,000,000 (forty-five billion pesos), the New Financers who delivered the Financing Commitments to the Company are not required to maintain said commitments, and may inform the Company and the Administrator of their withdrawal, maintenance or increase within two business days after the notice issued by the administrator to the New Financers with the final results of the New Financing rounds and offers. Those New Financers who indicate nothing within said period shall be understood as maintaining their respective Financing Commitment. After fulfilling the withdrawal period for the Financing Commitments, the Company and the Administrator shall calculate the total amount of Financing Commitments net of those withdrawn (the "***Net Financing Commitments***"). If Net Financing Commitments do not exceed the Minimum Financing Amount, the Financing Condition will be understood as unfulfilled and, consequently, a default event under the Reorganization Agreement shall occur and Enjoy must immediately request its own voluntary liquidation. If the Net Financing Commitments are greater than or equal to $25,000,000,000 (twenty-five billion pesos) but less than $45,000,000,000 (forty-five billion pesos), the Financing Condition

Presentation version 8/8

shall be understood as fulfilled in this aspect, unless the Creditors Commission resolves otherwise by vote of four of its members, in which case the Reorganization Agreement shall be understood as not fulfilled and Enjoy must immediately request its own voluntary liquidation.

iii.- In the event that the Financing Commitments meet or exceed $45,000,000,000 (forty-five billion pesos), the Financing Condition shall be considered as fulfilled in that respect.

iv.- For purposes of calculating the amounts set forth in this letter **e.-**, the amounts committed by New Financers who are International Bondholders shall be assumed in their peso-equivalent, using the Observed Dollar exchange rate published by the Central Bank of Chile applicable on the day the Deliberative Meeting is held, without prejudice to the amount at which the currencies received from them are effectively liquidated on the date of the respective disbursement.

f.- Once the periods for receiving the Financing Commitments have lapsed, as noted in letter **c.-** above, the New Financers must sign the non-revolving loan opening agreement and other New Financing documents by the second banking day after the date the Administrator reports each New Financer's share in the Bridge Loan. For purposes of entering into the non-revolving credit line agreement, the New Financers shall authorize the Administrator to sign the aforementioned agreement in their name and behalf, upon exercising their option to grant the New Financing. The terms defined in the process of allocating each New Financer's share in the Bridge Loan and entering and disbursing them shall be reported by the Auditor and/or Administrator, as applicable.

g.- Funds disbursed by each New Financer shall be kept on deposit with the withholding agents to be designated in the Bridge Loan (hereinafter the "***Withholding Agents***"), until their release and delivery to Enjoy in accordance with the Bridge Loan's provisions.

h.- If, by the second banking day after the Bridge Loan disbursement date, one or more New Financers fails to fulfill their Financing Commitment and consequently an amount has not been delivered to the Withholding Agents equivalent to those they permitted to give in fulfillment of the condition set forth in Letter h of the Financing Condition, the Debtor Company must so advise the Administrator and the Creditors Commission in order for the latter to determine whether the amount effectively disbursed is sufficient as to trigger the release of funds to the Company by the Withholding Agents. If the Creditors Commission, by vote of four of its members, fails to accept the amount effectively disbursed, the Company, within 10 banking days after the date of the Creditors Commission's resolution, must propose new alternative financing to supplement the missing amount, under the same terms as the Bridge Loan. If the Creditors Commission accepts the Company's proposal, it shall undertake release of the funds to the Company by the Withholding Agents. Otherwise, the disbursed amounts shall be considered sufficient,

Presentation version 8/8

unless the Creditors Commission resolves otherwise by vote of four of its members, and the disbursed amounts shall be returned by the Withholding Agents to the respective New Financer.

i.- The Debtor Company shall pay each New Financer (to the extent the respective disbursement is actually made under the Bridge Loan) a commitment fee totaling 2% of the total amount actually disbursed by the respective New Financer under the Bridge Loan, to be deducted from their total disbursement when the latter becomes due.

j.- Funds disbursed under the Bridge Loan shall be allocated to repaying obligations incurred during the course of the regular business activities of the Debtor Company and its subsidiaries, in accordance with the conditions and restrictions applying thereto under this Agreement. In this regard, the Debtor Company must submit to the Creditors Commission a Plan for the Use of Funds for general approval, with the Debtor Company retaining the allocation and specific responsibility for its implementation, the fulfillment of which shall be supervised by the Administrator.

k.- The Unsecured Creditors' receivables and the loans against Enjoy that arise after the date of the Deliberative Meeting (with the exception of the International Bonds and the New International Bonds, which are preferential, the "Lease Agreement with Purchase Option" entered into between Enjoy and Banco Security, pursuant to a public instrument dated October 5, 2016, Directory No. 21,180-2016 issued through the Santiago Notary office of Mr. Eduardo Diez Morello, and the guarantee vouchers referenced in **Chapter XII** below), shall be understood as subordinate to the Bridge Loan and the Convertible D Bonds, until the end of the Conversion Period, i.e., day 540 after the Bridge Loan disbursement date. Loans against Enjoy that arise after the date of the Deliberative Meeting, excepting those already noted, as well as loans with respect to non-financial providers generated during the ordinary course of Enjoy's business  must expressly contain this subordination in its instruments. Without prejudice to the subordination specified above with respect to the Unsecured Creditors, Unsecured Creditors who participate in the Bridge Loan authorize the Administrator to confirm and ratify the aforementioned subordination agreements on their behalf, by public instrument.

l.- The option to grant the New Financing may be assigned by the respective creditor, in whole or in part, to which end it shall so note in the communication expressing its Financing Commitment, which must also be signed by the respective assignee.

m.- The assignment of a loan under the Bridge Loan by a creditor subject to this Agreement shall not in any way alter or affect the rights and preferences corresponding to said assigning creditor in that capacity, pursuant to this Agreement, for its participation in granting the New Financing.

**2.- Financing Condition.**

33

The obligation to undertake disbursements under the Bridge Loan shall be subject to fulfillment, within a maximum of 90 calendar days from the date of the Deliberative Meeting, of the following contingent and supplementary conditions (the "***Financing Condition***"):

a.- That Enjoy have the relevant corporate authorizations to subscribe, disburse and fulfill the Bridge Loan;

b.- Approval by part of the Shareholders at an extraordinary shareholders meeting of Enjoy for a capital increase, through the issuance of shares and of bonds convertible to shares of Enjoy, in an amount sufficient as to back the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the shares to be allocated to the Option and the Support Shares (as these terms are defined in **Chapter X**), and amendments of the corporate bylaws that might be needed for these purposes;

c.- Acquisition of the commitment of at least 60% of current Shareholders, to waive their preferential option rights to subscribe the Convertible A-1 Bond and Convertible A-2 Bond, under the terms stipulated in the Support Agreement.

d.- Acquisition of the commitment of at least 60% of current Shareholders to waive 90.88% of their preferential option rights to subscribe the Convertible D Bond, under the terms stipulated in the Support Agreement;

e.- Acquisition of a commitment of at least 60% of current Shareholders to not sell their shares in the Company under the terms stipulated in the Support Agreement.

f.- That this Reorganization Agreement be understood as approved and begin to apply pursuant to Art. 89 of Law No. 20,720;

g.- That the Administrator certify that, except for the disbursement of the Bridge Loan, the conditions have been fulfilled for the release in favor of the Debtor Company of time deposits totaling $9,300,000,000 currently held in guarantee by the banks issuing the guarantee vouchers to which **Chapter XII** of this Agreement refers, as opposed to the condition for the effective disbursement of at least $25,000,000,000 of the New Financing; and

h.- (i) That the Debtor Company receive Financing Commitments totaling at least the Minimum Financing Amount and (ii) that the Creditors Commission not declare a violation of the Financing Condition in the event that Financing Commitments are less than $45,000,000,000 (forty-five billion pesos), as noted in Letter e, Part ii of Numeral 1 above.; and

Presentation version 8/8

i.- That the New York Southern District Bankruptcy Court (New York State, United States of America) recognizes the Agreement in the so-called Chapter 15 proceeding the Company is filing with said court by reason of its Reorganization Proceeding, Case No. 20-11411 (MG), as described in Appendix 1.

**3.- Convertible D Bond**.

a.- Enjoy unconditionally and irrevocably undertakes to issue the Convertible D Bond, which shall have an issuance amount equal to $65,000,000,000 (sixty-five billion pesos). Should fractions of Convertible D Bonds exist as a result of the difference between a New Financer's New Financing Prepayment Amount and the Convertible D Bonds cutoff amount, this difference shall be paid in cash by the Debtor Company to the respective New Financers, prorated for their share in the New Financing, on the Prepayment Date.

b.- Since Convertible D Bonds must preferentially be offered to Shareholders in accordance with Law No. 18,046 on Corporations, the mechanism for doing so shall be regulated in Chapter X.

c.- The Convertible D Bond shall have the following features:

**i.- Currency**:

The Convertible D Bond shall be issued in Chilean pesos.

**ii.- Principal amortization**:

The Convertible D Bond shall be repaid through a single installment within 99 years of the date of the Deliberative Meeting approving the Proposal (bullet).

**iii.- Interest:**

Interest shall be calculated and capitalized by applying an annual effective nominal rate (base 360 days and semi-annual periods equal to 180 days) up to the date of conversion to shares, which shall be reduced gradually as described below:

- **5.7%** for the period starting on the Prepayment Date of the Bridge Loan and ending 540 days after the date of disbursement of the Bridge Loan.

- **0.0%** nominal annual effective rate from day 541 after the date of disbursement of the Bridge Loan.

**iv.- Conversion Period**:

The Convertible D Bond may only be converted to shares of Enjoy during a period starting on the Prepayment Date, and ending 540 days after the date of disbursement of the Bridge Loan. At any time

during the lifetime of the aforementioned conversion period, Convertible D Bondholders may exercise the option to convert the Convertible D Bond to shares of Enjoy, subject to written communication sent to Enjoy expressing therein their intent to exercise the conversion option, under the terms and in accordance with the communication form to be described in the agreement for the issuance of the Convertible D Bonds.

**v.- Conversion Rate**:

The Convertible D Bond will have a conversion rate of 266.67 (two hundred sixty-six point six seven) new shares of Enjoy for each $1,000.- (one thousand pesos) of current principal and accrued interest up to the latest date of interest capitalization prior to the conversion date.

In the event that the results of this calculation yield a fraction of shares, it shall be rounded to the nearest whole number and, if the fraction is 0.5, it shall be rounded to the next whole number, and if there is a difference, this difference shall be paid in cash by the Debtor Company, assuming as share price the sum of $3.75, to be paid by the Debtor Company on the conversion date.

**vi.- Preference**:

The Convertible D Bond shall be considered preferential for the payment of principal and interest and in the event of bankruptcy settlement with respect to Unsecured Creditors (with the exception of the International Bonds and the New International Bonds, which are preferential, the "Lease Agreement with Purchase Option" entered into between Enjoy and Banco Security, pursuant to a public instrument dated October 5, 2016, Directory No. 21,180-2016, issued through the Notary Office of Mr. Eduardo Diez Morello, and the guarantee vouchers discussed in **Chapter XII** below) and loans against Enjoy that arise after the date of the Deliberative Meeting (with the exception of loans expressly agreed to by means of this Judicial Reorganization Agreement), which loans, therefore, shall be understood as being subordinate to the Convertible D Bond, until the end of the Conversion Period, i.e., day 540 after the Bridge Loan disbursement date. Loans against Enjoy that arise after the date of the Deliberative Meeting, excepting those already noted, must expressly contain this subordination in their instruments. Without prejudice to the subordination set forth in this Agreement with respect to all Unsecured Creditors, those Unsecured Creditors that participate in the Bridge Loan authorize the Administrator to confirm and ratify the aforementioned subordination agreements on their behalf, by public instrument,.

**vii.- Use of funds**:

Funds from the Convertible D Bond shall be used exclusively for prepaying the Bridge Loan, and in the event of a remainder after paying the above, said funds shall be allocated to repaying the obligations corresponding to the normal operations of the Debtor Company and its subsidiaries.

36

**viii.- Other terms and conditions**

Other terms and conditions of the Convertible D Bond are attached as **Appendix No. 2** to this Proposal, on the understanding that said Appendix shall form part of the Proposal for all legal purposes.

**4.- Prepayment of the Bridge Loan**

Prepayment of the Bridge Loan to the New Financers shall be made on the Prepayment Date, to which end Enjoy must grant a prepayment notice to the New Financers, by declaring an Essential Event at least five banking days before the Prepayment Date, and on said date Enjoy shall prepay the corresponding amounts in cash through immediately available funds, to the bank accounts reported by the respective New Financers to Enjoy at least two banking days before the Prepayment Date, and for delivery of the Convertible D Bonds, by delivering the same through the DCV, by means of their transfer and/or deposit to the accounts that the respective New Financers have registered with the DCV or the account that their respective Custodian has registered with the DCV, and reported to Enjoy at least two banking days before the Prepayment Date. For these purposes, the New Financers must deliver to Enjoy on that same date the promissory notes delivered to them under the Bridge Loan, with confirmation of payment of the same.

## IX. OPTION FOR ~~CONDITIONAL~~ SUBSCRIPTION OF SHARES BY CURRENT SHAREHOLDERS.

Pursuant to this Reorganization Agreement, and subject to the corresponding statutory approvals, Shareholders shall be granted ~~an~~a preferential option ~~(hereinafter the "*Option*")~~, simultaneously with the opening of the Preferential Offer Period, to subscribe 9,389,919,856 new Company payment shares ~~for~~(hereinafter the "*Option*"), which may be paid within a term of 24 months after the date of the Deliberative Meeting approving the Proposal, at a subscription price of $~~5.75~~5.42 per share (yielding a rate of 2.00 new shares for each current share).

To apply the Option, Enjoy shall grant, in the same capital increase as supports the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the issuance of shares for payment of the Option. The Option on these new payment shares shall be offered preferentially to Shareholders with right to subscribe them (those registered with the Enjoy Shareholders Registry as of midnight on the fifth business day prior to the start date of the Preferential Offer Period), at a subscription price of $~~5.75~~5.42 (five point ~~seven five~~four two pesos) per share, who may exercise the Option ~~(and ultimately subscribe the shares at the aforementioned price of $5.75)~~by subscribing the shares during the Preferential Option Period, by paying the subscription price within 24 months after the date of the Deliberative Meeting. The ~~Option shall be implemented by entering into an option agreement for the subscription of Enjoy shares incorporating the above terms as to the option's subscription price and exercise period, expressly stating that the aforementioned option may be freely assigned by the respective shareholder.~~ outstanding balances of subscribed shares not paid-in shall be adjusted in the same proportion as the value of the Chilean *Unidad de Fomento* varies in accordance with the law. At the extraordinary shareholders

Presentation version 8/8

meeting convened to approve the aforementioned capital increase, it shall be proposed that shareholders authorize the Board to not persevere in

Presentation version 8/8

collecting on subscribed shares that have not been paid-in within the aforementioned period, and to amend the bylaws to state that subscribed shares with value not totally paid-in (considered individually) shall not be entitled to vote so long as they remain unpaid.

The preferential subscription offering of the shares covered by the Option shall be undertaken in accordance with the terms set forth in **Chapter X** below.

## X.    LEGAL STRUCTURE FOR THE FINANCING AND CONVERSION PROCESSES.

1.- Prior to the Deliberative Meeting, the Debtor Company may supplement the legal structure for implementation of the loan renegotiation as agreed to in this Accord and, specifically, for implementation of the New Financing, mandatory prepayment of the unsecured loans with Convertible A-1 Bonds and Convertible A-2 Bonds and Fixed Income B Bond, repayment of the Bridge Loan with Convertible D Bonds, etc.

2.- Without prejudice to the entry into force of this Agreement, the Bankruptcy Administrator shall convene the Creditors Commission, together with the Debtor Company and the technical advisors assisting them, to adopt the necessary agreements for appropriate implementation of the various steps considered in the Reorganization Agreement if necessary, with full powers. Said meeting of the Creditors Committee must be held no later than the fifth business day after the date of holding of the Deliberative Meeting.

3.- Notwithstanding the above, following are the general guidelines proposed for some of the steps considered in this Proposal.

a.- All bonds convertible to shares issued by the Company must be offered preferentially to Shareholders in accordance with Law No. 18,046 on Corporations (hereinafter the "***Preferential Offer Period***"). If no Shareholder exercises their preferential option during the Preferential Offer Period, the Company shall allocate the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds that are necessary to be delivered in prepayment of the Convertible Prepayment Amount and the New Financing Prepayment Amount, as set forth in this Reorganization Agreement. If shareholders exercise their aforementioned preferential subscription option, the procedure shall be as follows:

i.- Convertible A-1 Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the Convertible Prepayment Amount of the rescheduled Unsecured Loans entitled to receive Convertible A-1 Bonds in payment, prorated.

ii.- Should there exist a balance in the Convertible Prepayment Amount after applying the amounts indicated in number i.- above, the net proceeds the Company obtains for the subscription and payment of the Convertible A-1 Bonds during the Preferential Offer Period shall be allocated for

Presentation version 8/8

paying off the balance of the Convertible Prepayment Amount of the rescheduled Unsecured Loans with right to receive Convertible A-1 Bonds in payment, prorated.

iii.- Convertible A-2 Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the Convertible Prepayment Amount of the rescheduled Unsecured Loans entitled to receive Convertible A-2 Bonds in payment, prorated.

iv.- Should there exist a balance in the Convertible Prepayment Amount right to receive Convertible A-2 Bonds in payment after applying the amounts indicated in Number iii.- above, the net proceeds the Company obtains for the subscription and payment of the Convertible A-2 Bonds during the Preferential Offer Period shall be allocated for paying off the balance of the Convertible Prepayment Amount with right to receive Convertible A-2 Bonds in payment, prorated.

v.- Convertible D Bonds not placed during the Preferential Offer Period shall be allocated in a quantity of bonds equivalent to what is needed to prepay the New Financing Prepayment Amount, prorated.

vi.- Should there exist a balance in the New Financing Prepayment Amount right to receive Convertible D Bonds in payment after applying the amounts noted in Number v.- above, the net proceeds the Company obtains for subscription and payment of the Convertible D Bonds during the Preferential Offer Period shall be allocated to paying off the balance of the New Financing Prepayment Amount, prorated.

vii.- In the three cases set forth above, the Company may issue Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, as applicable, for an amount greater than requested to cover the payment set forth in this Reorganization Agreement.

b.- The Preferential Offer Period for the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds and for shares to exercise the Option shall be realized simultaneously (at the same time). The Preferential Offer Period for the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds and for shares to exercise the Option must be initiated within [15] business days after the deadline for recording these issuances in the CMF's Securities Registry.

c.- With a view to facilitating the feasibility of the agreements contained in this Reorganization Proposal:

i.- The companies Entretenciones Consolidadas SpA, Inversiones e Inmobiliaria Almonacid Limitada and Inversiones Cumbres Limitada, which represent 60.52% of the Enjoy shareholder capital, shall sign a support agreement with Enjoy (hereinafter the "***Support Agreement***") pursuant

40

to which: (i) they undertake to assist and participate with all their shares in the extraordinary shareholders meeting addressing Part e below, approving ~~thereat~~there at the issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds, the capital increase noted in the aforementioned Letter e, the changes of bylaws necessary for these purposes, and other matters necessary for implementation of the Proposal in the context of the Enjoy Judicial Reorganization Agreement; (ii) they promise to waive their preferential subscription rights to subscribe the Convertible A-1 Bonds and Convertible A-2 Bonds and waive 90.88% of their rights to preferentially subscribe the Convertible D Bonds, when said rights arise, under the terms stipulated in the Support Agreement; and (iii) they undertake not to transfer their shares, in accordance with the terms set forth in the Support Agreement. The Support Agreement must be entered into and delivered to the Auditor in advance of the date of the Deliberative Meeting, in order for the Auditor to address the Support Agreement at the aforementioned Meeting; and

ii.- Company Creditors must express and send to the Auditor, before the date of the Deliberative Meeting, their commitment to participate in the New Financing subject to the terms and conditions of this Reorganization Agreement, in the amount of $25,000,000,000 (twenty-five billion pesos).

d.- The Financing Commitments must be formalized through a standardized binding document, the format of which shall be sent to each creditor by the Auditor, prior to the Deliberative Meeting, which must be delivered by the respective creditor to the Bankruptcy Administrator in its first round, by August 20, 2020 at 5:00 p.m. The procedure for formalizing this commitment shall be reported by the Auditor prior to the Deliberative Meeting, which in any case must be consistent with the procedure described in Letter c), Number 1, **Chapter VIII** of this Agreement.

e.- Within 60 calendar days after the date of entry into force of the Reorganization Agreement, an Extraordinary Shareholders Meeting must be held, to which the following will be submitted for Shareholder consideration:

i.- A single capital increase, through the issuance of new shares, to allow fulfillment of the following:

- Issuance of the necessary shares to support the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds;

- Issuance of shares needed to be able to grant the Option to Shareholders; and

- Issuance of payment shares for up to an additional $10,000,000,000.- (ten billion pesos), as a mechanism to protect against cash flow needs, the conditions of which (including

Presentation version 8/8

their placement price) may be set by the board within the legal deadlines (hereinafter the "***Reserve Shares***"), a part of which may be allocated to compensation plans for workers of the Company and its subsidiaries, in accordance with the terms set by the Board (hereinafter the "***Stock Option***").

ii.- Issuance of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds identified previously in this Reorganization Agreement.

iii.- Any other matters that may be necessary to submit for consideration of the Shareholders at the aforementioned Meeting, for correct implementation of this Agreement.

4.- In all cases, the number of shares into which the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds may be converted pursuant to this Agreement were set in order to fulfill the condition that current Company shareholders not reduce their equity stake in Enjoy to a percentage less than 10% after converting all the aforementioned bonds. However, this minimum of 10% falls exclusively within the context of the Judicial Reorganization of Enjoy, and therefore is not applicable in the event that Enjoy, after completing the Reorganization, requires new capital, in which case the shareholders and their dilutions (if applicable) shall be subject to the specific conditions of said new capital increase or financing.

## XI. ADMINISTRATION.

The administration of Enjoy shall be exercised by the current entities that have established its bylaws, during the term of this Agreement.

Without prejudice to the above, and as set forth in Article 69 of Law No. 20,720, it is proposed that the creditors at the Deliberative Meeting appoint a Bankruptcy Administrator with the authority indicated below and for the term set forth in the aforementioned provision. The latter's fees shall be set by the Creditors Commission, which shall be regulated below, together with the Debtor Company.

## XII. RENEWAL OF GUARANTEE VOUCHERS (*BOLETAS DE GARANTIAS*).

1.- With a view to guaranteeing to the Superintendency of Gambling Casinos fulfillment of the technical offer; construction and development [of] the plans in timely and appropriate fashion at the Coquimbo, Viña del Mar, Puerto Varas and Pucón casinos; and finally, complete fulfillment of the economic offer contained in the tender proceedings carried out by the regulatory authority, in 2018 the banks Banco BTG Pactual Chile, Banco Internacional and Banco Security issued Guarantee Vouchers for approximately UF 4,800,000.0 (four million, eight hundred thousand Unidades de Fomento) in favor of Casino de la Bahía S.A., Casino del Mar S.A., Casino de Lago

S.A. and Casino de Puerto Varas S.A. Part of said Guarantee Vouchers are secured by insurance policies issued by CESCE Chile Aseguradora S.A.

2.- All guarantee vouchers – which are not secured by the security policies referenced above – and the obligations under said policies are, in turn, guaranteed (i) by the endorsement, joint and several surety and joint and several co-debt of Enjoy; (ii) by a mortgage on a property owned by an Enjoy S.A. subsidiary located in the city of Castro; (iii) by time deposits pledged in guarantee, totaling approximately $32,000,000,000 (thirty-two billion pesos), taken by Enjoy S.A. in favor of the Banks, which securities are in the possession of Banco BTG Pactual Chile, as the agent bank for the bank syndicate and as guarantee agent.

3.- On July 14, 2020, the Administration and issuers of the aforementioned guarantee vouchers entered into new agreements for renewal of the aforementioned vouchers and policies, and agreed to the conditions for the release of the aforementioned security deposits, subject to the meeting of certain milestones, including the granting and subsequent recording of a mortgage on certain properties owned by an Enjoy subsidiary located in the commune of Rinconada de Los Andes, corresponding to fourteen lots (together the "**Rinconada Property**").

4.- Release of the security deposits is subject to fulfillment of the following conditions:

**a.- For the release of $5,200,000,000 (five billion, two hundred million pesos):** When all the following conditions are found to be met: (i) Authorizations have been obtained from Enjoy creditors pursuant to Article 74, Section Two of Law No. 20,720, and with regard to local bondholders and, in addition, the latter have approved all the matters stipulated in Letters c) and d) of the convocation of the bondholders meeting, the first notice of which was published June 27, 2020, to be held July 13 at 12 noon; (ii) all parties have signed the mortgage agreement and restrictions on the Rinconada Property in favor of Banco BTG Pactual Chile, as guarantee agent, together with all the Loan Documentation, as this term is defined below to the satisfaction of the financers; and (iii) complete payment of the premium or premiums corresponding to the guarantee insurance policy. These conditions have already been met, and therefore these deposits were released on July 14;

**b.- For the release of $18,600,000,000 (eighteen billion, six hundred million pesos)**

i.-    $9,300,000,000 (nine billion, three hundred million pesos) will be released when the following three conditions together are met:

- When the Court certifies that the Debtor Company's Judicial Reorganization Agreement is approved pursuant to Article 89 of Law No. 20,720 and that it may be fulfilled and begin to apply in accordance with Part Four of said article.

Presentation version 8/8

- That said Judicial Reorganization Agreement incorporates and agrees to the following matters: (a) Complete restructuring of the Enjoy international bond; and (b) Capitalization of at least 70% of the unsecured loans verified in the reorganization procedure, with a minimum of $115,000,000,000 (one hundred fifteen billion pesos); and c) That the text of the approved Reorganization Agreement includes statements aimed at confirming and expressly ratifying (c.i) all loans granted; (c.ii) the restructuring of liabilities; and (c.iii) transactions between the banks, Banco BTG Pactual Chile, Banco Internacional and Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos and their administered funds, including but not limited to BTG Pactual Deuda Privada Fondo de Inversión [Private Debt Investment Fund] and its respective subsidiaries and other related parties, with Enjoy and its subsidiary companies, in the two years prior to the start of the Judicial Reorganization Procedure, leaving confirmation in the text of the agreement of the withdrawal and final waiver by the creditors of all judicial or other types of actions seeking to dispute or question the efficacy and/or enforceability of the acts and agreements executed or entered into to which Points (c.1), (c.ii) and (c.iii) above refer, and the conditions noted in letter c) above, that have not been subject to dispute.

  In fulfillment of the above terms and conditions, by means of this Agreement, the matters to which Points (c.1), (c.ii) and (c.iii) above refer are expressly confirmed and ratified. Further, by means of this Agreement, the Creditors confirm the withdrawal and final abandonment of any judicial or other type of action that might seek to dispute or question the efficacy and/or enforceability of the instruments and agreements executed or entered into to which Points (c.1), (c.ii) and (c.iii) above refer.

- For purposes of the above, and without prejudice to the fact that the Bondholders Meeting held July 13 of this year approved and ratified the validation of the aforementioned deals, among other matters, the creditors present at this Deliberative Meeting expressly confirm and ratify (i) all grants of loans; (ii) the restructuring of liabilities; and (iii) arrangements entered into or executed between the banks, Banco BTG Pactual Chile, Banco Internacional and Banco Security, BTG Pactual Chile S.A. Administradora General de Fondos, and their administrated funds, including but not limited to BTG Pactual Deuda Privada Fondo de Inversión and their respective subsidiaries and other related parties, with Enjoy and its subsidiary companies, in the two years before the start of the Judicial Reorganization Procedure, and have stated that they expressly waive the exercise of any judicial or other type of action seeking to dispute or question the efficacy and/or enforceability of the acts and agreements executed or entered into to which Points (i), (ii) and (iii) above refer, or request their revocation.

- The effective disbursement of at least $25,000,000,000 (twenty-five billion pesos) under the New Financing granted to Enjoy, by one or more creditors, effectively incorporating said amount into the company's coffers.

ii.- $9,300,000,000 (nine billion, three hundred million pesos) will be released when the above conditions, together, have been met and the specific mortgage and restrictions set on the Rinconada Property have been legally recorded in favor of the Agent Bank, as creditor and guarantee agent, in the respective Real Estate Registry.

**c.- For the release of $8,300,000,000 (eight billion, three hundred million [pesos]):** Having fulfilled each and every one condition, together, mentioned previously in Parts a.- and b.- above, the procedure shall be: (a) The release of $4,150,000,000 (four billion, one hundred fifty million pesos), against the effective incorporation into Enjoy's coffers of at least another $10,000,000,000 (ten billion pesos) in addition to the $25,000,000,000 (twenty-five billion pesos) referenced previously; (b) The release of $4,150,000,000 (four billion, one hundred fifty million pesos) against the effective incorporation into Enjoy's coffers of at least another $5,000,000,000 (five billion pesos) in addition to the $25,000,000,000 (twenty-five billion pesos) and $10,000,000,000 (ten billion pesos) mentioned above.

**d.- For the release of the mortgage and restrictions on the Rinconada Property:** This may only be released as of month 18 after the date of issuance of the respective guarantee vouchers and/or policies, subject to certain conditions noted in the respective financing documents signed on the occasion of the issuance of the new guarantee vouchers, including that the decision approving the Judicial Reorganization Agreement be final and enforceable.

XIII.    **OBLIGATIONS TO DO AND NOT DO.**

As set forth in **Chapter IV**, the obligations to do and to not do shall be maintained vis-à-vis the International Bondholders as contained in the **Indenture** – with the changes described in **Appendix No. 1** with respect to the New International Bonds. In turn, the following obligations to do and not do shall be established exclusively vis-à-vis the rest of the Creditors enrolled in this Agreement:

1.**- Obligations to Do**.

a.- To carry out or cause to carry out all necessary measures to preserve and maintain in full force and effect its corporate existence and validity, without altering its corporate form, including its status as publicly traded, limited-liability corporation, registered with the Securities Registry maintained for these purposes by the CMF and, in addition, including but not limited to, its dissolution or transformation, without incurring legal grounds for dissolution; as well as to preserve and maintain all rights, properties, licenses, trademarks, permits, exemptions, easements, concessions or patents that may be necessary for the

Presentation version 8/8

normal functioning of the Debtor Company and the development of its business operations; and to maintain all its relevant assets in good state of repair consistent with their natural use and wear and tear.

b.- To pay all taxes and other applicable tax obligations as well as those of a labor-related origin or other preferential payments in accordance with current law, except those that may be disputed in good faith and in accordance with the appropriate legal procedures.

c.- To fulfill in all aspects the laws, regulations and provisions and applicable orders, specifically including, without restriction, the timely payment of all taxes, contributions, encumbrances and tax charges of any other kind affecting the Debtor Party or its assets, and to fulfill any tax, labor, social security and environmental obligations that may apply thereto in a timely fashion, as applicable, except those with respect to which the appropriate legal appeals have been filed in good faith.

d.- To provide the Bankruptcy Administrator with all additional financial and/or accounting information that might be requested thereby.

e.- To ensure that, at all times, its obligations under this Reorganization Agreement have at least the same prevalence and payment priority under the law as its remaining payment obligations, current or future, to other creditors of the same class, in accordance with the law. The above is without prejudice to the preferences set forth in this Reorganization Agreement.

f.- To complete, sign, execute and enter into any instruments and agreements to afford complete fulfillment of the Reorganization Agreement, as required of it by the Bankruptcy Administrator.

2.- **Obligations to Not Do**.

a.- Grant loans or credits or any type of financing to third parties, excluding subsidiaries, except in the case of financing within the Issuer's ordinary course of business, which must at all times and under all circumstances be carried out under market conditions.

b.- Enter into transactions with Related Parties, without fulfillment of the provisions of Title XVI of the Chilean Corporations Act [*Ley de Sociedades Anónimas*]. For all due purposes, "transactions with related parties" shall be understood as those defined as such in Article One Hundred Forty-Six of the Corporations Act, or that which may modify or replace it in the future.

c.- As of the date of the Deliberative Meeting approving the Proposal, to establish itself as endorser, guarantor, joint and several co-debtor or to commit its equity to fulfill third-party obligations, unless said third parties are subsidiaries of the Issuer.

46

Presentation version 8/8

## XIV. APPROVAL AND VALIDITY OF THE AGREEMENT.

1.- Pursuant to Art. 89 of Law 20,720, this Agreement shall be understood as approved and shall enter into force provided that:

a.- Upon expiration of the period for disputing it, without its having been disputed, the competent court so declares it at its own behest or at the petition of any interested party of the Auditor.

b.- If it has been disputed and the disputes are dismissed, provided that the resolution dismissing the dispute or disputes is enforceable and the Agreement is declared approved.

c.- If it had been disputed and the disputes were filed by creditors of a specified class or category, representing less than 30% of the liabilities with right to vote in their respective class or category and the court so states.

2.- The Reorganization Agreement shall be valid until the last of the following dates: (i) (a) the expiration date of the conversion period of the Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bond or (b) the date when all Convertible A-1 Bonds, Convertible A-2 Bonds and Convertible D Bonds have been converted, whichever occurs first, in the event that this latter event occurs before expiration of the aforementioned conversion period, and (ii) the date of occurrence of the exchange of the International Bonds for the New International Bonds.

## XV. CREDITORS COMMISSION.

1.- To oversee fulfillment of the stipulations of the Judicial Reorganization Agreement and the actions of the Company's Administrative Entities, a Creditors Commission is appointed (non-remunerated, except as noted further below), consisting of five acting members and their respective alternates (one for each acting member of the Creditors Commission), who shall exercise their duties so long as this Agreement remains in force. The Creditors Commission shall consist of two representatives of the International Bondholders, two representatives of the domestic bondholders and a fifth member, not a creditor nor a creditor representative, and its respective alternate, who shall be elected by the remaining members of the Creditors Commission at its first session, at which remuneration may also be set. Each creditor mentioned above shall be entitled to remove their representative from the Creditors Commission and appoint a replacement. The four acting members and alternates of the Creditors Commission who shall be creditor representatives shall be elected at the Creditors Meeting, respectively, by the International Bondholders (two acting members and two alternates) and domestic bondholders (two acting members and two alternate members). It is set forth that neither a renegotiation of International Bondholders nor a rescheduling of Unsecured Creditors shall involve a change or update in the members of the Creditors Commission.

2.- Members of the Creditors Commission shall be required to maintain absolute secrecy over all information that is confidential by nature of its content and must refrain from disclosing it to any person or entity. To

47

Presentation version 8/8

this end, they must sign a Confidentiality Agreement containing the obligation set forth above.

3.- The Enjoy S.A. Board of Directors has committed to adopting measures that, within the framework of the provisions of the Chilean Corporations Act [*Ley sobre Sociedades Anónimas*], allow it three (3) representatives on the Creditors Commission consisting of representatives of Enjoy's international and local bondholders, for them to be invited to Board sessions to discuss matters corresponding to the implementation and fulfillment of the Reorganization Agreement, in order to afford adequate coordination between matters submitted for the knowledge and approval of the Board of Directors, on the one hand, and fulfillment of the Reorganization Agreement and the powers of the Creditors Commission, on the other. For purposes of the above, members of the Creditors Commission must grant in advance a confidentiality agreement providing for due confidentiality of the Company's information on the part of those who might access it.

4.- The Commission shall set its form [of] functioning and determine the frequency of its meetings. There shall be acting and alternate members. Nevertheless, the management of the Debtor Company or the Bankruptcy Administrator, as the case may be, may request that the Creditors Commission meet to hear and decide upon specific matters. To this end, a certified letter shall be sent to the domicile of the legal representative of the respective members of the Creditors Commission or to their email addresses (registered at the first organizational session of this Commission), at least seven banking days in advance, requesting a meeting and noting the topics to be consulted or discussed. The resulting convocations must have at least two business day's difference between the first and second convocations. If, at the latter's request, the Creditor's Commission does not meet, having issued the two consecutive convocations, the corresponding authorizations shall be requested of the competent Court.

4.5.- As to quorums for sessions and majorities to approve resolutions, the Creditors Commission shall meet with the participation of a simple majority of its members (at least three) and resolutions shall be adopted by simple majority of its members attending the respective session (at least two), except with regard to the Renegotiation Conditions, Rescheduling Conditions and/or Financing Condition or the matters noted in Numbers 6.7.g and 6.7.j below, for which a quorum of attendance of at least 4 (four) of its members and a majority of at least four of those in attendance shall be required to approve resolutions.

5.6.- The Creditors Commission shall appoint a Chair thereof, which shall have the following powers:

a.- To convene the Commission members to meet, at the request of any Commission Member, the Bankruptcy Administrator or the Debtor Company.

b.- To convene the Creditors Meeting in all cases that the Commission deems necessary or appropriate.

48

c.- To communicate to the Debtor Company the decisions adopted by the Creditors Commission.

6 7.- The Creditors Commission shall have the following powers:

a.- To remove and replace the Administrator and request from it such information and actions as it deems relevant.

b.- To set the fees of the Administrator with regard to its administration activities as such. Said fees must be adapted to current market remuneration, in accordance with the complexity and responsibility of the position and the Company's payment capacity.

c.- To hear the background information provided by the Administrator, in particular the account of its management, the frequency of which shall be determined by the Commission.

d.- To provide the authorizations set forth in this Reorganization Agreement.

e.- To replace the Chair and/or Vice Chair of the Creditors Commission.

f.- To request the Debtor Company, through the Administrator's intermediation, for information on the regular course of business and its operations, plans and programs.

g.- Pursuant to Part Two, Art. 83 of Law 20,720, the Creditors Commission may amend all or part of the contents of the Reorganization Agreement, except with respect to the capacity of creditor, its class or category, differences between creditors of the same class or category, the amount of their loans and their preference. It is set forth that any modification to the rights of the International Bondholders under the Indenture or the New Indenture shall require the modification of said agreement, as applicable, with the prior consent of the Company and of the International Bondholders under the rules of the Indenture or the New Indenture.

h.- To authorize Enjoy, on an extraordinary basis, to not fulfill a specific obligation to do and/or to not do under this Reorganization Agreement.

i.- In representation of the creditors, to justifiably waive fulfillment of any of the conditions established to its benefit in the Agreement (subject to the respective quorum set in this Agreement), or to approve its fulfillment in a form other than that originally agreed to or to temporarily suspend its application.

j.- In the event that the Renegotiation Conditions stipulated in **Chapter IV**, or the Financing Conditions contained in **Chapter VIII** of this Reorganization Agreement are not fulfilled, the Creditors Commission shall analyze and identify a mechanism that permits implementing renegotiation of the International Bonds in

49

Presentation version 8/8

accordance with the terms stipulated in the aforementioned **Chapter IV** or, as the case may be, shall approve the appropriate formula for obtaining temporary financing, with the ability to agree with the Debtor Company on the terms and other conditions of this financing. These matters must be approved by at last four members of the Commission, who shall also set the terms for fulfilling execution of the instruments and agreements necessary for implementing and developing the aforementioned Creditor actions.

k.- To approve the Plan for the Use of Funds from the New Financing in general, with the Debtor Company to retain the allocation and specific responsibility for its implementation, the fulfillment of which will be supervised by the Administrator.

l.- Such other powers as this Agreement grants thereto.

m.- To attend Enjoy board of director sessions pursuant to No. 3 of this Chapter XV.

## XVI. BANKRUPTCY ADMINISTRATOR.

1.- Without prejudice to the formation of a Creditors Commission, and as set forth in Article 69 of Law 20,720, it is proposed that the Deliberative Creditors Meeting appoint an Administrator (hereinafter the '***Bankruptcy Administrator***' or '***Administrator***''), who shall exercise their duties so long as this Agreement remains in force, and shall have the powers set forth in the aforementioned article and those stipulated below.

2.- This appointment must fall to a current auditor from the List of Auditors registered with the Chilean Insolvency and Recovery Superintendency (*Superintendencia de Insolvencia y Reemprendimiento).*

3.- Without prejudice to the powers corresponding thereto under Article 294 of the Chilean Civil Procedures Code [*Código de Procedimiento Civil*], it is proposed that the appointed Bankruptcy Administrator have the following powers:

a.- Have access to the offices and facilities of the Debtor Company to request all the latter's accounting, financial and commercial information, in order to verify or monitor due fulfillment of the obligations assumed in this Reorganization Agreement.

b.- Inform the Creditors Commission of any background information or transaction executed by the Debtor Company that might affect normal servicing of the debt assigned to this Agreement.

c.- Regularly (at least monthly) inform the Creditors Commission of the revenue and expenses of the Debtor Company, and in particular its operational efficiency and expenses and its payment of suppliers.

d.- Draw up minutes of the Commission's meetings.

e.- Approve all payments made for debt service.

50

Presentation version 8/8

f.- Undertake confirmation as to the balance of the loans assigned to this Reorganization Agreement and determine the priority of the payments.

g.- Authorize the Debtor Company to grant personal or real guarantees to secure own and/or third-party obligations, in cases other than those already permitted under this Agreement, when linked to the Company's operations.

h.- Fulfill and execute all powers and obligations set forth in this Reorganization Agreement and those assigned thereto by the Creditors Commission.

i.- Regularly (at least monthly) inform the Creditors Commission as to the use of the funds originating from the Bridge Loan.

j.- Such other powers as are granted thereto in this Reorganization Agreement.

## XVII. NON-COMPLIANCE.

1.- Pursuant to Articles 98 and thereafter of Law 20,720, any creditor to which this Agreement is applied may request a declaration of non-compliance, in the event of failure to comply with the stipulations of this Agreement, and/or in the event that the poor condition of the Debtor Company's businesses has been aggravated in such a way as to cause said creditors fear of loss.

2.- It shall be an express cause for violation of the Reorganization Agreement, if the Financing Commitments do not exceed $25,000,000,000 (twenty-five billion pesos). Should said violation occur, Enjoy must immediately request its own voluntary liquidation.

3.- The following events shall be express causes for violation of the Reorganization Agreement (and a "Bankruptcy Law Event of Default" under the New Indenture): (i) that the extraordinary shareholders meeting for capital increase is not held [as] indicated in **Chapter X** above within 60 days after the date of the Deliberative Meeting; (ii) that at the aforementioned extraordinary shareholders meeting not all proposed matters are approved; (iii) that Enjoy does not sign each bond issuance agreement within 90 days after the date of the Deliberative Meeting; (iv) that Enjoy does not request that the CMF record the respective bonds on the Securities Registry within 120 days after the date of the Deliberative Meeting; (v) that Enjoy does not obtain from the CMF the recording of the respective bonds in the Securities Registry within one year after the date of the Deliberative Meeting; (vi) that Enjoy does not initiate the Preferential Offer Period within 30 business days after the deadline for effecting the recording in the CMF Securities Registry of the issuances of convertible bonds and shares; and (vii) that Enjoy does not undertake prepayments of the respective bonds on the dates set in this Agreement. Should any of the above events transpire, Enjoy must immediately request its own voluntary liquidation.

Presentation version 8/8

4.- Moreover, the Creditors may also individually exercise any actions conferred thereon by the law to obtain complete repayment of their loans, all within the framework of this Reorganization Agreement, except in the case of the shares of the International Bondholders under the Indenture, which shall be freely exercised without being subject to this Agreement as explained in Chapters IV and XVIII.

## XVIII. GUARANTEES.

Enjoy's obligations under the **Indenture** and the **International Bonds** are ratified, and therefore all real and personal guarantees established in these documents are maintained, ratified and reserved, in all their parts, to guarantee payment of the Indenture obligations, including but not limited to during the Extension of the International Bonds. Further, said real and personal Guarantees shall guarantee all Enjoy's obligations under the New Instruments, and the documents that may be required under Chilean and Uruguayan law for the due reserve, ratification and maintenance of the same must be granted, or for the creation of new guarantees in accordance with terms substantially identical to the current ones.

By means of this instrument, or rather, through a Public Instrument of Declaration (hereinafter the "*Declaration Instrument*"), forwarded to the 8th Civil Court of Santiago, in Case C-6,689-2020, before holding the Deliberative Meeting, Enjoy Gestión Limitada., Inversiones Enjoy SpA, Inversiones Inmobiliarias Enjoy SpA., Enjoy Consultora S.A., Inversiones Andes Entretención Limitada., Inmobiliaria Proyecto Integral Coquimbo SpA, Operaciones Integrales Coquimbo Limitada, Inmobiliaria Kuden SpA, Campos del Norte S.A., Enjoy Caribe SpA, Inmobiliaria Proyecto Integral Castro SpA, Slots S.A., Masterline S.A., Kuden S.A., Operaciones Turísticas S.A., Operaciones Integrales Isla Grande S.A., Rantrur S.A., Casino de Iquique S.A., Casino de la Bahía S.A., Casino del Mar S.A., Casino del Lago S.A., Casino de Puerto Varas S.A., Yojne S.A. and Baluma S.A. (hereinafter jointly the "*Guarantors*"), represented by the legal representatives Messrs. Esteban Rigo-Righi Baillie, RUT No. 13.454.480-5 and Rodrigo Larraín Kaplan, RUT No. 10.973.139-0, appear and expressly represent that they are acceding to Enjoy's obligations under the Indenture, this Agreement and the New Instruments, and expressly represent that the pledges, mortgages, trusts and joint and several co-debts established thereby as set forth in the terms noted in the Indenture, as applicable, shall also be extended to the obligations of the Debtor Company under the Indenture, this Agreement and the New Instruments, as set forth in this Agreement.

Additionally, by means of this instrument or through the Declaration Instrument, Inmobiliaria Proyecto Integral Coquimbo SpA and Inmobiliaria Kuden SpA, represented by their legal representatives Messrs. Esteban Rigo-Righi Baillie and Rodrigo Larraín, appear and represent that they will expressly accede to Enjoy's new obligations under the Indenture, this Agreement and the New Instruments herein agreed to. Further, pursuant to Article 1,642 of the Chilean Civil Code [*Código Civil*], Inmobiliaria Proyecto Integral Coquimbo SpA, Inmobiliaria Kuden SpA and the Debtor Company, all of them represented by the legal representatives Messrs. Esteban Rigo-Righi Baillie and Rodrigo Larraín Kaplan, and the International Bondholders expressly agree to the reserve of the mortgages established by Inmobiliaria Coquimbo SpA and Inmobiliaria Kuden SpA, to the benefit of the International Bondholders.

Presentation version 8/8

To remove all doubt, real and personal guarantees covering Enjoy's obligations under the Indenture and the International Bonds, reserved and ratified by means of this instrument or through the Declaration Instrument, are extended and accede to the total payment of Enjoy's debt to the International Bondholders, under either this Agreement, the current International Bonds, the Indenture and its Security Documents, or the New Indenture and New International Bonds in the event that the exchange provided for in **Chapter IV** is carried out, extending in all cases to the successive extensions, renegotiations or substitutions of said loans, as expressly accepted by the appearing guarantors.

The Guarantors, represented in the form set forth above, undertake to sign all instruments, agreements and documents that may be necessary or appropriate for the implementation of this Reorganization Agreement, including on or before the exchange of the International Bonds by the new Instruments and as a condition for said exchange, the granting of public instruments of reserve and ratification of the Guarantees, and the granting of the corresponding corporate authorizations, to the satisfaction of the International Bonds Trustee.

In the event that the International Bonds Trustee believes that, for any of the Guarantees, it is more beneficial for the International Bondholders to be granted new guarantee agreements applying to those same assets, moveable or real, in place of the ratification and reserve of existing ones, the Guarantors shall sign all instruments, agreements and documents that may be necessary or appropriate for the implementation of those new guarantees, under terms substantially identical to those of the current Guarantees, and the exchange condition shall be understood as fulfilled upon granting the new guarantees to the satisfaction of the International Bonds Trustee.

## XIX. FORMAL RECORDING REQUIREMENTS AND OTHER STIPULATIONS.

1. As set forth in Article 90 of Law 20,720, a copy of the minutes of the Creditors Meeting declaring a vote in favor of the Agreement and its complete text, and a copy of the court resolution approving it and its execution certificate, may be authorized by a certifying officer or be notarized by a notary public. Without prejudice to the above, the Debtor Company shall be required to sign the new instruments documenting the terms of this Agreement.

2.- This Reorganization Agreement, duly approved, shall have the effect of immediately terminating all pending judgments or of preventing the filing of legal actions of various kinds, whether civil, commercial or other, including but not limited to judgments of notification of collection of invoices, judgments of notification of protest of check, complaints for fraudulent passing of checks and/or enforcement judgments of any kind, which have been filed against the Debtor Company or its joint and several co-debtors, endorsers or guarantors, by the creditors to whom this Reorganization Agreement applies pursuant to Article 66 of Law 20,720.

3.- To this end, an authorized copy of the resolution approved by the Reorganization Agreement shall serve as timely and sufficient official notice to request the corresponding Court to call for termination of the judgment and

53

the lifting of attachments, precautionary measures and any encumbrances of various kinds. All the above is without prejudice to the direct instruction sent electronically for this purpose by the Court convened to hear this Proposal, requesting termination of the procedures and the respective lifting.

The Agreement now starting to apply shall have the same effect as indicated in the preceding paragraphs notwithstanding any disputes by creditors representing fewer than 30% of the liabilities with right to vote in their respective class or category, as provided for in Part Four, Article 89 of Law 20,720. For purposes of determining the percentage stipulated above, a certification must be executed by the Secretary of this Court.

4.- The creditors of the Debtor Company that have published their delinquent receivables in the respective registries maintained by various institutions, whether public or private, such as DICOM EQUIFAX, the *Boletín Comercial* published by the Chile Chamber of Commerce, the delinquency registry of the Financial Market Commission, and in general any existing registry of delinquencies in our country, hereby authorize the Debtor Company to request the elimination of all records of delinquencies and in general any publication related to this purpose, with regard to receivables prior to the Reorganization Resolution and those subsequent thereto concerning previously assumed loans.

Further, the creditors hereby undertake to not request new publications with respect to the loans forming part of this Reorganization Agreement, so long as the Debtor Company is current with fulfillment of its obligations under this Agreement.

The background information specified in the first number of this Chapter shall serve as timely and sufficient official notice for purposes of requesting elimination of the publications referenced previously.

5. The creditors and the Debtor Company set forth that after fulfillment of the Financing Condition, the restriction set forth in Article 67 of Law No. 20,720 shall not apply, without prejudice to the contractual restriction on effecting capital reductions under the New Indenture.

## XX.    REPRESENTATIONS AND ASSURANCES ON THE DATE OF THIS JUDICIAL REORGANIZATION AGREEMENT.

The Debtor Company, duly represented in the form stipulated in the body of this instrument, on this date, represents and assures the following to each Creditor of this Judicial Reorganization Agreement:

1.- That it is a corporation duly organized and current under the laws of Chile and that both the entering into of this Judicial Reorganization Agreement, and the fulfillment and execution of all the obligations contained therein fall within the legal and corporate powers that have been approved by its competent administrative entities; and that the parties appearing in this Judicial Reorganization Agreement on its behalf have sufficient power and

54

authority as to enter into this Reorganization Agreement and to fulfill the obligations assumed therein.

2.- That entering into this Judicial Reorganization Agreement does not require the approval or authorization of any additional government or judicial authority whatsoever, nor of third parties, except those already obtained and that remain current, and that it has no information or knowledge that entering into and fulfilling this Judicial Reorganization Agreement violates or contravenes current laws, regulations or resolutions, nor its respective bylaws. The above is without prejudice to any approvals and/or authorizations and/or procedures that may be required by reason of implementation of this Agreement, pursuant to **/i/** the bylaws of Enjoy; **/ii/** Law 18,046 on Corporations and its Regulation; **/iii/** Law 18,045 on the Securities Market and related regulations decreed by the Financial Market Commission; **/iv/** DL [Decree-Law] 211 setting the regulations for the protection of Free Trade; **/v/** Law No. 19,995 establishing the general bases for the authorization, functioning and monitoring of gambling casinos; **/vi/** regulations issued by the Chilean Superintendency of Gambling Casinos; and **/vii/** the applicable regulations and laws in Uruguay and Argentina.

3.- That this instrument constitutes legal, valid, necessary, enforceable, mandatory and sufficient documentation for its collection, and in any collection action involving the obligations under this Judicial Reorganization Agreement, it will recognize this instrument as sufficient for their collection.

4.- No waiver of any provision of this Judicial Reorganization Agreement, nor the consent for the Debtor Company to act differently therefrom, shall have any effect whatsoever unless granted in writing and signed by the Creditors Commission in this Judicial Reorganization Agreement, and in said case that waiver or consent shall have effect only in the specific case and for the specific purpose for which it has been granted. In all cases, any changes to this Judicial Reorganization Agreement must adhere to and comply, in all applicable aspects, with the stipulations contained in this instrument.

5.- The provisions of this Judicial Reorganization Agreement shall be mandatory for and extended to the benefit of the Parties and their respective legal successors and assigns.

6.- The names signed by the Parties for the various stipulations of this Reorganization Agreement have been established solely for reference and ease of reading, without affecting the meaning or scope of the entire clause which might differ from said name.

**XXI. DOMICILE AND COMPETENT JURISDICTION.**

The special domicile of the Agreement shall be the city of Santiago, and therefore the decision as to any difficulty that might arise in any of the classes or categories of this Agreement shall be submitted to the competency

Presentation version 8/8

of its ordinary courts, without excluding the possibility that the International Bondholders might resort for fulfillment of the Indenture to the corresponding jurisdictions under this agreement.

**<u>Exhibit C</u>**

**Annex 1**

| | |
|---|---|
| **ANEXO N° 1** | **ANNEX N° 1** |
| del | to |
| ACUERDO DE REORGANIZACIÓN JUDICIAL | THE PLAN |
| Nuevos Bonos Garantizados - Términos y Condiciones ("Term Sheet") | New Senior Secured Notes Term Sheet ("Term Sheet") |

1. **Bonos Garantizados Existentes.** Se hace referencia a la Escritura de Emisión de fecha 16 de mayo de 2017, complementada por Escritura de Emisión complementaria N° 1 de fecha 30 de mayo de 2017 (ambas, la "Escritura de Emisión Existente"), celebradas entre Enjoy S.A., una sociedad anónima abierta organizada y existente bajo las leyes de Chile (la "Compañía" o el "Emisor" o el "Deudor"), las Filiales Garantes parte de este documento, Citibank N.A. como Fideicomisario,[1] y Lord Securities Corporation como Agente de Garantía, en relación con los bonos garantizados tasa 10.50% emitidos por la Compañía pagaderas en 2022 (las "Bonos Garantizados Existentes").[2] Los términos en mayúsculas en este Anexo N° 1 tendrán el mismo significado que en la Escritura de Emisión Existente o el Acuerdo de Reorganización Judicial (como se definen más adelante), según dicho Acuerdo de Reorganización Judicial se propone a la fecha del presente y modificación al mismo circulado a Tenedores y beneficiarios finales de derechos sobre los Bonos Garantizados Existentes ("Beneficiarios Finales"). [3]

2. **Acuerdo de Reorganización Judicial.** La Compañía ha solicitado el Acuerdo de Reorganización Judicial de Enjoy S.A. (el "Acuerdo de Reorganización Judicial") en un procedimiento de reorganización (el "Procedimiento de Reorganización") regulado por el Capítulo III de la Ley N° 20.720 de Reorganización y Liquidación de Empresas y Personas en el 8° Juzgado Civil de Santiago en Santiago de Chile (el "Tribunal Chileno") (cuyo procedimiento comenzó el 5 de mayo de 2020).

3. **Nuevos Bonos Garantizados.**

(a) De acuerdo con el Acuerdo de Reorganización Judicial, y sujeto a las condiciones del Párrafo 11 siguiente (las "Condición de Intercambio de los Bonos Garantizados"), se emitirán nuevos "Bonos Garantizados 2027" (los "Nuevos Bonos Garantizados") en reemplazo de las Bonos Garantizados Existentes. Cuando y si es que son emitidos, se considerará como fecha de emisión de los Nuevos Bonos Garantizados (la "Fecha de Emisión de los Nuevos Bonos Garantizados") la fecha de la Junta Deliberativa de Acreedores.

1. **Existing Senior Secured Notes.** Reference is made to the Indenture dated as of May 16, 2017, as supplemented by the Supplemental Indenture No. 1 dated as of May 30, 2017 (together, the "Existing Indenture"), each among Enjoy S.A., a publicly traded stock corporation (*sociedad anónima abierta*) organized and existing under the laws of Chile (the "Company" or the "Issuer" or the "Debtor"), the Subsidiary Guarantors party thereto, Citibank N.A. as Trustee, and Lord Securities Corporation as Collateral Agent, relating to the Company's 10.50% Senior Secured Notes due 2022 (the "Existing Senior Secured Notes"). [2] Capitalized terms used in this Annex N° 1 shall have the meanings assigned thereto in the Existing Indenture or the Plan (as hereinafter defined), as such Plan is proposed as of the date this Term Sheet and an amended Plan is distributed to Holders and owners of beneficial interests (the "Beneficial Owners") in the Existing Senior Secured Notes. [3]

2. **The Plan.** The Company has filed the *Enjoy S.A. Judicial Reorganization Agreement* (the "Plan") in a reorganization proceeding (the "Reorganization Proceeding") governed by Chapter III of Law N°20,720 on Reorganization and Liquidation of Companies and Individuals in the 8° Civil Court of Santiago in Santiago, Chile (the "Chilean Court") (which proceeding was commenced on May 5, 2020).

3. **New Senior Secured Notes.**

(a) Pursuant to the Plan, and subject to conditions set forth in Paragraph 11 below (the "Senior Secured Notes Exchange Conditions"), new "Senior Secured Notes due 2027" (the "New Senior Secured Notes") shall be issued in exchange for the Existing Senior Secured Notes. When and if issued, the issuance date of the New Senior Secured Notes shall be deemed to be (the "New Senior Secured Notes Issuance Date") the date of the Deliberative Creditors' Meeting.

1

(b)    Las Nuevos Bonos Garantizados consistirán en dos tramos identificados como Tramo A y Tramo B. El Tramo A y el Tramo B de las Nuevos Bonos Garantizados  serán idénticos en todos los aspectos, excepto (i) con respecto a la prioridad dada a los canjes obligatorios del Tramo A de las Nuevos Bonos Garantizados  según se establece a continuación, y (ii) tras cualquier liquidación de la Compañía, el Tramo A de las Nuevos Bonos Garantizados se pagará en su totalidad (en cuanto al capital y los intereses acumulados y no pagados) antes de cualquier pago del Tramo B de los Nuevos Bonos Garantizados.

(c)    El Tramo A de Nuevos Bonos Garantizados será emitido en reemplazo de las Bonos Garantizados Existentes mantenidos por los Beneficiarios Finales que elijan suscribir la compra de los Pagarés del Crédito Puente, suscripción que estará disponible para todos los Beneficiarios Finales de Bonos Garantizados Existentes.  El Tramo B de las Nuevos Bonos Garantizados será emitido en reemplazo de las Bonos Garantizados Existentes mantenidas por todos los demás Beneficiarios Finales.

4.    Nuevos Bonos Garantizados la Nueva Escritura de Emisión. Las Nuevos Bonos Garantizados serán emitidos por la Compañía en virtud de, y estarán regulados por, una escritura (la "Nueva Escritura de Emisión"). Las Nuevos Bonos Garantizados el Nueva Escritura de Emisión  serán idénticos a los Bonos Garantizados Existentes y la Escritura de Emisión  de Emisión Existente, excepto por (i) las modificaciones o variaciones descritas en este Term Sheet, y (ii) las modificaciones y variaciones inmateriales que sean solicitadas razonablemente por el fideicomisario de los Nuevos Bonos Garantizados (el "Nuevo Fideicomisario") y una mayoría en la principal cantidad de intereses financieros en las Bonos Garantizados Existentes (la "Beneficiarios Finales Mayoritarios"). El Nuevo Fideicomisario inicial será UMB BANK, N.A.

5.    Gravámenes y Documentos de Garantía. Los documentos de garantía existentes serán enmendados y modificados para proporcionar que los Nuevos Bonos Garantizados estén caucionados por Gravámenes de primera prioridad de conformidad con los Documentos de Garantía Existentes (en su forma enmendada y modificada, los "Nuevos Documentos de Garantía ") en la misma medida y de la misma manera que las Bonos Garantizados Existentes están actualmente aseguradas, incluso según lo dispuesto actualmente en el Artículo Once de la Escritura de Emisión de Emisión Existente, para cumplir con las disposiciones de este Term Sheet, y con el mismo Agente de

(b)    The New Senior Secured Notes shall consist of two tranches, identified as "Tranche A" and "Tranche B". The Tranche A and Tranche B New Senior Secured Notes shall be identical in all respects, except (i) as provided below regarding the priority given to mandatory redemptions of the Tranche A New Senior Secured Notes, and (ii) upon any liquidation of the Company, the Tranche A New Senior Secured Notes shall be paid in full (as to principal and accrued and unpaid interest) prior to any payment on the Tranche B New Senior Secured Notes.

(c)    Tranche A New Senior Secured Notes shall be issued in exchange for Existing Senior Secured Notes held by Beneficial Owners who elect to subscribe to purchase the Bridge Loan Notes, which shall be made available for subscription to all of the Beneficial Owners of the Existing Senior Secured Notes.  Tranche B New Senior Secured Notes shall be issued in exchange for Existing Senior Secured Notes held by all other Beneficial Owners.

4.    New Senior Secured Notes and New Indenture. The New Senior Secured Notes shall be issued by the Company pursuant to, and governed by, an indenture (the "New Indenture"). The New Senior Secured Notes and the New Indenture shall be identical to the Existing Senior Secured Notes and the Existing Indenture, except for (i) the modifications or variations described in this Term Sheet, and (ii) immaterial modifications or variations that shall be reasonably requested by the trustee for the New Senior Secured Notes Trustee (the "New Trustee") and a majority in principal amount of the beneficial interests in the Existing Senior Secured Notes (the "Majority Beneficial Owners"). The initial New Trustee shall be UMB BANK, N.A.

5.    Liens and Security Documents. The Existing Security Documents shall be amended and modified (or at the election of the New Trustee, new Security Documents identical to the Existing Security Documents shall be executed and recorded) to provide that the New Senior Secured Notes shall be secured by first-priority Liens pursuant to the Existing Security Documents (as so amended and modified, the "New Security Documents") to the same extent and in the same manner as the Existing Senior Secured Notes are currently secured, including as provided currently in Article Eleven of the Existing Indenture, to

2

Garantía inicial, y los nuevos títulos ejecutivos en Chile y Uruguay para facilitar la ejecución de los Gravámenes se proporcionarán a satisfacción del Fideicomisario Existente, el Nuevo Fideicomisario, el Agente de Garantía y los Beneficiarios Finales Mayoritarios.

6. <u>Filiales Garantes</u>. Las Filiales Garantes bajo el Nueva Escritura de Emisión serán los mismos que aquellos bajo la Escritura de Emisión Existente, y con las obligaciones del Garante según se establece actualmente en el Artículo Doce de la Escritura de Emisión Existente. Las Filiales Garantes acordarán que sus obligaciones bajo la Escritura de Emisión Existente y los Documentos de Garantía Existentes se extenderán a las Nuevos Bonos Garantizados para todos los propósitos legales, y según se acuerda en este documento, en particular para los propósitos del artículo 1649 del Código Civil de Chile. En consecuencia, todas las Hipotecas, Contratos de Prenda y otras garantías de las Filiales Garantes son y serán ratificadas y extendidas en consecuencia, y garantizarán todas las obligaciones bajo los Nuevos Bonos Garantizados, la Nueva Escritura de Emisión y los Nuevos Documentos de Garantía .

7. <u>Vencimiento de los Nuevos Bonos Garantizados y Liquidaciones</u>.

(a)   <u>Vencimiento Pactado</u>. El Vencimiento Pactado para los Nuevos Bonos Garantizados será el séptimo aniversario de la fecha de la Junta Deliberativa de Acreedores.

(b)   <u>Rescate Opcional.</u> La Nueva Escritura de Emisión, incluyendo el Artículo Cinco (<u>Rescate Opcional de los Bonos</u>), se verá modificada (a partir de la Escritura de Emisión Existente) de la siguiente manera (con un lenguaje conforme en la Nueva Escritura de Emisión según sea necesario para reflejar lo siguiente):

(i)   Cualquier rescate opcional (o prepago del capital) de los Nuevos Bonos Garantizados se realizará únicamente en relación con todos los Nuevos Bonos Garantizados que se encuentren vigentes (una "<u>Rescate Opcional</u>"); y no se permitirá ninguna Rescate Opcional por menos que todos los Nuevos Bonos Garantizados. Una "Rescate Opcional " no incluye ninguna Venta/Rescate Especial de Activos , siempre que la Compañía haya cumplido con los términos y condiciones de la Venta/Rescate Especial de Activos.

conform to the provisions of this Term Sheet, and with the same initial Collateral Agent, and new executive titles (*títulos ejecutivos*) in Chile and Uruguay to facilitate the execution of the Liens shall be provided to the satisfaction of the Existing Trustee, the New Trustee, the Collateral Agent and the Majority Beneficial Owners.

6. <u>Subsidiary Guarantors</u>. The Subsidiary Guarantors under the New Indenture shall be the same as under the Existing Indenture, and with Guarantor obligations as provided currently in Article Twelve of the Existing Indenture. The Subsidiary Guarantors shall agree that their obligations under the Existing Indenture and the Existing Security Documents shall be extended to the New Senior Secured Notes for all legal purposes as agreed herein, in particular for purposes of article 1649 of the Chilean Civil Code. Consequently, all Mortgages, Collateral Pledge Agreements and other guarantees granted by the Subsidiary Guarantors are and shall be ratified and extended accordingly, and will secure all obligations under the New Senior Secured Notes, the New Indenture and the New Security Documents.

7. <u>New Senior Secured Notes Stated Maturity and Redemptions</u>.

(a)   <u>Stated Maturity</u>. The Stated Maturity for the New Senior Secured Notes shall be the seventh anniversary of the date of the Deliberative Creditors Meeting.

(c)   <u>Optional Redemption</u>. The New Indenture, including Article Five (<u>Optional Redemption of Notes</u>), shall be modified (from the Existing Indenture) as follows (with conforming language in the New Indenture as necessary to reflect the following):

(i)   Any optional redemption (or prepayment of principal) of the New Senior Secured Notes shall be solely as to all of the New Senior Secured Notes then outstanding (an "<u>Optional Redemption</u>"); and any Optional Redemption of less than all of the New Senior Secured Notes shall not be permitted. "Optional Redemption" does not include any Special Asset Sale/Redemption provided that there has been compliance by the Company with the terms and conditions of the Special Asset Sale/Redemption.

(ii)    No se permitirá Rescate Opcional de los Nuevos Bonos Garantizados durante los Años 1 y 2 (como se menciona a continuación) después de la Fecha de Emisión de los Nuevos Bonos Garantizados.

(ii)    El Rescate Opcional de los Nuevos Bonos Garantizados se permitirá después de los Años 1 y 2, y los precios de rescate de los Nuevos Bonos Garantizados serán los establecidos en el Párrafo 5 (Rescate Opcional) del "Formulario del Reverso del Bono" del "Formato de Bono" adjunto como Anexo A de la Nueva Escritura de Emisión, que será modificada en los términos del "Apéndice A" adjunto al presente.

(d)    Venta/Rescate Especial de Activos

(i)    (A)    La Compañía y sus Filiales Restringidas y Filiales Garantes podrán efectuar una venta de los Activos Baluma, los Activos Coquimbo y los Activos Pucón (los "Activos Especiales") (una "Venta Especial de Activos") siempre que:

(1)    la venta de cualquiera de los Activos Especiales se realice (x) en condiciones equitativas y con todas las aprobaciones corporativas necesarias, e (y) por un precio igual o mayor que el Valor Justo de Mercado de dicho Activo Especial;

(2)    la Compañía proporcionará al Nuevo Fideicomisario (las siguientes, conjuntamente, "Opiniones de Venta Especial de Activos"): (x) una opinión, de una reconocido banco de inversiones chileno independiente o tasadora, de que la transacción cumple con las condiciones de la sub-cláusula (1) anterior; y (y) cualquier certificado u opinión requerido bajo la Sección 314(d)(1) de la Ley de Escrituras de Emisión de 1939, y sus modificaciones, o de otra forma requerida bajo la Nueva Escritura de Emisión (incluida la Sección 11.6 (Liberación de Garantía) o los Nuevos Documentos de Garantía en relación con la liberación de cualquier Garantía Real; y

(3)    la Compañía efectúe (dentro de los 30 Días Hábiles posteriores a la venta) las liquidaciones de los Nuevos Bonos Garantizados como se describe a continuación.

(B)    Ninguna otra "disposición" de los Activos Especiales será permitida, a no ser que:

(1)    No obstante las restricciones mencionadas anteriormente sobre cualquier disposición de

(ii)    No Optional Redemption of the New Senior Secured Notes shall be allowed during Years 1 and 2 (as referenced below) following the New Senior Secured Notes Issuance Date.

(iii)    The Optional Redemption of the New Senior Secured Notes shall be allowed after Years 1 and 2, and the redemption prices for the New Senior Secured Notes shall be as set forth in Paragraph 5 (Optional Redemption) of the "Form of Reverse of Note" of the "Form of Note" attached as Exhibit A to the New Indenture, modified as shown Schedule A hereto.

(c)    Special Asset Sale/Redemption.

(i)    (A)    The Company and its Restricted Subsidiaries and Subsidiary Guarantors shall be allowed to effect a sale of the Baluma Assets, the Coquimbo Assets and the Pucón Assets (the "Special Assets") (a "Special Asset Sale") provided that:

(1)    the sale of any of the Special Assets is (x) effected on an arms' length basis and with all necessary corporate approvals, and (y) for a price equal to or greater than the Fair Market Value of such Special Asset;

(2)    the Company shall provide to the New Trustee (the following together, the "Special Asset Sale Opinions"): (x) an opinion of a recognized Chilean independent investment banking or valuation firm that the transaction satisfies the conditions of the foregoing subclause (1); and (y) any certificate or opinion required under Section 314(d)(1) of the Trust Indenture Act of 1939, as amended, or otherwise required under the New Indenture (including Indenture Section 11.6 (Release of Collateral)) or the New Security Documents in connection with the release of any Collateral; and

(3)    the Company effects (within 30 Business Days following the sale) redemptions of the New Senior Secured Notes as described below.

(B)    No other "disposition" of the Special Assets shall be permitted except as follows:

(1)    Notwithstanding the restrictions referenced above on any disposition of

Activos Especiales, una Venta Especial de Activos puede incluir una Transacción de Venta y Arrendamiento que cumpla de otra manera con las disposiciones y condiciones de una Venta Especial de Activos y una Venta/Rescate Especial de Activos (como se define aquí) adelante en este Párrafo 7 (c).

(2)    Una transferencia de los Activos Especiales a cualquier Filial que sea propiedad total (directa o indirecta) de la Compañía, que sea tanto una Filial Restringida como una Filial Garante que sea 100% propiedad de la Compañía como parte de una reestructuración corporativa no será considerada una Venta Especial de Activos (una "Reestructuración Corporativa Aprobada") siempre que: (x) el cesionario acepte que tanto éste como los Activos Especiales continuarán sujetos a las condiciones y disposiciones de la Venta Especial de Activos y de la Venta/Rescate Especial de Activos y todas las demás condiciones y disposiciones de la Nueva Escritura de Emisión de Emisión, incluso con respecto a la creación de Gravámenes sobre los Activos Especiales y en el caso de cualquier disposición futura (o intento de disposición) de los Activos Especiales; e (y) todos los Nuevos Documentos de Garantía que cubran los Activos Especiales se enmendarán y modificarán según lo requiera el Nuevo Fideicomisario y el Agente de Garantía para preservar los gravámenes de primera prioridad de las Nuevos Bonos Garantizados en cuanto a los Activos Especiales y hacer que los Nuevos Documentos de Garantía continúen en plena vigencia y efecto sin efecto adverso sobre dichos Gravámenes de primera prioridad de las Nuevos Bonos Garantizados.

(i)    (A)    "Monto Mínimo de Rescate" significa lo siguiente en cuanto a cada Venta Especial de Activos:

Monto Mínimo de Rescate
Activos Baluma        US$ 160 millones
Activos Coquimbo    UF 1.150.000
Activos Pucón          UF 660.000

(B)    Si se produce una Venta Especial de Activos, entonces una cantidad equivalente al mayor de los Montos Mínimos de Rescate aplicables a dicha Venta Especial de Activos y al 80% de los ingresos netos en efectivo (y el equivalente en efectivo del Valor Justo de Mercado de cualquier contraprestación no efectiva) recibidos por la Compañía en dicha Venta Especial de Activos serán pagados a la Compañía en efectivo (dólares estadounidenses) (independientemente de la forma de contraprestación recibida por la Compañía en la Venta Especial de Activos) para rescatar Nuevos Bonos Garantizados en el orden de prioridad descrita abajo. Todos los ingresos (o el equivalente en efectivo del Valor Justo de Mercado) de cualquier Venta Especial de Activos se depositarán con el Agente de Garantía para financiar (total o

the Special Assets, a Special Asset Sale may include a Sale and Leaseback Transaction that complies otherwise with the provisions and conditions of a Special Asset Sale and a Special Asset Sale/Redemption (as defined herein) set forth on this Paragraph 7(c).

(2)    A transfer of the Special Assets to any Subsidiary wholly-owned (directly or indirectly) by the Company which is both a Restricted Subsidiary and a Subsidiary Guarantor that is 100% owned by the Company as part of a corporate restructuring shall not be deemed to be a Special Asset Sale provided that (an "Approved Corporate Restructuring"): (x) such transferee agrees that it and the Special Assets shall continue to be bound by the Special Asset Sale and the Special Asset Sale/Redemption conditions and provisions and all other conditions and provisions of the New Indenture, including regarding the incurrence of Liens on the Special Assets and in the event of any future disposition (or attempted disposition) of the Special Assets; and (y) all New Security Documents covering the Special Assets shall be amended and modified as required by the New Trustee and the Collateral Agent to preserve the first-priority Liens of the New Senior Secured Notes as to the Special Assets and to cause the New Security Documents to continue in full force and effect without adverse effect on such first-priority Liens of the New Senior Secured Notes.

(i)    (A)    "Minimum Redemption Amount" means the following as to each Special Asset Sale:

Minimum Redemption Amount
Baluma Assets         US$ 160 million
Coquimbo Assets    UF 1,150,000
Pucón Assets            UF 660,000

(B)    If there shall occur a Special Asset Sale, then an amount equal to the greater of the Minimum Redemption Amount applicable to such Special Asset Sale and 80% of the net cash proceeds (and the cash equivalent of the Fair Market Value of any non-cash consideration) received by the Company in such Special Asset Sale shall be paid by the Company in cash (U.S. dollars) (regardless of the form of consideration received by the Company in the Special Asset Sale) to redeem New Senior Secured Notes in the priority described below. All proceeds (or Fair Market Value cash equivalent) from any Special Asset Sale shall be deposited with the Collateral Agent to fund (in whole or in part) such redemption. The redemption price for New Senior

parcialmente) dicho rescate. El precio de rescate o rescate de los Nuevos Bonos Senior Garantizados será el monto de capital de dichos Nuevos Bonos Garantizados redimidos más todos los intereses (incluidos los Intereses Incumplidos) acumulados e impagos en la fecha de pago del rescate. Cualquier Nuevo Bono Garantizado que no se rescate permanecerá vigente. Toda Venta Especial de Activos y rescate de Nuevos Bonos Garantizados se denominan "Venta/Rescate Especial de Activos", y la cantidad de efectivo requerida para efectuar la Venta/Rescate Especial de Activos se denomina en este documento "Monto de Venta/Rescate Especial de Activos". Inmediatamente después de cualquier Venta/Rescate Especial de Activos , los ingresos netos de la Venta/Rescate Especial de Activos que no se utilicen para financiar dicha Venta/Rescate Especial de Activos se devolverán a la Compañía

(iii)    Sin perjuicio de las disposiciones de la Sección 3.13 de la Escritura de Emisión  (Limitación de las Ventas de Activos), la Sección 3.15 (Limitación de las Transacciones de Venta y Arrendamiento) y la Sección 3.19 (Limitación de las Transacciones con Relacionados), o cualquier otra disposición de la Nueva Escritura de Emisión , y las acciones que la Compañía o las Filiales Restringidas puedan estar autorizadas a realizar bajo las Secciones 3.13, 3.15 y 3.19 de la Escritura de Emisión o de otra forma, ninguna Venta de Activos (incluida cualquier Transacción de Venta y Arrendamiento) u otra "disposición" con respecto a los Activos Baluma, los Activos Coquimbo y los Activos Pucón se permite excepto como (x) Venta Especial de Activos y con una Venta/Rescate Especial de Activos , (y) Reestructuración Corporativa Aprobada, o (z) con el consentimiento de Tenedores o Beneficiarios Finales de al menos 66-2/3% del monto total de capital de Nuevos Bonos Garantizados vigentes (y tal consentimiento podrá modificar las obligaciones de rescate de la Compañía en una Venta/Rescate Especial de Activos).

(iv)    Tras el cierre o consumación de cualquier Venta Especial de Activos, la Compañía dará aviso al Fideicomisario y (distribuida por la Compañía a través de DTC) a los Tenedores y Beneficiarios Finales de las Nuevos Bonos Garantizados acerca de la Venta Especial de Activos y de las obligaciones de rescate de la Compañía (un "Aviso de Venta/Rescate Especial de Activos"). El Aviso de Venta/Rescate Especial de Activos describirá con razonable detalle los términos de la Venta Especial de Activos (incluyendo un resumen razonable de las Opiniones de Venta Especial de Activos o copias de estos) y el Monto de la Venta/Rescate Especial de Activos para el rescate de Nuevos Bonos Garantizados. Los Beneficiarios Finales del Tramo A de Nuevos Bonos Garantizados podrán optar (dentro de los 10 Días Hábiles posteriores al Aviso de Venta/Rescate Especial de Activos) por el rescate de

Secured Notes shall be the principal amount of such New Senior Secured Notes redeemed plus all interest (including Defaulted Interest) thereunder accrued and unpaid at the redemption payment date. Any New Senior Secured Notes that are not redeemed shall remain outstanding. Any Special Asset Sale and the redemption of New Senior Secured Notes is referred to as a "Special Asset Sale/Redemption", and the amount of cash required to effect the Special Asset Sale/Redemption is referred to herein as the "Special Asset Sale/Redemption Amount".  Immediately following any Special Asset Sale/Redemption, the net proceeds of the Special Asset Sale that are not used to fund such Special Asset Sale/Redemption shall be returned to the Company.

(iii)    Notwithstanding the provisions of Indenture Section 3.13 (Limitation on Asset Sales), Indenture Section 3.15 (Limitation on Sale and Leaseback Transactions) and Indenture Section 3.19 (Limitation on Transactions with Affiliates), or any other provision of the New Indenture, and actions that the Company or Restricted Subsidiaries may be permitted to take under Indenture Sections 3.13, 3.15 and 3.19 or otherwise, no Asset Sale (including any Sale and Leaseback Transaction) or other "disposition" with respect to the Baluma Assets, the Coquimbo Assets and the Pucón Assets shall be permitted except (x) as a Special Asset Sale and with a Special Asset Sale/Redemption, (y) an Approved Corporate Restructuring, or (z) otherwise with the consent of the Holders or Beneficial Owners of at least 66-2/3% in aggregate principal amount of the New Senior Secured Notes then outstanding (and any such consent may modify the redemption obligations of the Company under any Special Asset Sale/Redemption).

(iv)    Upon the closing or consummation of any Special Asset Sale, the Company shall give notice to the Trustee and notice (distributed by the Company through DTC) to the Holders and Beneficial Owners of the New Senior Secured Notes of the Special Asset Sale and the mandatory redemption obligations of the Company (a "Special Asset Sale/Redemption Notice"). The Special Asset Sale/Redemption Notice shall describe in reasonable detail the terms of the Special Asset Sale (including a reasonable summary of the Special Asset Sale Opinions or copies thereof) and the Special Asset Sale/Redemption Amount for redemption of New Senior Secured Notes. The Beneficial Owners of the Tranche A New Senior Secured Notes may elect (within 10 Business Days after the Special Asset Sale/Redemption Notice) to

sus Nuevos Bonos Garantizados y declarando el monto de capital de los Nuevos Bonos Garantizados que deseen sean rescatados. Si las elecciones de rescate por parte de los Beneficiarios Finales del Tramo A de las Nuevos Bonos Garantizados superan el Monto de Venta/Rescate Especial de Activos, el rescate se prorrateará entre los Beneficiarios Finales del Tramo A que hayan optado por el rescate de sus Nuevos Bonos Garantizados. Si las elecciones de rescate por parte de los Beneficiarios Finales del Tramo A de las Nuevos Bonos Garantizados suman menos que el Monto de Venta/Rescate Especial de Activos, todos los fondos que no se usen para rescatar el Tramo A de los Nuevos Bonos Garantizados se utilizarán para rescatar (obligatoriamente) Nuevos Bonos Garantizados del Tramo B. Si, después de dichos rescates del Tramo B de los Nuevos Bonos Garantizados, aún quedan fondos del Monto de Venta/Rescate Especial de Activos, entonces dichos fondos se utilizarán para rescatar (obligatoriamente) Nuevos Bonos Garantizados del Tramo A (pero después de dar prioridad a las elecciones de rescate iniciales de los Beneficiarios Finales del Tramo A de las Nuevos Bonos Garantizados según se estableció precedentemente.

(v)    No obstante las otras disposiciones de este Párrafo 7 (c), en el caso de cualquier transacción que afecte a los Activos Especiales que también sea un Cambio de Control, las disposiciones de la Sección 3.7 de la Escritura de Emisión de Emisión (Evento de Recompra de Cambio de Control) continuarán aplicándose.

8.    Fecha de Pago de Intereses y Tasa de Interés Nuevos Bonos Garantizados

(a)    Las Fechas de Pago de Intereses bajo los Nuevos Bonos Garantizados serán los días 14 de los meses de agosto, noviembre, febrero y mayo siguientes a la fecha de emisión de los Nuevos Bonos Garantizados con fecha de registro el primer día de cada uno de esos meses.

(b)    (i)    Los intereses se devengarán bajo los Nuevos Bonos Garantizados (desde y hasta después de la fecha de emisión de los Nuevos Bonos Garantizados) de acuerdo con las siguientes tasas anuales durante cada uno de los Años (v.gr., periodos de 12 meses) que se indican a continuación con posterioridad a la fecha de emisión de los Nuevos Bonos Garantizados y hasta la fecha en que sean íntegramente pagados los Nuevos Bonos Garantizados y las obligaciones que de ellos emanan:

have their New Senior Secured Notes redeemed and stating the principal amount of the New Senior Secured Notes they wish to have redeemed. If redemption elections by the Beneficial Owners of the Tranche A New Senior Secured Notes exceed the Special Asset Sale/Redemption Amount, the redemption shall be prorated among the electing Beneficial Owners of the Tranche A New Senior Secured Notes. If redemption elections by the Beneficial Owners of the Tranche A New Senior Secured Notes aggregate less than the Special Asset Sale/Redemption Amount, any funds not used to redeem Tranche A New Senior Secured Notes shall be used to redeem (mandatorily) Tranche B New Senior Secured Notes. If, after such redemptions of the Tranche B New Senior Secured Notes, there are funds remaining from the Special Asset Sale/Redemption Amount, then such funds shall be used to redeem (mandatorily) additional Tranche A New Senior Secured Notes (but after giving priority to the initial redemption elections of the Beneficial Owners of the Tranche A New Senior Secured Notes as stated above).

(v)    Notwithstanding the other provisions of this Paragraph 7(c), in the event of any transaction affecting the Special Assets which is also a Change of Control, the provisions of Indenture Section 3.7 (Change of Control Repurchase Event) shall continue to apply.

8.    New Senior Secured Notes Interest Payment Dates and Interest Rates.

(a)    The Interest Payment Dates under the New Senior Secured Notes shall be the 14th day of each August, November, February and May following the New Senior Secured Notes Issuance Date with Record Dates on the first day of each such month.

(b)    (i)    Interest shall accrue under the New Senior Secured Notes (from and after the New Senior Secured Notes Issuance Date) at the following annual rates during each of the Years (i.e. 12-month periods) indicated below following the New Senior Secured Notes Issuance Date and until the New Senior Secured Notes and all Obligations thereunder are paid in full:

7

| | | | | |
|---|---|---|---|---|
| Año 1: | 6,0% | | Year 1: | 6.0% |
| Año 2: | 7,0% | | Year 2: | 7.0% |
| Año 3: | 7,5% | | Year 3: | 7.5% |
| Año 4: | 8,0% | | Year 4: | 8.0% |
| Año 5: | 8,5% | | Year 5: | 8.5% |
| Año 6: | 9,0% | | Year 6: | 9.0% |
| Año 7 y sigte.: | 9,5% | | Year 7 et. seq.: | 9.5% |

(ii)     Los intereses que se devenguen durante cada uno de los trimestres en el Año 1 no serán pagaderos en dinero, sino que serán capitalizados y añadidos al monto de capital de los Nuevos Bonos Garantizados, y los intereses sobre dichos intereses capitalizados (monto de capital adicional) devengarán sobre los mismos desde y hasta la Fecha de Pago de Intereses de pago aplicable. Cincuenta (50%) de los intereses que se devenguen durante el primer y segundo trimestre del Año 2 no serán pagaderos en dinero, sino que serán capitalizados y añadidos al monto de capital de los Nuevos Bonos Garantizados, y los intereses sobre tales intereses capitalizados (monto de capital adicional) se devengarán sobre los mismos desde y después de la Fecha de Pago de Intereses aplicable.

(iii)     todos los intereses que se devenguen bajo los Nuevos Bonos Garantizados que no sean capitalizados serán pagaderos en dinero a la Fecha de Pago de Intereses aplicable. Los Intereses Morosos ser aplicarán en los Nuevos Bonos Garantizados (calculados desde la Fecha de Pago de Intereses aplicable) a cualquier interés pagadero en dinero y no pagado oportunamente a la Fecha de Pago de Intereses aplicable. Tan pronto a continuación de cada Fecha de Pago de Intereses, la Compañía entregará al Fideicomisario y a los Tenedores y Beneficiarios Finales de los Nuevos Bonos Garantizados un reporte indicando los montos de intereses capitalizados correspondientes a esas Fechas de Pago de Intereses y acumuladamente.

9.     Ciertas Obligaciones de la Nueva Escritura de Emisión y Eventos de Incumplimiento. La Nueva Escritura de Emisión dispondrá lo siguiente:

(a)     Sección 3.11 de la Escritura de Emisión (Limitación para Incurrir en Endeudamiento Adicional) se modifica (de la Escritura de Emisión Existente) como sigue:

(i)     Sección 3.11(a) de la Escritura de Emisión indicará: "La Compañía no permitirá, ni causará que se permita por ninguna de sus Filiales Restringidas, directa o indirectamente, Incurrir en Endeudamiento (incluyendo Endeudamiento Adquirido)." [El resto de la *Sección 3.11(a) de la Escritura de Emisión se elimina como también cualquier definición relacionada que de otra forma no sea necesaria en la Nueva Escritura de Emisión después de la modificación de la Sección 3.11(a) de la Escritura de Emisión* .]

(ii)     Interest accruing during each of the four quarters in Year 1 shall not be payable in cash but shall be capitalized and added to the principal amount of the New Senior Secured Notes, and interest on such capitalized interest (additional principal amount) shall accrue thereon from and after the applicable Interest Payment Date. Fifty Percent (50%) of interest accruing during each of the first and second quarters in Year 2 shall not be payable in cash but shall be capitalized and added to the principal amount of the New Senior Secured Notes, and interest on such capitalized interest (additional principal amount) shall accrue thereon from and after the applicable Interest Payment Date.

(iii)     All interest accruing under the New Senior Secured Notes which is not capitalized shall be payable in cash on the applicable Interest Payment Dates. Defaulted Interest shall apply in the New Senior Secured Notes (calculated from the applicable Interest Payment Date) to any interest payable in cash and not timely paid on the applicable Interest Payment Date. Promptly following each such Interest Payment Date, the Company shall provide to the Trustee and Holders and Beneficial Owners of the New Senior Secured Notes a report showing the amount of the interest capitalized for such Interest Payment Dates and cumulatively.

9.     Certain New Indenture Covenants and Events of Default. The New Indenture shall provide as follows:

(a)     Indenture Section 3.11 (Limitation on Incurrence of Additional Indebtedness) shall be modified (from the Existing Indenture) as follows:

(i)     Indenture Section 3.11(a) shall state: "The Company shall not and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness)." [*The remainder of Indenture Section 3.11(a) will be deleted, as well as any related definitions not otherwise needed in the New Indenture after the modification of Indenture Section 3.11(a).*]

(ii)     "Endeudamiento Permitido" bajo la Sección 3.11(b) de la Escritura de Emisión de Emisión (la que no incluye Endeudamiento de Baluma de conformidad con Sección 3.11(c) de la Escritura de Emisión ) incluirá (todo lo que aquí se refiere como el "Nuevo Endeudamiento Permitido del Acuerdo de Reorganización Judicial"): los Pagarés del Crédito Puente y el Tramo Convertible D (ambos, el "Nuevo Endeudamiento Financiero "); el Tramo Convertible A-1; el Tramo Convertible A-2; el Bono Tramo Renta Fija B; el Bono Renta Fija Tramo C ; el Endeudamiento Bancario Permitido; hipotecas existentes que no están afectadas por el Proceso de Reorganización; líneas de crédito bancarias para sustentar boletas de garantía bancaria otorgadas a la Compañía y sus Filiales Restringidas en conexión con procesos licitatorios para postular, o adquirir, concesiones de casinos (las "Boletas de Garantía Bancaria"). Aparte de las Boletas de Garantía Bancaria, la Deuda Bancaria Permitida y las hipotecas existentes, todo Nuevo Endeudamiento Permitido del Acuerdo de Reorganización Judicial será de carácter valista.

(iii)     (A)     las siguientes cláusulas de la Sección 3.11(b) de la Escritura de Emisión se eliminan: cláusula (iii), cláusula (xi), cláusula (xiv) (excepto en cuanto se relacione con las Obligaciones de Leasing Capitalizadas de la Compañía o cualquier Filial Garante), cláusula (xvii) y cláusula (xix). Sección 3.11(b) de la Escritura de Emisión de Emisión (xviii) se modifica para eliminar el texto actual de la sub cláusula (i) y permitir Endeudamiento bajo la sub cláusula (i) de la misma hasta CLP$ 40 billones u otras divisas equivalente solo hasta marzo de 2024 (sujeto a las restricciones del Párrafo 9(b)(ii) más abajo y no incluyen el Nuevo Endeudamiento Permitido del Acuerdo de Reorganización Judicial o Endeudamiento incurrido por Baluma según lo permite la Sección 3.11(c)(ii)), y la sub-cláusula (ii) de la Sección 3.11(b) de la Escritura de Emisión (xviii) se elimina.

(B)     Sección 3.11(b) de la Escritura de Emisión, cláusula (i), se modifica para permitir "Deuda Bancaria Permitida" de conformidad con el Acuerdo de Reorganización Judicial por un monto agregado vigente en cualquier tiempo no superior a CLP$ 12.000 millones.

(iv)     Sección 3.11(c), cláusula (ii), de la Escritura de Emisión se modifica para eliminar su texto actual y reemplazarlo por el siguiente:

"(ii)  Endeudamiento de Baluma S.A. no debe exceder: (i) US$ 15,000,000 en cualquier tiempo en o antes de noviembre 30, 2021; y (y) US$ 10,000,000 desde y después de diciembre 1, 2021; menos (en cada caso) cualquier Endeudamiento incurrido de conformidad con la Sección 3.11(c)(vi);"

(ii)     "Permitted Indebtedness" under Indenture Section 3.11(b) (which does not include Indebtedness of Baluma pursuant to Indenture Section 3.11(c))  shall include (all of the following being herein referred to as the "Plan New Permitted Indebtedness"): the Bridge Loan Notes and the Convertible Tranche D (together the "New Financing Indebtedness"); the Convertible Tranche A-1; the Convertible Tranche A-2; the Fixed Income Tranche B Bond; the Fixed Income Tranche C Bond; the Permitted Bank Indebtedness; existing mortgages that are unaffected by the Reorganization Proceeding; banking credit lines to support performance bonds granted to the Company and its Restricted Subsidiaries in connection with bidding processes for, or acquiring, licensed casino projects (the "Performance Bonds"). Other than the Performance Bonds, the Permitted Bank Indebtedness and the existing mortgages, all Plan New Permitted Indebtedness shall be unsecured.

(iii)     (A)     The following clauses of Indenture Section 3.11(b) shall be deleted: clause (iii), clause (xi), clause (xiv) (except as it relates to Capitalized Lease Obligations of the Company or any Subsidiary Guarantor), clause (xvii) and clause (xix). Indenture Section 3.11(b)(xviii) shall be amended to delete the current language of subclause (i) thereof and to permit Indebtedness under subclause (i) thereof up to CLP$ 40 billion or its other currency equivalent solely until March 2024 (subject to the restrictions in Paragraph 9(b)(ii) below and not including Plan New Permitted Indebtedness or Indebtedness incurred by Baluma as permitted by Section 3.11(c)(ii)), and subclause (ii) of Indenture Section 3.11(b)(xviii) shall be deleted.

(B)     Indenture Section 3.11(b), clause (i), shall be modified to allow "Permitted Bank Indebtedness" pursuant to the Plan in an aggregate amount outstanding at any time not to exceed CLP$ 12 billion.

(iv)     Indenture Section 3.11(c), clause (ii), shall be modified to delete the current language and to state that:

"(ii)  Indebtedness of Baluma S.A. not to exceed: (i) US$ 15,000,000 at any time on or before November 30, 2021; and (y) US$ 10,000,000 from and after December 1, 2021; less (in each case) any Indebtedness incurred pursuant to Section 3.11(c)(vi);"

9

(v)    Sección 3.11(c)(vi) de la Escritura de Emisión se modifica para eliminar la sub-cláusula (ii) y la salvedad que le sigue.

(b)    (i)    Al final del trimestre en que cualquier venta de Activos Baluma  ocurra, y al final de cada trimestre  de ahí en adelante, de conformidad con los estados financieros consolidados de la Compañía informados a la *Comisión para el Mercado Financiero* o *CMF*, la Compañía tendrá un Ratio Financiero no mayor a un múltiplo de 3,0 veces; excepto que dicho cálculo se hará sobre una base *pro forma* (excluyendo los efectos de venta de Activos Baluma ) para el trimestre en que la venta haya ocurrido.

(ii)    Comenzando en marzo de 2024, salvo que haya ocurrido una venta de Activos Baluma, la Compañía no incurrirá, ni permitirá que cualquiera de sus Filiales Restringidas, directa o indirectamente, incurran o permitan que exista cualquier Endeudamiento, que después de dar efecto a dicho nuevo Endeudamiento resulte en (i) un Ratio Financiero  de 6,5 veces desde marzo 2024, y hasta diciembre 2025, (ii) un ratio Financiero de 6,0 veces desde marzo 2026, y hasta diciembre 2026, y (iii) un Ratio Financiero de 5,5 veces desde marzo 2027, y de ahí en adelante.

(iii)    (A)    "Deuda Financiera Neta" significará: (x) la suma de los montos registrados como "otros pasivos financieros corrientes", "otros pasivos financieros no-corrientes", "pasivos corrientes de leasings" y "pasivos no-corrientes de leasings", menos (y) los montos registrados como "caja y equivalentes de caja"; todo lo anterior de conformidad con el Estado de la Posición Financiera Consolidado de la Compañía, que se reporta trimestralmente a la CMF.

(B)    "EBITDA Ajustado" significará el resultado de los siguientes ítems contables de los Estados Financieros de Enjoy S.A. para los doce meses que terminen en la fecha de medición: (v) ingresos de actividades ordinarias totales; menos (w) costos de venta; menos (x) gastos de administración; mas (y) depreciación; mas (z) amortización.

(C)    "Ratio Financiero" significa la ratio de Deuda Financiera Neta a EBITDA Ajustado.

(c)    Cualquier venta de los Activos Baluma, Activos Coquimbo o Activos Pucón se regirá por las disposiciones sobre Venta/Rescate Especial de Activos y no

(v)    Indenture Section 3.11(c)(vi) shall be modified to delete subclause (ii) thereof and the proviso that follows.

(b)    (i)    As of the end of the quarter in which any sale of the Baluma Assets shall occur, and as of the end of each quarter thereafter, pursuant to the consolidated financial statements of the Company reported to the Chilean Financial Market Commission (*Comisión para el Mercado Financiero* or the "CMF"), the Company shall have a Financial Ratio of no greater than 3.0 times; except such calculation shall be on a *pro forma* basis (excluding the effects of sale of the Baluma Assets) for the quarter in which the sale shall have occurred.

(ii)    Beginning in March 2024, unless there shall have been a sale of the Baluma Assets, the Company shall not, and shall not cause or permit any of its Restricted Subsidiaries, to directly or indirectly, incur or allow to exist any Indebtedness, which after giving effect to such new Indebtedness results in (i) a Financial Ratio of 6.5 times from March 2024, and until December 2025, (ii) a Financial Ratio of 6.0 times from March 2026, and until December 2026, and (iii) a Financial Ratio of 5.5 times from March 2027, and thereafter.

(iii)    (A)    "Net Financial Debt" shall mean: (x) the sum of the amounts recorded as "other current financial liabilities", "other non-current financial liabilities", "current lease liabilities" and "non-current lease liabilities", less (y) the amounts recorded as "cash and cash equivalents"; all of the above pursuant to the Consolidated Statement of Financial Position of the Company, reported on a quarterly basis to the CMF.

(B)    "Adjusted EBITDA" for shall mean the result of the following accounting items of Enjoy S.A's Income Statement for the twelve-month period ending on the measurement date: (v) total revenues (*ingresos de actividades ordinarias*); less (w) cost of sales (*costo de venta*); less (x) selling, general and administrative expenses (*gastos de administración*); plus (y) depreciation; plus (z) amortization.

(C)    The "Financial Ratio" means the ratio of Net Financial Debt to Adjusted EBITDA.

(c)    Any sale of the Baluma Assets, the Coquimbo Assets or the Pucón Assets shall be governed by the Special Asset Sale/Redemption

por la Sección 3.13 de la Escritura de Emisión  (Limitation on Asset Sales).

(d)    La definición de "Gravámenes Permitidos" se modifica para incluir (x) las garantías que cubren Boletas de Garantía Bancaria siempre que tales garantías se limiten a hipotecas sobre bienes raíces en Rinconada y Chiloé, y (y) depósitos a plazo entregados en garantía en favor de emisores de Boletas de Garantía Bancaria en conformidad con los términos y condiciones de las líneas de crédito relevantes y contratos de agencia de garantías al 14 de julio de 2020.

(e)    La Compañía no reducirá su capital para absorber pérdidas acumuladas.

(f)    Las transacciones bajo y en conformidad con el Acuerdo de Reorganización Judicial, incluyendo la emisión de los Nuevos Bonos Garantizados, el Nuevo Endeudamiento Financiero, Tramo Convertible A-1 , Tramo Convertible A-2 y el Tramo Convertible D y la celebración por la Compañía, sus Filiales Restringidas y las Filiales Garantes en los Nuevos Instrumentos de Garantía y el otorgamiento por la Compañía, sus Filiales Restringidas y las Filiales Garantes de Gravámenes bajo las mismas (incluyendo la emisión de capital al momento de la conversión de cualquier instrumento de deuda convertible emitido de conformidad con el Acuerdo de Reorganización Judicial), no constituirá un Evento de Compra por Cambio de Control bajo la  Sección 3.7 de la Escritura de Emisión (Evento de Compra por Cambio de Control). La definición de "Tenedores Permitidos" se modifica para incluir a los Tenedores Permitidos actualmente definidos en la Escritura de Emisión Existente y a todos los nuevos tenedores de más de 5% de las acciones ordinarias de la Compañía a continuación de la perfección de las transacciones precedentes de conformidad con el Acuerdo de Reorganización Judicial.

(g)    Sección 3.12 de la Escritura de Emisión (Limitation on Restricted Payments) se modifica a los efectos de:

(i)    prohibir absolutamente cualquier rescate, prepago o recompra por la  Compañía, sus Filiales Restringidas o las Filiales Garantes de Nuevo Endeudamiento Permitido del Acuerdo de Reorganización Judicial (fuera de (x) cualquier pago de acreencias bancarias en el Acuerdo de Reorganización Judicial mediante la entrega de Bonos Renta Fija Tramo C, (y) repago  de créditos valistas bajo el Acuerdo de Reorganización Judicial mediante la entrega bonos Tramo Convertible A-1 , Tramo Convertible A-2 y Tramo Renta Fija Bono B, y (z) repago los Pagarés del Crédito Puente de conformidad con los términos o el canje de los

provisions and not Indenture Section 3.13 (Limitation on Asset Sales).

(d)    The definition of "Permitted Liens" shall be amended to include (x) the collateral securing the Performance Bonds provided that such collateral is limited to a mortgage on real property in Rinconada and Chiloe, and (y) term deposits granted as guaranties in favor of the issuers of Performance Bonds in accordance with the terms and conditions of the relevant credit lines and security agency agreements as of July 14, 2020.

(e)    The Company shall not reduce its capital to absorb accumulated losses.

(f)    The transactions under and in accordance with the Plan, including the issuance of the New Senior Secured Notes, the New Financing Indebtedness, the Convertible Tranche A-1, the Convertible Tranche A-2 and the Convertible Tranche D and the entry by the Company, its Restricted Subsidiaries and the Subsidiary Guarantors into the New Security Documents and the grant by the Company, its Restricted Subsidiaries and the Subsidiary Guarantors of Liens thereunder (including the issuance of equity upon the conversion of any convertible debt instruments issued pursuant to the Plan), shall not constitute a Change of Control Purchase Event under Indenture Section 3.7 (Change of Control Purchase Event). The definition of "Permitted Holders" shall be amended to include the Permitted Holders currently defined in the Existing Indenture and all new holders of more than 5% of the ordinary shares of the Company following completion of the foregoing transactions under and in accordance with the Plan.

(g)    Indenture Section 3.12 (Limitation on Restricted Payments) shall be modified to effect:

(i)    an absolute prohibition on any redemption, prepayment or repurchase by the Company, its Restricted Subsidiaries or the Subsidiary Guarantors of the Plan New Permitted Indebtedness (other than (x) any payment of bank claims in the Plan by the delivery of the Fixed Income Tranche C Bond, (y) repayment of unsecured credits under the Plan through the delivery of the Convertible Tranche A-1, Convertible Tranche A-2 and Fixed Income Tranche Bond B, and (z) repayment of the Bridge Loan Notes in accordance with their terms or the exchange of

11

Pagarés del Crédito Puente por Tramo Convertible D o Acciones de Conversión, todo de conformidad con el Acuerdo de Reorganización Judicial) previo al rescate o pago íntegro de todas las Obligaciones bajo los Nuevos Bonos Garantizados;

(ii)    una prohibición de cualquier rescate, prepago o recompra por la Compañía o sus Filiales Restringidas o las Filiales Garantes de Boletas de Garantía Bancaria previo a su Vencimiento Pactado originalmente establecido de conformidad con el Acuerdo de Reorganización Judicial a no ser que esas Boletas de Garantía Bancaria sean contemporáneamente remplazadas con nuevas Boletas de Garantía Bancaria por un monto igual o menor; y

(iii)    la eliminación del texto de la Sección 3.12(a) de la Escritura de Emisión que sigue a la cláusula (iv) (comenzando con la frase "si en cualquier tiempo el Pago Restringido e inmediatamente después de dar efecto *pro forma* al mismo;"

(iv)    eliminación de la Sección 3.12(b) de la Escritura de Emisión, excepto que:

(A)    las sub-cláusulas (i), (vi) y (vii) de la misma se mantienen;

(B)    nuevas sub-cláusulas se añaden a la Sección 3.12(b) de la Escritura de Emisión conforme a lo siguiente:

\*          \*          \*

En tanto se mantengan vigentes los Bonos y cualquier Obligación bajo los mismos, la Escritura de Emisión o los Documentos de Garantía se mantengan impagas o insatisfechas, la Compañía o sus Filiales Restringidas se abstendrán de aprobar, declarar, efectuar o pagar (todo lo cual se refiere en este anexo como una "Reducción de Capital") cualquier reducción de capital o distribución a los accionistas de la Compañía como resultado de una reducción de capital, recompra de acciones o cualquier otra actuación societaria equivalente que tenga por efecto reducir el capital de la Compañía o de cualquier Filial Restringida, excepto por las reducciones de capital obligatorias que sean requeridas de conformidad con la Ley de Sociedades Anónimas.

Los dividendos obligatorios permitidos y pagaderos bajo la Sección 3.12(b)(vi), estarán permitidos. La declaración y pago de dividendos adicionales por la Compañía será permitida pero

the Bridge Loan Notes for the Convertible Tranche D or Conversion Shares, all in accordance with the Plan) prior to the redemption or payment in full of all Obligations under the New Senior Secured Notes;

(ii)    a prohibition on any redemption, prepayment or repurchase by the Company or its Restricted Subsidiaries or the Subsidiary Guarantors of the Performance Bonds prior to their Stated Maturity as originally established pursuant to the Plan unless such Performance Bonds are contemporaneously replaced with new Performance Bonds for an equal or lesser amount; and

(iii)    the deletion of the language of Indenture Section 3.12(a) that follows clause (iv) (beginning with the language "if at the time of the Restricted Payment and immediately after giving *pro forma* effect thereto;"

(iv)    the deletion of Indenture Section 3.12(b), except that:

(A)    subclauses (i), (vi) and (vii) thereof) shall be preserved;

(B)    new subclauses shall be added to Indenture Section 3.12(b) that read as follows:

\*          \*          \*

So long as the Notes are outstanding and any Obligation under the Notes, the Indenture or the Security Documents remains unpaid or unsatisfied, the Company or its Restricted Subsidiaries shall not approve, declare, make or pay (all of the following being referred to herein as a "Capital Reduction") any capital reduction or any distribution to the shareholders of the Company as a result of a capital reduction, share repurchase or any other equivalent corporate decision having the effect of reducing the capital of the Company or any Restricted Subsidiary, except for mandatory capital reductions required pursuant to the Chilean Corporations Law.

Mandatory dividends permitted and paid under Section 3.12(b)(vi), shall be allowed. The declaration and payment of additional dividends by the Company shall be allowed but

12

(sumado en monto a cualesquiera dividendos obligatorios pagados) no podrá exceder las utilidades líquidas (y para obviar dudas, utilidades líquidas después absorbidas todas las pérdidas acumuladas), siempre que (i) tales dividendos no resulten en una Reducción de Capital, (ii) el pago de dichos montos cumpla con la Ley de Sociedades Anónimas y los estatutos de la Compañía o sus Filiales Restringidas, según sea el caso, y (iii) la Compañía, sus Filiales Restringidas y las Filiales Garantes se encuentren en cumplimiento con esta Escritura de Emisión a la época en que se declare el pago de tales dividendos, incluyendo el que no exista ningún Evento de Incumplimiento a la época de la declaración y pago de tales dividendos o que pudiese existir a continuación de la declaración y pago de tales dividendos (o, en cualquiera de ambos casos, pudiese existir con el paso de cualquier plazo de gracia aplicable para dicho Evento de Incumplimiento).

not (together in amount with any mandatory dividends paid) in excess of net profits (for the avoidance of doubt, net profits being after offsetting all cumulative losses), provided that (i) such dividends do not result in any Capital Reduction, (ii) the payment of such amounts is in compliance with Chilean corporate law and the bylaws of the Company or its Restricted Subsidiaries, as applicable, and (iii) the Company, the Restricted Subsidiaries and the Subsidiary Guarantors are in compliance with this Indenture at the time of any declaration and payment of such dividends, including that no Event of Default exists at the time of any declaration and payment of such dividends or would exist after the declaration or payment of such dividends (or, in either case, may exist with the passage of any applicable grace period for such Event of Default).

\* \* \*

y;

(iv) la modificación de la Sección 3.12(c) de la Escritura de Emisión en armonía con el Párrafo 9(g).

\* \* \*

and;

(v) the modification of Indenture Section 3.12(c) to comport with this Paragraph 9(g).

(h) Sección 3.22 de la Escritura de Emisión (Covenant Suspension) se modifica de modo que las disposiciones en la Nueva Escritura de Emisión que (w) restringen el Incurrir en Deuda (Incurrence of Debt) de conformidad con el Párrafo 9(b) precedente, (x) restringen el repago de Endeudamiento u otros Pagos Restringidos de conformidad con el Párrafo 9(g) precedente, (y) se relacionan con cualquier Venta Especial de Activos o Venta/Rescate Especial de Activos conforme al Párrafo 7(c) precedente, y (z) pertenezcan al ámbito de transacciones con Partes Relacionadas bajo la Sección 3.19 de la Escritura de Emisión (Limitation on Transactions with Affiliates), sobrevivirán respecto de todas esas disposiciones a la suspensión de obligaciones (covenants).

(h) Indenture Section 3.22 (Covenant Suspension) shall be amended such that the provisions in the New Indenture that (w) restrict the Incurrence of Debt pursuant to Paragraph 9(b) above, (x) restrict the repayment of Indebtedness or other Restricted Payments pursuant to Paragraph 9(g) above, (y) relate to any Special Asset Sale or Special Asset Sale/Redemption pursuant to Paragraph 7(c) above, and (z) pertain to transactions with Affiliates under Indenture Section 3.19 (Limitation on Transactions with Affiliates), shall as to all of the aforementioned provisions survive covenant suspension.

(i) (A) La definición de "Bankruptcy Law Event de Default" se modifica para añadir e incluir cualquier incumplimiento material por la Compañía, sus Filiales Restringidas o las Filiales Garantes de, o la falta de cumplimiento con, sus obligaciones materiales bajo el Acuerdo de Reorganización Judicial o la adopción de cualquier acción material en contravención al Acuerdo de Reorganización Judicial o la satisfacción de las condiciones del Intercambio de Bonos Asegurados. De ocurrir cualquier Evento de Incumplimiento por Ley de Insolvencia, todos los derechos y acciones legales bajo los Bonos Garantizados Existentes, la Escritura de Emisión Existente, los Documentos de

(i) (A) The definition of "Bankruptcy Law Event of Default" shall be amended and modified to add and include any material breach by the Company, its Restricted Subsidiaries or the Subsidiary Guarantors of, or other failure to perform, their material obligations under the Plan or the taking of any material action in contravention of the Plan or to satisfy the Senior Secured Notes Exchange Conditions. Upon the occurrence of any Bankruptcy Law Event of Default, all rights and remedies under the Existing Senior Secured Notes, the Existing Indenture, the Existing Security Documents and the Subsidiary

Garantía Existentes y las Garantías de las Filiales podrán ser ejercidos por el Fideicomisario Existente, el Agente de Garantías y los Tenedores y Beneficiarios Finales de los Bonos Garantizados Existentes.

(B)    La Nueva Escritura de Emisión dispondrá que, en el caso de cualquier acción permitida adoptada por Tenedores que constituyan una mayoría u otro porcentaje de los Nuevos Bonos Garantizados vigentes (incluyendo instrucciones al Fideicomisario o el Agente de Garantías, renuncias (de Eventos de Incumplimiento u otro) o consentimientos), incluyendo para propósitos de acciones de los Tenedores Requeridos, tales acciones se tendrán por adoptadas apropiadamente o autorizadas por los Beneficiarios Finales equivalentes que provean al Fideicomisario y la Compañía confirmaciones de los partícipes del DTC que sean custodios de tales Beneficiarios Finales que dicho partícipes del DTC mantengan un interés en los Nuevos Bonos Garantizados para dichos Beneficiarios Finales y declarado los montos por ellos mantenidos.

(C)    La Compañía acuerda que, ocurra o no el Intercambio de Bonos Garantizados, el voto de los Tenedores o Beneficiarios Finales de los Bonos Garantizados Existentes aprobando el Acuerdo de Reorganización Judicial constituirá una inmediata enmienda y modificación de la Escritura de Emisión Existente según lo expresado, solamente a los efetos de este Párrafo 9(i), y la Compañía conviene en otorgar y entregar al Fideicomisario Existente, dentro de los 10 Días Hábiles siguientes a la Junta Deliberativa, una Escritura de Emisión Complementaria escriturando las modificaciones precedentes.

10.    Documentación Final. Los Nuevos Bonos Garantizados, la Nueva Escritura de Emisión y los Nuevos Instrumentos de Garantía conformarán sus disposiciones a las descripciones contenidas en este Term Sheet y estarán en forma y sustancia razonablemente satisfactorios para el Fideicomisario Existente, el Nuevo Fideicomisario y la Mayoría de los Beneficiarios Finales.

11.    Efectividad del Intercambio de Bonos Garantizados.  Si bien la Fecha de Emisión de los Nuevos Bonos Garantizados tendrá efecto retroactivamente a la fecha de la Junta Deliberativa,

(i)    salvo y hasta en tanto que el tribunal que conoce del proceso de reorganización de la Compañía haya certificado la efectividad del Acuerdo de Reorganización Judicial (de conformidad con el artículo

Guarantees may be exercised by the Existing Trustee, the Collateral Agent and the Holders and Beneficial Owners of the Existing Senior Secured Notes.

(B)    The New Indenture shall provide that, in the case of any action permitted to be taken by Holders constituting a majority or other percentage of the New Senior Secured Notes outstanding (including directions to the Trustee or the Collateral Agent, waivers (of Events of Default or otherwise) or consents), including for purposes of actions of Required Holders, such action shall be deemed to have been properly taken or authorized by the equivalent Beneficial Owners who provide to the Trustee and the Company confirmations from DTC participants who are custodians for such Beneficial Owner that such DTC participants hold interests in the New Senior Secured Notes for such Beneficial Owners and stating the amounts so held.

(C)    The Company agrees that, whether or not the Senior Secured Notes Exchange shall occur, the vote of the Holders or Beneficial Owners of the Existing Senior Secured Notes to approve the Plan shall constitute also an immediate amendment and modification of the Existing Indenture as aforesaid solely for the purpose of this Paragraph 9(i), and the Company shall execute and deliver to the Existing Trustee, within 10 Business Days following the Deliberative Creditors' Meeting, a Supplemental Indenture memorializing the foregoing amendment.

10.    Final Documentation. The New Senior Secured Notes, the New Indenture and the New Security Documents shall conform to the descriptions thereof in this Term Sheet and shall be in form and substance otherwise reasonably satisfactory to the Existing Trustee, the New Trustee and the Majority Beneficial Owners.

11.    Effectiveness of the Exchange of Senior Secured Notes. While the New Senior Secured Notes Issuance Date will be deemed retroactively to be the date of the Deliberative Creditors' Meeting,

(i)    unless and until the Chilean court has certified that the reorganization plan is effective (pursuant to Article 89 of the Law 20.720 (Chilean Insolvency and Bankruptcy Law)) (the "Chilean

89 de la ley 20.720 (ley de reorganización y liquidación) y el tribunal que conoce del proceso de Capítulo 15 haya homologado dicho proceso de reorganización, el Acuerdo de Reorganización Judicial y el certificado del tribunal chileno (en donde cada orden tribunalicia se encuentre firme y ejecutoriada, sin orden de no innovar y sin apelación pendiente ni ulterior recurso), y cuya homologación por el tribunal del Capítulo 15 haya sido también aprobada bajo la Sección 1145 del Código de Quiebras de los Estados Unidos de América, y su aplicación a la oferta y emisión de los Nuevos Bonos Garantizados; o

(ii)    si las Nuevas Condiciones de Financiamiento no se cumplen (incluyendo la emisión de los Pagarés del Crédito Puente por el monto total de las Suscripciones de Pagarés de Crédito Puente y no se haya invocado una liquidación por el Comité de Acreedores);

(A)    los Nuevos Bonos Garantizados no se emitirán, la Nueva Escritura de Emisión no será otorgada ni entrará en vigor, los Nuevos Documentos de Garantía no serán enmendados o modificados o ejecutados ni entrarán en vigencia, y las operaciones bajo los Párrafos 3, 4, 5 y 6 precedentes (a veces referidas como el "Intercambio de Bonos Garantizados") no ocurrirán, y

(B)    los Bonos Garantizados Existentes, la Escritura de Emisión Existente, los Documentos de Garantía Existentes y las Garantías de Filiales permanecerán plenamente vigentes, las acciones y derechos y recursos del Fideicomisario Existente, el Agente de Garantías y los Tenedores y Beneficiarios Finales de los Bonos Garantizados Existentes no se extinguirán (incluyendo con respecto a Intereses Moratorios e Intereses Post-Protección Concursal), y los Eventos de Incumplimiento bajo los mismos no serán renunciados.

### Apéndice A

5.  Rescate Opcional

(a)  Rescate Opcional con una Prima de "*Make-Whole*". En cualquier momento y de tiempo en tiempo **durante el plazo que comienza el 15 de agosto de 2022 y expira 14 de agosto de 2024**, la Compañía tendrá el derecho, a su opción, de recatar los Bonos, en su totalidad, **pero no** parcialmente, a un precio de rescate igual a 100% del monto de capital de **los** Bonos rescatados más el exceso de:

(i)    el valor presente (calculado por el Banquero de Inversiones Independiente) a la tal

Court Order") and the Chapter 15 Court (as defined herein) has "recognized" the reorganization proceeding, the plan and the Chilean Court Order (the "Chapter 15 Recognition Order" (with each such court order being a final order with no further right of appeal or appeal pending and no stay of such court order), and which Chapter 15 Recognition Order shall have also approved under Section 1145 of the U.S. Bankruptcy Code, and its application to, the offering and issuance of the New Senior Secured Notes; or

(ii)    if the New Financing Conditions are not satisfied (including the issuance of the Bridge Loan Notes for the full amount of the Bridge Loan Notes Subscriptions and no invocation of liquidation by the Creditors Committee);

(A)    the New Senior Secured Notes shall not be issued, the New Indenture shall not be executed or effective, the New Security Documents shall not be amended or modified or executed or effective, and the transactions under Paragraphs 3, 4, 5 and 6 above (being sometimes referred to as the "Senior Secured Notes Exchange") shall not occur, and

(B)    the Existing Senior Secured Notes, the Existing Indenture, the Existing Security Documents and the Subsidiary Guarantees shall continue in full force and effect, the claims, rights and remedies of the Existing Trustee, the Collateral Agent and the Holders and Beneficial Owners of the Existing Senior Secured Notes thereunder shall not be extinguished (including in respect of Defaulted Interest and Post-Petition Interest), and Events of Default thereunder shall not be waived.

### Appendix A

5.  Optional Redemption

(a)  Optional Redemption with a Make-Whole Premium. At any time and from time to time **during the period commencing August 15, 2022 and ending August 14, 2024**, the Company shall have the right, at its option, to redeem the Notes, in whole **but not** in part, at a redemption price equal to 100% of the principal amount of **the** Notes redeemed plus the excess of:

(i)    the present value (as calculated by the Independent Investment Banker) at such

Fecha de Rescate de (A) **100% del monto de capital de los Bonos** más (B) todos los restantes intereses programados debidos de ahí en adelante hasta el **14 de agosto de 2027** (excluyendo los intereses devengados e impagos a la Fecha de Rescate), descontados a la Fecha de Rescate sobre una base semestral (asumiendo un año de 360 días consistente de doce meses de 30 días) a una tasa del Tesoro (*Treasury Rate*) más **400** puntos base, sobre

(ii)    el monto de capital de **los** Bonos (el "Monto *Make-Whole*"), más en cada caso cualquier monto de interés devengado e impagos sobre el monto de capital de los Bonos a, pero sin incluir, la Fecha de Rescate (sujeto al derecho de los Tenedores registrados a la Fecha de Registro relevante para recibir intereses debidos a la Fecha de Pago de Intereses relevante).

"Emisión Comparable al Tesoro" significa el o los valores del Tesoro Norteamericano (*United States Treasury*) seleccionados por un Banquero de Inversión Independiente como un valor que tenga un vencimiento, real o interpolado, comparable a **14 de agosto de 2027** que se utilizaría, al tiempo de la selección y en conformidad con prácticas financieras habituales, para poner precio a nuevas emisiones de deuda corporativa con vencimiento comparable a **14 de agosto de 2027**.

[*El resto del Párrafo 5(a) permanecerá sin cambios.*]

\*        \*        \*

(b)    Opción de Rescate Opcional sin Prima de "*Make-Whole*". En cualquier momento y de tiempo en tiempo después del **14 de agosto de 2024**, la Compañía tendrá el derecho, a su opción, de rescatar **los** Bonos, en su totalidad, **pero no** parcialmente, a un **precio de rescate igual a 100% del monto de capital de los Bonos** más los intereses devengados e impagos sobre dicho capital, de haberlos, a, pero sin incluir, la Fecha de Rescate aplicable (sujeto al derecho de los Tenedores registrados la Fecha de Registro para recibir intereses debidos a la Fecha de Pago de Intereses relevante).

[*El resto del Párrafo 5(b) se elimina*]

\*        \*        \*

El Párrafo 5(c) (*Opción de Rescate Opcional con producto de Ofertas de Acciones*) y Párrafo 5(d) (*Opción de Rescate Opcional por Evento Tributario*) se eliminan.

**Notas al Pie**

Redemption Date of (A) **100% of the principal amount of Notes** plus (B) all required remaining scheduled interest payments due thereon through **August 14, 2027** (excluding accrued but unpaid interest to the Redemption Date), discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus **400** basis points, over

(ii)    the principal amount of **the** Notes (the "Make-Whole Amount"), plus in each case any accrued and unpaid interest on the principal amount of the Notes to, but not including, the Redemption Date (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date).

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to **August 14, 2027** that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities with a maturity comparable to **August 14, 2027**.

[*The remainder of Paragraph 5(a) will remain unchanged.*]

\*        \*        \*

(b)    Optional Redemption Without a Make-Whole Premium.  At any time and from time to time after **August 14, 2024**, the Company may, at its option, redeem **the** Notes, in whole **but not** in part, at **a redemption price equal to 100% of the principal amount of the Notes**, plus accrued and unpaid interest thereon, if any, to, but not including, the applicable Redemption Date (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date).

[*The remainder of Paragraph 5(b) will be deleted.*]

\*        \*        \*

Paragraph 5(c) (*Optional Redemption with Proceeds of Equity Offerings*) and Paragraph 5(d) (*Optional Redemption Upon Tax Event*) will be deleted.

**Footnotes**

[1] De conformidad con el Acuerdo de Renuncia, Nombramiento y Aceptación de fecha del 9 de julio de 2020 (el "Acuerdo de Aceptación") por y entre la Compañía, UMB BANK, NA, una asociación bancaria nacional debidamente organizada y existente bajo las leyes de los Estados Unidos de América ("UMB" o el "Fideicomisario Sucesor") y CITIBANK, NA, una asociación bancaria nacional debidamente organizada y existente bajo las leyes de los Estados Unidos de América ("Citibank" o el "Fideicomisario Renunciante"), el Fideicomisario Sucesor ha sido designado como "Fideicomisario" en virtud de la Escritura de Emisión Existente. El Fideicomisario Sucesor será el Fiduciario inicial también bajo el Nuevo Fideicomiso de Notas Garantizadas Senior.

[2] Los Bonos Garantizados Existentes (y los Nuevos Bonos Garantizados (según se definen en este documento)) a veces se denominan, en el Acuerdo de Reorganización Judicial (según se define en este documento), como los "Bonos Internacionales"; sin embargo, para evitar dudas, todas las referencias en el Acuerdo de Reorganización Judicial a los Bonos Internacionales significarán e incluirán todas Bonos Garantizados Existentes.

[3] Después del Intercambio de Bonos Garantizados (como se define en el Acuerdo de Reorganización Judicial), "Beneficiarios Finales" significará los titulares de derechos beneficiarios sobre los Nuevos Bonos Garantizados. Los tenedores de una mayoría del monto de capital de tales derechos beneficiales sobre Bonos Garantizados Existentes, o los titulares de los mismos derechos sobre los Nuevos Bonos Garantizados luego de su emisión son referidos en este Anexo N° 1 como la "Mayoría de los Beneficiarios Finales".

[1] Pursuant to Agreement of Resignation, Appointment and Acceptance dated as of July 9, 2020 (the "Acceptance Agreement") by and among the Company, UMB BANK, N.A. a national banking association duly organized and existing under the laws of the United States of America ("UMB" or the "Successor Trustee") and CITIBANK, N.A., a national banking association duly organized and existing under the laws of the United States of America ("Citibank" or the "Resigning Trustee"), the Successor Trustee has been appointed as "Trustee" under the Existing Indenture. The Successor Trustee will be the initial Trustee also under the New Senior Secured Notes Indenture.

[2] The Existing Senior Secured Notes (and the New Senior Secured Notes (as defined herein)) are sometimes referred to, in the Plan (as defined herein), as the "International Bonds"; however, for the avoidance of doubt all references in the Plan to the International Bonds shall mean and include all of the Existing Senior Secured Notes outstanding.

[3] After the Senior Secured Notes Exchange (as defined in Paragraph 11 below), "Beneficial Owners" shall mean the owners of beneficial interests in the New Senior Secured Notes. The holders of a majority in principal amount of the beneficial interests in the Existing Senior Secured Notes, or the beneficial interests in the New Senior Secured Notes after the issuance thereof, are referred to in this Annex N° 1 as the "Majority Beneficial Owners".